Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
Kyle G. Bates (SBN: 299114)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com
jbloom@schneiderwallace.com

Garrett W. Wotkyns*
John J. Nestico *
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 315-3841
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

Todd S. Collins *
Ellen T. Noteware *
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
enoteware@bm.net

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO C. ALAS, ROBERT J. BUGIELSKI and CHAD S. SIMECEK, individually as participants in the AT&T Retirement Savings Plan and as a representatives of all persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> AT&T INC., AT&T SERVICES, INC. and John Does 1-50, <br><br> Defendants. | Case No. 2:17-cv-08106-VAP-RAO <br><br> **PLAINTIFFS' FIRST AMENDED CLASS COMPLAINT** |

1.      Plaintiffs Julio C. Alas, Robert J. Bugielski and Chad S. Simecek, participants in the AT&T Retirement Savings Plan ("Plan" or "AT&T Plan"), bring this ERISA action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), and under Fed. R. Civ. P. 23 as representatives of a class of participants and beneficiaries of the Plan, against defendants AT&T, Inc. ("AT&T"), AT&T Services, Inc. ("AT&T Services") and John Does 1-50 for breach of ERISA's fiduciary duties and transactions prohibited by ERISA.

2.      AT&T, Inc. is the sponsor of the Plan. AT&T holds formal fiduciary responsibility with respect to the Plan and appoints corporate officers who serve as Plan fiduciaries. AT&T also exercised de facto control over the management of the Plan. AT&T Services is the Plan administrator and a named fiduciary of the Plan with broad authority over the administration and management of the Plan. AT&T is the sole owner of AT&T Services and exercises complete control over the operations and management of AT&T Services. John Does 1-50 are individuals, including employees of AT&T Services and/or AT&T who exercised formal authority or de facto control over (i) the selection of the Plan's investment options and/or (ii) the retention of the Plan's recordkeeper or the negotiation of the Plan's fee agreement with the recordkeeper.   Among those named as John Doe defendants the members of the Benefit Plan Investment Committee ("Committee"). All Defendants are either express or *de facto* ERISA fiduciaries under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) with some level of discretionary authority or control over the matters set forth herein.

## INTRODUCTION

3.      With 241,414 active participants as of December 31, 2016 and $34.792 billion in net assets, the Plan is one of the largest retirement plans in the country.  It ranks in the top 0.1 % of over 500,000 American 401(k) plans in terms of the amount of its assets.[1]

4.      As set forth in more detail below, Defendants, as fiduciaries of the Plan, failed to fulfill their fiduciary duty to prudently and loyally ensure the Plan's administrative expenses were not

---

[1] *The BrightScope/ ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014* at 11. (Dec. 2016), available at https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf (last viewed March 16, 2018).

inflated and that participants paid no more than a reasonable amount for recordkeeping services.

5.     401(k) defined contribution plans such as the AT&T Plan have become America's primary retirement savings vehicle.  As with all defined contribution retirement plans that require participants to bear the costs of plan administration, the Plan participants' retirement savings suffer when the Plan has high fees.

6.     The marketplace for retirement plan services, like recordkeeping, is established and competitive.  Retirement plans the size of the AT&T Plan have the bargaining power to obtain very low-cost administrative and investment management services from financial services providers.  The overall trend in 401(k) plan administrative fees has been markedly downward over time.

7.     However, as a result of Defendants' failure to implement a prudent process to control the Plan's administrative and recordkeeping expenses, and failing to properly understand and evaluate the amount being paid for those services despite the express regulatory command to do so, the Plan's participants paid vastly more—in some periods more than double—what comparable very large retirement plans pay for recordkeeping services.

## JURISDICTION AND VENUE

8.     This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

9.     This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred here.

## PARTIES

10.     AT&T is a holding company organized under the law of the State of Delaware.  It is a publicly traded New York Stock Exchange company that provides telecommunications and digital entertainment services.  It employs 260,000 people and has revenues of $161 billion.

11.     AT&T Services is a wholly owned subsidiary of AT&T.

12.     The AT&T Retirement Savings Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and §1002(34).

13.     AT&T is the Plan sponsor under 29 U.S.C. § 1002(16)(B).

14.     AT&T Services is the Plan administrator under 29 U.S.C. § 1002(16)(A).

15.     John Does 1-50 are individuals, including employees of AT&T Services and/or AT&T who exercised formal authority or de facto control over (i) the selection of the Plan's investment options and/or (ii) the retention of the Plan's recordkeeper or the negotiation of the Plan's fee agreement with the recordkeeper.  Among those named as John Doe defendants the members of the Committee. Despite the exercise of reasonable diligence Plaintiffs have been unable to determine the identity of John Does 1-50 before filing this First Amended Complaint. On information and belief, the identities of the individuals named as John Does 1-50 are known to the entity Defendants, and following discovery of the identity of the relevant individuals, Plaintiff will seek leave of the Court to amend the complaint identify John Does 1-50 by name.

16.     As required by 29 U. S. C. §1102(a)(1), the Plan is established and maintained by a written plan document.

17.     As of December 31, 2016, the Plan had net assets of $34.792 billion and 241,414 participants with account balances.

18.     Plaintiff Julio C. Alas is a resident of Montebello, California.  He is an AT&T employee and has been a Plan participant from March 14, 2008 through the present.

19.     Plaintiff Robert J. Bugielski is a resident of Poinciana, Florida.  He was employed by AT&T or its predecessors since 1989 until his retirement in July of 2016, and has participated in the Plan or predecessor plans since approximately 1994.

20.     Plaintiff Chad S. Simecek is a resident of San Antonio, Texas. He was employed by AT&T or its predecessors or affiliates at times from 1997 until August of 2017, but remains a Plan participant.

**ERISA FIDICIARY STANDARDS**

21.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement

---

1   plans, like the Plan, that are covered by ERISA.  ERISA provides that  "a fiduciary shall discharge his

2   duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the

3   exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying

4   reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence

5   under the circumstances then prevailing that a prudent man acting in like capacity and familiar with

6   such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1), 29

7   U.S.C. § 1104(a)(1).

8        22.    ERISA's fiduciary duties under have been described as being among the "highest known

9   to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

10       23.    The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA

11  fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying

12  reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

13       24.    As the Ninth Circuit explained, "cost-conscious management is fundamental to

14  prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016)

15  (*en banc*) (quoting Restatement (Third) of Trusts § 90(c)(3), cmt. *b*); *see also Tatum v. RJR Pension*

16  *Inv. Comm.*, 855 F.3d 553, 566 (4th Cir. 2017) ("Fiduciaries ... ordinarily have a duty to seek ... the

17  lowest level of risk and cost for a particular level of expected return—or, inversely, the highest return

18  for a given level of risk and cost.").

19       25.    The content of ERISA fiduciary's duties are "derived from the common law of trusts."

20  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014). Therefore "[i]n determining the

21  contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble,* 135 S. Ct.

22  at 1828. Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in

23  amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of

24  Trusts § 90(c)(3) (2007).

25       26.    In determining whether ERISA fiduciary defendants fulfilled their duties under the

26  statute, courts consider how a prudent and loyal financial expert familiar with investment industry

27

28

practices and fees would have acted.  As explained below, here, a prudent and loyal financial expert would have acted very differently than did Defendants.

27.   Defendants failed to fulfill their duty to prudently and loyally control the administrative expenses paid by the Plan, and in so doing caused the Plan's participants to incur millions of dollars in unnecessary expenses.

### FACTS

28.   The Plan is an individual account, defined contribution pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

29.   The Plan is funded by a combination of salary withholding by plan participants and employer matching contributions.

30.   Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses.

31.   In a defined contribution retirement plan such as the AT&T Plan, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

32.   Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee Corporation), participants in defined contribution plans (like the Plan) get no more at retirement than they have in their accounts at that time.

33.   As such, ERISA's fiduciary duty to ensure fees paid by the Plan are reasonable is especially important in the context of fees paid by defined contribution plan participants, as the fees reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive at retirement.

34.   As the Supreme Court explained in 2015, in defined contribution plans like the Plan, employees' benefits at retirement "are limited to the value of their own individual investment

1   accounts, which is determined by the market performance of employee and employer contributions,

2   *less expenses*." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015) (emphasis added).

3       35.     Over time, even small differences in fees and performance compound and can result in

4   vast differences in the amount of savings available at retirement -- "[e]xpenses, such as management

5   or administrative fees, can sometimes significantly reduce the value of an account in a defined-

6   contribution plan." *Id.* In the context of individual account defined contribution plans, additional fees

7   of only 0.18% can have a large effect on investment results over time because "[b]eneficiaries subject

8   to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that

9   is, the money that the portion of their investment spent on unnecessary fees would have earned over

10  time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (en banc).

11      36.     Seemingly small differences in fees can lead to vastly different outcomes at retirement.

12  For example, a 1% difference in fees can mean 28% less in retirement assets over a thirty-five year

13  period, U.S. Dept. of Labor, A Look at 401(k) Plan Fees, (August 2013) at 1-2,

14  *https://www.dol.gov/ebsa/publications/401k_employee.html.*

15      37.     Therefore, fees are of critical importance to an ERISA fiduciary's prudent investment

16  menu selection.

17  **Plan Administrative Expenses Were Too High**

18      38.     Defendants, as the Plan's fiduciaries, controlled which investment options were

19  available in the Plan and selected the recordkeeping and administrative service providers for the Plan.

20      39.     Defendants chose Fidelity Investments Institutional Operations Company, Inc.

21  ("Fidelity") to provide the Plan's recordkeeping and administrative services.

22      40.     Defendants also chose Fidelity Brokerage Services, LLC to provide self-directed

23  brokerage accounts to Plan participants through Fidelity's trademarked BrokerageLink® service.

24      41.     And Defendants chose Financial Engines Advisors L.L.C. ("Financial Engines"), to

25  provide an individualized computer-based investment advice to Plan participants.

26      42.     Every defined contribution plan requires recordkeeping.  There are numerous vendors

27  that can provide high quality recordkeeping services to defined contribution plans such as the AT&T

28

Plan. These vendors strenuously compete against each other by offering the lowest price for the best service.

43.    Large plans are generally able to leverage their size to obtain lower fees per participant, in part because of the economies of scale that large plans provide recordkeepers.

44.    Typically, large ERISA defined contribution plans—even plans much smaller than the Plan—pay far less for those recordkeeping services than did the Plan. Generally, large plans pay no more than, on average, roughly $25-30 per participant for comparable recordkeeping services, although some large plans pay even less than that.

45.    With over 230,000 participants and billions of dollars in assets during the class period, the Plan is one of the largest defined contribution plans in the United States.

46.    The Plan thus had the bargaining power to obtain and maintain very low fees for recordkeeping and other administrative services, and had significant leverage to procure high quality management and administrative services at a low cost.

47.    Defendants failed to leverage the Plan's size to obtain reasonable recordkeeping fees.

48.    And, for those lower prices, other very large plans receive equivalent or better recordkeeping services than did the Plan.

49.    Between 2011 and 2016, the Plan's participants paid Fidelity at least the following amounts in direct compensation payments for recordkeeping services:

| Year | Total Direct Compensation Paid to Fidelity |
|------|--------------------------------------------|
| 2011 | $   5,055,000.00[2] |
| 2012 | $ 13,267,000.00 |
| 2013 | $ 14,086,000.00 |
| 2014 | $ 15,068,000.00 |
| 2015 | $ 15,015,000.00 |
| 2016 | $ 15,529,000.00 |

[2] In 2011, the Plan merged with another defined contribution plan, the AT&T Savings Plan (the "ASP"). Prior to the merger, there were only 55,000 participants in the Plan. In 2011, the ASP paid roughly $8.5 million to Fidelity for recordkeeping and administrative services in addition to the $5,055,000 reported in the Table, making the total fees paid for the two plans $13,555,000 for 2011.

50.     Thus, for each year after 2011, when the Plan had, on average, 230,000 participants, the Plan's participants paid, on average, roughly $61 per participant each year in recordkeeping expenses through direct compensation.

51.     The Plan's Annual Reports (commonly known as "Form 5500s") reflect that the Plan also paid indirect compensation to Fidelity, the Plan's recordkeeper. However, the amount of that indirect compensation is not reflected on the Form 5500s.

52.     Those recordkeeping costs were ultimately borne by the Plan's participants. *E.g.*, 2013 Summary Plan Description (ECF No. 33-1), at 40 ("Under the Plan, all expenses incurred to administer the Plan are charged directly to participants, either directly to their accounts or through the Plan's Trust or investment funds... Some examples of these types of administrative expenses include recordkeeping fees, communications fees and legal fees.").

53.     The fact that the Plan's reported compensation paid to Fidelity indicates that participants consistently paid significantly more than the average market rate for the recordkeeping services they received, without even considering the millions of dollars in additional unreported indirect compensation, suggests that the Plan's fiduciaries were asleep at the switch.

54.     On information and belief, the Defendants, who were the Plan's fiduciaries and had the primary fiduciary duty to control the Plan's administrative and recordkeeping expenses, failed to take reasonable and prudent steps to control those costs and ensure that the Plan paid no more than a reasonable amount. In particular, on information and belief, Defendants failed to implement a prudent process to periodically review the Plan's recordkeeping expense, failed to demand an accurate accounting of the indirect compensation received by Fidelity, and/or failed to evaluate whether comparable or better services could have been obtained in the market for less.

55.     A prudent and loyal fiduciary in Defendants' position would have engaged an independent third party to benchmark the reasonableness of the direct and indirect compensation received by Fidelity to ensure that only reasonable fees were charged to Plan participants. Moreover, a prudent and loyal fiduciary in Defendants' position would have conducted a competitive bidding

process for the Plan's recordkeeping services every few years to ensure that the Plan was paying no more than an acceptable market rate for the services it was receiving—particularly because recordkeeping fees for large plans such as the Plan have been declining steadily since well before the start of the class period. Given that recordkeeping fees for the Plan were well above the market rate, on information and belief, Defendants failed to prudently and loyalty retain an independent third party advisor or conduct a competitive bidding process during the class period. In the alternative, if Defendants in fact did retain an advisor or conduct a bidding process, they either did so imprudently (for example, by failing to investigate the advisor's credentials, conflicts of interest or basis for results) or they ignored the unmistakable results of that process and failed to protect the interests of participants in a prudent and loyal manner.

56.     These failures were not isolated, but were ongoing over a period of many years—starting no later than 2012 and continuing to today.

57.     Had Defendants adopted and carried out a prudent process to monitor and control the Plan's recordkeeping expenses, they would have greatly reduced the amount of recordkeeping expenses paid by the Plan's participants.

58.     Defendants' failure to adopt and carry out such a prudent process cost Plan participants tens of millions of dollars in unnecessary recordkeeping expenses during the class period.

59.     Defendants' failures are also illustrated by the handful of changes to the recordkeeping fees actually implemented during the class period. That is, during the class period, two of the sources of administrative fees paid to Fidelity were reduced or eliminated, but the total amount of fees and the amount paid per participant did not decline. Throughout the class period, Plan participants paid a flat recordkeeping fee directly out of their Plan accounts.

(a)     As late as 2013, however, the Plan's participants also paid a 0.01% asset based fee to Fidelity, deducted from participants' holdings in all but one of the Plan's investment options. In 2014 the Plan eliminated those fees. However, despite eliminating that source of recordkeeping fees, the Plan's participants paid 6.67% more in total to Fidelity

that year--$15 million in 2014 compared to $14 million in 2013. In addition, the recordkeeping fees per participant surged from $58.11 to $68.37 – a 15% increase.

(b)     As late as 2015, the Plan's participants that invested in the AT&T Total Return Bond Fund paid an additional recordkeeping fee. The formula amount of that fee declined each year from 2012 (when the fee was 0.17%) to 2015 (when the fee was 0.02%), before the fee was eliminated entirely in 2016. Yet, as with the recordkeeping fees for the other investment options, Fidelity's fees did not decline.

Despite these apparent fee decreases, the actual amount of direct compensation the Plan's participants paid to Fidelity did not decline between 2012 and 2016. Any reasonably prudent fiduciary would have evaluated why the direct compensation to Fidelity continued to grow despite reducing or eliminating sources of fees.

60.     Moreover, the disclosures provided to Plan participants (such as summary plan descriptions ("SPDs") and periodic account statements) as well as in other publicly available documents (such as the Form 5500s) are so opaque that it is impossible to determine either the total amount of compensation (direct and indirect) that participants pay to Fidelity. The Plan's 5500s, for example, do not report either the amount of Fidelity's indirect compensation or the formula used to determine that amount. It is also impossible to determine from these documents whether any particular fees were counted as direct or indirect, or even the nature or sources of the types of compensation that participants are paying Fidelity apart from the flat fee.[3] Nor do the disclosures provide any direct information about Defendants' fiduciary process with respect to these recordkeeping fees.

61.     On information and belief, Fidelity also received other forms of income that were not disclosed to participants.  Beginning in 2014, Fidelity also received indirect compensation from another Plan service provider—Financial Engines. Financial Engines provides individualized investment account management to Plan participants to assist them with investing their retirement

---

[3] In preparing this Amended Complaint, counsel for Plaintiffs requested additional documentation and records from Defense counsel that would have clarified these issues. Even then, Defendants refused to provide that information.

assets in the Plan. Financial Engines receives a fee based on the percentage of assets in the participant's 401(k) account enrolled in the account management service. Financial Engines shares or kicks back to Fidelity a significant percentage of the fees that Plan participants pay to Financial Engines for advice, yet Fidelity provides no advice. Fidelity provides no material service to Financial Engines or the Plan participants to justify this payment to Fidelity from participants' Plan assets.

62.    Thus, since Financial Engines provided its advice services for less than the fee that was being charged to participants who subscribed to that service, participants, including Plaintiff Simecek, paid Financial Engines excessive fees for the services Financial Engines provided to them as a direct result of the illegal kickback to Fidelity.

63.    Defendants failed to properly monitor Fidelity's total compensation from all sources in light of the services Fidelity provided and available alternatives in the marketplace and thus caused the Plan's participants to pay unreasonable administrative expenses to Fidelity.

### *AT&T's Self-Interest*

64.    Defendants' fiduciary failures were not simple imprudence, but were motivated in part by Defendants' self-interest.

65.    AT&T itself, through its senior management, stepped in and controlled the selection and retention of Fidelity as a service provider for the Plan.

66.    AT&T itself, through its senior management, also negotiated the terms of Fidelity's agreement with the Plan, including Fidelity's compensation.

67.    AT&T undertook to select and retain Fidelity for AT&T's own benefit, and not for the benefit of the Plan or its participants.

68.    In particular, AT&T simultaneously retained Fidelity as an administrative service provider for certain other defined benefit pension benefit plans and other employee benefit programs that AT&T sponsors at the same time that AT&T retained Fidelity as a service provider for the Plan.

69.    On information and belief, part of the larger agreement between AT&T and Fidelity required the Plan's participants to pay Fidelity greater than market compensation for providing services to the Plan—while Fidelity provided discounts on administrative services to other employee

1   benefit plans (for which AT&T itself otherwise would have had to pay) and/or provided other benefits

2   to AT&T.

3         70.    AT&T's deal with Fidelity was motivated primarily by AT&T's self-interest, and

4   benefitted AT&T and Fidelity at the expense of the participants in the Plan. That conduct violated

5   ERISA's duty of loyalty, and caused Plan participants to incur unnecessary administrative expenses

6   to relieve AT&T of costs and expenses related to other employee benefit programs.

7   **BrokerageLink**

8         71.    Fidelity offers another service to the Plan that allows Plan participants to invest in a

9   wide range of mutual funds that are not included among the Plans' designated investment alternative,

10  through an account that is alternatively referred to as a "brokerage window" or "self-directed

11  brokerage account."   The brand name for Fidelity's self-directed brokerage accounts is

12  "BrokerageLink."  BrokerageLink is available to participants in the Plan.  Plaintiff Bugielski used it

13  and the proposed Class used it – to their financial detriment, as described below.

14        72.    Each Plan participant participating in the BrokerageLink program compensates Fidelity

15  directly including by paying Fidelity a variety of brokerage fees for executing trades.

16        73.    Securities available to be purchased through BrokerageLink include, among other types

17  of investments, stocks, bonds, exchange-traded funds, Fidelity mutual funds, and non-Fidelity mutual

18  funds available through Fidelity Funds Network.

19        74.    A retirement plan investor who wishes to invest, for example, in a mutual fund that is

20  not available from the menu of the Plan's designated investment alternatives can invest in that mutual

21  fund through BrokerageLink.  There is no dispute that in such a case, it is the class member/retirement

22  plan participant who is making an initial investment decision.

23        75.    Selecting a particular mutual fund is not, however, the only discretionary decision made

24  in the process of completing a purchase of a mutual fund.  Many mutual funds offer different share

25  classes that have different charges and fees, depending largely on the identity of the investor and the

26  size of the investment.  Typically, a mutual fund that offers different share classes will offer "retail"

27  (also known as "investor") shares as well as "institutional" shares.

28

76.     Generally, "retail" and "investor" share classes are designed to be offered to individual investors who are not investing through a qualified retirement plan and and with respect to which the mutual fund must maintain individual investor records.  Retail share classes have higher expenses. Indeed, retail classes of mutual funds will often make "revenue sharing payments" to other parties for distributing the shares to retail customers or ostensibly for recordkeeping, sub-transfer agent fees and other shareholder services.

77.     Institutional class shares, as the name implies, are sold to institutional investors like qualified retirement plans that have large amounts to invest and do not purchase through a broker or other distributor.  The purchases and redemptions of mutual fund shares by thousands of individual participants in these retirement plans are aggregated by Fidelity and other individual account plan platform providers through an omnibus account.  As a result, from the perspective of the mutual fund, the recordkeeper for these plans is the sole investor in the mutual fund.  Generally speaking, fund managers for institutional class shares do not make any revenue sharing payments, or they make lower revenue sharing payments than for retail shares.

78.     Apart from their price, there is no difference from the perspective of an investor between a "retail" or "investor" class share and an "institutional" class share. "The principal difference between the classes is that the mutual fund will charge you different fees and expenses depending on the class you choose." Financial Industry Regulatory Authority, Understanding Mutual Fund Classes.[4]  Given the choice, a prudent and loyal fiduciary that was investing in a fund would always select the available share class with the lowest fees. Put another way, a prudent or loyal fiduciary would choose "institutional" class shares of the same fund every time over "retail" or "investor" class shares if the investor qualified for the "institutional" class.

---

[4]  *See*  http://www.finra.org/investors/alerts/understanding-mutual-fund-classes (last viewed October 18, 2017).

79.     Qualified retirement plans, almost regardless of the size of the plan, are customarily eligible to purchase institutional class shares where available.[5]

80.     Moreover, plan participants had, on average, over $1.5 billion in BrokerageLink throughout the class period. The enormous size of the Plan's investment in BrokerageLink should have permitted the Plan to obtain the lowest price share classes of virtually any mutual fund on the market.

81.     Defendants controlled which mutual funds – and, as relevant here, which share classes of mutual funds – would be offered to the Plans' participants through BrokerageLink.

82.     A fiduciary with authority to select or change investment options has a "continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

83.     For mutual funds that offered multiple share classes, absurdly **both** retail **and** institutional share classes for the same fund were offered to the Plan's participants through BrokerageLink, even though the institutional share classes had significantly lower fees and were eligible to be purchased by participants in qualified retirement plans. By including the higher cost share classes when institutional share classes were available, Fidelity caused Plan participants like Plaintiff Bugielski to select the higher cost share classes that pay significantly higher fees than necessary, depleting their retirement savings in the process.

84.     The Plan's participants did not receive any benefit whatsoever from investing in higher fee mutual fund retail share classes when less expensive institutional share classes of the same fund were available.

85.     Apart from the fees, the primary difference between high cost shares and low cost shares is that high cost shares make higher revenue sharing payments to service providers like Fidelity.

---

[5]   *See*   https://www.finra.org/newsroom/2014/finra-fines-merrill-lynch-8-million-over-89-million-repaid-retirement-accounts-and (last viewed may 18, 2016).

1   Fidelity and/or the Plan included the retail shares knowing that it is detrimental to retirement investors

2   like Plaintiffs to purchase a retail share class when an institutional share class of the same fund is

3   available, causing them to pay significantly greater expense for no additional benefit or value, and

4   providing significant additional compensation to Fidelity.

5       86.    Because Fidelity was already directly compensated by the Plan for providing the

6   BrokerageLink service, the increased revenue sharing payment from the unnecessarily expensive

7   share classes sold to Plaintiffs amounted to pure profit for Fidelity.  There is no mention in the fee

8   schedule provided by Fidelity to plan participants describing the fees charged for participating in

9   BrokerageLink.

10      87.    BrokerageLink includes a search engine which participants used to select available

11  mutual funds through BrokerageLink. When a participant used the search engine to search for a mutual

12  fund, the search engine routinely failed to include the institutional share classes, and instead routinely

13  included only more expensive share classes in the search results. The BrokerageLink system did not

14  notify participants in the Plan who selected a more expensive share class that a less expensive class of

15  the same fund was available.  In fact, neither Fidelity nor Defendants provide any information to

16  participants regarding the selection of share class, or advising them to be careful to select the

17  institutional share class when making purchases through BrokerageLink.

18      88.    Plaintiffs invested their Plan accounts in numerous different mutual funds through

19  BrokerageLink, most of which were expensive, retail class shares.  No reasonable investor in the Plan,

20  having been properly informed of the difference between retail and institutional share classes, would

21  have acquired mutual fund shares that charged a 1.00% annual fee when she or he could have acquired

22  a different share class in the exact same fund for an annual fee of just 0.60%.  Plaintiffs and all

23  members of the class who acquired retail share classes used the BrokerageLink program, which

24  effectively directed them to the purchase of retail share classes when it could have just as easily

25  directed them to the institutional share classes.

26      89.    To be sure, not every mutual fund Fidelity offers through BrokerageLink that makes

27  revenue sharing payments to Fidelity has more than one share class.

28

90.     That extra revenue sharing from the unnecessarily expensive share classes included in BrokerageLink was grossly excessive because Fidelity – which was already compensated by the Plan for providing BrokerageLink – did not perform any extra services in exchange. In fact, that extra revenue sharing resulted from Fidelity doing its job *badly*, that is, by including high fee share classes when lower fee versions of the same funds were available.

91.     Of course, it was no accident that the high fee share classes were included in BrokerageLink. Fidelity was all too willing to receive the extra revenue sharing payments from those funds, and both (i) included the high fee share classes when the purchase of those shares would always be detrimental to participants and beneficial to Fidelity; and (ii) set up the BrokerageLink search protocol to divert participants away from institutional fee share classes for no other reason than to line its pockets at the expense of the Plan's participants.

92.     Defendants, as Plan fiduciaries, were responsible for investigating and evaluating the BrokerageLink program to ensure that the program was appropriate for a qualified retirement plan, that it operated in a manner to protect the interests of plan participants, and that it resulted in the payment of no more than reasonable compensation to Fidelity as the service provider.  It is abundantly clear that Defendants utterly failed in the performance of that responsibility.

93.     Ultimately, while Plaintiffs are not in possession of documents expressly delineating the fiduciary responsibility, it is plain that Defendants (i) failed to examine, evaluate and comprehend that the mechanics of the BrokerageLink program manipulated participants to act against their best interest for the benefit of Fidelity, and (ii) failed to provide participants with even the bare minimum amount of information needed to avoid the traps inherent in the BrokerageLink program. It is also abundantly clear that no prudent or loyal fiduciary who investigated the matter would have permitted higher cost share classes of mutual funds to be included as options within BrokerageLink when lower fee share classes of exactly the same funds were available. Nor would any reasonable fiduciary, having learned that participants were persistently acting against their best interest, fail to educate participants about the pitfalls of the program and the simple means by which to avoid those pitfalls.  Finally, no reasonable fiduciary would fail to learn of the enormous additional compensation Fidelity was

1    gleaning from BrokerageLink, or fail to require that the plan receive credit for that compensation as

2    an offset to recordkeeping fees.   As a result, Defendants have violated the duties of prudence by

3    selecting a program that included a range of share classes with unnecessarily high fees and that were

4    inappropriate for a qualified retirement plan; by failing to properly educate participants about the

5    operation of the BrokerageLink; and by failing to account for all the revenue sharing received by

6    Fidelity from participants' use of BrokerageLink.

7    **Defendants' Fiduciary Status**

8    94.    ERISA requires that every plan identify "one or more" "named fiduciaries" with general

9    responsibility for administering the plan. ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

10   95.    The plan may also expressly provide a procedure for allocating responsibilities among

11   fiduciaries or for named fiduciaries to designate others to carry out fiduciary responsibilities. ERISA

12   § 405(c)(1), 29 U.S.C. § 1105(c)(1).

13   96.    ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in

14   fact* perform a fiduciary function. Thus in addition to expressly designated fiduciaries, anyone is a

15   fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting

16   management of such plan" or "exercises any authority or control respecting management or

17   disposition of its assets" or "has any discretionary authority or discretionary responsibility in the

18   administration of such plan." ERISA § 3(21)(A)(i) & (iii), 29 U.S.C. § 1002(21)(A)(i).

19   97.    Appointing a fiduciary is itself an act of discretionary control over a plan. As such,

20   appointing a fiduciary is a fiduciary function, and those who appoint fiduciaries are subject to ERISA's

21   fiduciary duties to the extent they do so. *E.g.*, *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998)

22   ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). In

23   addition, hiring a non-fiduciary service provider for a plan is also a fiduciary function.[6]

24

25

26   ───────────────

[6] *Meeting Your Fiduciary Responsibilities*, EBSA ("Hiring a service provider in and of itself is a

27   fiduciary function."). http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (last visited
     July 28, 2016).

28

98.     Here, the Plan document provided that AT&T Services was the "Plan Administrator." 2011 Plan Document, § 3.1(86). The Plan also provided that "the Plan Administrator is the 'administrator' and the 'named fiduciary' with respect to the general administration of the Plan." *Id.* § 15.1. According the SPD, "[t]he Plan Administrator has all powers necessary to accomplish its Plan duties." 2013 SPD, at 57 (ECF No. 33-1 at 82 of 112).

99.     The Plan permitted the Plan Administrator to, "from time to time delegate to one or more of the Employer's officers, employees, committees, or agents, or to any other person or organization, any of its fiduciary and/or ministerial powers, duties, and responsibilities with respect to the operation and administration of the Plan…." 2011 Plan Document, § 15.3. The Plan stated that "[t]he Plan Administrator, or its delegate, will make available investment options under the Plan other than the Company Stock Fund ("Non-ESOP Investment Funds"). The Non-ESOP Investment Funds will be selected and removed from time to time by the Plan Administrator and communicated to the Participants." *Id.* § 8.1(3).

100.     Under the heading "Administration of the Plan," the SPD indicates that "[t]he Benefit Plan Investment Committee has authority and responsibility for functions related to the investment funds and Trusts associated with the Plan." 2013 SPD, at 57. Under the subheading "Delegation of Duties," the SPD indicates that "[t]he Benefit Plan Investment Committee, or its delegates (which may include committees or individuals), chooses the Plan's investment funds, investment managers and Trustees and is responsible for certain other related functions." *Id.*

101.     It is not entirely clear from the documents available to Plaintiffs which Defendant or Defendants had primary authority for selecting the Plan's recordkeeper, negotiating a fee agreement on behalf of the Plan with potential recordkeepers, selecting Financial Engines or selecting Fidelity's BrokerageLink service. The Plan documents designate AT&T Services as the Plan Administrator and as a Named Fiduciary with respect to the general administration of the Plan. However, AT&T Services delegates much or all of its authority with respect to the Plans to the Committee, to the AT&T Investment Management Committee (which was created by the Committee), and to one of its officers. Each of these delegatees, however, acted *on behalf of* AT&T Services. Thus either (1) the members

of the Committee and other delegatees functioned as agents of AT&T Services such that AT&T Services had primarily fiduciary responsibility at all times, or (2) AT&T Services delegated primary fiduciary responsibility to the delegatees, and only retained fiduciary duties with respect to the appointment, monitoring and removal of the delegatees. Either way, though, AT&T Services and the delegatees had actual or de facto discretionary control and authority over the Plan and its assets. As such, AT&T Services and the delegatees, including the members of the Committee, are ERISA fiduciaries for the Plan by virtue of their discretionary authority and control over the Plan and its assets.

102.   AT&T was and is the Plan's sponsor, and the ultimate corporate parent of AT&T Services, which was AT&T's wholly owned subsidiary. AT&T, through its Board of Directors, was responsible for the appointment of its Chief Financial Officer. The Chief Financial Officer created the Committee and determined which officers, by title, would sit on the Committee. AT&T, through its Board of Directors, was also responsible for the appointment of the officers who, by virtue of their title, became members of the Committee. As the sole shareholder of AT&T Services, AT&T also exercised complete control over the management and operation of AT&T Services, including the appointment of AT&T Services officers and employees responsible for fulfilling AT&T Services' responsibilities with respect to the Plan. All of the other Defendants acted as agents of AT&T on behalf of AT&T in exercising their discretionary authority with respect to the Plan, thus any fiduciary responsibility possessed by the other Defendants was exercised in the name of and for the benefit of AT&T, making AT&T a fiduciary with respect to ERISA. At the very least, AT&T's responsibility for the appointment of the other Defendants and control over AT&T Services left AT&T with fiduciary duties with respect to the appointment, monitoring and removal of the other Defendants.

103.   In addition, as alleged above, AT&T itself, through its senior management, actually selected Fidelity as the recordkeeper for the Plan and participated in the negotiation of the Plan's agreement with Fidelity. Thus AT&T itself is a de facto fiduciary with respect to the selection of Fidelity and the negotiation of the Plan's agreement with Fidelity.

## **CLASS ACTION ALLEGATIONS**

104.    Plaintiffs  bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), or, in the alternative, 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons (the Class):

> All participants in and beneficiaries of the AT&T Retirement Savings Plan for the period from six years before the filing of this action until the time of trial (the Class Period).

105.    The members of the class are so numerous that joinder of all members is impracticable. At all relevant times, the numbers of class members was two hundred thousand or more.

106.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among such questions are:

> i.   Whether Defendants failed in their fiduciary duties with respect to the administration, management and supervision of recordkeeping and bookkeeping providers;
>
> ii.  Whether Defendants failed in their fiduciary duties to act as  prudent financial managers and to minimize plan administrative fees and investment option operating expenses;
>
> iii. Whether the operating expenses charged, collected and negotiated in connection with the Plan investment options were reasonable;
>
> iv.  Whether the annual notices on fees made adequate disclosure; and,
>
> v.   Whether Defendants' breaches of fiduciary duties caused losses to the Plan and its participants, and if so, in what amount.

107.    There are no substantial individual questions among Class members on the merits of this action.

108.    Plaintiffs' claims are typical of the members of the Class.

109.    Plaintiffs have been injured by the alleged breaches of fiduciary duties and is committed to fairly, adequately and vigorously representing and protecting the interests of Class members.

110.    Plaintiffs have retained counsel who are experienced in class action litigation.

111.    Neither Plaintiffs, nor their counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

112.   Plaintiffs are adequate class representatives.

113.   Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

114.   In the alternative, class certification is also appropriate under Fed. R. Civ. Pro. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class.

115.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Defendants have injured Plaintiffs and the members of the Class by diminishing their investment returns.  The diminution of returns and excessive fees are relatively small for each individual, but large in the aggregate.   Individual participants have an insufficient stake in the outcome of this matter to devote substantial resources to pursue it so only through a class action mechanism can their claims be effectively pursued.

116.   On information and belief, the names and addresses of all Class members are available through Defendants, and adequate notice can be provided to Class members as required by Fed. R. Civ. Pro. 23.

**COUNT I**
**Breaches of Fiduciary Duty and Self-Dealing Prohibited Transactions**
**ERISA §§ 404(a), 406(b)(1); 29 U.S.C. §§ 1104(a) & 1106(b)(1)**
**All Defendants**

117.   Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

118.   ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently and loyally, in particular, "solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and "(B) with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

119.   ERISA § 406(b)(1) supplements the general duty of loyalty, and provides that "A fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account."

120.   As alleged above, Defendants were express and/or de facto fiduciaries with respect to selecting the Plan's investment lineup, selecting the Plan's recordkeeper, negotiating the terms of the Plan's recordkeeper's service, including the fees paid to the recordkeeper, and either selecting the unnecessarily expensive high fee mutual fund share classes in BrokerageLink or monitoring Fidelity's selection of those high fee classes.

121.   Defendants imprudently failed to design or implement a process to evaluate or control the administrative expenses that the Plan's participants paid to the Plan's recordkeeper, and imprudently failed to prevent high fee share classes from being included in BrokerageLink.

122.   Defendants disloyally entered into an arrangement with Fidelity that increased the costs of the Plan's recordkeeping services while saving AT&T money on the administration of other plans and programs.

123.   Defendants' failures resulted in the Plan participants paying grossly excessive fees to the Fidliety based on the size of the Plan, the nature of the services provided by the recordkeeper, and the ready availability of comparable but less expenses alternatives from other service providers in the marketplace, and caused some of the Plan's participants to purchase unnecessarily expense high fee mutual fund share classes in BrokerageLink and incur the extra fees associated with those classes.

124.   Defendants thereby violated the duties of loyalty and prudence contained in ERISA § 404(a) and violated the prohibition against self-dealing set forth in ERISA § 406(b)(1).

125.   In addition, Defendants' conduct described above violated the co-fiduciary duties set forth in ERISA § 405(a).

126.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties must "make good" to the plan the losses to the plan resulting from its violations of ERISA, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

127.   Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA §§ 404(a) and 406(b)(1), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**COUNT II**
**Prohibited Transactions**
**ERISA § 406(a), 29 U.S.C. § 1106(a)**
**All Defendants**

128.   Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

129.   ERISA § 406(a) categorically prohibits certain transactions between plans and parties in interest. In particular, "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…"

130.   Each Defendant and Fidelity was a party in interest as that term is used in ERISA § 3(14); 29 U.S.C. § 1002(14). Defendants and Fidelity are and were all parties in interest. Defendants are all fiduciaries, and in that capacity are parties in interest under § 3(14)(A). AT&T is also "an employer any of whose employees are covered by such plan," and is as such a party in interest under § 3(14)(C). AT&T Services is a wholly owned subsidiary of AT&T and is a party in interest under § 3(14)(G). Fidelity is "a person providing services to such plan" and party in interest under § 3(14)(B). And, to the extent Fidelity fiduciary control over which share classes would be included in BrokerageLink, was a party in interest under § 3(14)(A).

131.   The payments to Fidelity from the Plan as well as the BrokerageLink fees and the revenue sharing payments to Fidelity from the funds in BrokerageLink amounted to "direct or

1   indirect" transactions described in ERISA § 406(a)(1)(C) and (a)(1)(D), as the Defendants knew or

2   should have known.

3        132.   Defendants thereby caused the Plan to engage in transactions prohibited by ERISA §

4   406(a)(1).

5        133.   In addition, Defendants' conduct described above violated the co-fiduciary duties set

6   forth in ERISA § 405(a).

7        134.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's

8   duties must "make good" to the plan the losses to the plan resulting from its violations of ERISA, and

9   is "subject to such other equitable or remedial relief as the court may deem appropriate."

10       135.   Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a),

11  Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their

12  violations of ERISA § 406(a)(1), and are "subject to such other equitable or remedial relief" as the

13  Court "may deem appropriate."

14

15                                    **PRAYER FOR RELIEF**

16       Wherefore, Plaintiffs pray for judgment as follows:

17       A.   Certify this action as a class action and appoint Plaintiffs' counsel as class
18            counsel pursuant to F. R. Civ. Pro.23;

19       B.   Declare that Defendants have breached their fiduciary duties to the Class;

20       C.   Enjoin Defendants from further violations of their fiduciary responsibilities,
21            duties and obligations under ERISA;

22       D.   Require that Defendants provide enhanced disclosures regarding revenue
            sharing;

23
24       E.   Order that Defendants make good to the Plan all losses resulting from their
            breaches of fiduciary duties;

25       F.   Order that Defendants disgorge any profits that they have made through their
26            breaches of fiduciary duties;

27

28

G.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. 1132(g), and/or for the benefit obtained for the common fund;

H.      Order Defendants to pay pre-judgment interest; and,

I.      Award such other and further relief as the Court deems just.

DATED: February 7, 2018                      Respectfully submitted,

By:  */s/ Jason H. Kim*
       Todd M. Schneider (SBN: 158253)
       Jason H. Kim (SBN: 220279)
       Kyle G. Bates (SBN: 299114)
       James A. Bloom (SBN: 311051)
       SCHNEIDER WALLACE COTTRELL
       KONECKY WOTKYNS LLP
       2000 Powell Street, Suite 1400
       Emeryville, California 94608
       Telephone: (415) 421-7100
       Facsimile: (415) 421-7105
       tschneider@schneiderwallace.com
       jkim@schneiderwallace.com
       kbates@schneiderwallace.com
       jbloom@schneiderwallace.com


       Garrett W. Wotkyns*
       John J. Nestico *
       SCHNEIDER WALLACE COTTRELL
       KONECKY WOTKYNS LLP
       8501 N. Scottsdale Rd., Suite 270
       Scottsdale, Arizona  85253
       Telephone: (480) 315-3841
       Facsimile: (866) 505-8036
       gwotkyns@schneiderwallace.com
       jnestico@schneiderwallace.com

       Todd S. Collins *
       Ellen T. Noteware *
       BERGER & MONTAGUE, P.C.
       1622 Locust Street
       Philadelphia, Pennsylvania 19103-6365
       Telephone: (215) 875-3000
       tcollins@bm.net
       enoteware@bm.net

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles. California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*
*(*Pro Hace Vice Applications forthcoming)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for United States District Court, Central District of California, by using the Court's CM/ECF system on March 27, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system. Certain defendants named in this amended complaint who were not previously named as defendants will be served separately.


*/s/ James A. Bloom*
James A. Bloom