1   MAYER BROWN LLP
    Nancy G. Ross (*pro hac vice*)
2   *nross@mayerbrown.com*
    Brian D. Netter (*pro hac vice*)
3   *bnetter@mayerbrown.com*
    Laura Hammargren (*pro hac vice*)
4   *lhammargren@mayerbrown.com*
    Jed W. Glickstein (*pro hac vice* - application pending)
5   *jglickstein@mayerbrown.com*
    71 South Wacker Drive
6   Chicago, IL 60606
    (312) 782-0600
7   (312) 701-7711 – Facsimile

8   John Nadolenco (SBN 181128)
    *jnadolenco@mayerbrown.com*
9   350 South Grand Ave
    25th Floor
10  Los Angeles, CA 90071-1503
    (213) 229-9500
11  (213) 625-0248 – Facsimile

12  Attorneys for Defendants
    AT&T Inc. and AT&T Services, Inc.
13

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16

17  JULIO C. ALAS, ROBERT J.              Case No. 2:17-cv-8106-VAP-RAO
18  BUGIELSKI, and CHAD S. SIMECEK,
    individually as participants in the AT&T   **MEMORANDUM OF POINTS AND**
19  Retirement Savings Plan and as         **AUTHORITIES IN SUPPORT OF**
    representatives of all persons similarly   **DEFENDANTS' MOTION TO**
20  situated,                              **DISMISS THE FIRST AMENDED**
                                           **CLASS COMPLAINT**
21              Plaintiffs,
22         v.                             Date: June 11, 2018
                                          Time: 2:00 p.m.
23  AT&T INC., AT&T SERVICES, INC.,       Place: Courtroom 8A
    and John Does 1-50,
24                                        Judge: Hon. Virginia A. Phillips
25              Defendants.
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................................ 2

    A.    Fidelity's Recordkeeping Fees ............................................. 3

    B.    Financial Engines ................................................................. 4

    C.    Fidelity BrokerageLink .......................................................... 4

LEGAL STANDARD ...................................................................................... 6

ARGUMENT ................................................................................................... 6

I.     Plaintiffs Lack Standing Regarding BrokerageLink .................... 6

II.    Plaintiffs' Claims Are Untimely ................................................... 8

    A.    Plaintiffs' Recordkeeping Claim Is Time-Barred ............... 9

    B.    Plaintiffs' BrokerageLink Claim Is Time-Barred ............. 11

III.   Count I Fails To State A Claim .................................................. 11

    A.    Plaintiffs Do Not Plausibly Plead A Duty Of Prudence Claim ......... 11

        1.    Plaintiffs' Allegations About Recordkeeping Expenses ......... 12

        2.    Plaintiffs' Allegations About Financial Engines .................... 15

        3.    Plaintiffs' Allegations About BrokerageLink ........................ 16

    B.    Plaintiffs Do Not Plausibly Plead A Duty Of Loyalty Claim ........... 18

IV.   Count II Fails To State A Claim ................................................. 19

V.    The Newly Added Defendants Should Be Dismissed ................. 20

    A.    AT&T Inc. Is Not An Appropriate Defendant ................... 21

        1.    Power To Appoint BPIC ........................................................ 21

        2.    *Respondeat Superior* And *De Facto* Fiduciary ................. 23

    B.    The Doe Defendants Are Not Appropriate Defendants .................... 24

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
    465 F.3d 1123 (9th Cir. 2006) ........................................................... 6, 7

*Almont Ambulatory Surgery Center, LLC v. UnitedHealth Grp., Inc.*,
    99 F. Supp. 3d 1110 (C.D. Cal. 2015) .................................................. 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................... 6, 19

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Cont'l
    Food Prods.*,
    2014 WL 7240264 (D. Md. Dec. 16, 2014) ........................................ 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................... 6, 7, 25

*Blanton v. Anzalone*,
    760 F.2d 989 (9th Cir. 1985) .............................................................. 8

*In Re Calpine Corp. ERISA Litig.*,
    2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ............................... 22, 23

*Cataldo v. U.S. Steel Corp.*,
    676 F.3d 542 (6th Cir. 2012) ............................................................. 24

*Cervantes v. Countrywide Home Loans, Inc.*,
    656 F.3d 1034 (9th Cir. 2011) ............................................................. 8

*CIGNA Corp. v. Amara*,
    563 U.S. 421 (2011) .......................................................................... 21

*In re Citigroup ERISA Litig.*,
    2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009), *aff'd*, 662 F.3d 128
    (2d Cir. 2011) ................................................................................. 24

*In re Computer Scis. Corp. ERISA Litig.*,
    635 F. Supp. 2d 1128 (C.D. Cal. 2009) ........................................ 22, 23

-ii-

*Cyr v. Reliance Standard Life Ins. Co.*,
  642 F.3d 1202 (9th Cir. 2011) (en banc) ........................................................ 24

*Davis v. FEC*,
  554 U.S. 724 (2008) ........................................................................................... 6

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982) ............................................................................ 19

*Donovan v. Mazzola*,
  716 F.2d 1226 (9th Cir. 1983) ......................................................................... 11

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.*,
  2014 WL 12558848 (C.D. Cal. May 30, 2014) .................................................. 7

*Emp'rs-Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Anchor
  Capital Advisors*,
  498 F.3d 920 (9th Cir. 2007) ............................................................................. 6

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014) ....................................................................................... 2

*Gale v. EIX Severance Plan*,
  2015 WL 93441 (C.D. Cal. Jan. 7, 2015) ........................................................ 21

*Gelardi v. Pertec Computer Corp.*,
  761 F.2d 1323 (9th Cir. 1985) (per curiam) .................................................... 23

*Gillespie v. Civiletti*,
  629 F.2d 637 (9th Cir. 1980) ........................................................................... 25

*Harris v. Amgen, Inc.*,
  2010 WL 11436373 (C.D. Cal. June 18, 2010) ................................................ 24

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ..................................................................... 10, 17

*In re JDS Uniphase Corp. ERISA Litig.*,
  2005 WL 1662131 (N.D. Cal. 2005) ................................................................ 22

*Jung v. FMC Corp.*,
  755 F.2d 708 (9th Cir. 1985) ........................................................................... 11

-iii-

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
   561 F.3d 112 (2d Cir. 2009) ............................................................... 7

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) ........................................................ 5, 17

*Marshall v. Northrop Grumman Corp.*,
   2017 WL 2930839 (C.D. Cal. Jan. 30, 2017)............................ 4, 8, 22

*In re McKesson HBOC, Inc.*,
   2005 WL 3176278 (N.D. Cal. Sept. 9, 2005).................................... 18

*Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*,
   856 F.2d 1418 (9th Cir. 1988) ........................................................... 8

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ........................................................................ 22

*Monper v. Boeing Co.*,
   104 F. Supp. 3d 1170 (W.D. Wash. 2015) ........................................ 24

*Morse v. Stanley*,
   732 F.2d 1139 (2d Cir. 1984) ........................................................... 19

*In re Northrop Grumman Corp. ERISA Litig.*,
   2015 WL 10433713 (C.D. Cal. Nov. 24, 2015)............................... 9, 10

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015) ........................................................... 6

*Parrino v. FHP, Inc.*,
   146 F.3d 699 (9th Cir. 1998) ............................................................. 9

*Patrico v. Voya Fin., Inc.*,
   2017 WL 2684065 (S.D.N.Y. June 20, 2017).................................... 4

*Reddy v. Litton Indus., Inc.*,
   912 F.2d 291 (9th Cir. 1990)............................................................. 13

*Rurbanc Data Sys., Inc. v. New Core Holdings, Inc.*,
   2012 WL 2711507 (N.D. Ohio July 9, 2012).................................... 24

-iv-

*Sacerdote v. New York University*,
   2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ............................................ 19, 20

*Scott v. AON Hewitt*,
   2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) ....................................................... 15

*Shirk v. Fifth Third Bancorp*,
   2009 WL 3150303 (S.D. Ohio Sept. 30, 2009)........................................... 8, 9, 10

*Spinedex Physical Therapy USA v. United Healthcare*,
   770 F.3d 1282 (9th Cir. 2014) ............................................................................ 24

*Spokeo, Inc. v. Robbins*,
   136 S. Ct. 1540 (2016) ........................................................................................ 6

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret.*
   *Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ........................................................... 2, 11, 16, 20

*Tibble v. Edison Int'l*,
   639 F. Supp. 2d 1074 (C.D. Cal. 2009) .............................................................. 19

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013) ............................................................................ 13

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016) ............................................................................ 11

*Tool v. Nat'l Emp. Ben. Servs., Inc.*,
   957 F. Supp. 1114 (N.D. Cal. 1996).................................................................... 23

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)............................................... 14, 23

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017) ....................................... 10, 11, 13

*Wible v. Aetna Life Ins. Co.*,
   375 F. Supp. 2d 956 (C.D. Cal. 2005)................................................................. 16

*Williams v. TouchTunes Music Corp.*,
   2014 WL 12626340 (C.D. Cal. June 13, 2014)................................................... 16

*Wright v. Oregon Metallurgical Corp.*,
   360 F.3d 1090 (9th Cir. 2004) ..................................................... 21

*Yameen v. Eaton Vance Distribs., Inc.*,
   394 F. Supp. 2d 350 (D. Mass. 2005) ........................................ 12

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   550 F. Supp. 2d 416 (S.D.N.Y. 2008) ....................................... 10

**Statutes**

29 U.S.C. § 1002(3) ....................................................................... 3

29 U.S.C. § 1002(34) ..................................................................... 3

29 U.S.C. § 1002(21)(A) .............................................................. 21

29 U.S.C. § 1104(a)(1) ............................................................. 2, 11

29 U.S.C. § 1106(a)(1) ................................................................. 20

29 U.S.C. § 1113 ........................................................................ 8, 9

**Other Authorities**

29 C.F.R. § 2550.408b-2(c)(1)(viii)(D) .......................................... 3

Dep't of Labor, *Fiduciary Requirements for Disclosure in
   Participant-Directed Individual Account Plans*, 75 Fed. Reg.
   64910 (Oct. 20, 2010) ............................................................... 18

Dep't of Labor, *Request for Information Regarding Standards for
   Brokerage Windows in Participant-Directed Individual Account
   Plans*, 79 Fed. Reg. 49469 (Aug. 21, 2014) ............................. 18

Dep't of Labor, *Best Interest Contract Exemption*, 81 Fed. Reg. 21002
   (Apr. 8, 2016) ........................................................................... 12

-vi-

This case involves another attempt by Plaintiffs to find a claim that can survive a motion to dismiss. As explained below, Plaintiffs' new claims have no more substance than the ones Plaintiff Julio C. Alas presented in the original complaint, virtually all of which Plaintiffs have now abandoned.

Alas's original complaint alleged that two entities—(1) AT&T Inc., the sponsor of the AT&T Retirement Savings Plan (the "Plan"); and (2) AT&T Services, Inc. ("AT&T Services"), the administrator of the Plan—breached their fiduciary duties to the Plan's participants and beneficiaries under the Employee Retirement Income Security Act of 1974 ("ERISA") by offering two funds and using two service providers with supposedly excessive fees. Dkt. 1. Because a breach of fiduciary duty claim can be stated only against a fiduciary, however, Alas stipulated to the dismissal of AT&T Inc. as a defendant. Dkt. 28. The remaining defendant, AT&T Services, moved to dismiss on the grounds that Alas lacked standing to bring certain of his claims and that his allegations were both time-barred and defective as a matter of law. Dkt. 33.

Instead of responding to the motion to dismiss, Alas returned to the drawing board. On March 27, 2018, Alas and two new Plaintiffs, Robert J. Bugielski and Chad S. Simecek, filed a First Amended Complaint containing in essence an entirely new set of claims. Dkt. 51 ("FAC").

The FAC discards Alas's claims based on the two particular fund offerings identified in his original complaint. Indeed, the FAC does not challenge the fees associated with the Plan's set menu of investment options at all. Rather, the FAC doubles down on the claim that the Plan overpaid Fidelity Investments Institutional Operations Co. Inc. ("Fidelity") for recordkeeping; offers a reworked theory for why the Plan overpaid Financial Engines Advisors L.L.C. ("Financial Engines"); and concocts a new claim that Plan fiduciaries did not supervise a Fidelity "BrokerageLink" service that allowed participants to access thousands of

investment options not on the Plan's set menu via a self-directed brokerage account. Plaintiffs also reversed course on their prior dismissal of AT&T Inc. and added 50 "John Doe" defendants who they supposedly will identify at a later date.

Even though the FAC looks very different than its predecessor, at the end of the day the outcome is the same. As we demonstrate below, the new claims and theories set out in the FAC are just as meritless as the initial claims and theories that Plaintiffs (sensibly) chose not to defend. Moreover, the Plan documents demonstrate that AT&T Inc. is not a Plan fiduciary, except conceivably insofar as AT&T Inc. has the authority to appoint members to an entity called the Benefits Plan Investments Committee ("BPIC"); the FAC does not contain any well-pleaded facts to suggest that AT&T Inc. improperly discharged this duty. Finally, Plaintiffs' attempt to add the 50 John Doe defendants is baseless.

It is no secret that "in a suit claiming breach of fiduciary duty," plaintiffs with "largely groundless claim[s]" may nevertheless seek to extort settlements by "exposing the ERISA fiduciary to probing and costly inquiries and document requests" in discovery. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). As the Supreme Court has recognized, a motion to dismiss is an "important mechanism for weeding out [such] meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). Courts accordingly must engage in "careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Id.* Here, careful consideration shows that Plaintiffs' claims are indeed groundless and should be dismissed—with prejudice.

## **BACKGROUND**

Section 404(a) of ERISA requires a fiduciary to act loyally and prudently on behalf of the plan's participants and beneficiaries. 29 U.S.C. § 1104(a)(1). The AT&T Retirement Savings Plan is an "employee benefit plan" within the meaning

of ERISA. *Id*. § 1002(3). Specifically, the Plan is a "defined contribution plan" (*id*. § 1002(34)), in which participants receive an individual account and select from a menu of investment options to construct a desired portfolio. FAC ¶¶ 12, 28. The Plan's sponsor is AT&T Inc.; its administrator is AT&T Services. *Id*. ¶¶ 13-14.

Plaintiffs Alas, Bugielski, and Simecek are Plan participants. Alas allegedly became a participant in 2008; Bugielski in 1994; and Simecek at some unidentified time between 1997 and 2017. *Id*. ¶¶ 18-20. Plaintiffs contend that Defendants breached fiduciaries duties to the Plan by "fail[ing] to . . . prudently and loyally control the administrative expenses paid by the Plan." *Id*. ¶ 27. The FAC offers three ways in which Defendants supposedly violated these duties.

## A.    Fidelity's Recordkeeping Fees

Plaintiffs first allege that Defendants breached their fiduciary duty by "fail[ing] to leverage the Plan's size to obtain reasonable recordkeeping fees." FAC ¶ 47. Every defined contribution plan requires recordkeeping. *Id*. ¶ 42. Although services vary between vendors and plans, a recordkeeper provides a platform for participants to access plan information and make investment decisions. A recordkeeper may also address inquiries from plan participants, enforce the rules of the plan, and send required disclosures. *E.g.*, 29 C.F.R. § 2550.408b-2(c)(1)(viii)(D) (defining "recordkeeping services").

Plaintiffs contend that Defendants did not obtain "reasonable" recordkeeping fees. Specifically, Plaintiffs assert that the Plan paid $61 per participant per year for recordkeeping even though "large plans pay no more than, on average, roughly $25-30 per participant for comparable recordkeeping services." *Id*. ¶¶ 44, 50. Plaintiffs declare that Defendants had the "bargaining power" to obtain "low fees" and that "for those lower prices, other very large plans receive equivalent or better recordkeeping services than did the Plan." *Id*. ¶¶ 46, 48. Plaintiffs do not say what other "very large plans" they are referring to; in what respects those plans'

-3-

recordkeepers provided "equivalent or better" services; or what basis they have for making these claims. Plaintiffs simply assert that the amount of fees paid to Fidelity "suggests that the Plan's fiduciaries were asleep at the switch." *Id*. ¶ 53.

## B.    Financial Engines

Plaintiffs also allege that Defendants breached their fiduciary duty by overpaying another Plan service provider called Financial Engines. FAC ¶ 61. Financial Engines provides "individualized computer-based investment advice" to the Plan's participants. *Id*. ¶ 41. As other courts have explained, this advice takes two forms: automated guidance, which is available on the Internet, and for which plans pay a fixed subscription fee; and individualized guidance, for which participants pay an additional fee. *Patrico v. Voya Fin., Inc.*, 2017 WL 2684065, at *1-3 (S.D.N.Y. June 20, 2017); *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839, at *9 (C.D. Cal. Jan. 30, 2017). Financial Engines paid some of the fees it received for providing individual guidance to Fidelity. FAC ¶ 61.

Ignoring the need for Financial Engines to access participants' accounts through Fidelity, Plaintiffs call these payments an "illegal kickback," asserting that Fidelity "provides no material service to Financial Engines or the Plan participants to justify this payment." *Id*. ¶¶ 61-62. Plaintiffs further allege that because Financial Engines made payments to Fidelity, participants necessarily paid "excessive fees" for Financial Engines' services. *Id*. ¶ 62.

## C.    Fidelity BrokerageLink

Lastly, Plaintiffs allege that Defendants breached their fiduciary duty with respect to a Fidelity-provided service called BrokerageLink, an example of a so-called "brokerage window" or "self-directed brokerage account." FAC ¶ 71. Whereas 401(k) plans traditionally offer participants a set menu of investment options, a brokerage window lets participants invest outside of the Plan's investment options by choosing from a wide array of financial instruments—

-4-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

including individual stocks, bonds, exchange-traded funds, and thousands of Fidelity and non-Fidelity mutual funds—much like investing through a brokerage account outside of a retirement plan. *Id.* ¶ 73.

Plaintiffs' allegations of breach of fiduciary duty focus on certain mutual funds available through BrokerageLink that were offered to investors in both "retail" and "investment" shares classes. *Id.* ¶ 75. Plaintiffs allege that retail shares "are designed to be offered to individual investors who are not investing through a qualified retirement plan" and for whom "the mutual fund must maintain individual investor records." *Id.* ¶ 76. By contrast, Plaintiffs allege that institutional shares "are sold to institutional investors like qualified retirement plans that have large amounts to invest and do not purchase through a broker or other distributor." *Id.* ¶ 77. Plaintiffs say that the only difference between share classes from an investor's perspective is that retail shares are more expensive. *Id.* ¶ 78.[1]

Plaintiffs contend that Fidelity's disclosures and software did not highlight the availability of less expensive institutional shares, allegedly causing some participants to invest in retail shares and incur unnecessary expenses. *Id.* ¶¶ 83-88, 90-91. Plaintiffs admit that they do not know what Defendants' "fiduciary responsibility" was with respect to BrokerageLink. *Id.* ¶ 93. Even so, Plaintiffs hypothesize that Defendants did not properly "investigate" and "evaluate" BrokerageLink. *Id.* Plaintiffs also contend that Defendants should have demanded that Fidelity offer only institutional shares where available; educated participants about BrokerageLink; and used Fidelity's profits from BrokerageLink to obtain a discount on recordkeeping fees. *Id.*

---

[1]     This allegation is incorrect. Among other things, "institutional investment vehicles come with a drawback: lower liquidity." *Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). "It is not clear that participants would gain from lower expense ratios at the cost of lower liquidity." *Id.*

## LEGAL STANDARD

This motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). "Where standing is raised in connection with a motion to dismiss" under Rule 12(b)(1), the Court "accept[s] as true all material allegations of the complaint, and construe[s] the complaint in favor of the complaining party." *Novak v. United States*, 795 F.3d 1012, 1017 (9th Cir. 2015). On a motion to dismiss under Rule 12(b)(6), the Court asks whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept all well-pleaded factual allegations as true, but need not credit "legal conclusion[s]" or "[t]hreadbare recitals of the elements of a cause of action." *Id*. Moreover, a complaint that "pleads facts that are 'merely consistent with' a defendant's liability" does not state a plausible claim. *Id*.

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING REGARDING BROKERAGELINK

"Standing is the threshold issue of any federal action." *Emp'rs-Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Anchor Capital Advisors*, 498 F.3d 920, 923 (9th Cir. 2007). The standing doctrine encompasses three "irreducible" elements: (1) an injury-in-fact that is (2) fairly traceable to the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs "bea[r] the burden of establishing these elements" and "must 'clearly . . . allege facts demonstrating' each element." *Id*. Plaintiffs also must demonstrate standing for "each claim" and "for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008).

An ERISA plaintiff cannot seek to represent others who have suffered an injury-in-fact. *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125-27 (9th Cir. 2006). Nor can a plaintiff rely on merely

-6-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

"an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of [an] entitlement to that fiduciary duty," to show "an injury-in-fact sufficient for constitutional standing." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 121 (2d Cir. 2009). Plaintiffs must allege that, for each claim they bring, they have a "concrete stake in the outcome of the proceedings." *Glanton*, 465 F.3d at 1127.

The FAC fails to demonstrate that any of the Plaintiffs have a concrete stake in challenging Defendants' oversight of BrokerageLink. The only Plaintiff that allegedly invested through BrokerageLink is Bugielski. FAC ¶ 71. But the FAC does not allege that Bugielski used BrokerageLink to invest in *any* mutual funds, let alone in any mutual funds that were available in both retail and institutional share classes. Notably, despite attaching Alas's account statement to the original complaint, Plaintiffs do not attach to the FAC any statements or other documents showing that Bugielski used BrokerageLink to purchase mutual funds.[2]

Nor can the Court reasonably infer that Bugielski has standing from the FAC's other allegations. Many different types of securities are available through BrokerageLink besides mutual funds. *Id.* ¶ 73. And "not every mutual fund Fidelity offers through BrokerageLink . . . has more than one share class." *Id.* ¶ 89. Finally, the assertion that Bugielski used BrokerageLink "to [his] financial detriment" (*id.* ¶ 71) is a nothing but a "conclusory allegatio[n]" about standing, which "will simply not do" in response to a motion to dismiss. *Downey Surgical Clinic, Inc. v. Ingenix, Inc.*, 2014 WL 12558848, at *7 (C.D. Cal. May 30, 2014) (citing *Twombly*, 550 U.S. at 555).

---

[2] Even if Bugielski had used BrokerageLink to purchase a mutual fund offering an institutional share class, he would still lack standing because he could not show that he was harmed by Defendants' conduct. To be eligible to purchase institutional shares of a mutual fund, an individual investor must make an institutional-sized investment—one on the order of many *millions* of dollars. *See* Part III.A.3 *infra*. Plaintiffs do not and cannot plausibly allege that Bugielski made this kind of an investment in a single mutual fund through BrokerageLink.

As Judge Birotte recently held in another ERISA case, when a complaint does not allege that "any of the named Plaintiffs invested" in a particular fund or "opted" to use the challenged service, claims based on those funds or services must be dismissed for lack of standing. *Marshall*, 2017 WL 2930839, at *8-9. The FAC's failure to allege that any Plaintiff invested in a retail share of a mutual fund for which institutional shares were supposedly available is similarly fatal. Because Plaintiffs have not shown a direct stake in the outcome of the litigation with respect to BrokerageLink, their claim that Defendants breached a fiduciary duty with respect to BrokerageLink must be dismissed. *Id*.

## II.    PLAINTIFFS' CLAIMS ARE UNTIMELY

It is well-settled that a court "may dismiss a claim '[i]f the running of the statute [of limitations] is apparent on the face of the complaint.'" *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011). Under ERISA, a litigant must bring a claim for breach of fiduciary duty no more than three years after the litigant becomes aware of the alleged violation, and no more than six years from the date of the alleged violation irrespective of the litigant's knowledge. 29 U.S.C. § 1113. The three-year period "is triggered" by a litigant's "knowledge of the transaction that constituted the alleged violation, not by [his] knowledge of the law." *Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418, 1423 (9th Cir. 1988) (quoting *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985)); *see also Marshall*, 2017 WL 2930839, at *4 ("to shorten the statute to three years a defendant must show. . . knowledge of the transaction that constituted the alleged violation, not knowledge of the law").

This knowledge standard is objective, focusing on "whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents." *Shirk v. Fifth Third Bancorp*, 2009 WL 3150303, at *3 (S.D. Ohio Sept. 30, 2009).

-8-

Thus, "actual knowledge runs from the date that documents were provided, or made available, to Plan Participants disclosing the facts underlying the alleged breach of fiduciary duty." *Id*. In addition, a plaintiff does not need to know "what prudent fiduciaries could have negotiated" or that particular fees were "unnecessary" or "excessive" to have actual knowledge. *In re Northrop Grumman Corp. ERISA Litig*., 2015 WL 10433713, at *19 (C.D. Cal. Nov. 24, 2015).

### A.   Plaintiffs' Recordkeeping Claim Is Time-Barred

The face of the FAC shows that by October 2014 at the latest, documents were available to Plaintiffs disclosing the facts they rely on for their recordkeeping claim. Because Plaintiffs did not file their complaint until November 2017, more than three years after that date, their claim is untimely under 29 U.S.C. § 1113.

Plaintiffs base their recordkeeping claim on the total direct and indirect compensation paid to Fidelity from 2011 onward. FAC ¶¶ 49-53. Plaintiffs' foremost source for these allegations are the Plan's Annual Reports—known as "Form 5500s"—which Plaintiffs expressly cite and incorporate throughout the FAC. *Id*. ¶¶ 49-51, 60. Plaintiffs do not and cannot deny that the Form 5500s for the years 2011, 2012, and 2013 were "publicly available" (*id*. ¶ 60) by October 7, 2014.[3] Plaintiffs also base their recordkeeping claim on an August 2013 Summary Plan Description. *Id*. ¶ 52 (citing Dkt. 33-1, Ex. A at 40 ("2013 SPD")). Their reliance on a 2013 SPD on its face shows that their claim comes too late.[4]

By October 2014 at the latest, therefore, Plaintiffs had sufficient

---

[3]     The 2013 Form 5500 (attached to this memorandum as Exhibit A) was filed on October 8, 2014. The Court may take judicial notice of Form 5500 filings on a motion to dismiss. *Almont Ambulatory Surgery Center, LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015).

[4]     The Court may consider governing Plan documents and summary plan descriptions because the authenticity of these documents cannot be questioned and they are integral to Plaintiffs' claims. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (documents governing plan membership and administration were "essential to [the] complaint" and could be considered on motion to dismiss).

information, based on the facts disclosed in the 2013 SPD and the Form 5500s from 2011 to 2013, to start the three-year clock. In *Shirk*, for instance, the court dismissed a claim where the "fees and investment-related expenses" challenged by the plaintiffs were disclosed in "semi-annual reports and annual reports" filed publicly with the SEC. *Shirk*, 2009 WL 3150303, at *6. Likewise, in *In re Northrop Grumman*, Judge Morrow rejected a claim that certain funds were too expensive because the plan's quarterly and annual disclosures identified the challenged fees more than three years before the suit was filed. 2015 WL 10433713, at *21-22.

Plaintiffs state that the SPD and the Form 5500s do not disclose fine-grained details about Fidelity's compensation[5] or provide "direct information about Defendants' fiduciary process with respect to . . . recordkeeping fees." *Id*. ¶ 60. But that is irrelevant, because Plaintiffs clearly thought it appropriate to file a claim today based on the same information. *See White v. Chevron Corp.*, 2017 WL 2352137, at *19 (N.D. Cal. May 31, 2017), *appeal docketed*, No. 17-162018 (9th Cir. filed June 9, 2017) (rejecting plaintiffs' argument that they "lacked sufficient detail in 2012 to state a claim" when they relied on "the same level of detail . . . in the FAC"). When, as here, "[t]he allegedly excessive fees that form the central basis" of a fiduciary duty claim were "readily apparent from the information provided to all Plan participants more than three years before," it is appropriate to dismiss a claim as untimely on the pleadings. *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 418-19 (S.D.N.Y. 2008).

Because Plaintiffs waited until November 2017 to sue based on facts they knew or should have known about by (at the latest) October 2014, Plaintiffs have

---

[5] Plaintiffs point to no applicable requirement that Plans disclose fee information at this level of detail. In fact, there is no such requirement. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure").

lost the right to bring breach of fiduciary duty claims with respect to the recordkeeping fees, including any claims in "the series of related breaches" alleged in the FAC. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016).

### B.    Plaintiffs' BrokerageLink Claim Is Time-Barred

Plaintiffs' BrokerageLink claim is untimely for similar reasons. The SPDs disclose that the Plan offered the BrokerageLink option since 2010. The August 2013 SPD, for example, states that "[i]n addition to the designated investment funds described herein . . . , participants also have the option of investing in the Fidelity BrokerageLink®." Dkt. 33-1, Ex. A at 36. Plaintiffs' BrokerageLink claim is based solely on the platform's available investment options and the features of the platform itself. Once again, all of these facts were available to Plaintiffs by (at the latest) August 2013, more than three years before they filed suit.

## III.    COUNT I FAILS TO STATE A CLAIM

ERISA requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity . . . would use." 29 U.S.C. § 1104(a)(1). These requirements are termed the "duty of loyalty" and "duty of prudence," respectively. *Jung v. FMC Corp.*, 755 F.2d 708, 711 n.4 (9th Cir. 1985). Count I of the FAC asserts a breach of both of these duties. FAC ¶¶ 117-27. As shown below, however, Plaintiffs do not plausibly allege a breach of either duty.

### A.    Plaintiffs Do Not Plausibly Plead A Duty Of Prudence Claim

ERISA's prudence standard focuses on a fiduciary's "*conduct* in arriving at an investment decision, not on its results." *White*, 2017 WL 2352137, at *4 (quoting *St. Vincent*, 712 F.3d at 716) (emphasis added); *see also Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983) (asking whether the defendant "employed the appropriate methods to investigate the merits of the investment and

to structure the investment"). Despite the legal standard, the FAC lacks any factual allegations about the process Defendants used to select the service providers for the Plan. Plaintiffs rely instead on speculative and conclusory allegations that the Plan incurred excessive fees. These allegations are not entitled to a presumption of truth on a motion to dismiss and are insufficient to state a claim.

### 1.    Plaintiffs' Allegations About Recordkeeping Expenses

Courts have held that, for good reason, "a complaint must state more than a legal conclusion that a fee is excessive in order to survive a motion to dismiss." *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 353 (D. Mass. 2005). As a matter of common sense, the costs of providing any service are dictated by the scope of those services, how difficult it is to deliver those services, and the quality of the service provided. Opening the floodgates of discovery to any Plan participant who alleges the mere existence of a lower-cost recordkeeper would hardly serve the interests of Plan participants, as it would prompt a race to the bottom at the expense of services that participants value and deserve.[6]

Plaintiffs repeatedly make conclusory assertions that the Plan overpaid for recordkeeping services, but they offer nothing substantive in support. The only putative "facts" they offer to show that the Plan paid excessive recordkeeping fees are conclusory allegations that (1) a reasonable recordkeeping fee is $25-30 per participant per year, but that (2) the Plan paid $61 per participant per year in recordkeeping expenses. FAC ¶¶ 47-50. Neither allegation withstands scrutiny.

First, Plaintiffs' assertion that "large plans pay no more than, on average,

---

[6]    The Department of Labor recently reached a similar conclusion. *See* Dep't of Labor, *Best Interest Contract Exemption*, 81 Fed. Reg. 21002, 21030 (Apr. 8, 2016) ("the essential question" in determining "whether compensation" paid to service providers "is reasonable" is "whether the charges are reasonable in relation to what the investor receives" and "confirm[ing] that an Adviser and Financial Institution do[es] not have to recommend the transaction that is the lowest cost or that generates the lowest fees without regard to other relevant factors").

1   roughly $25-30 per participant for comparable recordkeeping services" is based on
2   nothing more than their own say-so. FAC ¶ 44. Even though AT&T Services
3   highlighted the flimsiness of this allegation in its first motion to dismiss, *see* Dkt.
4   33-1 at 16, Plaintiffs do not indicate how they arrived at this supposedly
5   "reasonable" fee. Indeed, Plaintiffs' new estimate of $25-30 shaves some 15% off
6   of their original $30 estimate (*see* Dkt. 1 ¶ 37) without explanation. *Cf. Reddy v.*
7   *Litton Indus., Inc.*, 912 F.2d 291, 297 (9th Cir. 1990) (amended pleading may only
8   allege "other facts consistent with the challenged pleading").

9   In any event, the mere allegation that one or more unknown recordkeepers
10   supposedly charges less than Fidelity cannot state a claim. Courts have repeatedly
11   held that it is insufficient to allege merely that plan expenses could have been
12   reduced. "There are simply too many relevant considerations for a fiduciary, for
13   that type of bright-line approach to prudence to be tenable." *Tibble v. Edison Int'l*,
14   729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823
15   (2015). After all, "fiduciaries have latitude to value investment features other than
16   price, and indeed are required to do so." *White*, 2017 WL 2352137, at *14.

17   Second, and independently, Plaintiffs' allegations that the Plan paid too
18   much for recordkeeping are not supported by the documents on which Plaintiffs
19   rely. Plaintiffs assert that "[b]etween 2011 and 2016, the Plan's participants paid
20   Fidelity at least the following amounts in direct compensation payments for
21   recordkeeping services." FAC ¶ 49. The table that follows this assertion lists the
22   amount of total direct compensation to Fidelity disclosed on Schedule C of the
23   Plan's Form 5500s. *Id.* As the Form 5500s make clear, however, the compensation
24   numbers on the Form 5500 do not reflect just payments for recordkeeping services.
25   The numbers also reflect payments to Fidelity for participant loan processing,
26   account maintenance, securities brokerage commissions, and more.[7]

27   ───────
[7]   The services Fidelity provided to the Plan are listed by service code in Item
28   2(b) of Schedule C of the Form 5500. *See, e.g.*, Ex. A (2013 Form 5500) at 6; Ex.
(cont'd)

-13-

As supposed proof that Defendants did not adequately monitor recordkeeping fees, Plaintiffs allege that the total fees paid to Fidelity in 2014 and 2015 did not decrease even though the Plan eliminated an asset-based fee and a fee associated with the AT&T Total Return Bond Fund. FAC ¶ 59. But these allegations do not suggest imprudence. First, the fact that the fees paid to Fidelity held steady or increased despite the reduction of particular recordkeeping fees simply underscores how Plaintiffs have conflated *recordkeeping* fees with *total* fees. Second, and in any event, all Plaintiffs have alleged is that the Plan made changes to the recordkeeping fee structure. A change to the fee structure does not imply that total recordkeeping fees must fall in response. In fact, adjustments like the ones Plaintiffs describe in the FAC reflect an engaged fiduciary, not one that is failing to act in the participants' interests. *See White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (changes to the recordkeeping agreement "plausibly suggest that defendants were monitoring recordkeeping fees to ensure that they did not become unreasonable").

Plaintiffs' recordkeeping claim, in short, rests on quicksand. Although Plaintiffs purport to allege that the Plan paid "roughly $61 per participant each year in recordkeeping expenses" (FAC ¶ 50), they have really alleged only that the Plan paid $61 per participant per year for *all* the services Fidelity provided. That is not enough to state a claim. Even if a prudent wedding planner should not spend more than $25 per guest on wine, that does not mean it is imprudent to spend $100 per guest on wine, food, dessert, and tableware.

B (2014 Form 5500) at 6; Ex. C (2015 Form 5500) at 6. A table of service codes is provided on page 27 of the Form 5500 instructions, *available at* https://bit.ly/2rkWVzb. Recordkeeping fees are designated by service code 64.

Consistent with the Form 5500s, the Plan's SPD indicates that in addition to recordkeeping fees, expenses charged to Plan participants include various other fees like distribution fees, overnight delivery charges, loan initiation and maintenance fees, and processing fees for qualified domestic relations orders. *See* Dkt. 33-1, Ex. A at 40-41.

-14-

### 2.    Plaintiffs' Allegations About Financial Engines

Plaintiffs' allegations about Financial Engines are equally deficient. Plaintiffs do not question the process that the Plan fiduciaries used to select Financial Engines. Nor do they contend that equivalent services of comparable quality were available in the market at a materially better price.

Plaintiffs' sole theory is that the Plan paid too much to Financial Engines because Financial Engines made payments to Fidelity even though Fidelity "provides no advice" to participants and allegedly "provides no material service . . . to justify this payment." FAC ¶ 61. But the notion that Fidelity provides no services to Financial Engines is dead wrong. Financial Engines "provides *individualized* investment account management to Plan participants to assist them with investing their retirement assets in the Plan." *Id.* (emphasis added). To provide this advice, Financial Engines must securely access individualized participant information stored on Fidelity's systems, and the recordkeeper must be compensated for providing that service.

Fidelity's provision of services to Financial Engines is clearly disclosed in the 2016 Summary Plan Description, which explains that, if a participant chooses to enroll in Financial Engine's fee-based "Professional Management" program, the participants' investments "will be monitored and managed . . . on a discretionary basis by Financial Engines, with transactions handled *through Fidelity*." Ex. D (2016 SPD) at 85 (emphasis added). Courts too recognize that Financial Engines must sign a "separate contract with the plan record keepers . . . to connect with and utilize [their] proprietary recordkeeping systems." *Scott v. AON Hewitt*, 2018 WL 1384300, at *5 (N.D. Ill. Mar. 19, 2018). Plaintiffs cannot claim ignorance of this fact—their own counsel brought the *Scott* case.[8]

---

[8]    The idea that Financial Engines chooses to "kick back" its fees to Fidelity also is not believable on its face. If Financial Engines did charge above-market fees, as Plaintiffs allege, it would have no reason to give a portion of those fees to a

<span style="float:right">(cont'd)</span>

-15-

### 3.  Plaintiffs' Allegations About BrokerageLink

Plaintiffs' BrokerageLink claim is riddled with contradictions and logical gaps. The most fundamental error is Plaintiffs' assertion that Defendants should not have permitted Fidelity to offer retail shares of mutual funds when institutional shares of the same funds were available because "[t]he enormous size of the Plan's investment in BrokerageLink" supposedly "should have permitted the Plan to obtain the lowest price share classes of virtually any mutual fund on the market." *Id.* ¶ 80. Plaintiffs seem to think that because the *Plan* is large and could have obtained institutional shares itself, Plan *participants* investing outside of the set menu via BrokerageLink should have been able to purchase institutional shares for their individual accounts. *Id.* ¶¶ 79, 81-83. That is not plausible.

As the name suggests, "institutional" shares are offered to clients who make institutional-sized investments. FAC ¶¶ 76-77. For example, Fidelity offers institutional share classes of index mutual funds to clients who invest at least $5 *million* in a single fund.[9] Clients with the capacity to make such investments are almost always large institutions. Individual investors are technically eligible to purchase institutional shares. But the number of Plan participants with $5 million to invest in a single mutual fund through BrokerageLink is likely very, very small.

The supposed fact that Plan's 230,000 participants collectively invested $1.5 billion in BrokerageLink (an average of roughly $6,500 per participant) is a red herring. FAC ¶ 80. BrokerageLink gives participants the ability to invest their

company that supposedly provides it with "no material service." FAC ¶ 61.

[9]   *See Fidelity® Strengthens Index Mutual Fund Line-Up*, https://bit.ly/2KDsI6f (last visited May 4, 2018). Other large mutual funds have similar terms. Vanguard, for example, also offers its institutional shares for a minimum initial investment of $5 million. Vanguard, *Get to know Vanguard's share classes*, https://vgi.vg/2HTAebB (last visited May 4, 2018). The information on these web pages is appropriate for judicial notice on a motion to dismiss. *E.g.*, *Williams v. TouchTunes Music Corp.*, 2014 WL 12626340, at *6 (C.D. Cal. June 13, 2014); *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965-66 (C.D. Cal. 2005).

money in hundreds or thousands of different mutual funds, as well as in many other types of investments. There is no reason to think that participants' aggregate investments in any single mutual fund available through BrokerageLink exceeded the applicable threshold for institutional share class eligibility. Even if that were so, however, BrokerageLink provides participants with "self-directed brokerage accounts." *Id.* ¶ 40. Thus, individuals using BrokerageLink made investment decisions for *their* own individual account, not collectively or on behalf of the Plan. *Id.* ¶¶ 71, 74; Dkt. 33-1, Ex. A at 36. Institutional shares are not offered to retail investors who "purchase through a broker or other distributor." *Id.* ¶ 77.

In sum, Plaintiffs conflate investments by the Plan as an institution with investments by Plan participants individually. As Judge Easterbrook has explained, "Hertz gets a fleet discount from General Motors when it orders 10,000 cars at a time, but Hertz does not secure fleet discounts for members of its #1 Club to buy their own GM cars; retail transactions occur at retail prices. So too with retail transactions in mutual funds." *Loomis*, 658 F.3d at 672. Indeed, under the securities laws, investors in the same share class cannot receive "special deal[s]," *id.* at 673, so it may not even have been permissible to waive the minimum investment threshold for purchasing institutional shares only for Plan participants.

Plaintiffs' arguments are not only illogical but contrary to judicial and regulatory authority. In *Hecker*, the Seventh Circuit concluded that when a plan offers a diversified and low-cost array of default investment options along with thousands of "mutual funds available through BrokerageLink," plan fiduciaries are not responsible for monitoring individual options to see if the fees are reasonable. 556 F.3d at 590. And this case is even easier than *Hecker*. The *Hecker* plaintiffs' unsuccessful challenge to retail funds was directed at funds that were included on the plan's default menu; Plaintiffs, by contrast, have *abandoned* their challenge to the Plan's default options, likely because the Plan's low-cost offerings fall squarely

-17-

in the heartland of what courts have deemed appropriate. *See* Dkt. 33-1 at 10.

Plaintiffs' monitoring theory also is foreclosed by regulatory guidance from the Department of Labor. The Department has specifically exempted brokerage windows from the requirement that plan administrators "disclose the detailed performance, fee, and other investment-related information." Dep't of Labor, *Request for Information Regarding Standards for Brokerage Windows in Participant-Directed Individual Account Plans*, 79 Fed. Reg. 49469, 49470 (Aug. 21, 2014); *see also* Dep't of Labor, *Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans*, 75 Fed. Reg. 64910, 64923 (Oct. 20, 2010) (excluding brokerage windows from definition of "designated investment alternatives"). As a practical matter, moreover, a plan could not monitor each of the thousands of investments available through a brokerage window without vastly increasing administrative costs. That would negatively affect all participants or lead plans to drop brokerage windows entirely, to the detriment of participants who want the added flexibility brokerage windows offer.

If all this were not enough, Plaintiffs' assertion that Defendants did not provide participants "with even the bare minimum amount of information needed" (FAC ¶ 93) is contradicted by the Plan's SPD. Plan documents specifically informed participants that "[y]ou actively manage your [BrokerageLink] account and decide how it is invested"; that "[y]ou will be responsible for any fees . . . , including any investment and commission fees"; that "[a] self-directed brokerage account is not for everyone"; and that they should "[c]ontact the Fidelity Service Center for information about the fees and commissions and to obtain copies of any prospectus relating to each investment." Dkt. 33-1, Ex. A at 36. Factually and legally, Plaintiffs' claims are without merit.

**B.    Plaintiffs Do Not Plausibly Plead A Duty Of Loyalty Claim**

Plaintiffs' duty of loyalty claim fails along with their prudence claim. *See In*

-18-

*re McKesson HBOC, Inc.*, 2005 WL 3176278, at *22 (N.D. Cal. Sept. 9, 2005) (dismissing loyalty claim because "it was not imprudent" to take underlying action); Part III.A *supra*. But the loyalty claim also fails for an independent reason.

Plaintiffs' loyalty claim is based on the conclusory allegation—pled on "information and belief"—that AT&T Inc. "stepped in and controlled the selection and retention of Fidelity as a service provider for the Plan." FAC ¶¶ 65-69. The only pertinent factual allegation is that AT&T Inc. "retained Fidelity as an administrative service provider for certain other defined benefit pension plans and other employee benefit programs that AT&T sponsors." FAC ¶ 68. But it is hornbook law that "there is nothing wrong with a fiduciary taking an action that incidentally benefits the sponsor company, so long as the fiduciary does not benefit the company at the expense of the plan participants." *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1109 (C.D. Cal. 2009); *see also Morse v. Stanley*, 732 F.2d 1139 (2d Cir. 1984), and *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982)).

Plaintiffs otherwise rely on conclusory allegations that "AT&T undertook to select and retain Fidelity for AT&T's own benefit" or acted in its own "self-interest." FAC ¶¶ 67, 70. These are just recitations of the elements of their claim. Plaintiffs cannot "plead a claim simply by making a conclusory assertion that a defendant failed to act 'for the exclusive purpose of' providing benefits to participants and defraying reasonable administration expenses.'" *Sacerdote v. New York University*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," which are entirely absent here. *Iqbal*, 556 U.S. at 679.

## IV.   COUNT II FAILS TO STATE A CLAIM

Section 406(a)(1) of ERISA provides that a fiduciary shall not cause a plan to engage in certain prohibited transactions if "he knows or should know that such transaction constitutes a direct or indirect—(C) furnishing of goods, services, or

-19-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1). Count II of the FAC alleges that Defendants violated Section 406 by causing the Plan to make recordkeeping and related payments to Fidelity, an alleged party-in-interest. FAC ¶¶ 128-35. Remarkably, Plaintiffs do not contend that the prohibited transaction was paying too much for these services (although such a claim would fail for the reasons described in Part III *supra*). Rather, Count II is based on the mere fact that there *were* payments at all. *Id*. ¶ 131.

Plaintiffs' Section 406 claim fails because "it is circular to suggest that an entity which becomes a party in interest by providing services" to a plan has engaged in a prohibited transaction simply because the plan "ha[s] paid for those services." *Sacerdote*, 2017 WL 3701482, at *13. Allegations that a plan violated Section 406 by paying for recordkeeping or other services—even when coupled with "conclusory allegations suggesting self-dealing or disloyal conduct"— therefore do not state a claim. *Id*. at *14.

A contrary rule would be intolerable. Plaintiffs acknowledge that "[e]*very* defined contribution benefit plan *requires* recordkeeping"—and that there are "over 500,000 American 401(k) plans" alone. FAC ¶¶ 3, 42 (emphasis added). Plaintiffs thus would "transform" Section 406 into a "provision that proscribes a retirement pension plan's most basic operations." *Sacerdote*, 2017 WL 3701482, at *14. What is more, Plaintiffs' theory would mean that litigants could state a claim—and "expos[e]" virtually any fiduciary "to probing and costly inquiries and document requests," even in wholly meritless suits (*St. Vincent*, 712 F.3d at 719)— simply by alleging that the fiduciary had the temerity to pay for required services.

## V.   THE NEWLY ADDED DEFENDANTS SHOULD BE DISMISSED

The FAC improperly names AT&T Inc. and unknown "John Does" who selected or served as members on the BPIC as new Defendants. FAC ¶ 2. The

-20-

addition of these Defendants is improper. "To be found liable under ERISA for . . . breach of fiduciary duty, an individual or entity must be a 'fiduciary.'" *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004). ERISA provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or . . . (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). But Plaintiffs have not pleaded any facts showing that the new Defendants meet this definition with respect to the conduct in question.

## A.    AT&T Inc. Is Not An Appropriate Defendant

Under the terms of the Plan, AT&T Services is the "Plan Administrator" and "named fiduciary" with respect to "the general administration of the Plan." FAC ¶ 98. By contrast, the Plan does not name AT&T Inc. as a fiduciary. Under the express terms of the Plan, AT&T Inc. is only the Plan "sponsor." FAC ¶¶ 2, 13. ERISA "carefully distinguishes" between a plan sponsor and plan administrator. *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011). In particular, an administrator is a "trustee-like fiduciary" (*id.*) but a sponsor generally is not. *See, e.g.*, *Gale v. EIX Severance Plan*, 2015 WL 93441, at *5 (C.D. Cal. Jan. 7, 2015) ("The Committee is a fiduciary separate and apart from SCE, the Plan sponsor, which is not a fiduciary."). Plaintiffs offer three reasons why AT&T Inc. is a fiduciary, but each fails as a matter of law.

### 1.    Power to Appoint BPIC

Plaintiffs' principal argument for why AT&T Inc. is a fiduciary proceeds in two steps. First, Plaintiffs contend that the BPIC oversees the Plan's investment funds. *Id.* ¶ 100. Second, Plaintiffs argue that AT&T Inc. played a role in selecting the persons who became members of the BPIC. *Id.* ¶ 102.

Even if the BPIC itself were a Plan fiduciary—which Plaintiffs do not

-21-

1    allege—and even if AT&T Inc. did have some attenuated fiduciary duty by virtue

2    of its appointment power regarding the BPIC, AT&T Inc.'s fiduciary duty would

3    extend only to the appointment process and no further. ERISA defines a fiduciary

4    "in *functional* terms of control and authority over the plan," *Mertens v. Hewitt*

5    *Assocs.*, 508 U.S. 248, 262 (1993), so fiduciary status under ERISA is not an "all-

6    or-nothing concept." *In re JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131,

7    at *2 (N.D. Cal. 2005). "[L]imited discretionary authority . . . to appoint members"

8    of a fiduciary committee cannot "somehow be extended" to include breaches by

9    that separate entity. *Marshall*, 2017 WL 2930839, at *12.

10        Plaintiffs themselves acknowledge that "those who appoint fiduciaries" have

11   fiduciary duties only "*to the extent* they do so." FAC ¶ 91 (emphasis added). But

12   Plaintiffs have not alleged a remotely plausible breach of duty based on AT&T

13   Inc.'s supposed appointment power.

14        "Under ERISA, fiduciaries have a *limited duty* to monitor and review the

15   performance of their appointed fiduciaries." *In re Computer Scis. Corp. ERISA*

16   *Litig.*, 635 F. Supp. 2d 1128, 1144 (C.D. Cal. 2009) (emphasis added), *aff'd sub*

17   *nom. Quan v. Computer Scis. Corp.*, 623 F.3d 870 (9th Cir. 2010); *see also In Re*

18   *Calpine Corp. ERISA Litig.*, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005)

19   ("the duty of an ERISA fiduciary to review the performance of its appointees is a

20   limited one"). To state a claim for breach of this duty, a plaintiff must show that

21   the appointing fiduciary failed to "review the performance of their appointees at

22   reasonable intervals and in such a manner as may be 'reasonably expected to

23   ensure that their performance has been in compliance with the terms of the plan'

24   and statutory standards." *Computer Sci. Corp.*, 635 F. Supp. 2d at 1144. The FAC

25   does not contain any facts suggesting that AT&T Inc. failed to do these things, or

26   that AT&T Inc. did not determine the suitability of candidates for appointment to

27   the BPIC at the time of appointment.

28

-22-

1    Put another way, Plaintiffs cannot merely assert that AT&T Inc. *had*
2    "fiduciary duties with respect to the appointment, monitoring, and removal of the
3    other Defendants." FAC ¶ 102. They must allege "facts showing *how* the
4    monitoring process was deficient." *Chevron,* 2016 WL 4502808, at *19 (emphasis
5    added); *see also Calpine Corp.*, 2005 WL 1431506, at *6 (dismissing monitoring
6    claim where plaintiff "has not alleged any facts that support his claim that Calpine
7    and the Director Defendants failed to periodically review the performance of the
8    Committee members or the Employee Defendant"). Because the FAC is devoid of
9    facts suggesting that AT&T Inc. did not appropriately appoint or monitor members
10   of the BPIC, Plaintiffs have no claim against AT&T Inc.[10]

11           **2.      *Respondeat Superior* and *De Facto* Fiduciary**

12   Plaintiffs' alternative theories of AT&T Inc.'s fiduciary status fare no better
13   than their appointment and monitoring claim.

14   Plaintiffs first argue that AT&T Inc. is a fiduciary because the other
15   Defendants "acted as agents of AT&T . . . in exercising their discretionary
16   authority with respect to the Plan," supposedly "making AT&T a fiduciary with
17   respect to ERISA." FAC ¶ 102. As courts have recognized, however, the
18   contention that fiduciary status can be imputed from an "agent" to its principal
19   "would contradict the Ninth Circuit's strict construction of the liability provisions
20   in ERISA." *Tool v. Nat'l Emp. Ben. Servs., Inc.*, 957 F. Supp. 1114, 1121 (N.D.
21   Cal. 1996); *see also Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th
22   Cir. 1985) (per curiam) ("Although employees of [the plan sponsor] serve on the
23   Employee Benefits Committee and the Committee has a fiduciary responsibility in
24   determining claims, this does not make the employer a fiduciary with respect to the

25   —————————————————
26   [10]     Any duty to monitor claim against AT&T Inc. also fails because there was
     no underlying breach of fiduciary duty by other Defendants. *See Computer Scis.*
27   *Corp.*, 635 F. Supp. 2d at 1144 ("[B]ecause Plaintiffs' prudence claim fails for the
     reasons stated above, their monitoring claim also fails."); Part III.A *supra*.
28

-23-

1  Committee's acts."); *Monper v. Boeing Co.*, 104 F. Supp. 3d 1170, 1181 (W.D.

2  Wash. 2015) ("the Ninth Circuit has plainly signaled that common law theories,

3  such as *respondeat superior,* are not to be imported into ERISA actions so as to

4  expand the bases for liability that the statute provides").

5      Plaintiffs next contend that AT&T Inc. is a *de facto* fiduciary because its

6  management was purportedly responsible for selecting and negotiating with

7  Fidelity as the Plan's recordkeeper. FAC ¶ 103. However, as with so much of the

8  FAC, Plaintiffs' allegations about AT&T Inc.'s supposed *de facto* control are

9  entirely conclusory. *See* Part III.B *supra.* Courts routinely reject arguments that an

10 entity "not named in plan documents as a fiduciary" should be deemed a *de facto*

11 fiduciary based on conclusory allegations that the entity "exercises discretionary

12 control or authority over plan administration, management, or assets." *Cataldo v.*

13 *U.S. Steel Corp.*, 676 F.3d 542, 552 (6th Cir. 2012).[11]

14      **B.     The Doe Defendants Are Not Appropriate Defendants**

15     Plaintiffs' decision to name 50 John Does as individual defendants is

16 inappropriate. Plaintiffs state that the Doe Defendants are unknown employees of

17 AT&T Services and AT&T Inc., including members of the BPIC, who ostensibly

18 exercised formal authority or *de facto* control over the selection and retention of

19 the Plan's investment options and recordkeeper. FAC ¶ 2. But—once again—

20 Plaintiffs plead no facts to support this conclusion.

21     ERISA claims can be brought against individuals only "'as long as that

22 party's individual liability is established.'" *Spinedex Physical Therapy USA v.*

23 *United Healthcare*, 770 F.3d 1282, 1297 (9th Cir. 2014) (quoting *Cyr v. Reliance*

24 *Standard Life Ins. Co.*, 642 F.3d 1202, 1207 (9th Cir. 2011) (en banc)). However,

25

26 [11] *See also, e.g., Rurbanc Data Sys., Inc. v. New Core Holdings, Inc.*, 2012 WL 2711507, at *3 (N.D. Ohio July 9, 2012); *In re Citigroup ERISA Litig.*, 2009 WL

27 2762708, at *15 (S.D.N.Y. Aug. 31, 2009), *aff'd*, 662 F.3d 128 (2d Cir. 2011);

28 *Harris v. Amgen, Inc.*, 2010 WL 11436373, at *3 (C.D. Cal. June 18, 2010).

the FAC alleges no facts suggesting that any individual is liable for a breach of fiduciary duty. Plaintiffs point to no Plan document that makes a particular person or persons a fiduciary with respect to the Plan. And they allege nothing to suggest that any individual—known or unknown—had fiduciary responsibilities otherwise.

Absent any factual allegations plausibly showing that there are persons who are individually liable for breaching a fiduciary duty to the Plan, it is inappropriate to name John Doe defendants simply because Plaintiffs speculate that some unknown person might be liable on an individual basis in the future. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief about the speculative level."). That is especially true because of the Ninth Circuit's "general rule" that "the use of 'John Doe' to identify a defendant is not favored." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). This rule applies in ERISA cases, as well. The mere "suspicion" that John Does exist, "without more," is "not enough to make the generally disfavored device of a John Doe pleading appropriate." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Cont'l Food Prods.,* 2014 WL 7240264, at *3 (D. Md. Dec. 16, 2014).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' claims should be dismissed. Further, because Plaintiffs have already attempted to replead and failed to cure the many deficiencies in their complaint, the Court should dismiss the case with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

MAYER BROWN LLP


By: */s/ Nancy G. Ross*

Nancy G. Ross (*pro hac vice*)
*nross@mayerbrown.com*
Brian D. Netter (*pro hac vice*)
*bnetter@mayerbrown.com*
Laura Hammargren (*pro hac vice*)
*lhammargren@mayerbrown.com*
Jed W. Glickstein (*pro hac vice*)*
*jglickstein@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
(312) 701-7711 – Facsimile

John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500
(213) 625-0248 – Facsimile

*Attorneys for Defendants*
*AT&T Inc. and AT&T Services, Inc.*

*application pending

-26-