MAYER BROWN LLP
Nancy G. Ross (*pro hac vice*)
*nross@mayerbrown.com*
Brian D. Netter (*pro hac vice*)
*bnetter@mayerbrown.com*
Laura Hammargren (*pro hac vice*)
*lhammargren@mayerbrown.com*
Jed W. Glickstein (*pro hac vice*)
*jglickstein@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
(312) 701-7711 – Facsimile

John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500
(213) 625-0248 – Facsimile

Attorneys for Defendants
AT&T Inc. and AT&T Services, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JULIO C. ALAS, ROBERT J. BUGIELSKI, and CHAD S. SIMECEK, individually as participants in the AT&T Retirement Savings Plan and as representatives of all persons similarly situated,

Plaintiffs,

v.

AT&T INC., AT&T SERVICES, INC., and John Does 1-50,

Defendants.

Case No. 2:17-cv-8106-VAP-RAO

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS COMPLAINT**

Date: July 16, 2018
Time: 2:00 p.m.
Place: Courtroom 8A

Judge: Hon. Virginia A. Phillips

# TABLE OF CONTENTS

INTRODUCTION ........ 1

I. PLAINTIFFS LACK STANDING REGARDING BROKERAGELINK ........ 1

II. PLAINTIFFS' CLAIMS ARE UNTIMELY ........ 2

III. COUNT I FAILS TO STATE A CLAIM ........ 4

A. Recordkeeping Expenses ........ 4

B. Financial Engines ........ 6

C. BrokerageLink ........ 7

D. Duty of Loyalty ........ 10

IV. COUNT II FAILS TO STATE A CLAIM ........ 10

V. THE NEWLY ADDED DEFENDANTS SHOULD BE DISMISSED ........ 11

CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) ........ 11

*In re Calpine Corp. ERISA Litig.*,
2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ........ 12

*Cassell v. Vanderbilt Univ.*,
285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ........ 5

*Concha v. London*,
62 F.3d 1493 (9th Cir. 1995) ........ 4

*Divane v. Northwestern Univ.*,
2018 WL 2388118 (N.D. Ill. May 25, 2018) ........ 6

*Fernandez v. Franklin Res., Inc.*,
2018 WL 1697089 (N.D. Cal. Apr. 6, 2018) ........ 12

*Fifth Third Bank v. Dudenhoeffer*,
134 S. Ct. 2459 (2014) ........ 1, 5

*Green v. William Mason & Co.*,
996 F. Supp. 394 (D.N.J. 1998) ........ 11

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ........ 8

*Jones v. Harris Assocs.*,
130 S. Ct. 1418 (2010) ........ 8

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ........ 9

*Marshall v. Northrop Grumman Corp.*,
2017 WL 2930839 (C.D. Cal. Jan. 30, 2017) ........ 2, 3

*Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418 (9th Cir. 1988) .......... 3

*Nicolas v. Tr. of Princeton Univ.*, 2017 WL 4455897 (D.N.J. 2017) .......... 10

*In re Northrop Grumman*, 2015 WL 10433713 (C.D. Cal. Nov. 24, 2015) .......... 3

*Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244 (9th Cir. 1992) .......... 6

*Sacerdote v. N.Y.U.*, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) .......... 5, 6, 11

*Scott v. AON Hewitt*, 2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) .......... 6, 7

*Shirk v. Fifth Third Bancorp*, 2009 WL 3150303 (S.D. Ohio Sept. 30, 2009) .......... 2

*Spinedex Physical Therapy USA v. United Healthcare*, 770 F.3d 1282 (9th Cir. 2014) .......... 12

*Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143 (9th Cir. 2000) .......... 12

*Sweda v. Univ. of Pa.*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) .......... 11

*Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013) .......... 3, 6

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) .......... 11

*Waller v. Blue Cross of Cal.*, 32 F.3d 1137 (9th Cir. 1994) .......... 3

*White v. Chevron Corp.*, 2017 WL 2352137 (N.D. Cal. May 31, 2017) .......... *passim*

**Statutes**

29 U.S.C. § 1113(2) ........................................................................................ 2

## INTRODUCTION

Motions to dismiss in ERISA cases are an "important mechanism for weeding out meritless"—and "economically burdensome"—lawsuits. *Fifth Third Bank v. Dudenhoeffer*, 134 S. Ct. 2459, 2470-71 (2014). As Defendants previously showed, the FAC suffers from a serious lack of merit: standing defects, a statute of limitations bar, failure to plausibly allege a breach of fiduciary duty or a prohibited transaction, and the improper naming of AT&T Inc. and 50 John Doe defendants. Plaintiffs' Opposition fails to overcome these deficiencies and relies on generalities in the hopes that at least one of their claims will stick. That is not enough to state a claim. The FAC should be dismissed with prejudice.

## I. PLAINTIFFS LACK STANDING REGARDING BROKERAGELINK

Plan participants who opt to enroll in BrokerageLink, a self-directed brokerage account, have the opportunity to invest in thousands of stocks, bonds, and other securities on top of the Plan's designated investment alternatives. Plaintiffs allege that participants in BrokerageLink were offered retail shares of certain unnamed mutual funds even though cheaper institutional shares of the same fund supposedly were available for purchase as well. But Plaintiffs do not allege that *they* used BrokerageLink to purchase retail shares of such funds. Thus, as a threshold matter, Plaintiffs lack standing to raise a breach of fiduciary duty claim with respect to BrokerageLink. Defs.' Mem., Dkt. 54-1 ("Mem.") at 6-8.

Plaintiffs do not deny that they did not elect the retail funds they challenge. Rather, they respond that the "representational" nature of their claim permits them to seek relief that "sweeps beyond [their] own injury." Pls.' Opp., Dkt. 58 ("Opp.") at 7. They invoke cases in which participants invested in one of multiple mutual funds allegedly affected by a fiduciary breach. *Id*. Those cases are unavailing here because Plaintiffs do not allege that they suffered *any* injury from the fiduciary conduct that they wish to challenge. As a result, this Court could not provide them

any redress on the BrokerageLink claim, and Plaintiffs lack standing to pursue it.

Judge Birotte recently explained that "statutory authorization does not itself confer Article III standing," and plan participants can bring suit in a representational capacity only so long as they "otherwise meet the requirements for Article III standing." *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839, at *8 (C.D. Cal. Jan. 30, 2017). Because Plaintiffs did not purchase *any* of the challenged retail shares through BrokerageLink, they lack representational standing to bring claims on behalf of Plan participants who did.[1]

## II. PLAINTIFFS' CLAIMS ARE UNTIMELY

Other than the Financial Engines claim (which fails for the reasons discussed in Part III.B *infra*), Plaintiffs' claims are barred by ERISA's statute of limitations. *See* 29 U.S.C. § 1113(2); Mem. 8-11. The FAC expressly and repeatedly relies on Form 5500 filings and other documents that were available in 2014 and earlier and that disclose the precise basis for Plaintiffs' claims. *See* FAC ¶¶ 49-52, 60. Plaintiffs do not contend that they lacked knowledge about these facts in October 2014 or that they only became aware of the documents after that date. Instead, they argue that the Form 5500 allegedly "does not disclose the breach of fiduciary duty" and thus cannot start the three-year limitations period. Opp. 8.[2]

Plaintiffs' position on the statute of limitations—that actual knowledge

[1] It does not matter that Bugielski "enrolled in" and "paid fees for" BrokerageLink generally, or that Plaintiffs' other theories concern management fees "borne by all Plan participants." Opp. 6-7. Plaintiffs' complaint about BrokerageLink is that the Plan allowed participants to purchase retail shares of mutual funds, whose fees are assessed only to those individual investors who purchase shares of the funds in question and are not borne by all Plan participants generally. *See* FAC ¶ 83.

[2] Not only are Form 5500s publicly available, the 2013 SPD provided to Plan participants explains that participants are entitled to obtain copies of Form 5500s. Dkt. 33-1, Ex. A at 61. And numerous courts have held that a plaintiff cannot "avoid the bar of ERISA's three year statute of limitations by merely claiming that they did not read the documents that form the basis for their claims." *Shirk v. Fifth Third Bancorp*, 2009 WL 3150303, at *3 (S.D. Ohio Sept. 30, 2009) (collecting cases). For example, in *Shirk*, the court found actual knowledge based on information disclosed in SEC prospectuses and reports. *Id*. at *6. Here, too, Plaintiffs expressly make such public filings the "basis for their claims." *Id*. at *3; *see* FAC ¶¶ 51, 60.

requires knowledge about "how the fiduciary selected" the challenged service or investment—has been "repeatedly rejected" by courts applying the Ninth Circuit's standard. *In re Northrop Grumman*, 2015 WL 10433713, at *19 (C.D. Cal. Nov. 24, 2015). The Ninth Circuit interprets § 1113(2) to require "knowledge of the transaction that constituted the alleged violation"—here, the payment of allegedly excessive recordkeeping fees. *Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418, 1423 (9th Cir. 1988).[3]

Plaintiffs' effort to avoid a time bar by hiding behind their alleged lack of knowledge of Defendants' fiduciary process fails because their claims as pleaded do not turn on Defendants' process for making decisions on behalf of the Plan. Plaintiffs' BrokerageLink claim, for instance, challenges the supposed fact that participants *were offered* retail and institutional shares of certain funds. *See* FAC ¶ 93 (alleging that no prudent or loyal fiduciary "would have permitted higher cost" options "when lower fee share classes of exactly the same funds were available"). The recordkeeping claim asserts that, *whatever* process Defendants followed, the fees paid by the Plan were imprudent. *Id*. ¶¶ 54-55 (alleging that Defendants failed to review recordkeeping expenses, or alternatively did so imprudently, or alternatively did so prudently but ignored the results). And the prohibited transaction claim is admittedly based on the "mere fact" (Opp. 20) that Defendants caused the Plan to pay for recordkeeping services. Because Plaintiffs' claims do not purport to depend on Defendants' fiduciary process, Plaintiffs' argument does not save the claims from dismissal.[4]

[3] Plaintiffs suggest (at 8-9) that Defendants' position is inconsistent with *Waller v. Blue Cross of Cal.*, 32 F.3d 1137 (9th Cir. 1994), as reaffirmed by *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013). But in *Waller*, the Ninth Circuit expressly relied on allegations that plaintiffs "did not have actual knowledge" until less than three years before the filing of the complaint. 32 F.3d at 1341. No such allegations are offered here; to the contrary, Plaintiffs expressly rely on documents dated in 2013 and earlier. Further, the plaintiffs in *Northrop Grumman* moved for reconsideration based largely on *Waller* and *Tibble*, but Judge Birotte denied their motion. *See* No. 06-cv-6213, Dkt. 607 & Dkt. 643.

[4] The 2013 SPD cited in the FAC (at ¶ 52) clearly disclosed that Plan participants paid

Finally, Plaintiffs' assertion that knowledge of the fiduciary process is required to start the statute of limitations is flatly at odds with their position on what they must plead to state a plausible claim. *See* Part III *infra*. According to Plaintiffs, the FAC *need not* "describe directly the ways in which [Defendants] breached their fiduciary duties." Opp. 12. Yet simultaneously, Plaintiffs insist that they did not have actual knowledge in October 2014 because they did not know facts about Defendants' fiduciary process at that time. *Id*. at 8. Plaintiffs cannot argue that they "lacked sufficient detail in 201[4] to state a claim" and then rely on "the same level of detail … in the FAC" in an effort to state the very same claim. *White v. Chevron Corp.*, 2017 WL 2352137, at *19 (N.D. Cal. May 31, 2017).

## III. COUNT I FAILS TO STATE A CLAIM

Count I of the FAC alleges that Defendants' conduct fell short of fiduciary standards, but the FAC alleges only conclusory facts about Defendants' fiduciary process. Plaintiffs acknowledge as much. Citing *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995), Plaintiffs argue that they should not be faulted for failing to include such allegations. Opp. 5, 12. Yet even if Plaintiffs do not have to plead facts about the fiduciary process directly, they still must plead enough non-conclusory facts to plausibly suggest that the fiduciary process was defective. As Plaintiffs' Opposition makes clear, they have not satisfied this standard.

### A. Recordkeeping Expenses

The bulk of Plaintiffs' factual allegations about recordkeeping—that recordkeepers compete on price, that large plans use their size to obtain lower fees, and that the Plan failed to use that "leverage"—are just ways of asserting the legal conclusion that the Plan paid too much. Plaintiffs admit that they must plead more than that in order to state a claim. Opp. 14. But their attempts to do so suffer from two separate flaws, each of which independently compels dismissal.

recordkeeping fees to Fidelity and that participants could buy mutual funds on BrokerageLink. *See* Dkt. 33-1, Ex. A at 36, 40-41, 65-66.

***First***, Plaintiffs' allegation that the Plan paid $61 per person per year is refuted by the very documents on which Plaintiffs rely. As Defendants explained in their opening brief, the Form 5500s that Plaintiffs cite disclose *total* compensation paid to Fidelity, not recordkeeping compensation. *See* Mem. 13-14 & n.7.

Plaintiffs do not dispute that their estimates are flawed. Instead, they say the Form 5500 raises a "factual question" as to whether "some portion" of Fidelity's compensation was for non-recordkeeping services. Opp. 15. But there is no factual question that the Form 5500s reflect multiple fees besides recordkeeping fees, *see* Mem. 13-14 & n.7, and Plaintiffs allege nothing that would enable the Court to disaggregate the number on which Plaintiffs rely. Simply put, Plaintiffs cannot use this lawsuit and discovery to fish for support for their factually baseless claims. *See White*, 2017 WL 2352137, at *18 (dismissing claim where plaintiffs conceded that "the source of their per-participant estimate includes a number of other fees … that are unrelated to recordkeeping" and that they "do not know what portion of the total fees actually relate to recordkeeping").[5]

***Second***, despite numerous opportunities, Plaintiffs still have not pointed to any factual support for their allegation that a reasonable recordkeeping fee was $25-30 per person per year. They do not explain what services this estimate includes or name any recordkeeper that actually offered such pricing. Despite the critical need for "context specific" analysis at the Rule 12(b)(6) stage, *Dudenhoeffer*, 134 S. Ct. at 2471, Plaintiffs rest entirely on their own say-so.

Plaintiffs cite two cases—*Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056 (M.D. Tenn. 2018) and *Sacerdote v. N.Y.U.*, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)—in support of their position. Opp. 14. But neither decision rested solely on the price of recordkeeping services. The plaintiffs in those cases also challenged

[5] The observation (Opp. 15) that total fees paid to Fidelity rose in 2013 and 2014 despite the elimination of certain recordkeeping fees proves Defendants' point. That total compensation rose even though recordkeeping fees were lower shows that total compensation and recordkeeping compensation measure different things.

specific details of defendants' fiduciary process, including decisions to use multiple recordkeepers in 403(b) plans, whose recordkeeping structure stems from a very different historical premise than 401(k) plans. *E.g.*, *Sacerdote*, 2017 WL 3701482, at *8-9. In any event, the most recent 403(b) recordkeeping decision correctly holds that unsubstantiated allegations about supposedly reasonable fees are insufficient to state a plausible claim. *See Divane v. Northwestern Univ.*, 2018 WL 2388118, at *8 (N.D. Ill. May 25, 2018) (defendants are not "required to try to find a record-keeper willing to take $35/participant/year"). And of course, in neither *Cassell* nor *Sacerdote* did the plaintiffs rely on demonstrably incorrect interpretations of plan filings to allege that recordkeeping payments were too high.

The argument that bare allegations about cost can state a claim also is inconsistent with circuit law. A plaintiff cannot survive a motion to dismiss simply by contending that a plan could, in retrospect, have obtained similar services for less. As the Ninth Circuit has said, this "bright-line approach" is not "tenable." *Tibble*, 729 F.3d at 1135; *see also White*, 2017 WL 2352137, at *14 (similar).

**B. Financial Engines**

Plaintiffs' Financial Engines claim rests on the spurious contention that Financial Engines paid Fidelity a "kickback" in exchange for "no material service." Opp. 15. As Defendants previously explained, this theory not only is unbelievable, but Plaintiffs should know that—the same assertion was explicitly rejected in other cases brought by Plaintiffs' counsel. *See* Mem. 15 (citing *Scott v. AON Hewitt*, 2018 WL 1384300 (N.D. Ill. Mar. 19, 2018)).[6]

Plaintiffs concede that Fidelity "must be compensated" for providing

[6] Indeed, one week ago, a court dismissed another case brought by Plaintiffs' counsel asserting a similar Financial Engines theory. *See Chendes v. Xerox HR Sols., LLC*, No. 16-13980, Dkt. 63 (E.D. Mich. June 25, 2018). Plaintiffs complain that by citing these cases, Defendants argue facts "not alleged in the record." Opp. 16. But there is nothing inappropriate about citing related federal court decisions and documents subject to judicial notice on a motion to dismiss. *See Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

services but argue that Fidelity should not be compensated "twice." Opp. 16. But there is no double compensation: Fidelity charges the Plan for recordkeeping and other expenses, and separately charges Financial Engines a connectivity fee to interface with Fidelity's systems. Plaintiffs themselves contend that, in exchange for the so-called "kickback," Fidelity "agreed to allow Financial Engines access to its plan client base." Opp. 16-17. As this allegation acknowledges, Financial Engines could not perform its services for Plan participants without access to Fidelity's systems. *See Scott*, 2018 WL 1384300, at *5.

Plaintiffs' theory fails for the additional reason that they have not alleged that Plan participants suffered any actual harm as a result of the commercial contract between Financial Engines and Fidelity. Plaintiffs do not allege that the Plan could have received equivalent services from another provider for a materially lower price. And Plaintiffs do not allege that it was imprudent to offer Financial Engines' services to participants generally. Whether Financial Engines negotiated too high a fee with Fidelity is therefore irrelevant to the prudence of Defendants' selection of Financial Engines. Plan participants still received valuable investment advice and account management services at market rates.[7]

### C. BrokerageLink

Plaintiffs accuse Defendants of breaching their fiduciary duty because BrokerageLink made both retail and institutional shares of certain mutual funds available to participants. As Defendants have shown, however, under Department of Labor regulations fiduciaries *do not have* a fiduciary duty to monitor specific investment offerings available through a brokerage window rather than as part of the plan's designated investment alternatives. *See* Mem. 18. This conclusion is

[7] Plaintiffs appear to suggest that Defendants acted imprudently by not demanding lower recordkeeping fees from Fidelity given the fees Fidelity was making from Financial Engines. Opp. 16 (citing FAC ¶ 63). Other than groundless innuendo, however, Plaintiffs provide no reason why Defendants should have questioned the rate negotiated between Fidelity and Financial Engines. And Plaintiffs have not plausibly alleged that the Plan paid an unreasonably high recordkeeping fee in the first place. *See supra* Part III.A.

supported by common sense. It would be practically impossible for plan fiduciaries to monitor, much less negotiate with, each of the many thousands of mutual funds offered to investors on the open market. *See Jones v. Harris Assocs.*, 130 S. Ct. 1418, 1245 (2010) (noting that there were 9,000 mutual funds as of 2008). Accordingly, when a plan offers an appropriate mix of investments on its set menu, a fiduciary's choice to allow participants to access countless additional market-rate investments through a brokerage window is not subject to second-guessing based on claims that one or more of the additional investment options is not prudent.[8]

Plaintiffs do not respond to this fatal flaw in their theory. Instead, citing inapposite cases, they argue that "[t]he use of retail share classes of mutual funds when institutional share classes" are available "typically gives rise to an inference that the process used was imprudent." Opp. 17. None of those cases involved brokerage windows. Instead, they involved allegations that the fiduciaries imprudently included retail shares in the plan's set menu. Plaintiffs expressly abandoned any challenge to costs of the funds on the Plan's set menu when they amended their complaint. *See* Mem. 1.

Regardless, Plaintiffs have not alleged with facts—rather than conclusory assertions—that any given pair of retail and institutional shares on BrokerageLink are the same in all relevant respects. Indeed, Plaintiffs do not cite any specific example of a fund that supposedly offered retail and institutional shares through BrokerageLink that were identical in all respects but price. This failure is telling. If it were true that institutional shares were "available" whenever Plan participants

[8] As the Seventh Circuit held in *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), when a plan's set menu includes appropriately diversified and low-cost funds plus the BrokerageLink option, the fact that the *menu* may include retail shares rather than institutional does not state a claim for breach of fiduciary duty. It necessarily follows that the availability of both retail and institutional shares on the BrokerageLink platform does not state a claim either. Plaintiffs note that some district courts have declined to extend *Hecker* to claims that a Plan's set menu includes "different versions of the same investment vehicle." Opp. 18. Those cases are inapposite because Plaintiffs are not complaining about the set menu but rather the optional brokerage window supplement.

purchased funds through BrokerageLink (FAC ¶ 83), it would be simple to offer at least one example. And if a named Plaintiff actually had used BrokerageLink to purchase retail shares when equivalent institutional shares of the same fund were purportedly available, it would be straightforward to say so and attach supporting documentation. *Cf*. Dkt. 1, Ex. 1 (Plaintiff Alas's account statement).

Of course, as previously explained, Plaintiffs have not plausibly alleged that institutional shares were offered to participants through BrokerageLink on the same terms as retail shares. Mem. 16-17. A fiduciary selecting a limited number of funds for a plan's set menu can obtain institutional pricing because the mutual fund knows that it will receive a sizeable amount of plan assets in total; the funds selected for the set menu will be offered to all plan participants. By contrast, a brokerage window is self-directed—each participant chooses among thousands of mutual funds or other investments for him or herself. It is not plausible that "virtually any mutual fund" (Compl. ¶ 80) would have agreed to waive its customary pricing structure for individual participants who elected to purchase small amounts of shares through a brokerage window. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). As the Seventh Circuit astutely noted, "retail transactions occur at retail prices." *Id*.[9]

Finally, the allegations Plaintiffs muster in support of their argument (at 17-18) are irrelevant and self-defeating. For instance, Plaintiffs allege that institutional shares "are sold to institutional investors like qualified retirement plans that have large amounts to invest and do not purchase through a broker or other distributor."

[9] Plaintiffs weakly respond that this argument is "speculative." Opp. 17. But Plaintiffs have the burden of pleading a plausible claim and have not done so. Besides, Plaintiffs could end any speculation by simply naming a fund that offered institutional shares through BrokerageLink on the terms they suggest. Plaintiffs also argue that *Loomis* is inapposite because that case involved "trusts and pools" rather than "institutional share classes of the very same funds." Opp. 18. That is a distinction without a difference. *Loomis*'s core observation—equally true here—is that investors are not entitled to an institutional discount when making individual, self-directed purchases simply because they happen to be participants in a plan.

FAC ¶ 77. But as its name suggests, when a participant buys a fund through BrokerageLink, they purchase shares through a broker and not the plan itself. Plaintiffs also allege that retirement plans are customarily eligible to purchase institutional class shares. *Id.* ¶ 79. However, the document they cite in the FAC—a FINRA press release announcing an enforcement fine (*id.* ¶ 79 n.5)—says nothing about eligibility to purchase institutional shares through a brokerage window.

### D. Duty of Loyalty

Plaintiffs do not dispute that their loyalty claim falls with their prudence claim. The loyalty claim also independently fails because it is supported only by conclusory assertions pleaded "on information and belief." *See* Mem. 19.

The Opposition simply repeats these generic and conclusory allegations. For example, Plaintiffs allege that it was disloyal for Defendants to agree to "higher costs for Plan participants in exchange for lower costs to Defendants." Opp. 20. Yet Plaintiffs do not say what "lower costs" Defendants supposedly obtained, for what administrative services, or when and under what circumstances. Elsewhere, Plaintiffs refuse to say what Defendants did wrong, stating only that Fidelity "provided discounts on administrative services … *and/or* provided benefits to AT&T." *Id.* (citing FAC ¶ 69) (emphasis added). Plaintiffs cannot state a loyalty claim armed only with such vague and conclusory allegations. *See, e.g.*, *White*, 2017 WL 2352137, at *8; *Nicolas v. Tr. of Princeton Univ.*, 2017 WL 4455897, at *3 (D.N.J. 2017); *Sacerdote*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017).

## IV. COUNT II FAILS TO STATE A CLAIM

Plaintiffs concede that their prohibited transaction claim is based solely on the fact that the Plan paid for recordkeeping. Opp. 20. They also affirmatively allege that every benefits plan requires recordkeeping. FAC ¶ 42. In essence, Plaintiffs believe that *every* ERISA benefits plan in the country has committed a facial violation of ERISA § 406 merely by paying for services that the plan needs

to operate. Courts have squarely rejected Plaintiffs' theory that "any time plan administrators contracted with another party to provide [recordkeeping] services to plan participants in exchange for money … it would qualify as a prohibited transaction." *Sweda v. Univ. of Pa.*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017), *appeal docketed* Oct. 13, 2017; *see also Sacerdote*, 2017 WL 3701482, at *13 (same). This makes sense, as one of ERISA's recognized goals is to avoid "a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

Plaintiffs attack a straw man in raising the issue of affirmative defenses. Opp. 20. Defendants do not move to dismiss Count II due to an affirmative defense; they move to dismiss Count II for failure to state a claim at all. Indeed, by not even addressing the threshold question and leaping straight to affirmative defenses, Plaintiffs have effectively forfeited the point.

## V. THE NEWLY ADDED DEFENDANTS SHOULD BE DISMISSED

Plaintiffs are wrong that they can name AT&T Inc. as a defendant because AT&T Inc. allegedly controls AT&T Services. Mere control, in the sense of corporate ownership of a subsidiary, is not enough to give rise to fiduciary status. *See Green v. William Mason & Co.*, 996 F. Supp. 394, 398 (D.N.J. 1998) (parent corporation's control of subsidiary's "general operations" did not make parent an ERISA fiduciary). Plaintiffs' reliance (Opp. 25) on *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010)—an antitrust decision that has nothing to do with ERISA—makes the absence of legal support for their position clear.

Plaintiffs also are wrong that they can name 50 John Does solely on the grounds that individual committee members can be ERISA fiduciaries. Whether individuals *can* be fiduciaries is a separate question from whether Plaintiffs may assert claims against every individual on a fiduciary committee without alleging

facts bearing on the liability of a particular individual. A complaint must allege facts showing "individual liability." *Spinedex Physical Therapy USA v. United Healthcare*, 770 F.3d 1282, 1297 (9th Cir. 2014). Plaintiffs' citation (Opp. 24) to *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143 (9th Cir. 2000), is not to the contrary. In *Stewart*, the plaintiff adduced evidence that named individuals not only served on a fiduciary committee but also, in that capacity, took specific acts to violate duties under ERISA. *Id*. at 1157. *Stewart* does not imply that a plaintiff can name John Does simply because they *are* committee members.

Finally, Plaintiffs' reliance on the duty to appoint and monitor (Opp. 24) rings hollow. Once again, Plaintiffs rely only on conclusory assertions and speculation, arguing that because there allegedly were fiduciary breaches by AT&T Services and the BPIC, the persons responsible for appointing and monitoring these fiduciaries must have acted inappropriately as well. That is pure conjecture. And contrary to Plaintiffs' assertion that dismissal of their monitoring claims would be "premature," it is well established that plaintiffs cannot unlock the door to discovery unless they allege facts "showing *how* the monitoring process was deficient." *White*, 2016 WL 4502808, at *19 (emphasis added); *see also In re Calpine Corp. ERISA Litig.*, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005).[10]

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed. Dismissal should be with prejudice because plaintiffs have already amended their complaint once and do not request leave to amend. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993); *Leong v. Square Enix of Am. Holdings, Inc.*, 2010 WL 1641364, at *10 (C.D. Cal. Apr. 20, 2010).

[10] The cases Plaintiffs cite are in accord. In *Fernandez v. Franklin Res., Inc.*, for example, plaintiffs made concrete allegations about defendants' failure to monitor committee members, the fiduciary process, and particular conflicts of interest by Board members. 2018 WL 1697089, at *7 (N.D. Cal. Apr. 6, 2018). The FAC alleges nothing of the sort.

Respectfully submitted,

MAYER BROWN LLP

By: */s/ Nancy G. Ross*

Nancy G. Ross (*pro hac vice*)
*nross@mayerbrown.com*
Brian D. Netter (*pro hac vice*)
*bnetter@mayerbrown.com*
Laura Hammargren (*pro hac vice*)
*lhammargren@mayerbrown.com*
Jed W. Glickstein (*pro hac vice*)
*jglickstein@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
(312) 701-7711 – Facsimile

John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500
(213) 625-0248 – Facsimile

*Attorneys for Defendants AT&T Inc. and AT&T Services, Inc.*