Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
Kyle G. Bates (SBN: 299114)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com
jbloom@schneiderwallace.com

Garrett W. Wotkyns (*Pro Hac Vice*)
John J. Nestico *
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 315-3841
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

Todd S. Collins (*Pro Hac Vice*)
Ellen T. Noteware (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
enoteware@bm.net

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO C. ALAS, ROBERT J. BUGIELSKI and CHAD S. SIMECEK, individually as participants in the AT&T Retirement Savings Plan and as representatives of all persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> AT&T INC., AT&T SERVICES, INC. and John Does 1-50, <br><br> Defendants. | Case No. 2:17-cv-08106-VAP-RAO <br><br> **PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT** |

1.     Plaintiffs Julio C. Alas, Robert J. Bugielski and Chad S. Simecek, participants in the AT&T Retirement Savings Plan ("Plan" or "AT&T Plan"), bring this ERISA action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), and under Fed. R. Civ. P. 23 as representatives of a class of participants and beneficiaries of the Plan, against defendants AT&T, Inc. ("AT&T"), AT&T Services, Inc. ("AT&T Services") and John Does 1-50 for breach of ERISA's fiduciary duties and transactions prohibited by ERISA.

2.     AT&T, Inc. is the sponsor of the Plan. AT&T holds formal fiduciary responsibility with respect to the Plan and appoints corporate officers who serve as Plan fiduciaries. AT&T also exercised de facto control over the management of the Plan. AT&T Services is the Plan administrator and a named fiduciary of the Plan with broad authority over the administration and management of the Plan. AT&T is the sole owner of AT&T Services and exercises complete control over the operations and management of AT&T Services. John Does 1-50 are individuals, including employees of AT&T Services and/or AT&T who exercised formal authority or de facto control over (i) the selection of the Plan's investment options and/or (ii) the retention of the Plan's recordkeeper or the negotiation of the Plan's fee agreement with the recordkeeper.  Among those named as John Doe defendants the members of the Benefit Plan Investment Committee ("Committee"). All Defendants are either express or *de facto* ERISA fiduciaries under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) with some level of discretionary authority or control over the matters set forth herein.

## INTRODUCTION

3.     With 241,414 active participants as of December 31, 2016 and $34.792 billion in net assets, the Plan is one of the largest retirement plans in the country.  It ranks in the top 0.1 % of over 500,000 American 401(k) plans in terms of the amount of its assets.[1]

---

[1] *The BrightScope/ ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014* at 11. (Dec. 2016), available at https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf (last viewed March 16, 2018).

4.      As set forth in more detail below, Defendants, as fiduciaries of the Plan, failed to fulfill their fiduciary duty to prudently and loyally ensure the Plan's total recordkeeping and other administrative expenses were reasonable and not excessive.

5.      401(k) defined contribution plans such as the AT&T Plan have become America's primary retirement savings vehicle.  As with all defined contribution retirement plans that require participants to bear the costs of plan administration, the Plan participants' retirement savings suffer when the Plan has high fees.

6.      The marketplace for retirement plan services, like recordkeeping, is established and competitive.  Retirement plans the size of the AT&T Plan have the bargaining power to obtain very low-cost administrative and investment management services from financial services providers.  The overall trend in 401(k) plan administrative fees has been markedly downward over time.

7.      However, because of Defendants' failure to implement a prudent process to control the Plan's overall administrative and recordkeeping expenses, and failure to properly understand and evaluate the amount being paid for those services from all sources despite the express regulatory command to do so, the Plan's participants paid vastly more—in some periods more than double— what comparable very large retirement plans pay for recordkeeping services.

## JURISDICTION AND VENUE

8.      This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

9.      This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred here.

## PARTIES

10.      AT&T is a holding company organized under the law of the State of Delaware.  It is a publicly traded New York Stock Exchange company that provides telecommunications and digital entertainment services.  It employs 260,000 people and has revenues of $161 billion.

11. AT&T Services is a wholly owned subsidiary of AT&T.

12. The AT&T Retirement Savings Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and §1002(34).

13. AT&T is the Plan sponsor under 29 U.S.C. § 1002(16)(B).

14. AT&T designated the Chief Financial Officer of AT&T Inc. as the corporate officer authorized to exercise on behalf of AT&T Inc. all fiduciary responsibility with respect to the AT&T Plan.

15. The Chief Financial Officer of AT&T Inc. created the Benefits Plans Investment Committee comprised of the Chief Financial Officer, Treasurer, Comptroller, Vice President – Investment Management and Vice President – Benefits of AT&T Inc. to exercise the fiduciary authority and responsibility of AT&T Inc.

16. AT&T Services is the Plan administrator under 29 U.S.C. § 1002(16)(A).

17. John Does 1-50 are individuals, including employees of AT&T Services and/or AT&T who exercised formal authority or de facto control over (i) the selection of the Plan's investment options and/or (ii) the retention of the Plan's recordkeeper or the negotiation of the Plan's fee agreement with the recordkeeper. Among those named as John Doe defendants the members of the Committee. Despite the exercise of reasonable diligence Plaintiffs have been unable to determine the identity of John Does 1-50 before filing this First Amended Complaint. On information and belief, the identities of the individuals named as John Does 1-50 are known to the entity Defendants and following discovery of the identity of the relevant individuals, Plaintiff will seek leave of the Court to amend the complaint identify John Does 1-50 by name.

18. As required by 29 U.S.C. §1102(a)(1), the Plan is established and maintained by a written plan document.

19. As of December 31, 2016, the Plan had net assets of $34.792 billion and 241,414 participants with account balances.

20. Plaintiff Julio C. Alas is a resident of Montebello, California. He is employed by AT&T and has been a Plan participant from March 14, 2008 through the present. Mr. Alas would not be

considered a sophisticated investor and since the beginning of his participation has invested in only the 2040 Target Date fund, which is designed for participants who do not feel comfortable creating their own asset allocation among the available investment choices, and the AT&T Stock Fund.  Mr. Alas remembers receiving the Plan's Summary Annual Report but never requested or received a copy of the complete Annual Return or visited the website of the Employee Benefit Security Administration ("EBSA") to search that website's database for the actual Annual Report filed on Form 5500.

21.    Plaintiff Robert J. Bugielski is a resident of Poinciana, Florida.  He was employed by AT&T or its predecessors since 1989 until his retirement in July 2016, and has participated in the Plan or predecessor plans since approximately 1994.  Mr. Bugielski worked as a cable splicer for many years and then as an outside plant manager. Mr. Bugielski remembers receiving the Plan's Summary Annual Report but is otherwise not familiar with the Form 5500, and never requested or received a copy of the full annual report from the Plan Administrator or attempted to retrieve the complete Annual Return from the EBSA website.

22.    Plaintiff Chad S. Simecek is a resident of San Antonio, Texas. He was employed by AT&T or its predecessors or affiliates at times from 1997 until August of 2017 but remains a Plan participant.  Mr. Simecek would not be considered a sophisticated investor which is in part why he elected to enroll on Financial Engine's managed account service.

23.    Prior to the time that Plaintiffs' counsel began their investigation of facts relating to this case in or about June 2017, none of the Plaintiffs was aware of the amount of compensation Fidelity was receiving in connection with BrokerageLink or from Financial Engines or, therefore, total compensation Fidelity was receiving for recordkeeping and administrative services provided to the Plan, and had not referenced or reviewed the documents referred to in the Complaint.  Nor, prior to that time, were any of the Plaintiffs aware of other service agreements between AT&T and Fidelity. Furthermore, prior to the time that Plaintiffs' counsel began their investigation of facts relating to the breach of duty claims made herein in or about June 2017, none of the Plaintiffs had or have any actual knowledge regarding Defendants' fiduciary processes. None of the Plaintiffs are fiduciaries for the Plan and none participated in the relevant fiduciary investment decisions or search for or negotiation

1   with service providers. The facts about Defendants' fiduciary process are not made public generally

2   and have not been described to the Plan's participants.  Defendants' violations described herein

3   continued at least up until the time of the filing of the original complaint in this case on an annual basis

4   in connection with the reporting of Fidelity's compensation required to complete and file the Annual

5   Report as well as each time Defendants fulfilled their obligation (if they did) to periodically monitor

6   the terms of the agreement with Fidelity and the reasonableness of Fidelity's compensation.

7                              **ERISA FIDICIARY STANDARDS**

8          24.    ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement

9   plans, like the Plan, that are covered by ERISA.  ERISA provides that  "a fiduciary shall discharge his

10   duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the

11   exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying

12   reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence

13   under the circumstances then prevailing that a prudent man acting in like capacity and familiar with

14   such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1), 29

15   U.S.C. § 1104(a)(1).

16         25.    ERISA's fiduciary duties under have been described as being among the "highest known

17   to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

18         26.    The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA

19   fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying

20   reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

21         27.    As the Ninth Circuit explained, "cost-conscious management is fundamental to

22   prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016)

23   (*en banc*) (quoting Restatement (Third) of Trusts § 90(c)(3), cmt. *b*); *see also Tatum v. RJR Pension

24   *Inv. Comm*., 855 F.3d 553, 566 (4th Cir. 2017) ("Fiduciaries ... ordinarily have a duty to seek ... the

25   lowest level of risk and cost for a particular level of expected return—or, inversely, the highest return

26   for a given level of risk and cost.").

27

28

_____

28.     The content of ERISA fiduciary's duties is "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble,* 135 S. Ct. at 1828. Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007).

29.     In determining whether ERISA fiduciary defendants fulfilled their duties under the statute, courts consider how a prudent and loyal financial expert familiar with investment industry practices and fees would have acted.  As explained below, here, a prudent and loyal financial expert would have acted very differently than did Defendants.

30.     Defendants failed to fulfill their duty to prudently and loyally control the administrative expenses paid by the Plan, and in so doing caused the Plan's participants to incur millions of dollars in unnecessary expenses.

## FACTS

31.     The Plan is an individual account, defined contribution pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

32.     The Plan is funded by a combination of salary withholding by plan participants and employer matching contributions.

33.     Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses.

34.     In a defined contribution retirement plan such as the AT&T Plan, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

35.     Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee

1  Corporation), participants in defined contribution plans (like the Plan) get no more at retirement than
2  they have in their accounts at that time.

3       36.    As such, ERISA's fiduciary duty to ensure fees paid by the Plan are reasonable is
4  especially important in the context of fees paid by defined contribution plan participants, as the fees
5  reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive
6  at retirement.

7       37.    As the Supreme Court explained in 2015, in defined contribution plans like the Plan,
8  employees' benefits at retirement "are limited to the value of their own individual investment
9  accounts, which is determined by the market performance of employee and employer contributions,
10 ***less expenses***." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015) (emphasis added).

11      38.    Over time, even small differences in fees and performance compound and can result in
12 vast differences in the amount of savings available at retirement -- "[e]xpenses, such as management
13 or administrative fees, can sometimes significantly reduce the value of an account in a defined-
14 contribution plan." *Id.* In the context of individual account defined contribution plans, additional fees
15 of only 0.18% can have a large effect on investment results over time because "[b]eneficiaries subject
16 to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that
17 is, the money that the portion of their investment spent on unnecessary fees would have earned over
18 time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (en banc).

19      39.    Seemingly small differences in fees can lead to vastly different outcomes at retirement.
20 For example, a 1% difference in fees can mean 28% less in retirement assets over a thirty-five-year
21 period, U.S. Dept. of Labor, A Look at 401(k) Plan Fees, (August 2013) at 1-2,
22 *https://www.dol.gov/ebsa/publications/401k_employee.html.*

23      40.    Therefore, fees are of critical importance to an ERISA fiduciary's prudent investment
24 menu selection.

25                    **Plan Administrative Expenses Were Too High**

26      41.    Defendants, as the Plan's fiduciaries, controlled which investment options were
27 available in the Plan and selected the recordkeeping and administrative service providers for the Plan.

28

---

PLAINTIFFS' SECOND AMENDED COMPLAINT

7

42.     Defendants chose Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") to provide the Plan's recordkeeping and administrative services.

43.     Defendants also chose Fidelity Brokerage Services, LLC to provide self-directed brokerage accounts to Plan participants through Fidelity's trademarked BrokerageLink® service.

44.     Defendants chose Financial Engines Advisors L.L.C. ("Financial Engines"), to provide an individualized computer-based investment advice to Plan participants.

45.     Every defined contribution plan requires recordkeeping.  There are numerous vendors that can provide high quality recordkeeping services to defined contribution plans such as the AT&T Plan. These vendors strenuously compete against each other by offering the lowest price for the best service.

46.     Large plans are generally able to leverage their size to obtain lower fees per participant, in part because of the economies of scale that large plans provide recordkeepers.

47.     With over 230,000 participants and billions of dollars in assets during the class period, the Plan is one of the largest defined contribution plans in the United States.

48.     The Plan thus had the bargaining power to obtain and maintain very low fees for recordkeeping and other administrative services and had significant leverage to procure high quality management and administrative services at a low cost.

49.     Defendants failed to leverage the Plan's size to obtain reasonable recordkeeping fees.

50.     And, for those lower prices, other very large plans receive equivalent or better recordkeeping services than did the Plan.

51.     Between 2011 and 2016, the Plan's participants paid Fidelity at least the following amounts in direct compensation payments for recordkeeping services:

| Year | Total Direct Compensation Paid to Fidelity |
|------|--------------------------------------------|
| 2011 | $    5,055,000.00[2]                        |

---

[2]  In 2011, the Plan merged with another defined contribution plan, the AT&T Savings Plan (the "ASP"). Prior to the merger, there were only 55,000 participants in the Plan. In 2011, the ASP paid

| Year | Total Direct Compensation Paid to Fidelity |
|------|--------------------------------------------|
| 2012 | $ 13,267,000.00 |
| 2013 | $ 14,086,000.00 |
| 2014 | $ 15,068,000.00 |
| 2015 | $ 15,015,000.00 |
| 2016 | $ 15,529,000.00 |

52.     Thus, for each year after 2011, when the Plan had, on average, 230,000 participants, the Plan's participants paid, on average, roughly $61 per participant each year in recordkeeping expenses through direct compensation.

53.     Typically, large ERISA defined contribution plans—even plans much smaller than the Plan—pay far less for those recordkeeping services than did the Plan. Generally, very large plans pay no more than roughly $30 per participant for comparable recordkeeping services, although some large plans pay even less than that.

54.     For example, according to 5500s on file with the EBSA, the Home Depot Futurebuilder Plan, roughly comparable to the AT&T Plan though with fewer participants (approximately 200,000 participants with account balances and with much lower assets ($6 billion), reported direct compensation to Hewitt Associates for services comparable to the services being provided by Fidelity of approximately $28 per participant each year since 2012.  The FedEx Corporation Retirement Savings Plan, which uses the Vanguard Group as the plan's recordkeeper and has 220,000 participants and $13 billion in assets, paid between $23 and $30 per participant from 2012 through 2016.  The FedEx plan does not offer Financial Engines or a brokerage window like BrokerageLink.  The HCA 401(k) Plan, with more than 250,000 participants and $14 billion in assets, uses Xerox HR Solutions as recordkeeper and has paid between $24 and $30 per participant since 2012 in direct compensation for services comparable to the services being provided by Fidelity.  The Costco 401(k) plan paid to T. Rowe Price as recordkeeper $29 per participant in 2015, $38 per participant in 2016 and $35 per

---

roughly $8.5 million to Fidelity for recordkeeping and administrative services in addition to the $5,055,000 reported in the Table, making the total fees paid for the two plans $13,555,000 for 2011.

participant in 2017.  The Bank of America 401(k) Plan, with more than 240,000 participants and $20 billion in assets, paid Fidelity $30 per participant in 2015, then reduced the per participant charge to $14 per participant by moving the plan to the Merrill Lynch recordkeeping platform.

55.    According to data compiled in the 2018 edition of the 401k Averages Book, for plans with 100 participants and $5 million in assets (*i.e.* plans substantially smaller than the Plan), the average record-keeping / administration fee was $35 per participant.

56.    The reasonableness of record-keeping and administration fees is not static.  Rather, from 2010 until recently, such fees have been consistently falling, due to lawsuits challenging such fees, fee disclosure regulations issued in 2012, increased competition among service providers, and greater fiduciary attention to this issue.

57.    It is now the standard of care for fiduciaries, especially those for the largest plans, to periodically solicit formal bids via request for proposals for recordkeeping and administrative services.

58.    There is no indication that Defendants engaged in any meaningful process to solicit competitive bids or even benchmark the Plan's record-keeping and administrative fees.  Had Defendants done so, they would have received bids and/or market information consistent with the data presented above for comparable plans.  Instead, Defendants engaged Fidelity for the entire relevant period and the total direct compensation paid to Fidelity was never substantially reduced, contrary to the trend during the relevant time period for lower recordkeeping and administrative fees.

59.    Those recordkeeping costs were ultimately borne by all the Plan's participants. *E.g.*, 2013 Summary Plan Description (ECF No. 33-1), at 40 ("Under the Plan, all expenses incurred to administer the Plan are charged directly to participants, either directly to their accounts or through the Plan's Trust or investment funds... Some examples of these types of administrative expenses include recordkeeping fees, communications fees and legal fees.").

60.    Amounts that were charged against the Trust or the Plan's investment choices for the purpose of paying the Plan's recordkeeping and other administrative expenses, through revenue sharing or otherwise, were applied to satisfy the aggregate obligation of the Plan to pay Fidelity's

compensation, and not just to the expenses attributable to or allocable to the individual participants who had invested in the funds being charged for those expenses.

61.     The fact that the Plan's reported compensation paid to Fidelity indicates that participants consistently paid roughly double the amount being paid by similar or even smaller jumbo plans for recordkeeping services to any of four of the other major recordkeeping platform providers, without even considering the millions of dollars in additional unreported indirect compensation, suggests that the Plan's fiduciaries were asleep at the switch or, as described below, acting out of self-interest.

62.     On information and belief, the Defendants, who were the Plan's fiduciaries and had the primary fiduciary duty to control the Plan's administrative and recordkeeping expenses, failed to take reasonable and prudent steps to investigate, evaluate control those costs and ensure that the Plan paid no more than a reasonable amount. On information and belief, Defendants failed to implement a prudent process to periodically review Fidelity's total compensation, failed to demand an accurate accounting of the indirect compensation received by Fidelity, and/or failed to evaluate whether comparable or better services could have been obtained in the market for less.

63.     A prudent and loyal fiduciary in Defendants' position would have engaged an independent third party to benchmark the reasonableness of the direct and indirect compensation received by Fidelity to ensure that only reasonable fees were charged to Plan participants. Moreover, a prudent and loyal fiduciary in Defendants' position would have conducted a competitive bidding process for the Plan's recordkeeping services every few years to ensure that the Plan was paying no more than an acceptable market rate for the services it was receiving—particularly because recordkeeping fees for large plans such as the Plan have been declining steadily since well before the start of the class period. Given that recordkeeping fees for the Plan were well above the market rate, on information and belief, Defendants failed to prudently and loyalty retain an independent third-party advisor or conduct a competitive bidding process during the class period. In the alternative, if Defendants in fact did retain an advisor or conduct a bidding process, they either did so imprudently (for example, by failing to investigate the advisor's credentials, conflicts of interest or basis for results)

1    or they ignored the unmistakable results of that process and failed to protect the interests of participants

2    in a prudent and loyal manner.

3         64.    These failures were not isolated but were ongoing over a period of many years—starting

4    no later than 2012 and continuing to today.

5         65.    Had Defendants adopted and carried out a prudent process to monitor and control the

6    Plan's recordkeeping expenses, they would have greatly reduced the amount of recordkeeping

7    expenses paid by the Plan's participants.

8         66.    Defendants' failure to adopt and carry out such a prudent process cost Plan participants

9    tens of millions of dollars in unnecessary recordkeeping expenses during the class period.

10        67.    Defendants' failures are also illustrated by the handful of changes to the recordkeeping

11   fees implemented during the class period. That is, during the class period, two of the sources of

12   administrative fees paid to Fidelity were reduced or eliminated, but the total amount of fees and the

13   amount paid per participant did not decline. Throughout the class period, Plan participants paid a flat

14   recordkeeping fee directly out of their Plan accounts.

15        (a)    As late as 2013, however, the Plan's participants also paid a 0.01% asset-based fee to

16               Fidelity, deducted from participants' holdings in all but one of the Plan's investment

17               options. In 2014 the Plan eliminated those fees. However, despite eliminating that

18               source of recordkeeping fees, the Plan's participants paid 6.67% more in total to Fidelity

19               that year--$15 million in 2014 compared to $14 million in 2013. In addition, the

20               recordkeeping fees per participant surged from $58.11 to $68.37 – a 15% increase.

21        (b)    As late as 2015, the Plan's participants that invested in the AT&T Total Return Bond

22               Fund paid an additional recordkeeping fee. The formula amount of that fee declined

23               each year from 2012 (when the fee was 0.17%) to 2015 (when the fee was 0.02%),

24               before the fee was eliminated entirely in 2016. Yet, as with the recordkeeping fees for

25               the other investment options, Fidelity's fees did not decline.

26   Despite these apparent fee decreases, the actual amount of direct compensation the Plan's participants

27   paid to Fidelity did not decline between 2012 and 2016. Any reasonably prudent fiduciary would have

28

1    evaluated why the direct compensation to Fidelity continued to grow despite reducing or eliminating

2    sources of fees.

3         68.    Moreover, the disclosures provided to Plan participants (such as summary plan

4    descriptions ("SPDs") and periodic account statements) as well as in other publicly available

5    documents (such as the Form 5500s) are so opaque that it is impossible to determine either the total

6    amount of compensation (direct and indirect) that participants pay to Fidelity. The Plan's 5500s, for

7    example, do not report either the amount of Fidelity's indirect compensation or the formula used to

8    determine that amount. It is also impossible to determine from these documents whether any particular

9    fees were counted as direct or indirect, or even the nature or sources of the types of compensation that

10   participants are paying Fidelity apart from the flat fee.[3] Nor do the disclosures provide any direct

11   information about Defendants' fiduciary process with respect to these recordkeeping fees.

12        69.    Defendants failed to properly monitor Fidelity's total compensation from all sources in

13   relation to the services Fidelity provided and available alternatives in the marketplace and thus caused

14   the Plan's participants to pay unreasonable administrative expenses to Fidelity.

15                                    ***AT&T's Self-Interest***

16        70.    Defendants' fiduciary failures were not simple imprudence but were motivated in part

17   by Defendants' self-interest.

18        71.    AT&T itself, through its senior management, stepped in and controlled the selection and

19   retention of Fidelity as a service provider for the Plan.

20        72.    AT&T itself, through its senior management, also negotiated the terms of Fidelity's

21   agreement with the Plan, including Fidelity's compensation.

22        73.    AT&T undertook to select and retain Fidelity for AT&T's own benefit, and not for the

23   benefit of the Plan or its participants.

24

25

26   [3] In preparing the First Amended Complaint, counsel for Plaintiffs requested additional
     documentation and records from Defense counsel that would have clarified these issues. Even then,
27   Defendants refused to provide that information.

28

---

PLAINTIFFS' SECOND AMENDED COMPLAINT

13

74.     AT&T simultaneously retained Fidelity as an administrative service provider for certain other defined benefit pension benefit plans and other employee benefit programs that AT&T sponsors at the same time that AT&T retained Fidelity as a service provider for the Plan.

75.     On information and belief, part of the larger agreement between AT&T and Fidelity required the Plan's participants to pay Fidelity greater than market compensation for providing services to the Plan—while Fidelity provided discounts on administrative services to other employee benefit plans (for which AT&T itself otherwise would have had to pay) and/or provided other benefits to AT&T.

76.     AT&T's deal with Fidelity was motivated primarily by AT&T's self-interest and benefitted AT&T and Fidelity at the expense of the participants in the Plan. That conduct violated ERISA's duty of loyalty and caused Plan participants to incur unnecessary administrative expenses to relieve AT&T of costs and expenses related to other employee benefit programs.

## BrokerageLink

77.     Fidelity offers another service to the Plan that allows Plan participants to invest in a wide range of mutual funds that are not included among the Plans' designated investment alternative, through an account that is alternatively referred to as a "brokerage window" or "self-directed brokerage account."   The brand name for Fidelity's self-directed brokerage accounts is "BrokerageLink."  BrokerageLink is available to participants in the Plan.  Plaintiff Bugielski invested a portion of his account through BrokerageLink for many years.  Although Mr. Bugielski acquired the securities of individual companies and did not acquire shares of mutual funds, he paid $732 in the past three and a half years in transaction fees; fees that were negotiated by Defendants without regard for, or even awareness of, the significant amount of additional indirect compensation Fidelity would and has been receiving through revenue sharing. The amount that Mr. Bugielski paid for transaction fees through BrokerageLink was clearly excessive considering the millions of dollars Fidelity was receiving through revenue sharing, and Defendants breached their duties by allowing Fidelity to charge Mr. Bugielski such amounts.

78.     Each Plan participant participating in the BrokerageLink program compensates Fidelity directly including by paying Fidelity a variety of brokerage fees for executing trades.

79.     Securities available to be purchased through BrokerageLink include, among other types of investments, stocks, bonds, exchange-traded funds, Fidelity mutual funds, and non-Fidelity mutual funds available through Fidelity Funds Network.

80.     A retirement plan investor who wishes to invest, for example, in a mutual fund that is not available from the menu of the Plan's designated investment alternatives can invest in that mutual fund through BrokerageLink.  There is no dispute that in such a case, it is the class member/retirement plan participant who is making an initial investment decision.

81.     Selecting a particular mutual fund is not, however, the only discretionary decision made in the process of completing a purchase of a mutual fund.  Many mutual funds offer different share classes that have different charges and fees, depending largely on the identity of the investor and the size of the investment.  Typically, a mutual fund that offers different share classes will offer "retail" (also known as "investor") shares as well as "institutional" shares.

82.     Generally, "retail" and "investor" share classes are designed to be offered to individual investors who are not investing through a qualified retirement plan and with respect to which the mutual fund must maintain individual investor records.  Retail share classes have higher expenses.  Indeed, retail classes of mutual funds will often make "revenue sharing payments" to other parties for distributing the shares to retail customers or ostensibly for recordkeeping, sub-transfer agent fees and other shareholder services.

83.     Institutional class shares, as the name implies, are sold to institutional investors like qualified retirement plans that have large amounts to invest and do not purchase through a broker or other distributor.  The purchases and redemptions of mutual fund shares by thousands of individual participants in these retirement plans are aggregated by Fidelity and other individual account plan platform providers through an omnibus account.  As a result, from the perspective of the mutual fund, the recordkeeper for these plans is the sole investor in the mutual fund.  Generally speaking, fund

1   managers for institutional class shares do not make any revenue sharing payments, or they make lower

2   revenue sharing payments than for retail shares.

3       84.   Apart from their price, there is no difference from the perspective of an investor between

4   a "retail" or "investor" class share and an "institutional" class share. "The principal difference between

5   the classes is that the mutual fund will charge you different fees and expenses depending on the class

6   you choose." Financial Industry Regulatory Authority, Understanding Mutual Fund Classes.[4]  Given

7   the choice, a prudent and loyal fiduciary that was investing in a fund would always select the available

8   share class with the lowest fees. Put another way, a prudent or loyal fiduciary would choose

9   "institutional" class shares of the same fund every time over "retail" or "investor" class shares if the

10  investor qualified for the "institutional" class.

11      85.   Qualified retirement plans, almost regardless of the size of the plan, are customarily

12  eligible to purchase institutional class shares where available.[5]  Even funds that require a certain

13  minimum investment for Class I and Class R6 institutional share classes will often waive the minimum

14  investment for retirement plans.[6]

15      86.   All securities acquired by Plan participants through BrokerageLink, including all mutual

16  fund shares, are not held in individual retail brokerage accounts but are held in an omnibus account in

17  the name of the Plan's trust, just like the Plan's other assets.  While it is the individual participant that

18  is directing the purchase of mutual fund shares through BrokerageLink, as far as any registered

19  investment company knows, the purchaser of those shares is the AT&T Retirement Savings Plan

20  Trust; a very large institutional investor.

21

22  _____
    [4]  *See*  http://www.finra.org/investors/alerts/understanding-mutual-fund-classes (last viewed October

23  18, 2017).
    [5]  *See*  https://www.finra.org/newsroom/2014/finra-fines-merrill-lynch-8-million-over-89-million-
    repaid-retirement-accounts-and (last viewed may 18, 2016).

24  [6] For example, the prospectus for the John Hancock Disciplined Value Fund states that the minimum

25  investment for Class R6 shares is $1 million. "However, there is no minimum initial investment
    requirement for: (i) qualified and nonqualified plan investors that do not require the fund or its

26  affiliates to pay any type of administrative payment". Likewise, the prospectus for the Goldman Sachs
    Large Cap Value Fund states: "Those share classes with a minimum initial investment requirement

27  do not impose it on certain employee benefit plans . . . ."

28

_____

Moreover, plan participants had, on average, over $1.5 billion in BrokerageLink throughout the class period. The enormous size of the Plan's investment in BrokerageLink should have permitted the Plan to obtain the lowest price share classes of virtually any mutual fund on the market, and it should have permitted the Plan to obtain materially lower transaction fees for Mr. Bugielski and other Plan participants who purchased individual securities through BrokerageLink.

87.    Apart from the fees, the primary difference between high cost shares and low cost shares is that high cost shares make higher revenue sharing payments to service providers like Fidelity. Fidelity and/or the Plan included the retail shares knowing that it is detrimental to retirement investors like Plaintiffs to purchase a retail share class when an institutional share class of the same fund is available, causing them to pay significantly greater expense for no additional benefit or value, and providing significant additional compensation to Fidelity.

88.    As a result of the design of the BrokerageLink program, plan participants acquiring mutual fund shares through BrokerageLink end up purchasing retail share classes instead of the far less expensive institutional I shares or R6 shares.  As a result of those purchases, Fidelity receives millions of dollars in revenue sharing payments with resect to those retail share classes of mutual funds.

89.    Revenue sharing payments to a platform provider like Fidelity vary depending on the identity of the fund and the share class acquired.  A plan may include both institutional share classes that pay no revenue sharing for some funds and, for other funds, share classes that do pay revenue sharing.  When a plan pays for recordkeeping and other administrative expense through revenue sharing, the revenue sharing payments are not applied to offset recordkeeping and other administrative expenses of just those participants who invested in the funds that pay revenue sharing.  The aggregate amount of revenue sharing is treated as a benefit to the plan as a whole and used to benefit all participants, even those participants who have not invested in any funds that pay revenue sharing.  In other words, all revenue sharing payments are used to reduce the aggregate administrative expense of the plan as a benefit to all participants.

90.    If that usual process had been employed in connection with the revenue sharing received through BrokerageLink, the recordkeeping and administrative fees for all participants would have been reduced, or at least the transaction fees paid by all participants investing through BrokerageLink, including Mr. Bugielski, would have been reduced or eliminated.

91.    Although retirement plan fiduciaries are not required to monitor which securities a participant purchases through self-directed brokerage account such as BrokerageLink, Defendants, as Plan fiduciaries, were responsible for investigating and evaluating the BrokerageLink program to ensure that the program was appropriate for a qualified retirement plan, that it operated in a manner to protect the interests of plan participants, and that it resulted in the payment of no more than reasonable compensation to Fidelity as the service provider.  It is abundantly clear that Defendants utterly failed in the performance of that responsibility.

92.    Ultimately, while Plaintiffs are not in possession of documents demonstrating what level of review or investigation was performed as part of Defendant's evaluation of the BrokerageLink program for inclusion in the Plan, or any subsequent evaluation and monitoring of the BrokerageLink program to assess its continuing efficacy for inclusion in a qualified retirement plan, it is plain that Defendants (i) failed to examine, evaluate and comprehend that  BrokerageLink provided significant additional compensation to Fidelity, (ii) failed to take that compensation int account when reviewing and monitoring Fidelity's total compensation; and (iii) failed to disclose that critical information to plan participants.

93.    Based on examination of 5500s filed by other large plans that used FIIOC as plan recordkeeper and that offered participants the opportunity to invest through BrokerageLink and that reported the formula provided by Fidelity to calculate revenue sharing payments, FIIOC has been receiving approximately $1.5 million to $2.25 million per year from revenue sharing through BrokerageLink.  That indirect compensation to Fidelity should have been considered in determining Fidelity's overall compensation for recordkeeping and administrative services or, at a minimum, used to offset the direct compensation being paid to Fidelity by Plaintiff Bugielski and others for transaction fees.

94.     For many years, the DOL has provided guidance to plan fiduciaries regarding the performance of their obligations, including guidance regarding contracting for plan services:

> In selecting a service provider, plan fiduciaries must, consistent with the requirements of section 404(a), act prudently and solely in the interest of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan. Except as provided in section 408, plan fiduciaries also have an obligation under section 406(a) not to cause the plan to engage in certain transactions, including a direct or indirect furnishing of goods, services or facilities between the plan and a party in interest. Section 408(b)(2) exempts from the prohibitions of section 406(a) any contract or reasonable arrangement with a party in interest, including a fiduciary, for office space, or legal, accounting or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.[2]  In carrying out these responsibilities, the Department has indicated that a plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of services offered, and the reasonableness of the fees charged in light of the services provided.[7]

95.     The failure to do so provides significant evidence that Defendants' fiduciary process was seriously flawed.  But most importantly for this case, no reasonable fiduciary would fail to learn of the enormous additional compensation Fidelity was gleaning from BrokerageLink or fail to require that the plan receive credit for that compensation as an offset to recordkeeping fees, or, at a minimum, to offset the transaction fees paid by any participant, including Mr. Bugielksi, who invested through BrokerageLink.  As a result, Defendants have violated the duties of prudence by selecting a program that included a range of share classes with unnecessarily high fees and that were inappropriate for a qualified retirement plan; by failing to properly educate participants about the operation of the BrokerageLink; and by failing to account for all the revenue sharing received by Fidelity from participants' use of BrokerageLink.

**<u>Financial Engines</u>**

96.     Financial Engines offers automated investment advice and account management services to participants n qualified retirement plans. For a fee, Financial Engines will effectively assume the investment management of an individual's plan account and allocate the account among

---

[7] DOL Field Assistance Bulletin 2002-3, available at https://www.dol.gov/ebsa/regs/fab2002-3.html, last viewed July 27, 2018.

1    the various investment choices in the plan in a manner deemed appropriate for an individual based on

2    his or her age, income, family status and other assets.  The computer-based program will periodically

3    re-balance a participant's asset allocation to take into account varying performance among the selected

4    investment choices and will modify the asset allocation as a participant grows older.  The entire advice

5    program was developed and is maintained and operated by Financial Engines.

6         97.    The Financial Engines program was first introduced to the Plan in 2015.

7         98.    To implement the services of Financial Engines, Fidelity provides access to

8    participants' accounts through a secure communications link, just as it provides to participants internet

9    access to their accounts in order to manage the investment of their accounts.  That is the only function

10   or service provided by Fidelity in connection with the Financial Engines advice program.  Financial

11   Engines pays a significant portion of the fees it collects from participants to Fidelity.  On information

12   and belief, Financial Engines pays Fidelity nearly half of its fees.

13        99.    Financial Engines needs only a single connection to Fidelity to access the accounts of

14   all participants in the Plan. Therefore, the nature and extent of whatever service Fidelity is actually

15   providing does not change from year to year or vary depending on how many participants enroll in

16   the Financial Engines advice program.  Yet Fidelity is receiving an asset-based fee for this fixed level

17   of service.

18        100.   In 2015, Financial Engines received $2,266,000 in direct compensation from the Plan.

19   In connection that compensation, Financial Engines paid Fidelity roughly $1.1 million for that secure

20   communications link.

21        101.   In 2016, Financial Engines received $4,004,000 in direct compensation from the Plan.

22   In connection that compensation, Financial Engines paid Fidelity roughly $2 million for the same

23   secure communications link that the previous year cost only $1.1 million.

24        102.   But the compensation situation is far more egregious than even that.  In all likelihood,

25   Financial Engines requires only a single communications link to the Fidelity system for all the plans

26   on Fidelity's platform that have elected to include the Financial Engines program as part of their plan

27   services.   Accordingly, in 2015, when Fidelity was receiving $1.1 million in compensation for

28

---

PLAINTIFFS' SECOND AMENDED COMPLAINT

20

providing Financial Engines with a secure communications link, it was receiving approximately $3 million from the Delta Airlines Family Care Savings Plan for the same communications link.  And in 2016, as Fidelity was receiving $2 million in compensation for the link the cost only $1.1 million the preceding year, Fidelity was also receiving approximately $4 million from the Delta Airlines Family Care Savings Plan for the same communications link, and millions more from all the other plans on the Fidelity platform that offer the Financial Engines advice program.

103.   Defendants failed to properly investigate or evaluate the fees being paid to Financial Engines and the extent to which those fees were grossly inflated to cover the enormous amount being received by Fidelity, ostensibly for a secure communications link, or that hundreds of plans were indirectly paying Fidelity for the same communications link.  More importantly, Defendants failed to investigate or evaluate the indirect compensation being paid to Fidelity and failed to account for that compensation in evaluating the aggregate compensation being received by Fidelity for recordkeeping and administrative services.

104.   Thus, since Financial Engines provided its advice services for far less than the fee that was being charged to participants who subscribed to that service, participants, including Plaintiff Simecek, paid Financial Engines excessive fees for the services Financial Engines provided to them as a direct result of the illegal kickback to Fidelity.  Mr. Simecek had no knowledge of the fee arrangement between Financial Engines and Fidelity until shortly before the filing of the First Amended Complaint on Mach 27, 2018.

**Annual Returns on Form 5500**

105.   Every qualified retirement plan with 100 or more participants is required to file with the EBSA an Annual Return on Form 5500 detailing financial information about the plan.  Among other required reporting, the Form 5500 must identify every service provider who received more than $5,000 in compensation for the reporting year and the amount of all direct and indirect compensation received.

106.   The complete Annual Return on Form 5500 is not required to be provided to participants unless it is expressly requested by a participant and the participant pays associated copying costs.

Participants receive only a Summary Annual Report that does not contain the detailed financial information required to be included on the 5500.

107.   The Plan's Annual Reports reflect that the Plan paid direct compensation to Fidelity, the Plan's recordkeeper, and the amount of that direct compensation. The Plan's Annual Reports also indicate that Fidelity received indirect compensation. There is no information included in the Annual Report, however, regarding the amount of that indirect compensation or the source of that indirect compensation.

108.   In fact, the 5500s falsely report that Fidelity Investments Institutional Operations Company received $0 in indirect compensation other than "eligible indirect compensation." In other words, the 5500 reports that all indirect compensation received by Fidelity as recordkeeper was "eligible indirect compensation." "Eligible indirect compensation" is a defined by the federal regulation governing the disclosure obligations of plan service providers as fees or expenses that are charged to the plan's investment funds and reflected in the value of the investment, that were not paid directly by the plan or sponsor.

109.   The EBSA has also issued additional guidance regarding these reporting obligations in the form of Frequently Asked Questions, which clarify that 12b-1fees, brokerage commissions and fees charged in connection with purchases and sales of interests in a fund, fees for providing services to plan investors or plan participants such as communication and other shareholder services, and fees relating to the administration of the employee benefit plans such as recordkeeping services, Form 5500 filing and other compliance services, would be reportable indirect compensation for Schedule C purposes. Accordingly, all these amounts of direct and indirect compensation (excluding the "eligible indirect compensation") must be separately identified and reported.

110.   Accordingly, neither the indirect compensation in the form of revenue sharing received through participants' investments through BrokerageLink, nor indirect compensation paid to Fidelity from Financial Engines qualify as "eligible indirect compensation, and the failure to report that indirect compensation clearly violates Defendants' reporting obligations.

111.   The relevant pages of the 5500s for the Plan for the 2011 through 2016 reporting years that include any information about the services being provided and the compensation received by Fidelity and Financial Engines are attached as Exhibit 1.  It is readily apparent that there is no disclosure of the indirect compensation being received by Fidelity from BrokerageLink or from Financial Engines despite the clear legal obligation to do so.

112.   It should also be apparent that it takes an expert to decipher the report and determine that either Fidelity Defendants have taken the position on the 5500 that all of Fidelity's indirect compensation was being characterized as "eligible indirect compensation," which is false, and that Defendants did nothing to correct that false reporting.

113.   It is apparent that no average Plan participant would be able to read the Annual Return and understand in any level of detail how much total compensation was being received by Fidelity and for what services.  While the box on the left side of the form includes "service codes," there is no indication of what those service codes represent or where to find additional information.  No average participant, and none of he named Plaintiffs, would have the slightest idea what distinguishes "indirect compensation" from "eligible indirect compensation" or be able to infer from a review of the 5500 that Fidelity was receiving millions of dollars in compensation that was not being reported on the 5500.

114.   Whether a service contract, like the contract between the Plan and Fidelity, results in an actionable, that is, non-exempt, prohibited transaction depends in significant part on whether the compensation paid for the service is reasonable in relation to the services being provided.  29 C.F.R. 2550.408b-2(c).  The only compensation reported on the Plan's 5500s is the direct compensation paid to Fidelity along with a series of two-digit service codes, with no indication of what the service codes mean specifically with respect to Fidelity's direct compensation or where to find that information. Unlike a comparison of expenses charged for different mutual funds, such as the difference between the Fidelity Magellan Fund and the Vanguard Wellington Fund, for which there is ample and readily available public information, no average AT&T employee would have any basis for evaluating the reasonableness of the compensation that was actually reported.  In short, nothing about the 5500

1    reporting should be deemed to have provided any Plan participant with "actual knowledge of the

2    breach or violation" alleged in this Complaint, especially with respect to the millions of dollars of

3    additional compensation that Fidelity and Defendants have failed to report.

4         115.   Apart from the false and misleading 5500s, there is no disclosure provided to

5    participants, including the named Plaintiffs, that discloses Fidelity's total direct and indirect

6    compensation or that Fidelity was even receiving compensation from Financial Engines or that it was

7    receiving millions of dollars in additional compensation through BrokerageLink.  Accordingly, none

8    of the named Plaintiffs had actual knowledge of Defendants' breaches alleged herein until, in the case

9    of Julio Alas, shortly before the filing of the original Complaint on November 3, 2017, and in the case

10   of Mr. Bugielski and Mr. Simecek, shortly before the filing of the First Amended Complaint on March

11   27, 2018.

12        116.   To the extent that 5500s form part of the basis for Plaintiffs claims, they are 5500s of

13   other retirement plans unrelated to AT&T that actually disclosed the fee-splitting arrangement

14   between Financial Engines and Fidelity and the revenue sharing compensation Fidelity received from

15   BrokerageLink.   Therefore, Plaintiffs could not have discovered Defendants' alleged breaches by

16   reference to any of the Plan's 5500s prior to the analysis by Plaintiffs' current counsel, which was

17   performed during the six-month period preceding the filing of the First Amended Complaint.

18        117.   Defendants' failure to properly report Fidelity's compensation on the Plan's 5500s

19   constitutes a violation of Defendants' fiduciary duty of candor and served to conceal from Plaintiffs

20   the full amount of Fidelity's compensation.

21                            **Defendants' Fiduciary Status**

22        118.   ERISA requires that every plan identify "one or more" "named fiduciaries" with general

23   responsibility for administering the plan. ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

24        119.   The plan may also expressly provide a procedure for allocating responsibilities among

25   fiduciaries or for named fiduciaries to designate others to carry out fiduciary responsibilities. ERISA

26   § 405(c)(1), 29 U.S.C. § 1105(c)(1).

27

28

---

120.   ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in fact* perform a fiduciary function. Thus, in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i) & (iii), 29 U.S.C. § 1002(21)(A)(i).

121.   Appointing a fiduciary is itself an act of discretionary control over a plan. As such, appointing a fiduciary is a fiduciary function, and those who appoint fiduciaries are subject to ERISA's fiduciary duties to the extent they do so. *E.g.*, *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). In addition, hiring a non-fiduciary service provider for a plan is also a fiduciary function.[8]

122.   Here, the Plan document provided that AT&T Services was the "Plan Administrator." 2011 Plan Document, § 3.1(86). The Plan also provided that "the Plan Administrator is the 'administrator' and the 'named fiduciary' with respect to the general administration of the Plan." *Id.* § 15.1. According the SPD, "[t]he Plan Administrator has all powers necessary to accomplish its Plan duties." 2013 SPD, at 57 (ECF No. 33-1 at 82 of 112).

123.   The Plan permitted the Plan Administrator to, "from time to time delegate to one or more of the Employer's officers, employees, committees, or agents, or to any other person or organization, any of its fiduciary and/or ministerial powers, duties, and responsibilities with respect to the operation and administration of the Plan…." 2011 Plan Document, § 15.3. The Plan stated that "[t]he Plan Administrator, or its delegate, will make available investment options under the Plan other than the Company Stock Fund ("Non-ESOP Investment Funds"). The Non-ESOP Investment Funds will be selected and removed from time to time by the Plan Administrator and communicated to the Participants." *Id.* § 8.1(3).

---

[8] *Meeting Your Fiduciary Responsibilities*, EBSA ("Hiring a service provider in and of itself is a fiduciary function."). http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (last visited July 28, 2016).

124.   Under the heading "Administration of the Plan," the SPD indicates that "[t]he Benefit Plan Investment Committee has authority and responsibility for functions related to the investment funds and Trusts associated with the Plan." 2013 SPD, at 57. Under the subheading "Delegation of Duties," the SPD indicates that "[t]he Benefit Plan Investment Committee, or its delegates (which may include committees or individuals), chooses the Plan's investment funds, investment managers and Trustees and is responsible for certain other related functions." *Id.*

125.   It is not entirely clear from the documents available to Plaintiffs which Defendant or Defendants had primary authority for selecting the Plan's recordkeeper, negotiating a fee agreement on behalf of the Plan with potential recordkeepers, selecting Financial Engines or selecting Fidelity's BrokerageLink service. The Plan documents designate AT&T Services as the Plan Administrator and as a Named Fiduciary with respect to the general administration of the Plan. However, AT&T Services delegates much or all its authority with respect to the Plans to the Committee, to the AT&T Investment Management Committee (which was created by the Committee), and to one of its officers. Each of these delegatees, however, acted *on behalf of* AT&T Services. Thus either (1) the members of the Committee and other delegatees functioned as agents of AT&T Services such that AT&T Services had primarily fiduciary responsibility at all times, or (2) AT&T Services delegated primary fiduciary responsibility to the delegatees, and only retained fiduciary duties with respect to the appointment, monitoring and removal of the delegatees. Either way, though, AT&T Services and the delegatees had actual or de facto discretionary control and authority over the Plan and its assets. As such, AT&T Services and the delegatees, including the members of the Committee, are ERISA fiduciaries for the Plan by virtue of their discretionary authority and control over the Plan and its assets.

126.   AT&T was and is the Plan's sponsor, and the ultimate corporate parent of AT&T Services, which was AT&T's wholly owned subsidiary. AT&T, through its Board of Directors, was responsible for the appointment of its Chief Financial Officer. The Chief Financial Officer created the Committee and determined which officers, by title, would sit on the Committee. AT&T, through its Board of Directors, was also responsible for the appointment of the officers who, by virtue of their title, became members of the Committee. As the sole shareholder of AT&T Services, AT&T also

exercised complete control over the management and operation of AT&T Services, including the appointment of AT&T Services officers and employees responsible for fulfilling AT&T Services' responsibilities with respect to the Plan. All the other Defendants acted as agents of AT&T on behalf of AT&T in exercising their discretionary authority with respect to the Plan, thus any fiduciary responsibility possessed by the other Defendants was exercised in the name of and for the benefit of AT&T, making AT&T a fiduciary with respect to ERISA. At the very least, AT&T's responsibility for the appointment of the other Defendants and control over AT&T Services left AT&T with fiduciary duties with respect to the appointment, monitoring and removal of the other Defendants.

127.   In addition, as alleged above, AT&T itself, through its senior management, selected Fidelity as the recordkeeper for the Plan and participated in the negotiation of the Plan's agreement with Fidelity. Thus AT&T itself is a de facto fiduciary with respect to the selection of Fidelity and the negotiation of the Plan's agreement with Fidelity.

## CLASS ACTION ALLEGATIONS

128.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), or, in the alternative, 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons (the Class):

> All participants in and beneficiaries of the AT&T Retirement Savings Plan at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breach, the first date on which BrokerageLink was offered to Plan participants, and in either case, through the date of judgment.

129.   The members of the class are so numerous that joinder of all members is impracticable. At all relevant times, the number of class members was two hundred thousand or more.

130.   Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among such questions are:

    i.   Whether Defendants failed in their fiduciary duties with respect to the administration, management and supervision of recordkeeping and bookkeeping providers;

    ii.   Whether Defendants failed in their fiduciary duties to act as prudent financial managers and to minimize plan administrative fees and investment option operating expenses;

    iii.   Whether the operating expenses charged, collected and negotiated in connection with the Plan investment options were reasonable;

    iv.   Whether the annual notices on fees made adequate disclosure; and,

    v.   Whether Defendants' breaches of fiduciary duties caused losses to the Plan and its participants, and if so, in what amount.

131.   There are no substantial individual questions among Class members on the merits of this action.

132.   Plaintiffs' claims are typical of the members of the Class.

133.   Plaintiffs have been injured by the alleged breaches of fiduciary duties and is committed to fairly, adequately and vigorously representing and protecting the interests of Class members.

134.   Plaintiffs have retained counsel who are experienced in class action litigation.

135.   Neither Plaintiffs, nor their counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

136.   Plaintiffs are adequate class representatives.

137.   Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

138.   In the alternative, class certification is also appropriate under Fed. R. Civ. Pro. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class.

139.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    Defendants have injured Plaintiffs and the members of the Class by diminishing their investment returns.  The diminution of returns and excessive fees are relatively small for each individual, but large in the aggregate.    Individual participants have an insufficient stake in the outcome of this matter to devote substantial resources to pursue it so only through a class action mechanism can their claims be effectively pursued.

140.    On information and belief, the names and addresses of all Class members are available through Defendants, and adequate notice can be provided to Class members as required by Fed. R. Civ. Pro. 23.

**COUNT I**
**Breaches of Fiduciary Duties of Prudence and Candor and Prohibited Transactions**
**ERISA §§ 404(a); 29 U.S.C. §§ 1104(a)**
**All Defendants**

141.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

142.    ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently and loyally, in particular, "solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and "(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

143.    ERISA § 406(b)(1) supplements the general duty of loyalty, and provides that "A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

144.    As alleged above, Defendants were express and/or de facto fiduciaries with respect to selecting Fidelity as the Plan's recordkeeper, negotiating the terms of the Plan's recordkeeper's service, including the fees paid to Fidelity, and annually monitoring the aggregate amount of

compensation being paid to the Plan's recordkeeper, taking into account all direct and indirect compensation being received by Fidelity.

145.   Defendants imprudently failed to design or implement a process to evaluate or control the administrative expenses that the Plan's participants paid to the Plan's recordkeeper, and imprudently failed to analyze and evaluate compensation paid to Fidelity from Financial Engines and investment through BrokerageLink.

146.   Defendants' failures resulted in the Plan participants paying grossly excessive fees to Fidelity based on the size of the Plan, the nature of the services provided by the recordkeeper, and the ready availability of comparable but less expensive services from other providers in the marketplace.

147.   Defendants were obligated to report on Form 5500 all direct and indirect compensation received by Fidelity in connection with the provision of recordkeeping and administrative services but failed to do so.   Instead, Defendants erroneously and misleadingly reported that all of Fidelity's indirect compensation was "eligible indirect compensation; a report that is demonstrably false.

148.   Defendants thereby violated the duty of candor contained in ERISA § 404(a) and recognized by numerous federal courts.

149.   In addition, Defendants' conduct described above violated the co-fiduciary duties set forth in ERISA § 405(a).

150.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties must "make good" to the plan the losses to the plan resulting from its violations of ERISA and is "subject to such other equitable or remedial relief as the court may deem appropriate."

151.   Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA §§ 404(a) and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**COUNT II**
**Prohibited Transactions**
**ERISA § 406(a), 29 U.S.C. § 1106(a)**
**All Defendants**

152.   Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

153.   ERISA § 406(a) categorically prohibits certain transactions between plans and parties in interest. In particular, "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(C) furnishing of goods, services, or facilities between the plan and a party in interest."

154.   Fidelity and Financial Engines were and are parties in interest as that term is used in ERISA § 3(14); 29 U.S.C. § 1002(14) and are providing services to the Plan. Defendants are all fiduciaries, and in that capacity are parties in interest under § 3(14)(A). AT&T is also "an employer any of whose employees are covered by such plan," and is as such a party in interest under § 3(14)(C). AT&T Services is a wholly owned subsidiary of AT&T and is a party in interest under § 3(14)(G). Fidelity is "a person providing services to such plan" and party in interest under § 3(14)(B).

155.   Defendants, as "responsible plan fiduciaries" as that term is defined in 29 C.F.R. 408b-2(c), were legally obligated as of July 31, 2012 to obtain from Fidelity detailed disclosures regarding all the services Fidelity was providing and all direct and indirect compensation Fidelity expected to receive in connection with those services and to affirmatively determine that the aggregate compensation Fidelity would receive was reasonable in relation to the services being provided. Defendants failed to obtain the disclosures required by 29 C.F.R. § 2550.408b-2(c) that were necessary to ensure that the services agreement with Fidelity met the conditions of ERISA section 408(b)(2) and failed to take into account the millions of dollars of additional compensation Fidelity was receiving from Financial Engines and through BrokerageLink, thereby causing the Plan to engage in a non-exempt prohibited transaction prohibited by ERISA § 406(a)(1).

156.   In addition, Defendants' conduct described above violated the co-fiduciary duties set forth in ERISA § 405(a).

157.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties must "make good" to the plan the losses to the plan resulting from its violations of ERISA and is "subject to such other equitable or remedial relief as the court may deem appropriate."

158.   Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 406(a)(1) and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

### COUNT III
**Breaches of Fiduciary Duties of Prudence and Candor and Self-Dealing Prohibited Transactions**
**ERISA §§ 404(a), 406(b)(1); 29 U.S.C. §§ 1104(a) & 1106(b)(1)**
**All Defendants**

159.   Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

160.   ERISA § 406(b)(1) supplements the general duty of loyalty, and provides that "A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

161.   Defendants disloyally entered into an arrangement with Fidelity that increased the costs of the Plan's recordkeeping services while saving AT&T money on the administration of other plans and programs.

162.   Defendants' failures resulted in the Plan participants paying grossly excessive fees to Fidelity based on the size of the Plan, the nature of the services provided by the recordkeeper, and the ready availability of comparable but less expensive services from other providers in the marketplace.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A.   Certify this action as a class action and appoint Plaintiffs' counsel as class counsel pursuant to F. R. Civ. Pro.23;

B.   Declare that Defendants have breached their fiduciary duties to the Class;

C.   Enjoin Defendants from further violations of their fiduciary responsibilities, duties and obligations under ERISA;

D.   Require that Defendants provide enhanced disclosures regarding revenue sharing;

---

E.     Order that Defendants make good to the Plan all losses resulting from their breaches of fiduciary duties;

F.     Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duties;

G.     Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. 1132(g), and/or for the benefit obtained for the common fund;

H.     Order Defendants to pay pre-judgment interest; and,

I.     Award such other and further relief as the Court deems just.

DATED: July 30, 2018                    Respectfully submitted,

                    By:  */s/ James A. Bloom*
                           Todd M. Schneider (SBN: 158253)
                           Jason H. Kim (SBN: 220279)
                           Kyle G. Bates (SBN: 299114)
                           James A. Bloom (SBN: 311051)
                           SCHNEIDER WALLACE COTTRELL
                           KONECKY WOTKYNS LLP
                           2000 Powell Street, Suite 1400
                           Emeryville, California 94608
                           Telephone: (415) 421-7100
                           Facsimile: (415) 421-7105
                           tschneider@schneiderwallace.com
                           jkim@schneiderwallace.com
                           kbates@schneiderwallace.com
                           jbloom@schneiderwallace.com

                           Garrett W. Wotkyns (*Pro Hac Vice*)
                           John J. Nestico *
                           SCHNEIDER WALLACE COTTRELL
                           KONECKY WOTKYNS LLP
                           8501 N. Scottsdale Rd., Suite 270
                           Scottsdale, Arizona 85253
                           Telephone: (480) 315-3841
                           Facsimile: (866) 505-8036
                           gwotkyns@schneiderwallace.com
                           jnestico@schneiderwallace.com

                           Todd S. Collins (*Pro Hac Vice*)
                           Ellen T. Noteware (*Pro Hac Vice*)
                           BERGER & MONTAGUE, P.C.

---

1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
enoteware@bm.net

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles. California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*

*(Pro Hac Vice Application forthcoming)*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for United States District Court, Central District of California, by using the Court's CM/ECF system on July 30, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system. Certain defendants named in this amended complaint who were not previously named as defendants will be served separately.


*/s/ James A. Bloom*
James A. Bloom