MAYER BROWN LLP
Nancy G. Ross (*pro hac vice*)
*nross@mayerbrown.com*
Brian D. Netter (*pro hac vice*)
*bnetter@mayerbrown.com*
Jed W. Glickstein (*pro hac vice*)
*jglickstein@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
(312) 701-7711 – Facsimile

John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500
(213) 625-0248 – Facsimile

Attorneys for Defendants
AT&T Inc. and AT&T Services, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO C. ALAS, ROBERT J. BUGIELSKI, and CHAD S. SIMECEK, individually as participants in the AT&T Retirement Savings Plan and as representatives of all persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T INC., AT&T SERVICES, INC., and John Does 1-50,<br><br>Defendants. | Case No. 2:17-cv-8106-VAP-RAO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS COMPLAINT**<br><br>Date: October 22, 2018<br>Time: 2:00 p.m.<br>Place: Courtroom 8A<br><br>Judge: Hon. Virginia A. Phillips |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

BACKGROUND ........................................................................................... 1

    A.    Recordkeeping Fees ..................................................................... 1

    B.    BrokerageLink .............................................................................. 2

    C.    Financial Engines ........................................................................ 3

    D.    Form 5500 Disclosures ................................................................ 4

LEGAL STANDARD ................................................................................... 4

ARGUMENT ................................................................................................. 5

I.    Plaintiffs Lack Standing For Two Of Their Claims ............................ 5

    A.    Plaintiffs Lack Standing With Respect To BrokerageLink ............... 6

    B.    Plaintiffs Lack Standing With Respect To The Form 5500 ............. 7

II.    The BrokerageLink Claim Is Time-Barred ....................................... 8

III.    Plaintiffs Fail To State A Claim ....................................................... 10

    A.    Plaintiffs Fail To Allege A Breach Of The Duty Of Prudence ......... 10

        1.    Plaintiffs' Allegations About Recordkeeping Expenses ......... 11

        2.    Plaintiffs' Allegations About BrokerageLink ........................ 14

        3.    Plaintiffs' Allegations About Financial Engines .................... 17

    B.    Plaintiffs Fail To Allege A Breach Of The Duty Of Loyalty ............ 18

    C.    Plaintiffs Fail To Allege A Breach Of The Duty Of Candor ............ 19

    D.    Plaintiffs Fail To Allege A Prohibited Transaction ......................... 21

IV.    AT&T Inc. And The John Does Should Be Dismissed ...................... 21

    A.    AT&T Inc. Is Not An Appropriate Defendant ................................ 22

        1.    Power To Appoint BPIC .................................................... 22

        2.    *Respondeat Superior* And *De Facto* Fiduciary ..................... 23

    B.    The John Doe Defendants Are Not Appropriate Defendants ........... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ackerman v. Warnaco, Inc.*,
   55 F.3d 117 (3d Cir. 1995) ..................................................................20

*Glanton ex rel. ALCOA Prescription Drug Plan v. Advance PCS Inc.*,
   465 F.3d 1123 (9th Cir. 2006) .............................................................. 7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................. 5

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Cont'l Food Prods.*,
   2014 WL 7240264 (D. Md. Dec. 16, 2014) ..........................................25

*In Re Calpine Corp. ERISA Litig.*,
   2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ...............................22, 23

*Cataldo v. U.S. Steel Corp.*,
   676 F.3d 542 (6th Cir. 2012) ...............................................................24

*Cervantes v. Countrywide Home Loans, Inc.*,
   656 F.3d 1034 (9th Cir. 2011) ............................................................. 8

*CIGNA Corp. v. Amara*,
   563 U.S. 421 (2011) .............................................................................22

*In re Citigroup ERISA Litig.*,
   2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009) ...................................24

*In re Computer Scis. Corp. ERISA Litig.*,
   635 F. Supp. 2d 1128 (C.D. Cal. 2009).........................................22, 23

*Cyr v. Reliance Std. Life Ins. Co.*,
   642 F.3d 1202 (9th Cir. 2011) (en banc)..............................................25

*David v. Alphin*,
   817 F. Supp. 2d 764 (W.D.N.C. 2011)................................................. 9

-ii-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

# TABLE OF AUTHORITIES

**Page(s)**

1

**Cases**

2

3

*Divane v. Northwestern Univ.*,
2018 WL 2388118 (N.D. Ill. May 25, 2018) ..................................... 12

4

5

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) ............................................................ 10

6

7

*Fifth Third Bancorp v. Dudenhoeffer*,
134 S. Ct. 2459 (2014) ....................................................................... 10

8

9

*Gale v. EIX Severance Plan*,
2015 WL 93441 (C.D. Cal. Jan. 7, 2015).......................................... 22

10

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) .............................................................. 25

11

12

*Griggs v. Pace American Grp., Inc.*,
170 F.3d 877 (9th Cir. 1999)............................................................... 25

13

14

*Harris v. Amgen, Inc.*,
2010 WL 11436373 (C.D. Cal. June 18, 2010)................................... 24

15

16

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009)................................................. 11, 16, 18

17

18

*Horvath v. Keystone Health Plan East, Inc.*,
333 F.3d 450 (3d Cir. 2003) ................................................................ 6

19

20

*In re Ins. Brokerage Antitrust Litig.*,
2008 WL 141498 (D.N.J. Jan. 14, 2008) ........................................... 20

21

22

*Jacobs v. Verizon Commc'ns, Inc.*,
2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017) ................................... 20

23

*In re JDS Uniphase Corp. ERISA Litig.*,
2005 WL 1662131 (N.D. Cal. 2005).................................................. 22

24

25

*Koslof v. Smith*,
2015 WL 4429169 (D. Kan. July 20, 2015) ......................................... 8

26

27

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
129 F. Supp. 3d 4 (S.D.N.Y. 2015) ..................................................... 9

28

-iii-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Lee v. Oregon*,
  107 F.3d 1382 (9th Cir. 1997) ............................................................... 6

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ................................................................ 15

*Marshall v. Northrop Grumman Corp.*,
  2017 WL 2930839 (C.D. Cal. Jan. 30, 2017) ................................... 3, 22

*In re McKesson HBOC, Inc.*,
  2005 WL 3176278 (N.D. Cal. Sept. 9, 2005) ...................................... 18

*Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*,
  856 F.2d 1418 (9th Cir. 1988) ................................................................ 8

*Meiners v. Wells Fargo & Co.*,
  — F.3d —, 2018 WL 3685525 (8th Cir. Aug. 3, 2018) ............... 12, 19

*Monper v. Boeing Co.*,
  104 F. Supp. 3d 1170 (W.D. Wash. 2015) ........................................... 24

*Multistar Indus., Inc. v. U.S. Dep't of Transp.*,
  707 F.3d 1045 (9th Cir. 2013) ................................................................ 6

*In re Northrop Grumman Corp. ERISA Litig.*,
  2015 WL 10433713 (C.D. Cal. Nov. 24, 2015) ..................................... 9

*Novak v. United States*,
  795 F.3d 1012 (9th Cir. 2015) ................................................................ 5

*Pappas v. Buck Consultants, Inc.*,
  1989 WL 157517 (N.D. Ill. Dec. 12, 1989) ........................................ 20

*Patrico v. Voya Fin., Inc.*,
  2017 WL 2684065 (S.D.N.Y. June 20, 2017) ....................................... 3

*Raypath, Inc. v. City of Anchorage*,
  544 F.2d 1019 (9th Cir. 1976) ............................................................. 20

-iv-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Scott v. AON Hewitt*,
2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) ........................................................ 4

*Shirk v. Fifth Third Bancorp*,
2009 WL 3150303 (S.D. Ohio Sept. 30, 2009) .................................................. 8, 9

*Spinedex Physical Therapy USA v. United Healthcare*,
770 F.3d 1282 (9th Cir. 2014) ............................................................................ 24

*Spokeo, Inc. v. Robbins*,
136 S. Ct. 1540 (2016) ..................................................................................... 5, 7

*Sweda v. Univ. of Pa.*,
2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) ..................................................... 21

*Taveras v. UBS AG*,
513 F. App'x 19 (2d Cir. 2013) ......................................................................... 19

*Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*,
741 F.3d 819 (7th Cir. 2014) ............................................................................ 20

*Tibble v. Edison Int'l*,
639 F. Supp. 2d 1074 (C.D. Cal. 2009) ............................................................ 19

*Tibble v. Edison Int'l*,
729 F.3d 1110 (9th Cir. 2013) .......................................................................... 12

*Tool v. Nat'l Emp. Ben. Servs., Inc.*,
957 F. Supp. 1114 (N.D. Cal. 1996) .................................................................. 24

*White v. Chevron Corp.*,
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...................................... 13, 14, 23

*White v. Chevron Corp.*,
2017 WL 2352137 (N.D. Cal. May 31, 2017) ............................................ *passim*

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) .......................................................................... 22

*Yameen v. Eaton Vance Distribs., Inc.*,
394 F. Supp. 2d 350 (D. Mass. 2005) ............................................................... 17

-v-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
      325 F. App'x 31 (2d Cir. 2009) ................................................................. 11, 12

**Statutes**

29 U.S.C. § 1104(a)(1) ......................................................................................... 10

29 U.S.C. § 1106(a)(1)(C) ................................................................................... 21

29 U.S.C. § 1113 ..................................................................................................... 8

ERISA § 406(a)(1)(C) ........................................................................................... 21

ERISA § 502(a)(1)(A) ........................................................................................... 20

**Other Authorities**

29 C.F.R. § 2550.408b-2 ....................................................................................... 21

*Request for Information Regarding Standards for Brokerage Windows
      in Participant-Directed Individual Account Plans*, 79 Fed. Reg.
      49469, 49470 (Aug. 21, 2014) ...................................................................... 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

1

## __INTRODUCTION__

2     This is Plaintiffs' third run at attempting to state a claim against Defendants.

3  Plaintiffs filed their original Complaint in November 2017. Dkt. 1 ("Compl.").

4  Faced with a motion to dismiss, Plaintiffs withdrew their claims against AT&T

5  Services and filed a First Amended Complaint alleging a new set of legal theories.

6  Dkt. 51 ("FAC"). On July 18, 2018, the Court dismissed the FAC with leave to

7  amend. Dkt. 67. Plaintiffs have now filed a Second Amended Complaint, inventing

8  a new set of grievances yet again. Dkt. 68 ("SAC"). But the SAC's shifting

9  allegations simply confirm that Plaintiffs' claims are—like their old claims—

10  entirely meritless. The SAC continues to suffer from myriad flaws, including

11  standing defects, a statute of limitations bar, and failure to state a claim on the

12  merits. Because Plaintiffs still cannot state a viable claim under ERISA, the Court

13  should dismiss this case in its entirety and without leave to replead.

14

## __BACKGROUND__

15     The Court is familiar with Plaintiffs' core theories from the prior pleadings

16  and briefing papers and its July 18, 2018 Order. We therefore focus below on those

17  areas where Plaintiffs have changed, deleted, or supplemented their allegations

18  from the FAC.

19     **A.    Recordkeeping Fees**

20     Plaintiffs allege that Defendants breached their fiduciary duty by causing the

21  Plan to pay purportedly higher expenses for recordkeeping and administrative

22  services than other similar plans. SAC ¶¶ 41-69. Specifically, Plaintiffs allege

23  Defendants paid on average $61 per participant per year for recordkeeping even

24  though other plans paid "roughly $30" for supposedly comparable (but entirely

25  unexplained) recordkeeping services. *Id*. ¶¶ 52-53.

26     Plaintiffs attempt to bolster these skeletal allegations with Form 5500s filed

27  for plans other than the Plan. SAC ¶ 54. Plaintiffs do not attach these filings to

28

-1-

1    their pleading, but the numbers they allege from these forms directly undercut their
2    contention that large plans should pay "no more than roughly $30 per participant"
3    for recordkeeping services. *Id*. ¶ 53. For example, Plaintiffs allege that the Costco
4    401(k) plan paid $38 per participant in recordkeeping fees in 2016 and $35 per
5    participant in recordkeeping fees in 2017. *Id*. ¶ 54. The SAC also adds allegations
6    that "[t]he reasonableness of record-keeping and administrative fees is not static"
7    and that the "standard of care" for fiduciaries is to "periodically solicit formal
8    bids" for recordkeeping. *Id*. ¶¶ 56-57. Plaintiffs say there is "no indication" that
9    Defendants solicited recordkeeping bids—an assertion apparently based solely on
10   the allegation that the Plan engaged Fidelity during the "relevant period" and that,
11   during this time, "total direct compensation" to Fidelity has remained about the
12   same. *Id*. ¶ 58.

13       **B.     BrokerageLink**

14       BrokerageLink is Fidelity's self-directed brokerage account option offered
15   to Plan participants who desire greater control over their retirement investments.
16   SAC ¶ 77. Sophisticated investors who wish to select investments themselves
17   rather than choose from the Plan's designated investment alternatives can use
18   BrokerageLink to invest their retirement funds from thousands of individual
19   securities and mutual funds, as if they were investing using a retail brokerage
20   account. Previously, Plaintiffs alleged that Defendants breached their fiduciary
21   duty by allowing BrokerageLink to offer both higher-priced "retail" shares and
22   lower-priced "institutional" shares of certain mutual funds, and accused
23   Defendants of failing to educate participants about the supposed "traps" that were
24   "inherent" in the program. FAC ¶ 93. In its July 18, 2018 Order, however, this
25   Court held that Plaintiffs lacked standing to challenge the BrokerageLink option
26   because no Plaintiff allegedly used BrokerageLink to invest in the supposedly
27   more expensive retail shares of mutual funds. Dkt. 67 at 9-11.

28

Plaintiffs now flatly admit that this is true: Plaintiff Bugielski "*did not acquire shares of [any] mutual funds*" through BrokerageLink whatsoever. SAC ¶ 77 (emphasis added). But, they say, Bugielski did use BrokerageLink to "acquir[e] the securities of individual companies," and in doing so, he was charged $732 in transaction fees over the past three-and-a-half years. *Id*. The SAC does not allege how many trades Bugielski made during this period or what the transaction fees were for each trade. But, in a conclusory and hard-to-follow fashion, Plaintiffs allege that Bugielski's fees were "clearly excessive" (*id*.) and that the Plan should have required Fidelity to "offset" its transaction and other fees to reflect the payments Fidelity supposedly received when other participants purchased retail shares of unspecified mutual funds through BrokerageLink. *Id*. ¶ 86, 89, 93.

## C.    Financial Engines

Financial Engines provides investment-advice and account-management services to Plan participants. SAC ¶ 96. As other courts have explained, this advice takes two forms: automated guidance, which is available on the Internet, and for which plans pay a fixed subscription fee; and individualized guidance, for which participants pay an additional fee. *Patrico v. Voya Fin., Inc.*, 2017 WL 2684065, at *1-3 (S.D.N.Y. June 20, 2017); *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839, at *9 (C.D. Cal. Jan. 30, 2017); *see also* SAC ¶ 96 (Financial Engines "effectively assume[s] the investment management of an individual's plan account" and "periodically re-balances a participant's asset allocation").

Financial Engines makes payments to Fidelity in connection with providing this service. *Id*. ¶ 98. Previously, Plaintiffs alleged that the payments from Financial Engines to Fidelity constituted a "kick back" because Fidelity purportedly "provides no material service to Financial Engines." FAC ¶ 61. Defendants explained that this allegation was nonsense; to provide individual investment advice and to manage individual investment accounts, Financial

-3-

1   Engines must securely access and interface with individualized participant
2   information stored on Fidelity's systems, and the recordkeeper requires
3   compensation to enable this access. Dkt. 54-1 at 15. As courts recognize, Financial
4   Engines must sign a "separate contract with the plan record keepers . . . to connect
5   with and utilize [their] proprietary recordkeeping systems." *Scott v. AON Hewitt*,
6   2018 WL 1384300, at *5 (N.D. Ill. Mar. 19, 2018).

7          Plaintiffs now admit that their allegations about Financial Engines were
8   wrong. Implicitly repudiating their previous contentions to the Court that Fidelity
9   "provided no material service" and thus "got something for nothing" (Dkt. 58 at
10   22-23), Plaintiffs concede, as they must, that Financial Engines requires "access to
11   participants' accounts through a secure communications link" from Fidelity. SAC
12   ¶ 98. But, pivoting once more, Plaintiffs allege that Financial Engine pays Fidelity
13   too much for the data services it receives. *Id*. ¶ 99. Plaintiffs do not allege that
14   Defendants had any role in negotiating Financial Engines' arrangement with
15   Fidelity. Defendants' only alleged involvement was in selecting Financial Engines
16   to provide advice for participants. *Id*. ¶ 44.

17          **D.    Form 5500 Disclosures**

18          Plaintiffs add new allegations to the SAC regarding the Plan's Form 5500s
19   filed with the Department of Labor. As the Court knows, ERISA requires
20   retirement plans to file annual Form 5500s with data about the plans' participants,
21   assets, service providers, and so forth. Plaintiffs state that they were unaware of the
22   Form 5500s prior to filing the SAC. SAC ¶ 104. They further contend that the
23   Plan's Form 5500s "falsely report" details about Fidelity's compensation. *Id*.
24   ¶¶ 107-08. Seeing as Plaintiffs allegedly did not review these filings prior to filing
25   the lawsuit, they naturally do not allege that they relied upon them in any respect.

26                            **LEGAL STANDARD**

27          This motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(1)

28

and (6). Under Rule 12(b)(1), the Court "accept[s] as true all material allegations of the complaint, and construe[s] the complaint in favor of the complaining party." *Novak v. United States*, 795 F.3d 1012, 1017 (9th Cir. 2015). On a motion to dismiss under Rule 12(b)(6), the Court asks whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all well-pleaded factual allegations as true, but need not credit "legal conclusion[s]" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* Moreover, a complaint that "pleads facts that are 'merely consistent with' a defendant's liability" does not state a plausible claim. *Id.*

<u>**ARGUMENT**</u>

The SAC asserts three causes of action based on a variety of legal and factual theories. Count I is captioned "breaches of fiduciary duties of prudence and candor and prohibited transactions"—although it does not mention any prohibited transactions. SAC at 29. Count II is captioned "prohibited transactions." SAC at 30. Count III is captioned "breaches of fiduciary duties of prudence and candor and self-dealing prohibited transactions"—although it focuses only on the fiduciary duty of loyalty. *Id.* at 32. Not only are Plaintiffs' claims difficult to follow, they fail to state a claim.

## I.  PLAINTIFFS LACK STANDING FOR TWO OF THEIR CLAIMS

Standing involves three "irreducible" elements: (1) an injury-in-fact that is (2) fairly traceable to the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs "bea[r] the burden of establishing these elements" and "must 'clearly . . . allege facts demonstrating' each element." *Id.*

As we describe below, Plaintiffs lack standing with respect to both BrokerageLink and their novel duty of candor claim.

## A.   Plaintiffs Lack Standing With Respect To BrokerageLink

This Court previously dismissed Plaintiffs' BrokerageLink claims after concluding that Bugielski, the only Plaintiff who allegedly used BrokerageLink, failed to demonstrate that he had standing to bring the claim. Dkt. 67 at 10. The Court "agree[d]" that the "lack of allegations that any named Plaintiffs invested in a retail share of a mutual fund for which institutional shares were supposedly available" was "fatal" to the BrokerageLink claim. *Id.* at 9. In the SAC, Plaintiffs acknowledge that Bugielski's BrokerageLink investments consisted only of individual stocks—and not of mutual funds. SAC ¶ 77.

Plaintiffs' new attempt at demonstrating standing in the SAC does not satisfy Article III either. Bugielski has no concrete injury that is fairly traceable to Defendants and that can be redressed by this Court. To create standing, the plaintiff must allege an injury that is "actual or imminent, not conjectural or hypothetical." Dkt. 67 at 9 (citing *Multistar Indus., Inc. v. U.S. Dep't of Transp.*, 707 F.3d 1045, 1054 (9th Cir. 2013)). The Ninth Circuit has "repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies." *Lee v. Oregon*, 107 F.3d 1382, 1389 (9th Cir. 1997).

Here, Plaintiffs do not allege that Bugielski actually suffered a direct injury from the BrokerageLink program; their theory is that he *might* have benefited from a workaround to cure the injuries of others. But that theory is entirely speculative. Plaintiffs would need to be able to demonstrate that Fidelity would have been *required* to reduce fees paid by stock traders to compensate for excessive mutual fund fees. Yet Plaintiffs' causal chain is far from compulsory; it appears to be pulled out of thin air. *Cf. Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (holding that the plaintiff lacked standing to bring ERISA claims based on the "far too speculative" allegations that a firm "would have passed th[e] savings" from alleged overpayments "on to its employees").

1    Indeed, given Plaintiffs' allegation that Defendants breached their fiduciary

2    duty by failing to offer institutional shares through BrokerageLink (*see* SAC ¶¶ 84,

3    86, 95), it would seem that the remedy for any breach would be to require

4    institutional shares, which, Plaintiffs say, "do not make any revenue sharing

5    payments" or "make lower revenue sharing payments than for retail shares." *Id.*

6    ¶ 83. If Defendants were to force Fidelity to offer only institutional share classes

7    through BrokerageLink, therefore, it would result in *less* purported revenue sharing

8    with which to supposedly "offset" fees. Thus, a finding that Defendants breached

9    their fiduciary duty by including retail shares from BrokerageLink would not help

10   Bugielski or redress his manufactured injury.

11   In short, Plaintiffs' faulty logic means that Bugielski cannot demonstrate, as

12   he must, that his transaction fees would have been lower but for the alleged breach.

13   Plaintiffs therefore have not pleaded any "concrete stake in the outcome of the

14   proceedings" with respect to the BrokerageLink claim, and that claim must be

15   dismissed. Dkt. 67 at 10 (quoting *Glanton ex rel. ALCOA Prescription Drug Plan*

16   *v. Advance PCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006)).

17   **B.    Plaintiffs Lack Standing With Respect To The Form 5500**

18   Plaintiffs also lack standing to challenge the purportedly inaccurate

19   disclosures on the Plan's Form 5500s. The Supreme Court has held that a plaintiff

20   cannot show standing by alleging a "bare procedural violation." *Spokeo*, 136 S. Ct.

21   at 1550. Thus, even where Congress has specifically authorized a litigant to sue for

22   a procedural violation—which Congress has not done with respect to Form 5500 or

23   other government reporting obligations—the mere fact that information is not

24   "entirely accurate" is insufficient to demonstrate "any material risk of harm." *Id.*

25   Here, Plaintiffs do not contend that the supposed inaccuracies on the Form

26   5500s harmed them in any concrete way. They claim only that the supposed

27   misstatement "served to conceal from Plaintiffs the full amount of Fidelity's

28

-7-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

1   compensation." SAC ¶ 117. That allegation is insufficient. As discussed above,

2   Plaintiffs "have no legally protected interest in [the] plan's Form 5500," and

3   therefore Plaintiffs "lack standing" to bring a claim of breach of fiduciary duty

4   predicated on a supposed misstatement. *Koslof v. Smith*, 2015 WL 4429169, at \*4

5   n.3 (D. Kan. July 20, 2015).

6          Even if they had a legally protected interest in the Form 5500s, Plaintiffs do

7   not plausibly suggest that the disclosures on the Form concealed material

8   information or caused them material harm. Plaintiffs do not dispute that

9   Defendants accurately disclosed the direct compensation and total indirect

10  compensation paid to Fidelity. SAC ¶ 107. They merely claim that Defendants

11  mischaracterized *certain* indirect compensation to Fidelity as "eligible" rather than

12  "non-eligible," as that term is used in Form 5500. *Id.* ¶¶ 108-10. Plaintiffs do not

13  and cannot explain how this technicality caused them concrete injury. That is

14  especially true because, as the SAC expressly alleges, Plaintiffs *did not see* the

15  Form 5500s prior to filing their complaint. *Id.* ¶ 20-22.

16  **II.     THE BROKERAGELINK CLAIM IS TIME-BARRED**

17         A court may dismiss a claim "[i]f the running of the statute [of limitations] is

18  apparent on the face of the complaint." *Cervantes v. Countrywide Home Loans,*

19  *Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011). Under ERISA, a litigant must bring a

20  claim for breach of fiduciary duty no more than three years after the litigant

21  becomes aware of the alleged violation. 29 U.S.C. § 1113. This period is triggered

22  by a litigant's "knowledge of the transaction that constituted the alleged violation,

23  not by [his] knowledge of the law." *Meagher v. Int'l Ass'n of Machinists &*

24  *Aerospace Workers Pension Plan*, 856 F.2d 1418, 1423 (9th Cir. 1988).

25         ERISA's knowledge standard is objective. It focuses on "whether documents

26  provided to participants sufficiently disclosed the alleged breach of fiduciary duty,

27  not whether the individual plaintiffs actually saw or read the documents." *Shirk v.*

28

-8-

*Fifth Third Bancorp*, 2009 WL 3150303, at *3 (S.D. Ohio Sept. 30, 2009). Thus, "actual knowledge runs from the date that documents were provided, or made available, to Plan Participants disclosing the facts underlying the alleged breach of fiduciary duty." *Id*. A plaintiff does not need to know "what prudent fiduciaries could have negotiated" or that particular fees were "unnecessary" or "excessive." *In re Northrop Grumman Corp. ERISA Litig*., 2015 WL 10433713, at *19 (C.D. Cal. Nov. 24, 2015). Here, there is no question that Plaintiffs had actual knowledge of the facts underlying the BrokerageLink claim over three years before the FAC was filed on March 27, 2018.[1]

Bugielski's claim challenges the mere availability of certain investment options through BrokerageLink as well as the transaction fees he allegedly paid while using it. The August 2013 SPD provided to Plan participants—and on which Plaintiffs expressly base their claims (SAC ¶¶ 59, 122)—states that participants can use BrokerageLink to purchase a variety of securities, including mutual funds, which are the focus of Plaintiffs' claims. Dkt. 33-1, Ex. A at 36. The 2013 SPD also states that there are "additional fees" for investing in a BrokerageLink account, disclosed on the Plan's fact sheet, including "fees associated with establishing, using and making trades, including any investment and commission fees." *Id*. Finally, Bugielski affirmatively alleges that he has participated in the Plan since 1994 (SAC ¶ 21); that he has invested through BrokerageLink for "many years" (*id*. ¶ 77); and that he has paid transaction fees for at least the "past three and a half years" (*i.e.*, at least since January 2015). *Id*.

In sum, Bugielski had actual knowledge of the availability of the product he challenges by 2013 and—even assuming his claim is dependent on transaction fees—he incurred and had knowledge of those fees by at least January 2015 (likely

---

[1] The BrokerageLink claim does not relate back to the filing of the original Complaint because that pleading did not mention the BrokerageLink theory. *See Leber v. Citigroup 401(k) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 19-20 (S.D.N.Y. 2015)); *David v. Alphin*, 817 F. Supp. 2d 764, 782-83 (W.D.N.C. 2011).

-9-

1   earlier). Plaintiffs' claim is thus indisputably time-barred.[2]

2   **III.   PLAINTIFFS FAIL TO STATE A CLAIM**

3       Setting aside the standing and limitations deficiencies, the SAC fails to state

4   a claim on the merits. As the Supreme Court has recognized, a motion to dismiss is

5   an "important mechanism" for "weeding out meritless claims" in ERISA cases and

6   courts should give "careful judicial consideration" to whether the complaint has

7   stated a claim. *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).

8   The SAC, like Plaintiffs' two previous pleadings, flunks that test.

9       **A.   Plaintiffs Fail To Allege A Breach Of The Duty Of Prudence**

10      ERISA requires plan fiduciaries to discharge their duties "with the care,

11  skill, prudence, and diligence under the circumstances then prevailing that a

12  prudent man acting in a like capacity . . . would use." 29 U.S.C. § 1104(a)(1).

13  Plaintiffs assert that Defendants breached this duty in three ways: (1) by paying

14  excessive recordkeeping expenses, (2) through their oversight of BrokerageLink,

15  and (3) through their oversight of Financial Engines.

16      ERISA's prudence standard focuses on a fiduciary's "*conduct* in arriving at

17  an investment decision, not on its results." *White v. Chevron Corp.*, 2017 WL

18  2352137, at *4 (N.D. Cal. May 31, 2017); *see also Donovan v. Mazzola*, 716 F.2d

19  1226, 1232 (9th Cir. 1983) (asking whether the defendant "employed the

20  appropriate methods to investigate the merits of the investment and to structure the

21  investment"). The SAC, however, contains no well-pleaded factual allegations

22  about the process Defendants used to select the service providers for the Plan.

23  Plaintiffs rely instead on conclusory, speculative, or implausible allegations about

24  the Plan's expenses, which are not sufficient to state a claim.

25

26  _____

    [2] In response to the dismissal of the FAC, Plaintiffs expressly allege that they had
27  no knowledge of the Form 5500s until shortly before filing this case. SAC ¶¶ 20-
    22. But regardless, Plaintiffs' new allegations and the August 2013 SPD show that
28  the statute of limitations had expired for the BrokerageLink claim in March 2018.

### 1. Plaintiffs' Allegations About Recordkeeping Expenses

The SAC's central allegation is that the Plan paid too much to Fidelity for recordkeeping. This allegation fails for two reasons.

*First*, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund" or service provider regardless of other considerations. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *see also Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (dismissing excessive fee claim where plaintiffs "allege no facts" concerning "factors relevant to determining whether a fee is excessive under the circumstances"). As a matter of common sense, the costs of providing any service are dictated by the scope of those services, how difficult it is to deliver those services, and the quality of the service provided. And opening the floodgates of discovery to any participant who alleges the mere existence of a lower-cost recordkeeper would hardly serve participants' interests, as it would prompt a race to the bottom at the expense of services that participants value and deserve.

Plaintiffs ignore these complications. They claim that large plans "pay no more than roughly $30 per participant" per year for recordkeeping services but that the Plan allegedly paid $61. SAC ¶¶ 52-53. And they cite Form 5500s from other large plans supposedly showing that some plans paid service providers $30 or more per participant for recordkeeping during the 2012 to 2016 period. *Id*. ¶ 54. But Plaintiffs fail to plausibly establish that each of these plans received comparable services as the Plan or that they were of similar complexity. Indeed, even among Plaintiffs' self-selected examples, alleged "recordkeeping" costs varied considerably from $14 to $38 per participant (2.7 times higher). *Id*. It is thus clear from the SAC itself that recordkeeping costs are not just a matter of tallying a plan's asset and participants.

As courts have repeatedly held, it is insufficient to allege merely that plan

-11-

expenses could have been reduced. There "are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015). After all, "fiduciaries have latitude to value investment features other than price, and indeed are required to do so." *White*, 2017 WL 2352137, at *14. For this reason, unsubstantiated allegations about supposedly reasonable fees are insufficient to state a plausible claim. *See Divane v. Northwestern Univ.*, 2018 WL 2388118, at *8 (N.D. Ill. May 25, 2018) (defendants are not "required to try to find a record-keeper willing to take $35/participant/year"). Having failed even to identify the services that Fidelity provided, Plaintiffs cannot plausibly allege that "the fees were excessive relative 'to the services rendered.'" *Young*, 325 F. App'x at 33.

**Second**, Plaintiffs continue to play fast and loose with the numbers. Their $61 figure relies on numbers derived from the Plan's Form 5500s. SAC ¶ 51. But as Defendants pointed out in the motion to dismiss the FAC, those figures reflect not just recordkeeping payments but also participant-directed payments for other services: participant loan processing, account maintenance, securities brokerage commissions, and more. *See* Dkt. 54-1 at 13-14. Lumping all these payments together to obtain the Plan's supposed total "recordkeeping" payment is like claiming that a restaurant overcharges for pickles based on the total cost of a hamburger. As the Eighth Circuit explained earlier this month in affirming the dismissal of an ERISA excessive fee case, a successful prudence claim requires the Plaintiff to "provide a *sound basis* for comparison." *Meiners v. Wells Fargo & Co.*, — F.3d —, 2018 WL 3685525, at *2 (8th Cir. Aug. 3, 2018) (emphasis added).

Plaintiffs' reliance on data from the "401k Averages Book" underscores this error. That publication allegedly estimates that average recordkeeping and administrative costs for smaller plans are $35 per participant. SAC ¶ 55. But the

$35 figure includes only "hard dollar charges for recordkeeping and administration services." 401k Averages Book, Frequently Asked Questions (FAQ 12), https://www.401ksource.com/faq (last visited Aug. 27, 2018). "Participant initiated transactions such as loans, distributions and QDRO's"—i.e., the sorts of payments that *are* included in the Plan's Form 5500—"*are not* included in 'recordkeeping and administration.'" *Id.* (emphasis added).

Plaintiffs offer nothing that would enable the Court to disaggregate the total recordkeeping fees from the numbers reported on the Form 5500. In fact, Plaintiffs concede that the Form 5500 does not provide a basis for determining whether the compensation paid for recordkeeping is reasonable. *See* SAC ¶ 114 ("nothing about the 5500 reporting should be deemed to have provided any Plan participant with 'actual knowledge of the breach or violation' alleged in this Complaint"). Plaintiffs cannot use this lawsuit and discovery to fish for support for their factually baseless claims. *See White*, 2017 WL 2352137, at *18 (dismissing claim where plaintiffs conceded that "the source of their per-participant estimate includes a number of other fees … that are unrelated to recordkeeping" and that they "do not know what portion of the total fees actually relate to recordkeeping").

As supposed proof that Defendants did not adequately monitor recordkeeping fees, Plaintiffs allege that the *total fees* paid to Fidelity in 2014 and 2015 did not decrease even though the Plan eliminated two particular fees. SAC ¶ 67. These allegations do not suggest imprudence. First, total fees are not the same as recordkeeping fees. Second, all Plaintiffs have alleged is that the Plan made changes to the recordkeeping fee structure. A change to the fee structure does not imply that total recordkeeping fees must fall. In fact, adjustments like the ones Plaintiffs describe in the SAC reflect an engaged fiduciary, not one that is failing to act in the participants' interests. *See White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (changes to the recordkeeping agreement

-13-

1    "plausibly suggest that defendants were monitoring recordkeeping fees to ensure
2    that they did not become unreasonable").

3        Plaintiffs also allege that "[t]here is no indication" that Defendants
4    conducted a bidding process with respect to recordkeeping. SAC ¶ 114. But there
5    is no requirement to conduct a bidding process, and failure to do so alone does not
6    show imprudence. *See White*, 2016 WL 4502808, at *14 ("nothing in ERISA
7    compels periodic competitive bidding"). Regardless, Plaintiffs' assertion that there
8    was no bidding process is wholly conclusory. Here, as in *White*, "there are no *facts*
9    alleged showing that Plan fiduciaries failed to consider putting the fee structure out
10   for competitive bidding." *Id*. at *15 (emphasis added).[3]

11              **2.    Plaintiffs' Allegations About BrokerageLink**

12       In the FAC, Plaintiffs claimed that "[f]or mutual funds that offered multiple
13   shares classes, absurdly *both* retail *and* institutional share classes for the same fund
14   were offered . . . through BrokerageLink," and they accused Defendants of
15   allowing BrokerageLink to direct Plaintiffs to "retail share classes when [the
16   platform] could have just as easily directed them to the institutional share classes."
17   FAC ¶¶ 83, 88. It was Plaintiffs' allegation that was absurd. *See* Dkt. 54-1 at 16-
18   17. Institutional shares are offered to clients who make institutional-sized
19   investments. SAC ¶¶ 82-83. But investors choosing from among thousands of
20   different mutual funds through self-directed brokerage accounts are not akin to
21   institutional investors. They are individuals deciding to invest retirement funds on
22   their own rather than through their plan's designated investment options. *Id*. ¶ 80.

23       The SAC retreats from these allegations. Plaintiffs remove the assertion that
24   "absurdly both retail and institutional share classes" were available and say nothing

25   ─────────────
     [3]   Plaintiffs infer that Defendants did not seek bids because total direct
26   compensation paid to Fidelity was not "substantially reduced" during the relevant
     time period. SAC ¶ 58. As discussed above, Plaintiffs have misconstrued what that
27   number represents. In addition, many of the other plans cited by Plaintiffs did not
     decrease their recordkeeping costs either; in the case of Costco, costs *increased* to
28   be more than the supposedly reasonable $30 per participant. *Id*. ¶ 54.

-14-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

1  about BrokerageLink supposedly "directing" participants to retail over institutional

2  shares. Instead, they allege that Defendants should have ensured that only

3  institutional share classes were available through BrokerageLink. It was feasible to

4  do so, Plaintiffs contend, because when a participant acquires securities through

5  BrokerageLink, "as far as any registered investment company knows, the

6  purchaser . . . is the AT&T Retirement Savings Plan Trust." SAC ¶ 86. But these

7  allegations are still totally implausible—and contrary to case law.

8      As the Seventh Circuit has explained, "Hertz gets a fleet discount from

9  General Motors when it orders 10,000 cars at a time, but Hertz does not secure

10  fleet discounts for members of its #1 Club to buy their own GM cars; retail

11  transactions occur at retail prices. So too with retail transactions in mutual funds."

12  *Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). Indeed, there are

13  hundreds if not thousands of plans that offer self-directed brokerage options to

14  their participants. *See, e.g.*, The Vanguard Group, *The Brokerage Option in DC*

15  *Plans* fig. 1 (June 2015), https://vgi.vg/2nMLGgL (last visited Aug. 27, 2018)

16  (noting that 298 Vanguard plans offered a brokerage window option in 2014). Yet

17  even now—after three rounds of pleading—Plaintiffs have not identified a single

18  example of a plan that obtained institutional share pricing for mutual funds offered

19  only through a brokerage window. Perhaps that is because, as Plaintiffs now

20  concede, they have never bought mutual funds on BrokerageLink in the first place.

21  SAC ¶ 77.[4]

22      Even indulging Plaintiffs' assumption about retail shares would not show a

23  breach of fiduciary duty. When, as here, a plan offers a diversified and low-cost

24  —————————

25  [4]  Plaintiffs rely instead on general allegations that retirement plans "are
customarily eligible" to purchase institutional funds and that "[e]ven funds that

26  require minimum investment" for institutional funds "often" will waive minimum
investment requirements. SAC ¶ 85. But Defendants do not dispute that funds may

27  waive minimum investments for retirement plans that agree to make the mutual
fund part of the plan's default menu. That does not suggest that funds will waive

28  their minimums and cut fees merely because an individual participant in a plan
wishes to use BrokerageLink to purchase shares *outside* the default menu.

1   array of default investment options along with thousands of "mutual funds

2   available through BrokerageLink," plan fiduciaries are not responsible for

3   monitoring individual options to see if the fees are reasonable. *Hecker*, 556 F.3d at

4   590. This makes sense—it is not imprudent to allow sophisticated investors that

5   desire more control over their money to invest in mutual funds and other securities

6   on the same terms offered to the marketplace as a whole.

7        Plaintiffs' monitoring theory also is foreclosed by regulatory guidance from

8   the Department of Labor. The Department has specifically exempted brokerage

9   windows from the requirement that plan administrators disclose "detailed

10  performance, fee, and other investment-related information." Dep't of Labor,

11  *Request for Information Regarding Standards for Brokerage Windows in*

12  *Participant-Directed Individual Account Plans*, 79 Fed. Reg. 49469, 49470 (Aug.

13  21, 2014). As a practical matter, moreover, a plan could not monitor each of the

14  thousands of investments available through a brokerage window without vastly

15  increasing administrative costs. That would negatively affect all participants or

16  lead plans to drop brokerage windows entirely, to the detriment of participants who

17  want the added flexibility that brokerage windows offer.

18       Finally, Plaintiffs' new "transaction fee" theory is unavailing. Plaintiffs

19  claim that Bugielski paid $732 in transaction fees over three-and-a-half years. SAC

20  ¶ 77. Not only are these allegations insufficient to cure Plaintiffs' standing

21  deficiency, *see* Part I.A *supra*, they are inadequate to state a claim. Plaintiffs do not

22  say how many times Bugielski traded or what the fees were or even allege that

23  Fidelity's transaction fees were higher than the rest of the market. Nor do they give

24  a single example of a plan that used supposed revenue-sharing from brokerage

25  window transactions to "offset" transaction or other fees for plan participants

26  generally. The allegation that the amount of fees Bugielski paid was "clearly

27  excessive" (SAC ¶ 77) is thus nothing more than "a legal conclusion that a fee is

28

-16-

1  excessive," which is not enough "to survive a motion to dismiss." *Yameen v. Eaton*

2  *Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 353 (D. Mass. 2005).[5]

3  **3.     Plaintiffs' Allegations About Financial Engines**

4  Previously, Plaintiffs alleged that Financial Engines' payments to Fidelity

5  were inappropriate because Fidelity supposedly "provides no material service" to

6  Financial Engines. FAC ¶ 61. Those allegations were wrong—as Plaintiffs' own

7  lawyers knew from their other cases. *See* Dkt. 54-1 at 15.

8  Plaintiffs have yet again abandoned their prior contention. They now admit

9  that Financial Engines *requires* access to Fidelity's system and that Fidelity must

10 be compensated for this service. SAC ¶ 98. But, based on unsupported say-so,

11 Plaintiffs allege that Financial Engines overpaid for the data and systems access,

12 and that this overpayment constitutes a breach of Defendants' fiduciary duty.

13 Plaintiffs do not question the process that the Plan fiduciaries used to select

14 Financial Engines or the utility of Financial Engines' services for participants. Nor

15 do Plaintiffs contend that comparable services were available elsewhere at a

16 materially better price. That is fatal to their claim. If the Plan was paying market

17 rate for valuable automated investment-advice and account-management services,

18 then it does not matter how Financial Engines and Fidelity negotiated their arms'

19 length contracts, any more than it matters how much Financial Engines chose to

20 pay its employees. The choice to select Financial Engines was still prudent.

21 Plaintiffs also do not plausibly allege that Financial Engines was overpaying

22 Fidelity. Plaintiffs try to downplay the services Financial Engines required from

23 Fidelity as a mere "communications link." *Id*. ¶ 98. That is quite an

24 understatement. The Plan has 241,414 active participants and $34.7 billion in

25 _____

26 [5] Plaintiffs' statistics are misleading in any event. Plaintiffs allege that Fidelity has received $1.5 to $2.25 million per year from BrokerageLink. SAC ¶ 93. But Plaintiffs do not say how much of that money is supposedly attributable to offering retail instead of institutional shares. As Plaintiffs previously acknowledged, "not every mutual fund Fidelity offers through BrokerageLink that makes revenue sharing payments to Fidelity has more than one share class." FAC ¶ 89.

27

28

-17-

assets. *Id.* ¶ 3. Integrating Financial Engines' sophisticated technology (*see id.* ¶¶ 96-97) with Fidelity's proprietary recordkeeping platform is a significant undertaking. Indeed, Plaintiffs' own allegations suggest that Fidelity was not profiting excessively from the Plan's use of Financial Engines; Fidelity supposedly earned two to three times *more* from a different Financial Engines customer. *Id.* ¶ 102. Plaintiffs thus fail to substantiate their theory that the payments are nothing more than "kickbacks." *Id.* ¶ 104. On top of that, the idea that Financial Engines would give "kickbacks" to Fidelity is not believable on its face. Financial Engines has every incentive to negotiate the best deal with Fidelity it can.

Finally, Plaintiffs' attempt to link purported overpayments to Financial Engines with purported overpayments to Fidelity for recordkeeping fails for similar reasons as their new BrokerageLink allegations. As discussed above, Plaintiffs do not allege that the Plan paid excessive fees for recordkeeping. And Plaintiffs do not allege that any other fiduciary has attained cuts on recordkeeping based on data link compensation. Fidelity is entitled to charge market rates for the services it provides to the Plan and to Financial Engines, and a fiduciary's only duty is to ensure that the Plan does not overpay for the services it receives. *Cf. Hecker*, 556 F.3d at 587 (it is the "total fee, not the internal- post-collection distribution of the fee," that matters from a fiduciary perspective).

### B. Plaintiffs Fail To Allege A Breach Of The Duty Of Loyalty

Plaintiffs' duty of loyalty claim fails along with their prudence claim. *See In re McKesson HBOC, Inc.*, 2005 WL 3176278, at *22 (N.D. Cal. Sept. 9, 2005) (no breach of duty of loyalty where "it was not imprudent" to take underlying action).

The loyalty claim separately fails because it is based almost exclusively on conclusory allegations about AT&T Inc. The only pertinent factual allegation supporting Plaintiffs' loyalty claim is repeated verbatim from the FAC: that AT&T Inc. "retained Fidelity as an administrative service provider for certain other

defined benefit pension plans and other employee benefit programs that AT&T sponsors." SAC ¶ 74. But it is hornbook law that "there is nothing wrong with a fiduciary taking an action that incidentally benefits the sponsor company, so long as the fiduciary does not benefit the company at the expense of the plan participants." *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1109 (C.D. Cal. 2009). And Plaintiffs' other allegations that AT&T selected Fidelity "for AT&T's own benefit" and out of "self interest" (SAC ¶¶ 73, 76) are just recitations of the elements of their claim. *See White*, 2017 WL 2352137, at *8. As the Eighth Circuit recently explained, "[w]hen both lawful and unlawful conduct would have resulted in the same decision, a plaintiff does not survive a motion to dismiss by baldly asserting that unlawful conduct occurred." *Meiners*, 2018 WL 3685525, at *4.

## C.    Plaintiffs Fail To Allege A Breach Of The Duty Of Candor

Based on their own reading of the instructions for Form 5500 Schedule C, and unsupported by any independent authority, Plaintiffs offer a new theory based on a breach of the supposed duty of candor. Defendants are not aware of any case in this Circuit that has recognized such a duty under ERISA, although courts elsewhere have addressed such claims. *See, e.g.*, *Taveras v. UBS AG*, 513 F. App'x 19, 24 (2d Cir. 2013) (no breach of duty of candor to participants based on statements made in SEC filings). Even if Defendants had a duty of candor under ERISA, however, Plaintiffs have not stated a claim that Defendants violated it.

*First*, Congress did not give plan participants a private right of action to enforce the accuracy of the Form 5500. ERISA imposes civil and administrative penalties "for not giving complete and inaccurate information" on the Form 5500, but nothing in the statute or the regulations authorizes private persons to sue to enforce this requirement. Instructions for Schedule C (Form 5500) at 7, *available at* https://bit.ly/2rkWVzb. Courts have therefore held that "ordinarily defects in fulfilling the reporting and disclosure requirements of ERISA do not give rise to a

substantive remedy other than that provided for in section 502(a)(1)(A) of that Act." *Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124 (3d Cir. 1995).[6]

In particular, allegations that Defendants breached a fiduciary duty by "allegedly failing to properly disclose" information on Form 5500 fail to state a claim. *In re Ins. Brokerage Antitrust Litig.*, 2008 WL 141498, at *7 (D.N.J. Jan. 14, 2008); *see also Jacobs v. Verizon Commc'ns, Inc.*, 2017 WL 8809714, at *13-15 (S.D.N.Y. Sept. 28, 2017); *Pappas v. Buck Consultants, Inc.*, 1989 WL 157517, at *2 (N.D. Ill. Dec. 12, 1989), *aff'd*, 923 F.2d 531 (7th Cir. 1991). These cases make sense given courts' general reluctance to recognize new causes of action or expand existing ones under ERISA. Indeed, the Supreme Court has cautioned "[t]ime and again" that ERISA "offers little room for implied causes of action" because its "enforcement scheme was the product of detailed study and a careful balancing of competing interests." *Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 824 (7th Cir. 2014) (collecting cases).[7]

**Second**, even if Plaintiffs had a cause of action, their claim would fail for lack of reliance. Plaintiffs expressly allege that they were not aware of and did not see the Form 5500s until shortly before bringing their claims. SAC ¶¶ 20-22. Any inaccuracies in the Form 5500 thus cannot have caused them any harm. *See Jacobs*, 2017 WL 8809714, at *15 (dismissing claim where plaintiff "has not asserted that she relied on the allegedly inaccurate Form 5500 in any way"); *Ins. Brokerage Antitrust Litig.*, 2008 WL 141498, at *7 ("Plaintiffs utterly fail to demonstrate that they relied on this misrepresentation").

---

[6] ERISA § 502(a)(1)(A) states that an administrator who fails to disclose required information to a participant within 30 days can be personally liable up to $100 per day. *Ackerman*, 55 F.3d at 124 n.7. Plaintiffs do not invoke the provision.

[7] Some courts use standing language to explain why there is no private right of action for claims based on supposed misrepresentations in Form 5500s. *E.g.*, *Jacobs*, 2017 WL 8809714, at *14 (describing *Pappas* as holding that "an ERISA plan participant lacks standing" to assert such a claim). This is unsurprising because, as the Ninth Circuit has observed, "[i]ssues of standing and the existence of a private right of action often overlap." *Raypath, Inc. v. City of Anchorage*, 544 F.2d 1019, 1021 (9th Cir. 1976); *see also* Part I.B *supra*.

-20-

### D.   Plaintiffs Fail To Allege A Prohibited Transaction

ERISA § 406(a)(1)(C) provides that a fiduciary shall not cause a plan to engage in certain prohibited transactions if "he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). Plaintiffs previously alleged that Defendants violated this provision by causing the Plan to make recordkeeping and related payments to Fidelity, an alleged party-in-interest. FAC ¶¶ 129-32. However, in the SAC, Plaintiffs change course. They allege that Defendants were "legally obligated to" but supposedly did not "obtain the disclosures" required by 29 C.F.R. § 2550.408b-2(c) from Fidelity. SAC ¶ 155. They also allege that Defendants "failed to take into account" Fidelity's compensation from Financial Engines and Brokerage Link. *Id*.[8]

Plaintiffs offer no basis on which to conclude that the Plan did not receive required disclosures from Fidelity. Indeed, Plaintiffs do not even mention 29 C.F.R. § 2550.408b-2 disclosures outside of Count II. And once again, Plaintiffs' core allegation—that Defendants supposedly did not take into account Fidelity's total compensation—is wholly conclusory. As discussed above (*see* Part III.A *supra*), Plaintiffs fail to plausibly allege that the Plan's recordkeeping costs were not "reasonable in relation to the services being provided." SAC ¶ 155. Accordingly, the prohibited transaction claim based on the same theory fails.

## IV.   AT&T INC. AND THE JOHN DOES SHOULD BE DISMISSED

If the Court concludes that Plaintiffs have stated a claim, it should nonetheless dismiss AT&T Inc. and the 50 "John Does" from the case.

---

[8] Plaintiffs previously contended that Defendants had engaged in a prohibited transaction merely by making payments to Fidelity at all. *See* Dkt. 58 at 20. They have apparently abandoned this theory, which is meritless in any event. *See Sweda v. Univ. of Pa.*, 2017 WL 4179752, at *11 (E.D. Pa. Sept. 21, 2017) (rejecting the argument that any time a plan contracts for recordkeeping services it qualifies as a prohibited transaction).

-21-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

## A.    AT&T Inc. Is Not An Appropriate Defendant

"To be found liable under ERISA for . . . breach of fiduciary duty, an individual or entity must be a 'fiduciary.'" *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004). AT&T Services is the "Plan Administrator" and "named fiduciary" with respect to "the general administration of the Plan." SAC ¶ 122. By contrast, the Plan names AT&T Inc. only as "sponsor." *Id*. ¶ 126. ERISA "carefully distinguishes" between these roles. *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011). An administrator is a "trustee-like fiduciary." *Id*. A sponsor generally is not. *See, e.g.*, *Gale v. EIX Severance Plan*, 2015 WL 93441, at *5 (C.D. Cal. Jan. 7, 2015) ("The Committee is a fiduciary separate and apart from SCE, the Plan sponsor, which is not a fiduciary."). Plaintiffs allege three reasons as to why AT&T Inc. supposedly is a fiduciary, but each fails as a matter of law.

### 1.    Power to Appoint BPIC

Plaintiffs imply that AT&T Inc. is a fiduciary because the BPIC allegedly oversees the Plan administration (SAC ¶ 125) and AT&T Inc., in turn, selects the persons to become members of the BPIC (*id*. ¶ 126). But any duty AT&T Inc. has by virtue of its appointment power over the BPIC extends only to the appointment process and no further. Fiduciary status under ERISA is not an "all-or-nothing concept." *In re JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131, at *2 (N.D. Cal. 2005). "[L]imited discretionary authority . . . to appoint members" of a fiduciary committee cannot "somehow be extended" to include breaches by that separate entity. *Marshall*, 2017 WL 2930839, at *12.

Plaintiffs have not alleged a breach of duty with respect to AT&T Inc.'s appointment power. "Under ERISA, fiduciaries have a *limited duty* to monitor and review the performance of their appointed fiduciaries." *In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1144 (C.D. Cal. 2009) (emphasis added), *aff'd sub nom. Quan v. Computer Scis. Corp.*, 623 F.3d 870 (9th Cir. 2010); *see also In*

-22-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

*Re Calpine Corp. ERISA Litig.*, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005) ("the duty of an ERISA fiduciary to review the performance of its appointees is a limited one"). To state a claim for breach of this duty, a plaintiff must show that the appointing fiduciary failed to "review the performance of their appointees at reasonable intervals and in such a manner as may be 'reasonably expected to ensure that their performance has been in compliance with the terms of the plan' and statutory standards." *Computer Scis. Corp.*, 635 F. Supp. 2d at 1144. The SAC—like the FAC—does not contain any facts suggesting that AT&T Inc. failed to do these things or that AT&T Inc. did not determine the suitability of candidates for appointment to the BPIC at the time of appointment.

Plaintiffs cannot merely assert that AT&T Inc. had "fiduciary duties with respect to the appointment, monitoring, and removal of the other Defendants." SAC ¶ 126. They must allege "facts showing *how* the monitoring process was deficient." *Chevron,* 2016 WL 4502808, at *19 (emphasis added); *see also Calpine Corp.*, 2005 WL 1431506, at *6 (dismissing monitoring claim where plaintiff "has not alleged any facts that support his claim that Calpine and the Director Defendants failed to periodically review the performance of the Committee members or the Employee Defendant"). The SAC is devoid of facts suggesting that AT&T Inc. did not appropriately appoint or monitor members of the BPIC.

Furthermore, any duty to monitor claim also fails because Plaintiffs have not pleaded a plausible breach of an underlying duty. *See Computer Scis. Corp.*, 635 F. Supp. 2d at 1144 ("because Plaintiffs' prudence claim fails . . . , their monitoring claim also fails").

### 2.    *Respondeat Superior* and *De Facto* Fiduciary

Plaintiffs alternatively allege that AT&T Inc. is a fiduciary because other Defendants supposedly acted as AT&T Inc.'s "agents" when "exercising their discretionary authority with respect to the Plan." SAC ¶ 126. This gambit fails too.

The contention that fiduciary status can be imputed from an "agent" to its principal "would contradict the Ninth Circuit's strict construction of the liability provisions in ERISA." *Tool v. Nat'l Emp. Ben. Servs., Inc.*, 957 F. Supp. 1114, 1121 (N.D. Cal. 1996). "[T]he Ninth Circuit has plainly signaled that common law theories, such as *respondeat superior,* are not to be imported into ERISA actions so as to expand the bases for liability that the statute provides." *Monper v. Boeing Co.*, 104 F. Supp. 3d 1170, 1181 (W.D. Wash. 2015).

Nor is AT&T Inc. a "*de facto* fiduciary" because its management was purportedly responsible for selecting and negotiating with Fidelity. SAC ¶ 127. Plaintiffs' allegations about AT&T Inc.'s supposed *de facto* control are entirely conclusory. Courts routinely reject arguments that an entity "not named in plan documents as a fiduciary" should be deemed a *de facto* fiduciary based on conclusory allegations that the entity "exercises discretionary control or authority over plan administration, management, or assets." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 552 (6th Cir. 2012); *see also*, *e.g.*, *Harris v. Amgen, Inc.*, 2010 WL 11436373, at *3 (C.D. Cal. June 18, 2010); *In re Citigroup ERISA Litig.*, 2009 WL 2762708, at *15 (S.D.N.Y. Aug. 31, 2009), *aff'd*, 662 F.3d 128 (2d Cir. 2011).

As Plaintiffs' prior counsel recognized, AT&T Inc. is not a proper defendant here. *See* Dkt. 28 (stipulating to dismiss AT&T Inc.).

## B.   The John Doe Defendants Are Not Appropriate Defendants

Plaintiffs' decision to name 50 John Does as individual defendants is similarly inappropriate. Plaintiffs state that the Doe Defendants are unknown employees of AT&T Services and AT&T Inc., including members of the BPIC, who ostensibly exercised formal authority or *de facto* control over the selection and retention of the Plan's investment options and recordkeeper. SAC ¶ 2. But ERISA claims can be brought against individuals only "'as long as that party's individual liability is established.'" *Spinedex Physical Therapy USA v. United*

-24-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS THE SECOND AMENDED CLASS COMPLAINT; CASE NO. 2:17-CV-8106

*Healthcare*, 770 F.3d 1282, 1297 (9th Cir. 2014) (quoting *Cyr v. Reliance Std. Life Ins. Co.*, 642 F.3d 1202, 1207 (9th Cir. 2011) (en banc)). The SAC alleges no facts suggesting that any individual is liable for a breach of fiduciary duty. Plaintiffs point to no Plan document that makes a particular person or persons a fiduciary with respect to the Plan. And they allege nothing to suggest that any individual—known or unknown—had fiduciary responsibilities otherwise.

Absent any factual allegations that there are persons who are individually liable for breaching a fiduciary duty to the Plan, it is inappropriate to name John Doe defendants simply because Plaintiffs speculate that unknown persons might be liable on an individual basis in the future. It is the "general rule" in the Ninth Circuit that "the use of 'John Doe' to identify a defendant is not favored." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). This rule applies in ERISA cases, as well. The mere "suspicion" that John Does exist, "without more," is "not enough to make the generally disfavored device of a John Doe pleading appropriate." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Cont'l Food Prods.*, 2014 WL 7240264, at *3 (D. Md. Dec. 16, 2014).

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed. As this is Plaintiffs' third bite at the apple, dismissal should be without leave to amend. *See Griggs v. Pace American Grp., Inc.*, 170 F.3d 877, 879 (9th Cir. 1999) (court has "particularly broad" discretion to deny leave to amend where "a plaintiff previously has been granted leave to amend").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  August 27, 2018

Respectfully submitted,

MAYER BROWN LLP

By: */s/ Nancy G. Ross*

Nancy G. Ross (*pro hac vice*)
*nross@mayerbrown.com*
Brian D. Netter (*pro hac vice*)
*bnetter@mayerbrown.com*
Jed W. Glickstein (*pro hac vice*)
*jglickstein@mayerbrown.com*
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
(312) 701-7711 – Facsimile

John Nadolenco (SBN 181128)
*jnadolenco@mayerbrown.com*
350 South Grand Ave
25th Floor
Los Angeles, CA 90071-1503
(213) 229-9500
(213) 625-0248 – Facsimile

*Attorneys for Defendants*
*AT&T Inc. and AT&T Services, Inc.*

-26-