FILED
CLERK, U.S. DISTRICT COURT
OCT 29, 2018
CENTRAL DISTRICT OF CALIFORNIA
BY: ___BH___ DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Julio C. Alas, et al.

    Plaintiff,

v.

AT&T Inc., et al.,

    Defendant.

LACV 17-08106-VAP (RAOx)

**Order re Defendants' Motion to Dismiss the Second Amended Class Complaint**

**(Doc. No. 71.)**

On November 6, 2017, Plaintiffs Julio C. Alas, Robert J. Bugielski, and Chad S. Simecek ("Plaintiffs") individually as participants in the AT&T Retirement Savings Plan (the "Plan") and as representatives of all persons similarly situated, filed the Second Amended Class Complaint ("SAC") under the Employment Retirement Income Security Act ("ERISA"), 28 U.S.C. §§ 1132(a)(2) and (3), against Defendants AT&T, Inc.,[1] AT&T Services, and John Does 1-50 ("Defendants"), for Defendants' alleged breach of their fiduciary duties and transactions prohibited by ERISA.  (Doc. No. 68.)

On August 27, 2018, Defendants filed the pending Motion to Dismiss the Second Amended Class Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. No. 71.)  Plaintiffs filed their

---

[1] The SAC asserts claims against AT&T, Inc., even though on December 21, 2017, the parties filed a stipulation to dismiss AT&T, Inc. from this suit.  (Doc. No. 28.)

1

Opposition on September 24, 2018, (Doc. No. 76), and Defendants filed their Reply on October 8, 2018 (Doc. No. 77).

After considering all papers filed in support of and in opposition to Defendants' Motion, the Court rules as follows.

## I. SUMMARY OF ALLEGATIONS

Plaintiffs have held various positions at AT&T, Inc., and all are participants in the Plan, a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)A) and § 1002(34). (SAC ¶¶ 20-22, 12.) The Plan is one of the largest retirement plans in the country, ranking in the top 0.1% of American 401(k) plans, and with 241,414 active participants and $34.792 billion in net assets as of December 31, 2016. (*Id.* ¶ 3.) The Plan is funded by a combination of salary withholding by its participants and employer matching contributions. (*Id.* ¶ 32.) Participant accounts in the Plan consist of employee contributions, employer contributions, and any investment income from the investment options selected within the participant account, minus fees and expenses. (*Id.* ¶ 33.)

Defendants chose Fidelity Investments Institutional Operations Company, LLC ("Fidelity") to provide the Plan's recordkeeping and administrative services, and Fidelity Brokerage Services, LLC, to provide self-directed brokerage accounts to Plan participants through Fidelity's trademarked BrokerageLink® service. (*Id.* ¶ 42-43.) Defendants chose Financial Engines Advisors LLC ("Financial Engines") to provide individualized computer-based investment advice to Plan participants. (*Id.* ¶

44.) In light of the Plan's vast size and the fierce competition among recordkeeping service providers, the Plan "had the bargaining power to obtain and maintain very low fees for recordkeeping and other administrative services, and had significant leverage to procure high quality management and administrative services at a low cost." (*Id.* ¶ 48.) Beginning no later than 2012, however, Defendants failed to leverage the Plan's size to obtain reasonable recordkeeping fees or review Fidelity's total compensation, and consequently paid fees that were significantly above market rate, costing Plan participants "tens of millions of dollars in unnecessary recordkeeping expenses during the class period." (*Id.* ¶¶ 49-66.)

Plaintiffs allege that these failures "were not simple imprudence but were motivated in part by Defendants' self-interest," as AT&T chose Fidelity for its own benefit, rather than for the benefit of the Plan's participants. (*Id.* ¶¶ 70, 73.) AT&T and Fidelity had a "larger agreement" in which Plan participants paid high rates for Fidelity's services to the Plan, while Fidelity provided discounts on services to other employee benefit plans, resulting in cost savings for AT&T. (*Id.* ¶ 75.)

Through BrokerageLink, Fidelity allowed Plan participants to invest in a wide range of mutual funds that are not included among the Plans' designated investment alternatives through an account that is referred to as a "brokerage window" or "self-directed brokerage account." (*Id.* ¶ 77.) Plan participants who used BrokerageLink compensated Fidelity through a variety of brokerage fees. (*Id.* ¶ 78.) Defendants controlled the mutual

funds that would be offered to the Plan's participants through BrokerageLink and offered "retail shares" of certain mutual funds, even when less expensive "institutional shares" of the same fund were also available. (*Id.* ¶ 81-84.) Qualified retirement plans are generally eligible to purchase institutional class shares where available, and the vast size of the Plan should have enabled it to obtain the lowest price share class of any mutual fund on the market. (*Id.* ¶¶ 85-87.) While retail shares were more expensive for Plan members to purchase, they provided "significant additional compensation to Fidelity" in the form of millions of dollars in revenue sharing payments. (*Id.* ¶¶ 86, 88.) Defendants did not take this additional money into account when monitoring Fidelity's total compensation, and did not disclose this information to Plan participants, much less use it to offset Fidelity's direct compensation that users paid in the form of transaction fees. (*Id.* ¶¶ 92-93.)

In 2015, the Plan also introduced participants to Financial Engines, which offers automated investment advice to participants. (*Id.* ¶¶ 96-97.) This merely required Fidelity to provide a secure communications link from participants' accounts to Financial Engines, but Fidelity received millions of dollars each year for this "fixed level of service." (*Id.* ¶¶ 98-102.) Defendants similarly failed to take this into account when determining Fidelity's aggregate compensation. (*Id.* ¶ 103.) Plaintiffs allege that because Financial Engines provided services to Fidelity for less than was being charged to Plan participants who subscribed to that service, it amounted to an "illegal kickback to Fidelity." (*Id.* ¶ 104.)

4

If a retirement plan has 100 or more participants, it must file a "Form 5500," listing every service provider receiving more than $5,000, and listing the direct and indirect compensation that the provider received. (*Id.* ¶ 105.) Defendants did not report Fidelity's indirect compensation from the Plan's use of BrokerageLink or Financial Engines, a violation of their reporting obligations. (*Id.* ¶ 110.) The complex, misleading nature of the 5500s could not have provided the average participant in the Plan with "actual knowledge of the breach or violation" Plaintiffs allege, and no Plaintiff was aware of Defendants' breaches until November 3, 2017. (*Id.* ¶¶ 114-115.)

Based on the foregoing, Plaintiffs now assert three claims against Defendants: (1) Breaches of Fiduciary Duties of Prudence and Candor and Prohibited Transactions, in violation of ERISA § 404(a), 29 U.S.C. § 1104(a); (2) Prohibited Transactions, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a); and Breaches of Fiduciary Duties of Prudence and Candor and Self-Dealing Prohibited Transactions, in violation of ERISA §§ 404(a), 406(b)(1), 29 U.S.C. §§ 1104(a), 1106(b)(1). (*Id.* ¶¶ 141-162.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of subject matter jurisdiction. "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). In the

5

context of a 12(b)(1) motion, the plaintiff has the burden of establishing Article III standing to assert the claims. *Id.*

Although the default standard for a Rule 12(b)(1) motion made at the pleading stage is to accept the plaintiff's allegations as true, limited exceptions exist. Relevant here is the exception created by the distinction between "facial" and "factual" attacks on subject matter jurisdiction. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). A facial attack accepts the factual allegations as pleaded, but "asserts that [they] are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A factual attack, in contrast, "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* Here, as Defendants do not contest the truth of the jurisdictional allegations in the FAC, their Motion is a facial attack that the Court resolves "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient to invoke the court's jurisdiction." *Leite*, 749 F.3d at 1121 (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

As Article III of the United States Constitution empowers federal courts to hear only "cases" and "controversies" (*see* U.S. Const. art. III, § 2), matters must satisfy the various justiciability criteria, like standing, developed for determining whether a matter is a case or controversy. To satisfy "the irreducible constitutional minimum of standing," the plaintiff must demonstrate: (1) he has suffered an "'injury in fact'"— an invasion of a legally protected interest which is (a) concrete and particularized, and (b)

6

actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct complained of — that is, the injury is "fairly traceable" to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it is "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction over the suit. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). In that event, the suit should be dismissed under Rule 12(b)(1). *Id.* (citing *Steel Co.*, 523 U.S. at 109–10; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003); *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 664 (9th Cir. 2002)).

**B.      Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F. 3d 1202, 1216 (9th Cir. 2011).

## III. DISCUSSION

Defendants seek dismissal of the SAC under Rules 12(b)(1) and 12(b)(6) on the following grounds: (1) Plaintiffs lack standing; (2) the BrokerageLink claim is untimely; (3) Plaintiffs fail to state a claim; and (4) AT&T Inc. and the Doe Defendants are not appropriate defendants. (Doc. No. 71-1.)

### A. Plaintiffs' Standing

Defendants argue that Plaintiffs lack standing to bring their claims as to both BrokerageLink and the Form 5500s. (Doc. No. 71-1 at 12-15.) A plaintiff establishes standing by demonstrating (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury" and the challenged action of the defendants; and (3) that is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Multistar Industries, Inc. v. U.S. Dept. of Transp.*, 707 F.3d 1045, 1054 (9th Cir. 2013) (quoting *Lujan*, 504 U.S. at 560-61).

In *Glanton ex rel. ALCOA Prescription Drug Plan v. Advance PCS Inc.*, the Ninth Circuit clarified the standing requirements for ERISA plaintiffs. 465 F.3d 1123 (9th Cir. 2006). The panel in *Glanton* considered whether the plaintiffs, one of whom participated in the defendant's prescription drug plan, had standing to sue the defendant for breach of fiduciary duty under ERISA. *Id.* at 1124-25. The plaintiffs, none of whom claimed they were denied benefits or received inferior drugs, claimed the defendant "charged the plans too much for drugs, and this caused the plans to demand higher co-

9

1  payments and contributions from participants."  *Id.* at 1125.  The panel
2  ultimately concluded that the plaintiffs lacked standing because they had
3  failed to demonstrate redressability.  *Id.*  In rejecting the plaintiffs' arguments
4  that they had associational standing, the panel noted that ERISA plan
5  beneficiaries could bring suits on behalf of the plan in a representative
6  capacity "so long as plaintiffs otherwise meet the requirements for Article III
7  standing."  *Id.* at 1127.

### 1. BrokerageLink

Defendants argue that Plaintiffs lack standing to claim that the Plan should have negotiated institutional pricing for mutual funds offered by BrokerageLink, as Mr. Bugielski, the only Plaintiff to use BrokerageLink, "has no concrete injury that is fairly traceable to Defendants and that can be redressed by this Court." (Doc. No. 77-1 at 13.)  Plaintiffs contend that the purportedly excessive fees that Mr. Bugielski paid are both concrete and redressable.  (Doc. No. 76 at 12-14.)  Plaintiffs contend that Mr. Bugielski paid high transaction fees that were "clearly excessive considering the millions of dollars Fidelity was receiving through revenue sharing." (SAC at ¶ 77).  The bulk of the SAC's allegations concerning BrokerageLink, however, discuss the inability of Plan participants to purchase less expensive institutional class mutual fund shares, as opposed to more expensive retail shares.  (*Id.* at ¶¶ 81-88.)  Although the SAC does not allege that Mr. Bugielski personally invested in mutual funds, it does note that the retail shares purchased by investors other than Plaintiffs resulted in "millions of dollars of revenue sharing payments."  (*Id.* at ¶ 88.)  Plaintiffs then aver that revenue sharing payments often are "used to reduce the

aggregate administrative expense of the plan as a benefit to all participants." (*Id.* at ¶89).

Even when considered alongside the SAC's discussion of the mutual funds available through BrokerageLink and the alleged "larger agreement" between Defendants and Fidelity, (*id.* ¶ 75), the bare allegation that the transaction fees were excessive is akin to a label or conclusion, *see Twombly,* 550 U.S. at 555, as opposed to a plausible inference that Mr. Bugielski suffered a concrete injury.

As noted in its previous Order, (Doc. No. 67 at 11), the court in *Marshall v. Northrop Grumman Corp.*, No. CV 16-06795 AB (JCx), 2017 WL 2930839, at *8-9 (C.D. Cal. Jan 30, 2017), reached the same conclusion. In *Marshall*, the complaint did not allege that any named plaintiff invested in the fund at issue, but did allege that plan participants bore the cost of mismanagement of the funds. *Id.* at *8. The court reasoned that "although the management fees may have been borne by all Plan participants such that Plaintiffs could assert a cognizable injury, the alleged performance losses were sustained by only those who invested in [a particular fund]." *Id.* Thus, the court concluded "[a]t least as to this latter allegation, Plaintiffs have not alleged they individually invested in that fund such that they have suffered a concrete injury." *Id.*

Accordingly, the Court GRANTS Defendants' Motion to Dismiss as to the SAC's allegations regarding BrokerageLink, with leave to amend, and

declines to rule on the parties' arguments regarding the timeliness of the claim.

### 2. Form 5500s

Defendants also contend that Plaintiffs do not have standing to assert claims regarding the challenged disclosures on the Plan's Form 5500s, as any inaccurate 5500 disclosures did not harm Plaintiffs "in any concrete way." (Doc. No. 77-1 at 14-15.) Courts commonly hold that plaintiffs seeking purely injunctive remedies of ERISA's disclosure requirements do not need to demonstrate actual injury, however.

The Ninth Circuit has found that a requirement that plaintiffs prove individual harm when seeking injunctive relief "would be to say that the fiduciaries are free to ignore their duties so long as they do no tangible harm," a result that "is not supported by the language of ERISA, the common law, or common sense." *Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003). *See also Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (A "plan participant may have Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant"); *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 456 (3d Cir. 2003) (finding that ERISA's "statutorily-created disclosure or fiduciary responsibilities" do not require plaintiffs seeking injunctive relief to show "actual harm" in order to have standing); *Wells v. California Physicians' Serv.*, No. C05-01229 CRB, 2007 WL

926490, at *3 (N.D. Cal. Mar. 26, 2007) ("When plan participants seek injunctive relief for violations of ERISA's disclosure or fiduciary requirements, they can demonstrate Article III standing by showing a violation of ERISA and need not prove actual injury.")

Plaintiffs thus have standing to allege that Defendants did not report all indirect compensation on the Form 5500s, a violation of their reporting obligations under ERISA's disclosure requirements. (SAC ¶¶ 110, 147.) Accordingly, the Court DENIES Defendants' Motion to Dismiss Plaintiffs' claims to injunctive relief regarding the Form 5500s.

**B.     Plaintiffs Have Stated a Claim**

Defendants also argue that Plaintiffs fail to state a claim for the breaches of fiduciary duty. (Doc. No. 71-1 at 10-21.) ERISA requires a fiduciary to discharge duties "solely in the interest of the participants and beneficiaries" and solely for the purposes of "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." 29 U.S.C.A. § 1104(a)(1)(A). This must be done "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a person or institution "acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). ERISA also "explicitly prohibits a fiduciary from engaging in self-dealing transactions." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citing 29 U.S.C. § 1106(b)).

Defendants correctly note that courts do not take a results-based approach when determining if a defendant has breached these duties. (Doc. No. 71-1 at 17). The relevant inquiry examines a fiduciary's conduct. *See White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137, at *4 (N.D. Cal. May 31, 2017); *see also Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983) (analyzing if a fiduciary "employed the appropriate methods" when investing on behalf of trustees). The SAC in large part simply recounts fees that Plaintiffs believe were too high, and concedes that Plaintiffs cannot demonstrate the levels "of review or investigation" Defendants undertook. (SAC ¶ 92.)

The Ninth Circuit has acknowledged, however, that "circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage" because plaintiffs may not "be in a position to describe with particularity the events constituting the alleged misconduct." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). The Court finds that Plaintiffs are in just such a position. Defendants maintain that "even if Plaintiffs do not have to plead facts about the fiduciary process directly, they still must plead facts that plausibly suggest that the fiduciary process was defective." (Doc. No. 77 at 11). Here, Plaintiffs have done so through their allegations that Plan participants paid excessive administrative costs, and that Defendants received a discount on administrative services in exchange for allowing Fidelity to overcharge Plan participants as part of a "larger agreement."

As the Court must accept Plaintiffs' allegations as true, rather than "look beyond the complaint and make a factual determination based on incomplete evidence," *Wyler Summit Partnership v. Turner Broad. System, Inc.*, 135 F.3d 658, 664 (9th Cir. 1998), the Court concludes it is plausible that the Defendants breached their fiduciary duties.  Accordingly, Defendants' Motion to Dismiss the SAC for failure to state a claim as to breaches of fiduciary duty is DENIED.

### C.     AT&T Inc. and John Does 1-50 Are Dismissed

Finally, Defendant argues that AT&T Inc. and the John Does should be dismissed from the case.  (Doc. No. 71-1 at 29-32.)  The Court agrees.

#### 1.     AT&T Inc.

AT&T Services is the administrator of the plan and the named fiduciary, (SAC ¶ 122), AT&T Inc. is the plan's sponsor, (SAC ¶ 126). Sponsorship of a plan does necessarily not confer fiduciary status.  See *CIGNA Corp. v. Amara*, 563 U.S. 421, 437, (2011) (finding that "ERISA carefully distinguishes" the roles of plan sponsor and administrator). Plaintiffs allege that AT&T Inc. took on a fiduciary role by selecting committee members overseeing the Plan, (SAC ¶ 126).  The fiduciary duty of a sponsor appointing another entity to administer a plan, however, is limited to monitoring and reviewing the performance of the appointee.  *In re Computer Scis. Corp. Erisa Litig.*, 635 F. Supp. 2d 1128, 1144 (C.D. Cal. 2009); *see also Marshall v. Northrop Grumman Corp.*, No. CV 16-06794 AB, 2017 WL 2930839, at *12 (C.D. Cal. Jan. 30, 2017) (finding that the duties of an entity appointing fiduciaries are limited to the discretionary authority it

exercises over the management of a plan). While Plaintiffs argue that it "is black-letter law that a corporate officer, authorized to sign a promissory not on behalf of the corporation, does not incur personal liability on the debt," Plaintiffs' Opposition cites no authority for the proposition that AT&T Inc. had any fiduciary responsibility for the Plan other than appointing and monitoring committee members.

As Plaintiffs have alleged no facts suggesting AT&T Inc. improperly appointed or neglected to monitor committee members overseeing the Plan, the Court GRANTS Plaintiffs' Motion dismissing AT&T Inc., with leave to amend.

### 2. John Does 1-50

Similarly, Plaintiffs have named 50 John Does as individual defendants in this action, but have alleged no facts demonstrating any plausible liability for individual defendants, as they must in order to bring an ERISA claim against a fiduciary in their individual capacity. *See, e.g., Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1297 (9th Cir. 2014) Plaintiffs' Opposition to Defendants' Motion to Dismiss again cites no authority in arguing that the John Does should remain as Defendants, other than it not being "nefarious, or prejudicial, or even burdensome." (Doc. No. 76 at 31.)

Accordingly, the Court GRANTS Plaintiffs' Motion dismissing John Does 1-50, with leave to amend.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss the Second Amended Complaint is GRANTED IN PART and DENIED IN PART. Should Plaintiffs wish to file an amended pleading, they must do so by November 12, 2018.

**IT IS SO ORDERED.**

Dated:  10/29/18

Virginia A. Phillips
Chief United States District Judge