Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
Kyle G. Bates (SBN: 299114)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com
jbloom@schneiderwallace.com

Garrett W. Wotkyns (*Pro Hac Vice*)
John J. Nestico (*Pro Hac Vice*)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 315-3841
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

Todd S. Collins (*Pro Hac Vice*)
Ellen T. Noteware (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
enoteware@bm.net

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JULIO C. ALAS, ROBERT J. BUGIELSKI and CHAD S. SIMECEK, individually as participants in the AT&T Retirement Savings Plan and as representatives of all persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> AT&T SERVICES, INC., the BENEFIT PLAN INVESTMENT COMMITTEE, JOHN J. STEPHENS, JONATHAN P. KLUG, GEORGE B. GOEKE, PAUL W. STEPHENS, DEBRA L. DIAL, SEAN P. FOLEY, | Case No. 2:17-cv-08106-VAP-RAO <br><br> **PLAINTIFFS' THIRD AMENDED CLASS COMPLAINT** |

1  WILLIAM H. HAMMOND and          )
2  MARTY WEBB,                      )

3          Defendants.

1.    Plaintiffs Julio C. Alas, Robert J. Bugielski and Chad S. Simecek, participants in the AT&T Retirement Savings Plan ("Plan" or "AT&T Plan"), bring this ERISA action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), and under Fed. R. Civ. P. 23 as representatives of a class of participants and beneficiaries of the Plan, against defendants AT&T Services, Inc. ("AT&T Services"), the Benefit Plan Investment Committee (the "Committee"), John J. Stephens, Jonathan P. Klug, George B. Goeke, Paul W. Stephens, Debra L. Dial, Sean P. Foley, William H. Hammond and Marty Webb (together,  Stephens, Klug, Goeke,  Stephens, Dial, Foley, Hammond and Webb are referred to herein as the "Committee Member Defendants") for breach of ERISA's fiduciary duties and transactions prohibited by ERISA.

2.    AT&T, Inc. ("AT&T"), which is not a Defendant, is the sponsor of the Plan. AT&T Services is the Plan administrator and a named fiduciary of the Plan with broad authority over the administration and management of the Plan. AT&T, the sole owner of AT&T Services, delegated all of its authority with respect to the Plan to the Chief Financial Officer of AT&T (the "CFO"). The CFO, in turn, created the Committee and determined which of AT&T's corporate officers (by title) would serve on the Committee. AT&T Services delegated its authority under the Plan for much of the fiduciary conduct at issue here to the Committee. The Committee Member Defendants were members of the Committee during the relevant time. All Defendants are either express or *de facto* ERISA fiduciaries under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) with some level of discretionary authority or control over the matters set forth herein. As a result of their relationships with AT&T, all Defendants were affiliates of AT&T and shared interests with AT&T. By improperly advancing the interests of AT&T, as alleged below, all Defendants improperly failed to fulfill their fiduciary obligation to manage the Plan in the interests of the Plan and its participants.  Instead, Defendants used their positions of fiduciary responsibility to advance their interests and AT&T's interests at the expense of the Plan and its participants.

**INTRODUCTION**

3.    With 241,414 active participants as of December 31, 2016 and $34.792 billion in net assets, the Plan is one of the largest retirement plans in the country.  It ranks in the top 0.1 % of over 500,000 American 401(k) plans in terms of the value of its assets.[1]

4.    As set forth in more detail below, Defendants, as fiduciaries of the Plan, failed to fulfill their fiduciary duties to prudently and loyally ensure the Plan's total recordkeeping and other administrative expenses were reasonable and not excessive.

5.    401(k) defined contribution plans such as the AT&T Plan have become America's primary retirement savings vehicle.  As with all defined contribution retirement plans that require participants to bear the costs of plan administration, the Plan participants' retirement savings suffer when the Plan charges participants high fees.

6.    The marketplace for retirement plan services, like recordkeeping, is established and competitive.  Retirement plans the size of the AT&T Plan have the bargaining power to obtain very low-cost administrative and investment management services from financial services providers.  The overall trend in 401(k) plan administrative fees has been markedly downward over time.

7.    However, because of Defendants' failure to implement a prudent process to control the Plan's overall administrative and recordkeeping expenses, and failure to properly understand and evaluate the amount being paid for those services from all sources despite the express regulatory command to do so, the Plan's participants paid vastly more—in some periods more than double—what comparable very large retirement plans pay for recordkeeping services.

**JURISDICTION AND VENUE**

8.    This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

---

[1] *The BrightScope/ ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014* at 11. (Dec. 2016), available at https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf (last viewed March 16, 2018).

9. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred here.

## PARTIES AND NON-PARTY AT&T

10. AT&T Services is a wholly owned subsidiary of AT&T, a holding company organized under the law of the State of Delaware. It is a publicly traded New York Stock Exchange company that provides telecommunications and digital entertainment services. It employs 260,000 people and has revenues of $161 billion.

11. The AT&T Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and §1002(34).

12. AT&T is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and designated the CFO of AT&T as the corporate officer authorized to exercise on behalf of AT&T all fiduciary responsibility with respect to the AT&T Plan.

13. The CFO of AT&T created the Benefit Plan Investment Committee, comprised of the CFO, Treasurer, Comptroller, Vice President – Investment Management and Vice President – Benefits of AT&T, to exercise the fiduciary authority and responsibility of AT&T Inc.

14. AT&T Services is the Plan administrator under 29 U.S.C. § 1002(16)(A).

15. AT&T Services has delegated its authority with respect to the fiduciary conduct at issue in this case to the Committee.

16. Defendant Committee is a Committee of AT&T and is a fiduciary for the Plan by virtue of express delegations of fiduciary authority from the CFO of AT&T and AT&T Services.

17. In addition, the members of the Committee are also fiduciaries for the Plan. "[W]here, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000).

18.     Since 2006, the Committee included the following officers and employees of AT&T, by title: (1) AT&T's CFO, (2) AT&T's Treasurer, (3) AT&T's Controller, (4) AT&T's Vice President – Investment Management, and (5) AT&T's Vice President – Benefits. *See* Exhibit A hereto.

19.     Defendant John J. Stephens has served as a member of the Committee at all relevant times. Stephens has served as AT&T's CFO since June of 2011, and prior to that time acted as AT&T's Controller.

20.     Defendant Jonathan P. Klug was AT&T's Treasurer until February 2017 and was a member of the Committee during that time.

21.     Defendant George B. Goeke is a member of the Committee and has been AT&T's Treasurer since February 2017.

22.     Defendant Paul W. Stephens was AT&T's Controller from 2011 until January of 2016, and was a member of the Committee during that time.

23.     Defendant Debra L. Dial is a member of the Committee and has been AT&T's Controller since January of 2016.

24.     Defendant Sean P. Foley was a member of the Committee and AT&T's Vice President – Investment Management until his retirement in 2012.

25.     Defendant William H. Hammond was a member of the Committee and AT&T's Vice President – Investment Management starting in 2012. On information and belief, he is still a member of the Committee and is still AT&T's Vice President – Investment Management.

26.     Defendant Marty Webb is a member of the Committee and has been AT&T's Vice President – Benefits since 2007.

27.     As required by 29 U.S. C. §1102(a)(1), the Plan is established and maintained by a written plan document.

28.     Plaintiff Julio C. Alas is a resident of Montebello, California.  He is employed by AT&T and has been a Plan participant from March 14, 2008 through the present.     Alas would not be considered a sophisticated investor and since the beginning of his participation has invested in only the 2040 Target Date fund, which is designed for participants who do not feel comfortable creating

their own asset allocation among the available investment choices, and the AT&T Stock Fund. . Alas remembers receiving the Plan's Summary Annual Report but never requested or received a copy of the complete Annual Return or visited the website of the Employee Benefit Security Administration ("EBSA") to search that website's database for the actual Annual Report filed on Form 5500.

29.   Plaintiff Robert J. Bugielski is a resident of Poinciana, Florida.  He was employed by AT&T or its predecessors since 1989 until his retirement in July 2016, and has participated in the Plan or predecessor plans since approximately 1994.  Bugielski worked as a cable splicer for many years and then as an outside plant manager. Bugielski remembers receiving the Plan's Summary Annual Report but is otherwise not familiar with the Form 5500, and never requested or received a copy of the full annual report from the Plan Administrator or attempted to retrieve the complete Annual Return from the EBSA website.

30.   Plaintiff Chad S. Simecek is a resident of San Antonio, Texas. He was employed by AT&T or its predecessors or affiliates at times from 1997 until August of 2017 but remains a Plan participant.  Simecek would not be considered a sophisticated investor which is in part why he elected to enroll on Financial Engine's managed account service.

31.   Prior to the time that Plaintiffs' counsel began their investigation of facts relating to this case in or about June 2017, none of the Plaintiffs was aware of the amount of compensation Fidelity was receiving in connection with BrokerageLink or from Financial Engines or, therefore, the total compensation Fidelity was receiving for recordkeeping and administrative services provided to the Plan, and had not referenced or reviewed the documents referred to in the Complaint.  Nor, prior to that time, were any of the Plaintiffs aware of other service agreements between AT&T and Fidelity. Furthermore, prior to the time that Plaintiffs' counsel began their investigation of facts relating to the breach of duty claims made herein in or about June 2017, none of the Plaintiffs had or has any actual knowledge regarding Defendants' fiduciary processes. None of the Plaintiffs is a fiduciary for the Plan and none participated in the relevant fiduciary investment decisions or search for or negotiation with service providers. The facts about Defendants' fiduciary process are not made public and have not been described to the Plan's participants.  Defendants' violations described herein continued at least

up until the time of the filing of the original complaint in this case on an annual basis in connection with the reporting of Fidelity's compensation required to complete and file the Annual Report as well as each time Defendants fulfilled their obligation (if they did) to periodically monitor the terms of the agreement with Fidelity and the reasonableness of Fidelity's compensation.

## ERISA FIDICIARY STANDARDS

32.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Plan, that are covered by ERISA.  ERISA provides that  "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

33.     ERISA's fiduciary duties under have been described as being among the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

34.     The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

35.     As the Ninth Circuit explained, "cost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts § 90(c)(3), cmt. *b*); *see also Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553, 566 (4th Cir. 2017) ("Fiduciaries ... ordinarily have a duty to seek ... the lowest level of risk and cost for a particular level of expected return—or, inversely, the highest return for a given level of risk and cost.").

36.     The content of ERISA fiduciary's duties is "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble,* 135 S. Ct.

at 1828. Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007).

37.    In determining whether ERISA fiduciary defendants fulfilled their duties under the statute, courts consider how a prudent and loyal financial expert familiar with investment industry practices and fees would have acted.  As explained below, here, a prudent and loyal financial expert would have acted very differently than did Defendants.

38.    Defendants failed to fulfill their duty to prudently and loyally control the administrative expenses paid by the Plan, and in so doing caused the Plan's participants to incur millions of dollars in unnecessary expenses.

## FACTS

39.    The Plan is an individual account, defined contribution pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

40.    The Plan is funded by a combination of salary withholding by plan participants and employer matching contributions.

41.    Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses.

42.    In a defined contribution retirement plan such as the AT&T Plan, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

43.    Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee Corporation), participants in defined contribution plans (like the Plan) get no more at retirement than they have in their accounts at that time.

44.     As such, ERISA's fiduciary duty to ensure fees paid by the Plan are reasonable is especially important in the context of fees paid by defined contribution plan participants, as the fees reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive at retirement.

45.     As the Supreme Court explained in 2015, in defined contribution plans like the Plan, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, ***less expenses***." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015) (emphasis added).

46.     Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement -- "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* In the context of individual account defined contribution plans, additional fees of only 0.18% can have a large effect on investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (en banc).

47.     Seemingly small differences in fees can lead to vastly different outcomes at retirement. For example, a 1% difference in fees can mean 28% less in retirement assets over a thirty-five-year period, U.S. Dept. of Labor, A Look at 401(k) Plan Fees, (August 2013) at 1-2, *https://www.dol.gov/ebsa/publications/401k_employee.html*.

48.     Therefore, fees are of critical importance to an ERISA fiduciary's prudent investment menu selection.

### Plan Administrative Expenses Were Too High

49.     Defendants, as the Plan's fiduciaries, controlled which investment options were available in the Plan and selected the recordkeeping and administrative service providers for the Plan.

50.     Defendants chose Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") to provide the Plan's recordkeeping and administrative services.

51.     Defendants also chose Fidelity Brokerage Services, LLC to provide self-directed brokerage accounts to Plan participants through Fidelity's trademarked BrokerageLink® service.

52.     Defendants chose Financial Engines Advisors L.L.C. ("Financial Engines"), to provide an individualized computer-based investment advice to Plan participants.

53.     Every defined contribution plan requires recordkeeping.  There are numerous vendors that can provide high quality recordkeeping services to defined contribution plans such as the AT&T Plan. These vendors strenuously compete against each other by offering the lowest price for the best service.

54.     Large plans are generally able to leverage their size to obtain lower fees per participant, in part because of the economies of scale that large plans provide recordkeepers.

55.     With over 230,000 participants and billions of dollars in assets during the class period, the Plan is one of the largest defined contribution plans in the United States.

56.     The Plan thus had the bargaining power to obtain and maintain very low fees for recordkeeping and other administrative services and had significant leverage to procure high quality management and administrative services at a low cost.

57.     Defendants failed to leverage the Plan's size to obtain reasonable recordkeeping fees.

58.     And, for those lower prices, other very large plans receive equivalent or better recordkeeping services than did the Plan.

59.     Between 2011 and 2016, the Plan's participants paid Fidelity at least the following amounts in direct compensation payments for recordkeeping services:

| Year | Total Direct Compensation Paid to Fidelity |
|------|--------------------------------------------|
| 2011 | $    5,055,000.00[2] |

---

[2] In 2011, the Plan merged with another defined contribution plan, the AT&T Savings Plan (the "ASP"). Prior to the merger, there were only 55,000 participants in the Plan. In 2011, the ASP paid roughly $8.5 million to Fidelity for recordkeeping and administrative services in addition to the $5,055,000 reported in the Table, making the total fees paid for the two plans $13,555,000 for 2011.

| Year | Total Direct Compensation Paid to Fidelity |
|------|--------------------------------------------|
| 2012 | $ 13,267,000.00 |
| 2013 | $ 14,086,000.00 |
| 2014 | $ 15,068,000.00 |
| 2015 | $ 15,015,000.00 |
| 2016 | $ 15,529,000.00 |

60.     Thus, for each year after 2011, when the Plan had, on average, 230,000 participants, the Plan's participants paid, on average, roughly $61 per participant each year in recordkeeping expenses through direct compensation.

61.     Typically, large ERISA defined contribution plans—even plans much smaller than the Plan—pay far less for those recordkeeping services than did the Plan. Generally, very large plans pay no more than roughly $30 per participant for comparable recordkeeping services, although some large plans pay even less than that.

62.     For example, according to 5500s on file with the EBSA, the Home Depot Future builder Plan, roughly comparable to the AT&T Plan though with fewer participants (approximately 200,000 participants with account balances and with much lower assets ($6 billion), reported direct compensation to Hewitt Associates for services comparable to the services being provided by Fidelity of approximately $28 per participant each year since 2012.   The FedEx Corporation Retirement Savings Plan, which uses the Vanguard Group as the plan's recordkeeper and has 220,000 participants and $13 billion in assets, paid between $23 and $30 per participant from 2012 through 2016.   The HCA 401(k) Plan, with more than 250,000 participants and $14 billion in assets, uses Xerox HR Solutions as recordkeeper and has paid between $24 and $30 per participant since 2012 in direct compensation for services comparable to the services being provided by Fidelity.   The Costco 401(k) Plan paid T. Rowe Price as recordkeeper $29 per participant in 2015, $38 per participant in 2016 and $35 per participant in 2017.   The Bank of America 401(k) Plan, with more than 240,000 participants and $20 billion in assets, paid Fidelity $30 per participant in 2015, then reduced the per participant charge to $14 per participant by moving the plan to the Merrill Lynch recordkeeping platform.

63.    According to data compiled in the 2018 edition of the 401k Averages Book, for plans with 100 participants and $5 million in assets (*i.e.* plans substantially smaller than the Plan), the average record-keeping / administration fee was $35 per participant.

64.    The reasonableness of record-keeping and administration fees is not static.  Rather, from 2010 until recently, such fees have been consistently falling, due to lawsuits challenging such fees, fee disclosure regulations issued in 2012, increased competition among service providers, and greater fiduciary attention to this issue.

65.    It is now the standard of care for fiduciaries, especially those for the largest plans, to periodically solicit formal bids via request for proposals for recordkeeping and administrative services.

66.    There is no indication that Defendants engaged in any meaningful process to solicit competitive bids or even benchmark the Plan's record-keeping and administrative fees. Had Defendants done so, they would have received bids and/or market information consistent with the data presented above for comparable plans.  Instead, Defendants engaged Fidelity for the entire relevant period and the total direct compensation paid to Fidelity was never substantially reduced, contrary to the trend during the relevant time period for lower recordkeeping and administrative fees.

67.    Those recordkeeping costs were ultimately borne by all the Plan's participants. *E.g.*, 2013 Summary Plan Description (ECF No. 33-1), at 40 ("Under the Plan, all expenses incurred to administer the Plan are charged directly to participants, either directly to their accounts or through the Plan's Trust or investment funds... Some examples of these types of administrative expenses include recordkeeping fees, communications fees and legal fees.").

68.    For many years, the DOL has provided guidance to plan fiduciaries regarding the performance of their obligations, including guidance regarding contracting for plan services:

> In selecting a service provider, plan fiduciaries must, consistent with the requirements of section 404(a), act prudently and solely in the interest of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan. Except as provided in section 408, plan fiduciaries also have an obligation under section 406(a) not to cause the plan to engage in certain transactions, including a direct or indirect furnishing of goods, services or facilities between the plan and a party in interest. Section 408(b)(2) exempts from the prohibitions of section 406(a) any contract or reasonable arrangement with a party in

interest, including a fiduciary, for office space, or legal, accounting or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.[2]  In carrying out these responsibilities, the Department has indicated that a plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of services offered, and the reasonableness of the fees charged in light of the services provided.[3]

69.     The failure to do so provides significant evidence that Defendants' fiduciary process was seriously flawed.  But most importantly for this case, by failing to implement an objective oversight process, the Plan fiduciaries failed learn of the enormous additional compensation Fidelity gleaned from Financial Engines and BrokerageLink and failed to require that the Plan receive credit for that compensation as an offset to recordkeeping fees.  As a result, Defendants have violated the duties of prudence by failing to account for all the direct and indirect compensation received by Fidelity.

70.     Amounts that were charged against the Trust or the Plan's investment choices for the purpose of paying the Plan's recordkeeping and other administrative expenses, through revenue sharing or otherwise, were applied to satisfy the aggregate obligation of the Plan to pay Fidelity's compensation, and not just to the expenses attributable to or allocable to the individual participants who had invested in the funds being charged for those expenses.

71.     The fact that the Plan's reported compensation paid to Fidelity indicates that participants consistently paid roughly double the amount being paid by similar or even smaller jumbo plans for recordkeeping services to any of four of the other major recordkeeping platform providers, without even considering the millions of dollars in additional unreported indirect compensation, suggests that the Plan's fiduciaries failed to fulfill their fiduciary responsibilities and/or as described below, acted out of self-interest.

72.     On information and belief, the Defendants, who were the Plan's fiduciaries and had the primary fiduciary duty to control the Plan's administrative and recordkeeping expenses, failed to take

---

[3] DOL Field Assistance Bulletin 2002-3, available at https://www.dol.gov/ebsa/regs/fab2002-3.html, last viewed July 27, 2018.

reasonable and prudent steps to investigate, evaluate control those costs and ensure that the Plan paid no more than a reasonable amount. On information and belief, Defendants failed to implement a prudent process to periodically review Fidelity's total compensation, failed to demand an accurate accounting of the indirect compensation received by Fidelity, and/or failed to evaluate whether comparable or better services could have been obtained in the market for less.

73.    A prudent and loyal fiduciary in Defendants' position would have engaged an independent third party to benchmark the reasonableness of the direct and indirect compensation received by Fidelity to ensure that only reasonable fees were charged to Plan participants. Moreover, a prudent and loyal fiduciary in Defendants' position would have conducted a competitive bidding process for the Plan's recordkeeping services every few years to ensure that the Plan was paying no more than an acceptable market rate for the services it was receiving—particularly because recordkeeping fees for large plans such as the Plan have been declining steadily since well before the start of the class period. Given that recordkeeping fees for the Plan were well above the market rate, on information and belief, Defendants failed to prudently and loyalty retain an independent third-party advisor or conduct a competitive bidding process during the class period. In the alternative, if Defendants in fact did retain an advisor or conduct a bidding process, they either did so imprudently (for example, by failing to investigate the advisor's credentials, conflicts of interest or basis for results) or they ignored the unmistakable results of that process and failed to protect the interests of participants in a prudent and loyal manner.

74.    These failures were not isolated but were ongoing over a period of many years—starting no later than 2012 and continuing to today.

75.    Had Defendants adopted and carried out a prudent process to monitor and control the Plan's recordkeeping expenses, they would have greatly reduced the amount of recordkeeping expenses paid by the Plan's participants.

76.    Defendants' failure to adopt and carry out such a prudent process cost Plan participants tens of millions of dollars in unnecessary recordkeeping expenses during the class period.

77. Defendants' failures are also illustrated by the handful of changes to the recordkeeping fees implemented during the class period. That is, during the class period, two of the sources of administrative fees paid to Fidelity were reduced or eliminated, but the total amount of fees and the amount paid per participant did not decline. Throughout the class period, Plan participants paid a flat recordkeeping fee directly out of their Plan accounts.

(a) As late as 2013, however, the Plan's participants also paid a 0.01% asset-based fee to Fidelity, deducted from participants' holdings in all but one of the Plan's investment options. In 2014, the Plan eliminated those fees. However, despite eliminating that source of recordkeeping fees, the Plan's participants paid 6.67% more in total to Fidelity that year--$15 million in 2014 compared to $14 million in 2013. In addition, the recordkeeping fees per participant surged from $58.11 to $68.37 – a 15% increase.

(b) As late as 2015, the Plan's participants that invested in the AT&T Total Return Bond Fund paid an additional recordkeeping fee. The formula amount of that fee declined each year from 2012 (when the fee was 0.17%) to 2015 (when the fee was 0.02%), before the fee was eliminated entirely in 2016. Yet, as with the recordkeeping fees for the other investment options, Fidelity's fees did not decline.

Despite these apparent fee decreases, the actual amount of direct compensation the Plan's participants paid to Fidelity did not decline between 2012 and 2016. Any reasonably prudent fiduciary would have evaluated why the direct compensation to Fidelity continued to grow despite reducing or eliminating sources of fees.

78. Moreover, the disclosures provided to Plan participants (such as summary plan descriptions ("SPDs") and periodic account statements) as well as in other publicly available documents (such as the Form 5500s) are so opaque that it is impossible to determine either the total amount of compensation (direct and indirect) that participants pay to Fidelity. The Plan's 5500s, for example, do not report either the amount of Fidelity's indirect compensation or the formula used to determine that amount. It is also impossible to determine from these documents whether any particular

fees were counted as direct or indirect, or even the nature or sources of the types of compensation that participants are paying Fidelity apart from the flat fee. Nor do the disclosures provide any direct information about Defendants' fiduciary process with respect to these recordkeeping fees.

79.     Defendants failed to properly monitor Fidelity's total compensation from all sources in relation to the services Fidelity provided and available alternatives in the marketplace and thus caused the Plan's participants to pay unreasonable administrative expenses to Fidelity.

### *Defendants' Self-Interest*

80.     Defendants' fiduciary failures were not simple imprudence but were motivated in part by Defendants' self-interest on behalf of not only Defendants but also Defendants' affiliates, including AT&T.

81.     Through AT&T's senior management, Defendants stepped in and controlled the selection and retention of Fidelity as a service provider for the Plan.

82.     Through AT&T's senior management, Defendants also negotiated the terms of Fidelity's agreement with the Plan, including Fidelity's compensation.

83.     Defendants undertook to select and retain Fidelity for their own benefit and for the benefit of AT&T, and not for the benefit of the Plan or its participants.

84.     Defendants or their affiliates retained Fidelity as an administrative service provider for certain other defined benefit pension benefit plans and other employee benefit programs that AT&T sponsors at the same time that Defendants retained Fidelity as a service provider for the Plan.

85.     On information and belief, part of the larger agreement between Defendants and AT&T, on one hand, and Fidelity, on the other hand, required the Plan's participants to pay Fidelity greater than market compensation for providing services to the Plan—while Fidelity provided discounts on administrative services to other employee benefit plans (for which AT&T itself otherwise would have had to pay) and/or provided other benefits to AT&T.

86.     This deal with Fidelity was motivated primarily by Defendants' and AT&T's self-interest and benefitted Defendants, AT&T and Fidelity at the expense of the participants in the Plan. That conduct violated Defendants' duty of loyalty under ERISA and caused Plan participants to incur

1  unnecessary administrative expenses to relieve AT&T of costs and expenses related to other employee

2  benefit programs.

3  **Financial Engines**

4  87.  Financial Engines offers automated investment advice and account management

5  services to participants in qualified retirement plans.  For a fee, Financial Engines will effectively

6  assume the investment management of an individual's plan account and allocate the account among

7  the various investment choices in the plan in a manner deemed appropriate for an individual based on

8  his or her age, income, family status and other assets.  The computer-based program will periodically

9  re-balance a participant's assets among the selected investment choices and will modify the asset

10 allocation as a participant grows older.

11 88.  The Financial Engines program was first introduced to the Plan in 2015.

12 89.  To implement the services of Financial Engines, Fidelity provides access to

13 participants' accounts through a secure communications link, just as it provides to participants internet

14 access to their accounts in order to manage the investment of their accounts.  That is the only function

15 or service provided by Fidelity in connection with the Financial Engines advice program.  Financial

16 Engines pays a significant portion of the fees it collects from participants to Fidelity.  On information

17 and belief, Financial Engines pays Fidelity nearly half of its fees.

18 90.  Financial Engines needs only a single connection to Fidelity to access the accounts of

19 all participants in the Plan. Therefore, the nature and extent of whatever service Fidelity is actually

20 providing does not change from year to year or vary depending on how many participants enroll in

21 the Financial Engines advice program.  Yet Fidelity is receiving an asset-based fee for this fixed level

22 of service.

23 91.  In 2015, Financial Engines received $2,266,000 in direct compensation from the Plan.

24 In connection that compensation, Financial Engines paid Fidelity roughly $1.1 million for that secure

25 communications link.

26

27

28

92.     In 2016, Financial Engines received $4,004,000 in direct compensation from the Plan. In connection that compensation, Financial Engines paid Fidelity roughly $2 million for the same secure communications link that the previous year cost only $1.1 million.

93.     But the compensation situation is far more egregious than even that.  In all likelihood, Financial Engines requires only a single communications link to the Fidelity system for all the plans on Fidelity's platform that have elected to include the Financial Engines program as part of their plan services.  Accordingly, in 2015, when Fidelity was receiving $1.1 million in compensation for providing Financial Engines with a secure communications link, it was receiving approximately $3 million from the Delta Airlines Family Care Savings Plan for the same communications link.  And in 2016, as Fidelity was receiving $2 million in compensation for the link the cost only $1.1 million the preceding year, Fidelity was also receiving approximately $4 million from the Delta Airlines Family Care Savings Plan for the same communications link, and millions more from all the other plans on the Fidelity platform that offer the Financial Engines advice program.

94.     Defendants failed to properly investigate or evaluate the fees being paid to Financial Engines and the extent to which those fees were grossly inflated to cover the enormous amount being received by Fidelity, ostensibly for a secure communications link, or that hundreds of plans were indirectly paying Fidelity for the same communications link.  More importantly, Defendants failed to investigate or evaluate the indirect compensation being paid to Fidelity and failed to account for that compensation in evaluating the aggregate compensation being received by Fidelity for recordkeeping and administrative services.

95.     Thus, since Financial Engines provided its advice services for far less than the fee that was being charged to participants who subscribed to that service, participants, including Plaintiff Simecek, paid Financial Engines excessive fees for the services Financial Engines provided to them as a direct result of the illegal kickback to Fidelity.  Simecek had no knowledge of the fee arrangement between Financial Engines and Fidelity until shortly before the filing of the First Amended Complaint on Mach 27, 2018.

**Annual Returns on Form 5500**

96.     Every qualified retirement plan with 100 or more participants is required to file with the EBSA an Annual Return on Form 5500 detailing financial information about the plan.  Among other required reporting, the Form 5500 must identify every service provider who received more than $5,000 in compensation for the reporting year and the amount of all direct and indirect compensation received.

97.     The complete Annual Return on Form 5500 is not required to be provided to participants unless it is expressly requested by a participant and the participant pays associated copying costs. Participants receive only a Summary Annual Report that does not contain the detailed financial information required to be included on the 5500.

98.     The Plan's Annual Reports reflect that the Plan paid direct compensation to Fidelity, the Plan's recordkeeper, and the amount of that direct compensation. The Plan's Annual Reports also indicate that Fidelity received indirect compensation. There is no information included in the Annual Report, however, regarding the amount of that indirect compensation or the source of that indirect compensation.

99.     In fact, the 5500s falsely report that Fidelity Investments Institutional Operations Company received $0 in indirect compensation other than "eligible indirect compensation."  In other words, the 5500 reports that all indirect compensation received by Fidelity as recordkeeper was "eligible indirect compensation."  "Eligible indirect compensation" is a defined by the federal regulation governing the disclosure obligations of plan service providers as fees or expenses that are charged to the plan's investment funds and reflected in the value of the investment, that were not paid directly by the plan or sponsor.

100.    The EBSA has also issued additional guidance regarding these reporting obligations in the form of Frequently Asked Questions, which clarify that 12b-1fees, brokerage commissions and fees charged in connection with purchases and sales of interests in a fund, fees for providing services to plan investors or plan participants such as communication and other shareholder services, and fees relating to the administration of the employee benefit plans such as recordkeeping services, Form 5500 filing and other compliance services, would be reportable indirect compensation for Schedule C

purposes.  Accordingly, all these amounts of direct and indirect compensation (excluding the "eligible indirect compensation") must be separately identified and reported.

101.   The indirect compensation paid to Fidelity from Financial Engines does not qualify as "eligible indirect compensation, and the failure to report that indirect compensation clearly violates Defendants' reporting obligations.

102.   The relevant pages of the 5500s for the Plan for the 2011 through 2016 reporting years that include any information about the services being provided and the compensation received by Fidelity and Financial Engines are attached as Exhibit B.  It is readily apparent that there is no disclosure of the indirect compensation being received by Fidelity from Financial Engines despite the clear legal obligation to do so.

103.   It should also be apparent that it takes an expert to decipher the report and determine that either Fidelity has taken the position on the 5500 that all of Fidelity's indirect compensation was being characterized as "eligible indirect compensation," which is false, and that Defendants did nothing to correct that false reporting.

104.   It is apparent that no average Plan participant would be able to read the Annual Return and understand in any level of detail how much total compensation was being received by Fidelity and for what services.  While the box on the left side of the form includes "service codes," there is no indication of what those service codes represent or where to find additional information.  No average participant, and none of he named Plaintiffs, would have the slightest idea what distinguishes "indirect compensation" from "eligible indirect compensation" or be able to infer from a review of the 5500 that Fidelity was receiving millions of dollars in compensation that was not being reported on the 5500.

105.   Whether a service contract, like the contract between the Plan and Fidelity, results in an actionable non-exempt prohibited transaction depends in significant part on whether the compensation paid for the service is reasonable in relation to the services being provided.  29 C.F.R. 2550.408b-2(c). The only compensation reported on the Plan's 5500s is the direct compensation paid to Fidelity along with a series of two-digit service codes, with no indication of what the service codes mean specifically

with respect to Fidelity's direct compensation or where to find that information. Unlike a comparison of expenses charged for different mutual funds, such as the difference between the Fidelity Magellan Fund and the Vanguard Wellington Fund, for which there is ample and readily available public information, no average AT&T employee would have any basis for evaluating the reasonableness of the compensation that was actually reported. In short, nothing about the 5500 reporting should be deemed to have provided any Plan participant with "actual knowledge of the breach or violation" alleged in this Complaint, especially with respect to the millions of dollars of additional compensation that Fidelity and Defendants have failed to report.

106. Apart from the false and misleading 5500s, there is no disclosure provided to participants, including the named Plaintiffs, that discloses Fidelity's total direct and indirect compensation or that Fidelity was even receiving compensation from Financial Engines. Accordingly, none of the named Plaintiffs had actual knowledge of Defendants' breaches alleged herein until, in the case of Julio Alas, shortly before the filing of the original Complaint on November 3, 2017, and in the case of Bugielski and Simecek, shortly before the filing of the First Amended Complaint on March 27, 2018.

107. To the extent that 5500s form part of the basis for Plaintiffs claims, they are 5500s of other retirement plans unrelated to AT&T that disclosed the fee-splitting arrangement between Financial Engines and Fidelity. Therefore, Plaintiffs could not have discovered Defendants' alleged breaches by reference to any of the Plan's 5500s prior to the analysis by Plaintiffs' current counsel, which was performed during the six-month period preceding the filing of the First Amended Complaint.

108. Defendants' failure to properly report Fidelity's compensation on the Plan's 5500s constitutes a violation of Defendants' fiduciary duty of candor and served to conceal from Plaintiffs the full amount of Fidelity's compensation.

**Defendants' Fiduciary Status**

109. ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

110.   The plan may also expressly provide a procedure for allocating responsibilities among fiduciaries or for named fiduciaries to designate others to carry out fiduciary responsibilities. ERISA § 405(c)(1), 29 U.S.C. § 1105(c)(1).

111.   ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in fact* perform a fiduciary function. Thus, in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i) & (iii), 29 U.S.C. § 1002(21)(A)(i).

112.   Appointing a fiduciary is itself an act of discretionary control over a plan. As such, appointing a fiduciary is a fiduciary function, and those who appoint fiduciaries are subject to ERISA's fiduciary duties to the extent they do so. *E.g.*, *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). In addition, hiring a non-fiduciary service provider for a plan is also a fiduciary function.[4]

113.   Here, the Plan document provided that AT&T Services was the "Plan Administrator." 2011 Plan Document, § 3.1(86). The Plan also provided that "the Plan Administrator is the 'administrator' and the 'named fiduciary' with respect to the general administration of the Plan." *Id.* § 15.1. According the SPD, "[t]he Plan Administrator has all powers necessary to accomplish its Plan duties." 2013 SPD, at 57 (ECF No. 33-1 at 82 of 112).

114.   The Plan permitted the Plan Administrator to, "from time to time delegate to one or more of the Employer's officers, employees, committees, or agents, or to any other person or organization, any of its fiduciary and/or ministerial powers, duties, and responsibilities with respect to the operation and administration of the Plan…." 2011 Plan Document, § 15.3. The Plan stated that "[t]he Plan Administrator, or its delegate, will make available investment options under the Plan other

---

[4] *Meeting Your Fiduciary Responsibilities*, EBSA ("Hiring a service provider in and of itself is a fiduciary function."). http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (last visited July 28, 2016).

than the Company Stock Fund ("Non-ESOP Investment Funds"). The Non-ESOP Investment Funds will be selected and removed from time to time by the Plan Administrator and communicated to the Participants." *Id.* § 8.1(3).

115.    The Plan documents designate AT&T Services as the Plan Administrator and as a Named Fiduciary with respect to the general administration of the Plan. AT&T Services delegates much of its authority to the Committee. In particular, under the heading "Administration of the Plan," the SPD indicates that "[t]he Benefit Plan Investment Committee has authority and responsibility for functions related to the investment funds and Trusts associated with the Plan." 2013 SPD, at 57. Under the subheading "Delegation of Duties," the SPD indicates that "[t]he Benefit Plan Investment Committee, or its delegates (which may include committees or individuals), chooses the Plan's investment funds, investment managers and Trustees and is responsible for certain other related functions." *Id.* Accordingly, AT&T Services, the Committee and the Committee Member Defendants had primary fiduciary responsibility for retaining Fidelity and negotiating and monitoring Fidelity's compensation.

## CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), or, in the alternative, 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons (the Class):

> All participants in and beneficiaries of the AT&T Retirement Savings Plan at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breaches through the date of judgment.

117.    The members of the Class are so numerous that joinder of all members is impracticable. At all relevant times, the number of class members was two hundred thousand or more.

118.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the class.  Among such questions are:

   i. Whether Defendants failed in their fiduciary duties with respect to the administration, management and supervision of recordkeeping and bookkeeping providers;

   ii. Whether Defendants failed in their fiduciary duties to act as prudent financial managers and to minimize plan administrative fees and investment option operating expenses;

   iii. Whether the operating expenses charged, collected and negotiated in connection with the Plan investment options were reasonable;

   iv. Whether the annual notices on fees made adequate disclosure; and,

   v. Whether Defendants' breaches of fiduciary duties caused losses to the Plan and its participants, and if so, in what amount.

119. There are no substantial individual questions among Class members on the merits of this action.

120. Plaintiffs' claims are typical of the members of the Class.

121. Plaintiffs have been injured by the alleged breaches of fiduciary duties and is committed to fairly, adequately and vigorously representing and protecting the interests of Class members.

122. Plaintiffs have retained counsel who are experienced in class action litigation.

123. Neither Plaintiffs, nor their counsel, have any interests that would cause them to refrain from vigorously pursuing this action.

124. Plaintiffs are adequate class representatives.

125. Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

126. In the alternative, class certification is also appropriate under Fed. R. Civ. Pro. 23(b)(3) because common issues of law and fact predominate over questions affecting only individual members of the Class.

127.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Defendants have injured Plaintiffs and the members of the Class by diminishing their investment returns.   The diminution of returns and excessive fees are relatively small for each individual, but large in the aggregate.   Individual participants have an insufficient stake in the outcome of this matter to devote substantial resources to pursue it so only through a class action mechanism can their claims be effectively pursued.

128.   On information and belief, the names and addresses of all Class members are available through Defendants, and adequate notice can be provided to Class members as required by Fed. R. Civ. Pro. 23.

**COUNT I**
**Breaches of Fiduciary Duties of Prudence and Candor and Prohibited Transactions**
**ERISA §§ 404(a); 29 U.S.C. §§ 1104(a)**
**All Defendants**

129.   Plaintiffs repeat and re-allege each of the allegations in the foregoing paragraphs as if fully set forth herein.

130.   ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently and loyally, in particular, "solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and "(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

131.   ERISA § 406(b)(1) supplements the general duty of loyalty, and provides that "A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

132.   As alleged above, Defendants were express and/or de facto fiduciaries with respect to selecting Fidelity as the Plan's recordkeeper, negotiating the terms of the Plan's recordkeeper's service, including the fees paid to Fidelity, and annually monitoring the aggregate amount of

compensation being paid to the Plan's recordkeeper, taking into account all direct and indirect compensation being received by Fidelity.

133.   Defendants imprudently failed to design or implement a process to evaluate or control the administrative expenses that the Plan's participants paid to the Plan's recordkeeper, and imprudently failed to analyze and evaluate compensation paid to Fidelity from Financial Engines and investment through BrokerageLink.

134.   Defendants' failures resulted in the Plan participants paying grossly excessive fees to Fidelity based on the size of the Plan, the nature of the services provided by the recordkeeper, and the ready availability of comparable but less expensive services from other providers in the marketplace.

135.   Defendants were obligated to report on Form 5500 all direct and indirect compensation received by Fidelity in connection with the provision of recordkeeping and administrative services but failed to do so.   Instead, Defendants erroneously and misleadingly reported that all of Fidelity's indirect compensation was "eligible indirect compensation; a report that is demonstrably false.

136.   Defendants thereby violated the duty of candor contained in ERISA § 404(a) and recognized by numerous federal courts.

137.   In addition, Defendants' conduct described above violated the co-fiduciary duties set forth in ERISA § 405(a).

138.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties must "make good" to the plan the losses to the plan resulting from its violations of ERISA and is "subject to such other equitable or remedial relief as the court may deem appropriate."

139.   Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA §§ 404(a) and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**COUNT II**
**Prohibited Transactions**
**ERISA § 406(a), 29 U.S.C. § 1106(a)**
**All Defendants**

140.   Plaintiffs repeat and re-allege each of the allegations in the foregoing paragraphs as if fully set forth herein.

141.   ERISA § 406(a) categorically prohibits certain transactions between plans and parties in interest. In particular, "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(C) furnishing of goods, services, or facilities between the plan and a party in interest."

142.   Fidelity and Financial Engines were and are parties in interest as that term is used in ERISA § 3(14); 29 U.S.C. § 1002(14) and are providing services to the Plan. Defendants are all fiduciaries, and in that capacity are parties in interest under § 3(14)(A). AT&T is also "an employer any of whose employees are covered by such plan," and is as such a party in interest under § 3(14)(C). AT&T Services is a wholly owned subsidiary of AT&T and is a party in interest under § 3(14)(G). Fidelity is "a person providing services to such plan" and party in interest under § 3(14)(B). The Committee Member Defendants are employees, officers or directors of AT&T and are accordingly parties in interest under § 3(14)(H).

143.   Defendants, as "responsible plan fiduciaries" as that term is defined in 29 C.F.R. 408b-2(c), were legally obligated as of July 31, 2012 to obtain from Fidelity detailed disclosures regarding all the services Fidelity was providing and all direct and indirect compensation Fidelity expected to receive in connection with those services and to affirmatively determine that the aggregate compensation Fidelity would receive was reasonable in relation to the services being provided. Defendants failed to obtain the disclosures required by 29 C.F.R. § 2550.408b-2(c) that were necessary to ensure that the services agreement with Fidelity met the conditions of ERISA section 408(b)(2) and failed to take into account the millions of dollars of additional compensation Fidelity was receiving from Financial Engines thereby causing the Plan to engage in a non-exempt prohibited transaction prohibited by ERISA § 406(a)(1).

144.   In addition, Defendants' conduct described above violated the co-fiduciary duties set forth in ERISA § 405(a).

145.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties must "make good" to the plan the losses to the plan resulting from its violations of ERISA and is "subject to such other equitable or remedial relief as the court may deem appropriate."

146.   Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 406(a)(1) and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**COUNT III**
**Breaches of Fiduciary Duties of Prudence and Candor and**
**Self-Dealing Prohibited Transactions**
**ERISA §§ 404(a), 406(b)(1); 29 U.S.C. §§ 1104(a) & 1106(b)(1)**
**All Defendants**

147.   Plaintiffs repeat and re-allege each of the allegations in the foregoing paragraphs as if fully set forth herein.

148.   ERISA § 406(b)(1) supplements the general duty of loyalty, and provides that "A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

149.   Defendants disloyally entered into an arrangement with Fidelity that increased the costs of the Plan's recordkeeping services while saving AT&T money on the administration of other plans and programs.

150.   Defendants' failures resulted in the Plan participants paying grossly excessive fees to Fidelity based on the size of the Plan, the nature of the services provided by the recordkeeper, and the ready availability of comparable but less expensive services from other providers in the marketplace.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as follows:

A.   Certify this action as a class action and appoint Plaintiffs' counsel as class counsel pursuant to F. R. Civ. Pro. 23;

B.   Declare that Defendants have breached their fiduciary duties to the Class;

C.   Enjoin Defendants from further violations of their fiduciary responsibilities, duties and obligations under ERISA;

D.   Require that Defendants provide enhanced disclosures regarding revenue sharing;

E.   Order that Defendants make good to the Plan all losses resulting from their breaches of fiduciary duties;

F.   Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duties;

G.   Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. 1132(g), and/or for the benefit obtained for the common fund;

H.   Order Defendants to pay pre-judgment interest; and,

I.   Award such other and further relief as the Court deems just.

DATED: November 12, 2018                    Respectfully submitted,


                              By:  */s/ James A. Bloom*
                                   Todd M. Schneider (SBN: 158253)
                                   Jason H. Kim (SBN: 220279)
                                   Kyle G. Bates (SBN: 299114)
                                   James A. Bloom (SBN: 311051)
                                   SCHNEIDER WALLACE COTTRELL
                                   KONECKY WOTKYNS LLP
                                   2000 Powell Street, Suite 1400
                                   Emeryville, California 94608
                                   Telephone: (415) 421-7100
                                   Facsimile: (415) 421-7105
                                   tschneider@schneiderwallace.com
                                   jkim@schneiderwallace.com
                                   kbates@schneiderwallace.com
                                   jbloom@schneiderwallace.com

                                   Garrett W. Wotkyns (*Pro Hac Vice*)
                                   John J. Nestico (*Pro Hac Vice*)
                                   SCHNEIDER WALLACE COTTRELL
                                   KONECKY WOTKYNS LLP
                                   8501 N. Scottsdale Rd., Suite 270
                                   Scottsdale, Arizona 85253
                                   Telephone: (480) 315-3841
                                   Facsimile: (866) 505-8036

gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

Todd S. Collins (*Pro Hac Vice*)
Ellen T. Noteware (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
enoteware@bm.net

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles. California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for United States District Court, Central District of California, by using the Court's CM/ECF system on November 12, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system. Certain defendants named in this amended complaint who were not previously named as defendants will be served separately.

*/s/ James A. Bloom*
James A. Bloom