1  MAYER BROWN LLP
   Nancy G. Ross (*pro hac vice*)
2     *nross@mayerbrown.com*
   Richard E. Nowak (*pro hac vice*)
3     *rnowak@mayerbrown.com*
   Jed W. Glickstein (*pro hac vice*)
4     *jglickstein@mayerbrown.com*
   71 South Wacker Drive
5  Chicago, IL 60606
   (312) 782-0600
6  (312) 701-7711 – Facsimile

7  John Nadolenco (SBN 181128)
      *jnadolenco@mayerbrown.com*
8  350 South Grand Ave
   25th Floor
9  Los Angeles, CA 90071-1503
   (213) 229-9500
10 (213) 625-0248 – Facsimile

11 *Attorneys for Defendants*

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

15

16 ROBERT J. BUGIELSKI and CHAD          Case No. 2:17-cv-8106-VAP-RAO
   S. SIMECEK, individually as
17 participants in the AT&T Retirement    **DEFENDANTS' NOTICE OF**
   Savings Plan and as representatives of **MOTION AND MOTION FOR**
18 all persons similarly situated,        **SUMMARY JUDGMENT**

19                   Plaintiffs,          Date: August 23, 2021
20          v.                            Time: 2:00 PM
                                          Place: Courtroom 8A
21 AT&T SERVICES, INC. and the
   BENEFIT PLAN INVESTMENT              Judge: Hon. Virginia A. Phillips
22 COMMITTEE,

23                   Defendants.

24

25

26

27 ┌─────────────────────────────────────────────────────────┐
   │  **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED**    │
28 │                     **UNDER SEAL**                        │
   └─────────────────────────────────────────────────────────┘

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on August 23, 2021 at 2:00 PM, or as soon as the matter may be heard in the Courtroom of the Honorable Virginia A. Phillips, whether virtually or in courtroom 8A located in the United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Defendants AT&T Services, Inc. and the Benefit Plan Investment Committee will and hereby do move the Court for an order, pursuant to Federal Rule of Civil Procedure 56(c), granting summary judgment on all claims in the Third Amended Complaint ("TAC").

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place by telephone on Wednesday, June 2, 2021. *See* Declaration of Nancy G. Ross ¶ 1.

The Motion is based on the following grounds:

1. Defendants are entitled to judgment on Count I for breach of the duty of prudence under ERISA, related to recordkeeping expenses, because neither of the named defendants have fiduciary responsibility for the challenged acts. Even if plaintiffs had named the correct defendants, their claims still would fail because plaintiffs have no evidence of an imprudent process. Fee arrangements involving self-direct brokerage accounts or investment advisory services do not support plaintiffs' claims as a matter of law or as a factual matter. Separately, plaintiffs have no evidence of causation or loss. The Plan's actual recordkeeping fees were equal to—and often much lower than—the rates that Plaintiffs alleged would have been reasonable.

2. Defendants are entitled to judgment on Count II alleging prohibited transactions under ERISA, because hiring and paying a service provider for services rendered to the plan does not amount to a prohibited transaction under ERISA Section 406(a)(1)(C). Even if Section 406(a)(1)(C) applied here, ERISA Section 408(b)(2) exception would also apply and defeat liability because the services

Fidelity and Financial Engines provided to the plan were necessary. Further, the fees the Plan paid to Fidelity and Financial Engines were reasonable under Plaintiffs' own standards.

3. Plaintiffs have no claim for injunctive relief based on purportedly incorrect Form 5500s filed with the Department of Labor because plaintiffs lack Article III standing. Even if Plaintiffs had standing, they cannot show a predicate ERISA violation, and Defendants complied with all applicable reporting instructions.

The Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, Defendants' Statement of Undisputed Facts, the Declaration of Nancy G. Ross and all exhibits attached thereto, the Declaration of Julianne Galloway, the Declaration of John Phipps, the pleadings, papers, and records in this action, and on any other such matters and evidence as may be presented to the Court at the hearing.

Dated: June 14, 2021                Respectfully submitted,

                                     MAYER BROWN LLP
                                     Nancy G. Ross
                                     Richard E. Nowak
                                     Jed W. Glickstein
                                     John Nadolenco

                                     By: */s/ Nancy G. Ross*
                                     Nancy G. Ross

                                     *Attorneys for Defendants AT&T*
                                     *Services, Inc. and Benefit Plan*
                                     *Investment Committee*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 1

    A.    The AT&T Retirement Savings Plan ............................................ 1

    B.    Plan Recordkeeping ..................................................................... 2

    C.    Other Plan Services ..................................................................... 3

    D.    Procedural History ....................................................................... 5

ARGUMENT ..................................................................................................... 6

I.    Plaintiffs Have No Evidence Of Imprudence (Count I) ............................ 6

    A.    Neither Of The Named Defendants Have Fiduciary Responsibility For The Challenged Conduct ...................................... 7

    B.    Plaintiffs Have No Evidence Of An Imprudent Process .................... 7

    C.    Financial Engines And BrokerageLink Fee Arrangements Do Not Support Plaintiffs' Claims ........................................................ 9

    D.    Plaintiffs Have No Evidence Of Loss Or Causation ........................ 12

        1.    Plaintiffs Have No Evidence Of Loss ..................................... 13

        2.    Plaintiffs Have No Evidence Of Causation .............................. 14

II.    Plaintiffs' Voluntary Dismissal Of Count III Confirms That There Was No Fiduciary Breach ........................................................................ 15

III.    Plaintiffs Have No Evidence Of A Prohibited Transaction (Count II) ........ 16

IV.    Plaintiffs Have No Claim Based On The Form 5500s ................................ 18

    A.    Plaintiffs Lack Standing To Bring Claims Based On Form 5500s ........................................................................................... 18

    B.    Defendants Did Not Violate Any Underlying Duty .......................... 19

    C.    Defendants Complied With Applicable Requirements...................... 23

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Warnaco, Inc.*,
   55 F.3d 117 (3d Cir. 1995) ...................................................................21

*Acosta v. Brain*,
   910 F.3d 502 (9th Cir. 2018) ...............................................................21

*Anderson v. Intel Corp. Investment Policy Committee*,
   2021 WL 229235 (N.D. Cal. Jan. 21, 2021) .......................................19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................1, 6

*Anoka Orthopaedic Assocs., P.A. v. Lechner*,
   910 F.2d 514 (8th Cir. 1990) ...............................................................22

*Ariz. State Carpenters Pension Tr. Fund v. Citibank (Ariz.)*,
   125 F.3d 715 (9th Cir. 1997) ............................................................7, 8

*Armijo v. ILWU-PMA Coastwise Indemnity Plan*,
   2018 WL 6265062 (C.D. Cal. Nov. 14, 2018) ...................................20

*Bafford v. Northrop Grumman Corp.*,
   994 F.3d 1020 (9th Cir. 2021) ......................................................21, 22

*Brotherston v. Putnam Investments, LLC*,
   907 F.3d 17 (1st Cir. 2018) .................................................................13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..............................................................................6

*Chendes v. Xerox HR Sols., LLC*,
   2017 WL 4698970 (E.D. Mich. Oct. 19, 2017) ..................................11

*Cunningham v. Cornell Univ.*,
   2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ....................................14

*Dawson-Murdock v. Nat'l Counseling Grp., Inc.*,
   931 F.3d 269 (4th Cir. 2019) ...............................................................21

*Devonshire v. Johnston Grp. First Advisors*,
300 F. Supp. 2d 516 (N.D. Ohio 2003) ................................................................ 9

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) .............................................................................. 8

*In re Estate of Pechacek*,
2006 WL 4103782 (D.C. Super. Ct. Dec. 7, 2006) ............................................. 9

*Gates v. United Health Grp.*,
2012 WL 2953050 (S.D.N.Y. July 16, 2012) ...................................................... 20

*Godfrey v. Greatbanc Tr. Co.*,
2019 WL 4735422 (N.D. Ill. Sept. 26, 2019) ...................................................... 22

*Harper v. Wallingford*,
877 F.2d 728 (9th Cir. 1989) ................................................................................ 6

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) ............................................................................................. 20

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ................................................................................ 10

*Hurlic v. S. Cal. Gas Co.*,
539 F.3d 1024 (9th Cir. 2008) .............................................................................. 16

*In re Ins. Brokerage Antitrust Litig.*,
2008 WL 141498 (D.N.J. Jan. 14, 2008) ............................................................. 22

*Jacobs v. Verizon Commc'ns, Inc.*,
2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017) ....................................... 21, 22, 23

*In re JDS Uniphase Corp. ERISA Litig.*,
2005 WL 1662131 (N.D. Cal. July 14, 2005) ...................................................... 22

*Kastner v. Intrust Bank*,
569 F. App'x 593 (10th Cir. 2014) ....................................................................... 9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................. 19

*Marks v. Trader Joe's Co.*,
2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ................................................. 9, 13

*Marshall v. Northrop Grumman Corp.*,
  2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ............................................*passim*

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985) ........................................................................................ 20

*Monper v. Boeing Co.*,
  2014 WL 12102180 (W.D. Wash. May 28, 2014) ............................................ 20

*Pappas v. Buck Consultants, Inc.*,
  1989 WL 157517 (N.D. Ill. Dec. 12, 1989),
  *aff'd*, 923 F.2d 531 (7th Cir. 1991) ................................................................. 22

*Patrico v. Voya Fin., Inc.*,
  2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ............................................ 11, 17

*Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v.*
  *Alerus Fin., N.A.*,
  858 F.3d 1324 (10th Cir. 2017) ........................................................................ 12

*Reed v. Queens Vill. Comm. for Mental Health for J-Cap, Inc.*,
  2019 WL 4452386 (E.D.N.Y. Sept. 17, 2019) ...................................... 18, 22, 23

*Saumer v. Cliffs Natural Resources Inc.*,
  853 F.3d 855 (6th Cir. 2017) ............................................................................ 12

*Scott v. Aon Hewitt Fin. Advisors, LLC*,
  2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) .................................................... 11

*Shaver v. Operating Eng'rs Local 428 Pension Trust Fund*,
  332 F.3d 1198 (9th Cir. 2003) .......................................................................... 18

*Sheedy v. Adventist Health Sys. Sunbelt Healthcare Corp.*,
  2020 WL 70976 (M.D. Fla. Jan. 7, 2020) ......................................................... 18

*Sweda v. Univ. of Pa.*,
  923 F.3d 320 (3d Cir. 2019) .............................................................................. 17

*Taveras v. UBS AG*,
  513 F. App'x 19 (2d Cir. 2013) ........................................................................ 22

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020) ................................................................................. 18, 19

-iv-

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013).....................................................................10, 15

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) ...............................................................................................9

*White v. Chevron Corp.*,
  752 F. App'x 453 (9th Cir. 2018)....................................................................6, 13

*Willett v. Blue Cross & Blue Shield of Ala.*,
  953 F.2d 1335 (11th Cir. 1992) ...........................................................................12

*Wright v. Oregon Metallurgical Corp.*,
  360 F.3d 1090 (9th Cir. 2004)..................................................................12, 14, 15

**Statutes and Regulations**

29 U.S.C.
  § 1002(14)(B) .......................................................................................................16
  § 1021(b)(1)..........................................................................................................21
  § 1023(c) ..............................................................................................................21
  § 1024(a)...............................................................................................................21
  § 1105(c)(2) ...........................................................................................................7
  § 1106(a)(1)(C) ....................................................................................................16
  § 1108(b)(2)..........................................................................................................17
  § 1132(a)(3) ..........................................................................................................18

29 C.F.R.
  § 2509.75-8...........................................................................................................22
  § 2550.404a-5 ................................................................................................10, 21
  § 2550.408b-2 .......................................................................................................17

**INTRODUCTION**

On behalf of a class of participants and beneficiaries from November 2011 to the present, Plaintiffs Robert Bugielski and Chad Simicek allege that Defendants AT&T Services and the Benefit Plan Investment Committee failed to monitor expenses of the AT&T Retirement Savings Plan and caused the ARSP to "pa[y] vastly more" than comparable plans for recordkeeping. TAC ¶ 7.

Both of these allegations have proved to be utterly meritless. Although Plaintiffs allege that the Plan paid "roughly $61 per participant each year" for recordkeeping, *id*. ¶ 61, in actuality the Plan paid half that amount or less. Indeed, ██████████████████████████████████████████████████████████████. Similarly, although Plaintiffs claimed (on "information and belief") that Defendants decided to overcharge the ARSP for recordkeeping as part of a vague "larger agreement" to benefit AT&T, *id*. ¶ 85, discovery did not reveal any evidence of such an "agreement." Plaintiffs recently agreed to dismiss that claim with prejudice. Dkt. 161.

With the writing on the wall, Plaintiffs did not take any discovery from third parties or disclose an expert to testify in support of their contentions. In short, despite the opportunity to conduct full discovery into their claims, Plaintiffs do not have a shred of evidence to support the core "facts" alleged in the TAC.

This is precisely why Rule 56 exists. In opposing summary judgment, a plaintiff "may not rest upon . . . mere allegations" and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because Plaintiffs have no evidence of a genuine issue on their claims, the Court should grant summary judgment to Defendants.

**BACKGROUND**

**A.      The AT&T Retirement Savings Plan**

The ARSP is a 401(k) plan offered to eligible AT&T employees. AT&T Inc. is the Plan Sponsor. AT&T Services is the Plan Administrator. SUF 1-3.

AT&T Services delegated responsibility for certain investment-related functions, including the selection of investment options and monitoring of investment expenses, to the Benefit Plan Investment Committee. SUF 11. When Plaintiffs first brought this suit, they alleged that certain funds offered by the Plan were too expensive, Dkt. 1 ¶¶ 38-43, but quickly abandoned that theory in their First Amended Complaint. Dkt. 51. Therefore, these investment-related functions are not at issue in this case.

More pertinent here, in 2011, AT&T Services delegated discretion over third party administration and day-to-day direction, including recordkeeping fees, to a different entity: the Senior Vice President–Compensation, Benefits & Policy of AT&T Services. SUF 4, 12. In 2015, AT&T Services re-delegated that authority to the Vice President–Benefits. SUF 5-6. For the majority of the relevant time period, AT&T Services's Vice President–Benefits was Marty Webb, assisted by Assistant Vice President–Retirement John Phipps and Director–Savings Plan Operations Gary Hanson, among others. SUF 7, 9-10. In January 2020, Mr. Webb retired and Julie Galloway became Vice President–Benefits. SUF 8.

**B.    Plan Recordkeeping**

All 401(k) plans use a plan recordkeeper to track participant contributions and investments, process distributions, answer participant questions, and perform other administrative functions. In 2005, AT&T Services selected Fidelity, one of the leading service providers for large institutional retirement plans, as the Plan recordkeeper. SUF 13.

At all times during the class period, ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ SUF 18. AT&T Services regularly monitored Fidelity's compensation and negotiated a new recordkeeping contract with Fidelity during the class period. SUF 16-17, 19.

In 2011, at the start of the period, the Plan paid just ███ per participant per

1   year for recordkeeping. SUF 20. A few months into 2012, however, AT&T Services

2   negotiated an amendment to its recordkeeping agreement that reduced net

3   recordkeeping fees to ███ per participant. SUF 21.

4       In 2016, AT&T Services began negotiating a new agreement to replace the

5   expiring 2011 Fidelity recordkeeping agreement, retaining Deloitte Consulting LLP

6   to assist in that process. SUF 14, 17. Together with Mr. Phipps and other AT&T

7   Services employees, Deloitte determined that other large 401(k) plans'

8   recordkeeping fees were substantially higher than the ARSP's, ranging from ████

9   ███ per participant, with an average of ███. SUF 22. ████████████████████

10  ███████████████████ AT&T Services negotiated an even lower rate

11  beginning January 1, 2018—just ███ per participant. SUF 23.

12      **C.   Other Plan Services**

13      ***Fidelity's Other Services***. In addition to recordkeeping, Fidelity provided a

14  variety of other services to the Plan and its participants. For individual participants

15  who desired these services, Fidelity initiated and maintained loans and non-hardship

16  withdrawals, processed cash dividends to participants, and processed qualified

17  domestic relations orders. Fidelity also performed special projects like managing

18  plan design changes. SUF 24.

19      Another option offered to participants in the ARSP was the Fidelity

20  "BrokerageLink" service. SUF 25. BrokerageLink, a so-called "self-directed

21  brokerage account" or "brokerage window," functions like a retail brokerage

22  account within a 401(k) plan. Participants who want more control or flexibility can

23  use their BrokerageLink account to trade mutual funds, individual stocks and bonds,

24  and other investments not offered through the Plan's default investment menu.

25  Participants do not incur account fees for selecting BrokerageLink. However, if a

26  participant executes transactions through BrokerageLink, the participant agrees to

27  Fidelity's standard fee and expense schedule and pays any 12b-1 or other fees

28  associated with the selected investments. SUF 26-27.

-3-

1     ***Financial Engines.*** In 2013, AT&T Services determined that Plan
2 participants would benefit from investment advisory and managed account options
3 and began a search for a firm to provide those services. SUF 28. With the help of
4 Deloitte, AT&T Services issued a request for proposal. SUF 29. Subsequently,
5 AT&T Services narrowed its choices to two firms—Fidelity and Financial
6 Engines—and after an extensive diligence process signed a contract with Financial
7 Engines in August 2014. SUF 30-32.

8     Financial Engines began to offer managed account and advisory services to
9 ARSP participants in 2015. SUF 38. All participants received online advisory
10 services like individualized retirement assessments, online portfolio advice, and
11 educational and research content. The Plan initially paid a ███████████
12 ██████████ per participant per year. SUF 39.

13     Financial Engines also offered an optional professional management service.
14 Participants using the professional management service received customized
15 investment advice and authorized Financial Engines to interface with the Fidelity
16 recordkeeping platform to execute transactions in the participant's account. SUF 33.
17 Initially, participants who signed up for the optional management service paid an
18 asset-based fee of ███████████. SUF 39.

19     As with Fidelity, AT&T Services actively monitored the fees that the Plan
20 paid to Financial Engines and negotiated lower fees where possible. In October
21 2017, Financial Engines agreed to waive its ███ per participant ███ and lower
22 the rates it charged participants for professional management services. SUF 41.

23     ***Financial Engines and Fidelity.*** To offer investment advisory and
24 professional management services to defined contribution plans like the ARSP,
25 Financial Engines needs access to participant data and technological systems
26 maintained by the plan recordkeeper. Financial Engines entered into a separate,
27 bilateral agreement with Fidelity to govern this access. SUF 33-34.

28     AT&T Services was aware of the relationship between Financial Engines and

-4-

Fidelity and repeatedly took steps to ensure that Financial Engines's separate arrangement with Fidelity did not result in higher costs for Plan participants. SUF 35. For example, AT&T Services's Services Agreement with Financial Engines provided that █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████" SUF 36. Likewise, a September 2014 Letter of Direction with Fidelity stated that ████████████████████████████████████ ████████████" and "███████████████████████████████████████ ████████████████████." SUF 37.

### D.    Procedural History

Former Plaintiff Julio Alas filed this lawsuit on November 6, 2017. Dkt. 1. (The parties later stipulated to Mr. Alas's dismissal without prejudice. Dkt. 135.) The TAC was filed on November 12, 2018.

The TAC asserts three counts against Defendants, although they are duplicative and confusingly titled. Count I, titled "Breaches of Fiduciary Duties of Prudence and Candor and Prohibited Transactions," alleges a claim under ERISA Section 404(a). TAC ¶¶ 129-139. Count II, titled "Prohibited Transactions," alleges a claim under ERISA Section 406(a). *Id*. ¶¶ 140-146. Count III, titled "Breaches of Fiduciary Duties of Prudence and Candor and Self-Dealing Prohibited Transactions," alleges a claim under ERISA Section 406(b). *Id*. ¶¶ 147-150.

Plaintiffs filed the TAC after the Court ruled on Defendants' motion to dismiss the Second Amended Complaint in October 2018. *See* Dkt. 79 (order). Taking all of the allegations in that pleading as true, the Court concluded that Plaintiffs had stated ERISA Section 404(a) and 406(b) claims based on allegations that (1) "Plan participants paid excessive administrative costs," and (2) "Defendants received a discount on administrative services in exchange for allowing Fidelity to overcharge Plan participants as part of a 'larger agreement.'" *Id*. at 13-14. The Court did not address Plaintiffs' Section 406(a) claim.

1    In February 2019, after Plaintiffs filed the TAC, Defendants asked the Court
2  to reconsider Plaintiffs' Section 404(a) claim in light of *White v. Chevron Corp.*, 752
3  F. App'x 453 (9th Cir. 2018). The Court declined to do so, again crediting Plaintiffs'
4  allegations of (1) excessive costs and (2) a supposed "larger agreement" in
5  determining that the claim survived a motion to dismiss. Dkt. 106 at 3-6.

6    Although not pled as a separate count, Plaintiffs indicated in their motion to
7  dismiss briefing that they seek injunctive relief under ERISA's so-called "catchall"
8  provision, Section 502(a)(3). *See* Dkt. 76 at 22-24. Plaintiffs contend that they are
9  entitled to an injunction under this provision because Defendants allegedly filed
10  "incomplete and inaccurate Annual Reports" with the Department of Labor. *Id*. The
11  Court held at the pleading stage that Plaintiffs had Article III standing to seek this
12  relief, but did not opine on the claim's merits. Dkt. 106 at 6-9; Dkt. 79 at 12-13.

13                                **ARGUMENT**

14    The Federal Rules require summary judgment when the evidence, viewed in
15  the light most favorable to the nonmoving party, shows that there is no genuine issue
16  as to any material fact, and the movant is entitled to judgment as a matter of law.
17  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The
18  moving party bears the initial burden of informing the court of the basis for the
19  motion and the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.
20  On issues where the nonmoving party will bear the burden of proof at trial, the
21  movant can prevail merely by pointing out that there is an absence of evidence to
22  support the nonmoving party's case. *Id*. "[M]ere disagreement or the bald assertion
23  that a genuine issue of material fact exists" will not preclude summary judgment.
24  *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989). Rather, the non-movant
25  must point to "significantly probative" evidence to create a genuine dispute of
26  material fact. *Anderson*, 477 U.S. at 249.

27  **I.    Plaintiffs Have No Evidence Of Imprudence (Count I)**

28    Plaintiffs allege in Count I that Defendants "failed to design or implement a

process to evaluate or control" recordkeeping expenses and thereby caused the Plan to pay "grossly excessive fees to Fidelity" for recordkeeping. TAC ¶¶ 133-34. Defendants are entitled to summary judgment on this claim because Plaintiffs named the wrong defendants and because there is no evidence that the relevant fiduciaries failed to evaluate Plan recordkeeping expenses or caused the Plan to pay excessive recordkeeping fees. To the contrary, the evidence shows that AT&T Services acted prudently and appropriately at all times, and obtained lower recordkeeping rates than Plaintiffs themselves allege is reasonable.[1]

## A.   Neither Of The Named Defendants Have Fiduciary Responsibility For The Challenged Conduct

The two defendants named in this litigation are the Benefit Plan Investment Committee and AT&T Services. As explained above, the Benefit Plan Investment Committee was not delegated responsibility for monitoring recordkeeping expenses. SUF 11-12. It therefore breached no fiduciary duty with respect to these expenses.

AT&T Services, meanwhile, expressly delegated authority over third-party administration issues (including recordkeeping) to Benefits executives during the class period. SUF 4-6. ERISA specifically authorizes a fiduciary to make such delegations and provides that the named fiduciary "shall not be liable for an act or omission of [the delegate] in carrying out such responsibility" unless the delegation itself was imprudent. 29 U.S.C. § 1105(c)(2); *Ariz. State Carpenters Pension Tr. Fund v. Citibank (Ariz.*), 125 F.3d 715, 719 (9th Cir. 1997). Plaintiffs do not plead— and can offer no evidence—that AT&T Services acted imprudently in delegating this responsibility. Thus, any breach of fiduciary duty claim against AT&T Services based on recordkeeping fees fails under the plain terms of the statute.

## B.   Plaintiffs Have No Evidence Of An Imprudent Process

Even if Plaintiffs had named the correct defendant for the fiduciary claims,

---

[1] Count I also mentions a duty of candor (TAC ¶ 136), which effectively duplicates Plaintiffs' unpled injunctive relief claim. To avoid unnecessary repetition, AT&T discusses the duty of candor in Part IV *infra*.

1  their claims still would fail, because Plaintiffs cannot show any imprudence

2  whatsoever. As this Court previously explained, "courts do not take a results-based

3  approach when determining if a defendant has breached" its duty of prudence.

4  Dkt. 79 at 14. Rather, the "relevant inquiry" is based on a "fiduciary's *conduct*"—

5  *i.e.*, whether the fiduciary used a prudent process to make the relevant decision. *Id*.

6  (emphasis added); *see also Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir.

7  1983) (asking whether a fiduciary employed "appropriate methods").

8      Plaintiffs have no evidence of an imprudent process. At the pleading stage,

9  Plaintiffs relied on conclusory allegations that Defendants "failed to design or

10  implement a process to evaluate or control" recordkeeping expenses or

11  "compensation paid to Fidelity from Financial Engines and investment through

12  BrokerageLink. TAC ¶ 133. But the record contains uncontroverted evidence to the

13  contrary. AT&T Services and its designees *did* evaluate and control recordkeeping

14  expenses and consider compensation from Financial Engines and BrokerageLink.

15  No more is needed to satisfy the duty of prudence.

16      In particular, AT&T Services's Benefits team periodically reviewed 408(b)(2)

17  disclosures and invoices from Fidelity to ensure that the compensation paid to

18  Fidelity for recordkeeping was reasonable. SUF 16. The team supplemented its

19  internal review of Plan expenses with outside expertise. Personnel reviewed

20  benchmarking studies from several reputable industry participants, including survey

21  data published by Deloitte and the Committee on Investment of Employee Benefit

22  Assets (CIEBA), that confirmed that the ARSP's expenses were in line with, and

23  often lower than, other major defined contribution plans. SUF 19. Indeed, at the start

24  of the class period, Defendants evaluated the fees paid across several AT&T

25  retirement plans, including the ARSP. The ARSP's costs were the lowest of all the

26  AT&T plans. SUF 15.

27      In 2016, AT&T Services hired Deloitte to consult on the negotiation of a new

28  contract with Fidelity. Deloitte confirmed that the Plan's existing recordkeeping rate

-8-

was much lower than average for other large plans. SUF 22. Following negotiations, however, AT&T Services managed to obtain an even more advantageous deal, with an annual rate of just ███ per participant. SUF 23.[2]

In the face of this overwhelming evidence, Plaintiffs did not disclose an expert to opine on recordkeeping and monitoring practices. That speaks volumes. Under basic trust-law principles—the "starting point" for interpreting ERISA's requirements, *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)—expert testimony is required to establish a standard of care and breach thereof.[3] Even if expert testimony were not required here, moreover, Plaintiffs have not adduced *any* evidence (expert or non-expert) to meet their burden to prove this claim.

## C.   Financial Engines And BrokerageLink Fee Arrangements Do Not Support Plaintiffs' Claims

Given the dearth of evidence that Defendants had an imprudent process for monitoring recordkeeping fees, Plaintiffs may pivot to allegations that "the Plan fiduciaries failed [to] learn" of "additional compensation Fidelity gleaned from Financial Engines and BrokerageLink" for non-recordkeeping services. TAC ¶ 69. Such an attempt would be unavailing.

---

[2] Plaintiffs allege that Defendants should have issued RFPs to other recordkeepers during the class period. TAC ¶ 65. That allegation is not supported by facts or law. *E.g., Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *7 (C.D. Cal. Apr. 24, 2020) ("[N]othing in ERISA compels periodic competitive bidding."); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) ("[T]he allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation."). Like the plan sponsor in *Marshall*, AT&T "conducted an RFP before hiring [Fidelity], benchmarked [Fidelity's] fees using an external consultant," and "renegotiated [lower] recordkeeping fees." *Id.* at *11. AT&T Services's hands-on involvement was more than sufficient, as it led to the Plan paying ████████████ *See* Part I.D *infra*.

[3] *See, e.g., Kastner v. Intrust Bank*, 569 F. App'x 593, 600 (10th Cir. 2014) (affirming summary judgment on a breach-of-trust claim for failure to provide expert testimony on the standard of care); *In re Estate of Pechacek*, 2006 WL 4103782 (D.C. Super. Ct. Dec. 7, 2006) (explaining that the court "would demand as a matter of discretion, if not of law, expert testimony that a prudent person would have acted differently" to sustain a claim); *cf. Devonshire v. Johnston Grp. First Advisors*, 300 F. Supp. 2d 516, 520-21 (N.D. Ohio 2003) (granting summary judgment for failure to provide expert evidence of the standard of care required of a reasonable professional investment advisor in defendant's situation), *vacated on other grounds*, 2004 WL 2269625 (N.D. Ohio Apr. 19, 2004).

*First*, it is important to emphasize what Plaintiffs are *not* claiming. Plaintiffs do not challenge the prudence of Financial Engines's services or a self-directed brokerage account service. Nor could they.

It is not imprudent to arrange for participants to have access to advisory or management services. Indeed, in 2010, the Assistant Secretary of Labor testified that "[m]any workers need help in managing their plan investments" and explained that the Department of Labor was seeking to "encourage[e] plan sponsors to make unbiased investment advice available to workers" to "help avoid common errors that undermine retirement security." Testimony of Phyllis C. Borzi, Ass't Sec'y of Labor, Employee Benefits Security Admin., S. Hrg. 111-1161 (Oct. 7, 2010), *The Wobbly Stool: Retirement (In)security in America*; *Final Rule: Investment Advice— Participants and Beneficiaries*, available at https://bit.ly/2SsZnnM.

Nor is it imprudent to offer participants the option to trade in their own brokerage account in addition to using the Plan's extensive lineup of low-cost options. *See Tibble v. Edison Int'l*, 729 F.3d 1110, 1134-35 (9th Cir. 2013) ("participant choice is the centerpiece of what ERISA envisions for defined-contribution plans"); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (mentioning BrokerageLink specifically as an indication of prudence). Department of Labor regulations explicitly provide for brokerage windows or "similar plan arrangements that enable participants and beneficiary to select investments beyond those designated by the Plan." 29 C.F.R. § 2550.404a-5(c)(1)(i)(F).

*Second*, Plaintiffs do not allege that other plans paid less than the ARSP for self-directed brokerage accounts or comparable investment advisory or management services. In other words, Plaintiffs do not contend that Defendants caused the Plan to pay too much for these services, standing alone. Rather, Plaintiffs contend that Defendants should have required a "credit," in the form of an "offset to recordkeeping fees," for the amounts Fidelity received from Financial Engines and BrokerageLink. TAC ¶ 69. This "offset" theory fails for several reasons.

-10-

1    To begin, courts have consistently rejected claims that a fiduciary acted
2    imprudently by ignoring compensation paid to a plan recordkeeper by Financial
3    Engines. *E.g.*, *Scott v. Aon Hewitt Fin. Advisors, LLC*, 2018 WL 1384300, at *2
4    (N.D. Ill. Mar. 19, 2018) (dismissing claims that "Hewitt . . . agreed to a 'pay to
5    play' or improper kickback scheme [with] Financial Engines"); *Patrico v. Voya Fin.,*
6    *Inc.*, 2018 WL 1319028, at *6 (S.D.N.Y. Mar. 13, 2018) (dismissing claim that the
7    recordkeeper provided "no compensable services"); *Chendes v. Xerox HR Sols.*,
8    LLC, 2017 WL 4698970, at *2 (E.D. Mich. Oct. 19, 2017) (similar).

9    Judge Birotte's recent grant of summary judgment to the defendants in
10   *Marshall v. Northrop Grumman Corp.* is especially instructive. There, as here, the
11   plaintiffs argued that the defendants should have monitored and leveraged fees that
12   Financial Engines paid to the plan's recordkeeper. Judge Birotte concluded that the
13   claim failed as a matter of law because "ERISA does not require . . . that fiduciaries
14   leverage the type of third-party fees at issue here in order to reduce recordkeeping
15   fees." 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019). As Judge Birotte
16   explained, the fees paid by Financial Engines to the recordkeeper "are not subject to
17   fiduciary control," "are not paid out of plan assets," and are "for services [the
18   recordkeeper] provides to Financial Engines out of an independent business
19   arrangement." *Id.* Plaintiffs' theory is identical to the one the plaintiffs advanced in
20   *Marshall* and fails for exactly the same reasons.

21   *Marshall* also identifies a second ground for summary judgment on the
22   BrokerageLink and Financial Engines theories: Plaintiffs' lack of expert evidence to
23   establish a breach of the duty of prudence. Judge Birotte held that the viability of the
24   plaintiffs' Financial Engines claim "rises and falls" with their ability to present
25   expert evidence that prudent fiduciaries monitor the challenged forms of
26   compensation in negotiating recordkeeping fees. 2019 WL 4058583, at *11.
27   Plaintiffs have no such evidence, which dooms their claim.[4]

28   ───────────────
[4] In *Marshall*, the plaintiffs offered an expert to opine that "[p]rudent fiduciaries

1    Finally, even if *Marshall* did not foreclose Plaintiffs' claims as a matter of
2    law, those claims fail as a matter of fact. The record shows that AT&T Services did,
3    in fact, monitor the compensation Fidelity received from Financial Engine and
4    BrokerageLink, and used that information to lower recordkeeping fees.

5    Specifically, using the disclosures that Fidelity provided to AT&T Services
6    regarding its indirect compensation, Mr. Phipps and the Benefits group estimated
7    Fidelity's compensation from Financial Engines as the service was rolled out to Plan
8    participants. SUF 45. As Mr. Phipps testified, "[w]e certainly took note" of the fee
9    arrangement between Financial Engines and Fidelity, and that information "made us
10   realize that [the Plan's] relationship with Fidelity was all the more valuable."
11   SUF 46. Mr. Phipps also estimated Fidelity's BrokerageLink-related compensation
12   by looking at the Plan's investments through the BrokerageLink service and
13   assessing those investments' expense ratios. SUF 43. Mr. Phipps explained that his
14   team's ability to leverage this type of information in negotiations with Fidelity was
15   a key reason why AT&T Services was able to obtain an "incredible reduction" in
16   recordkeeping fees when it negotiated a new services contract in 2017. SUF 44, 47.

17   **D.    Plaintiffs Have No Evidence Of Loss Or Causation**

18   The prudence claim fails on two more related grounds—loss and causation.
19   In the Ninth Circuit, and many others, plaintiffs have the burden to show a "causal
20   link" between an alleged breach of fiduciary duty and their claimed harm. *Wright v.*
21   *Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004).[5] Even in those

22   monitor all sources of compensation to the recordkeeper, including additional
23   income it receives from the advisory services provider." 2019 WL 4058583, at *7.
     Before granting summary judgment, Judge Birotte excluded the expert, finding no
     evidence that he "ha[d] any expertise with these types of fees." *Id.* at *7, *11. Here,
24   Plaintiffs did not proffer expert testimony, so summary judgment on this basis is
25   even more straightforward.

26   [5] *Accord, e.g., Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1336 (10th Cir. 2017) ("[C]ausation is an element of the claim and . . . the plaintiff bears the burden of proving it."); *Saumer v. Cliffs Natural*
27   *Resources Inc.*, 853 F.3d 855, 863 (6th Cir. 2017) ("a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan"); *Willett v.*
28   *Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) ("the burden

-12-

circuits that take a different view, moreover, the plaintiff must first come forward with prima facie evidence of loss before the burden of causation will shift to defendants. *E.g.*, *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 39 (1st Cir. 2018) ("once an ERISA plaintiff has shown a breach of fiduciary duty *and* loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach") (emphasis added). Here, Plaintiffs' claims founder on both fronts.

## 1.    Plaintiffs Have No Evidence Of Loss

Plaintiffs do not have any evidence that they suffered a loss in connection with Plan recordkeeping fees. Their claimed loss is based on the allegation that the Plan paid $61 per participant for recordkeeping, or "roughly double" the costs paid by similar plans during the class period. TAC ¶ 71. The reality, however, is that the Plan's actual recordkeeping fees were equal to—and often much lower than—the rates that Plaintiffs alleged were reasonable. Ironically, it is *Plaintiffs* who have inflated the Plan's supposed recordkeeping expenses ████.[6]

The TAC states that "very large plans pay no more than roughly $30 per participant for comparable recordkeeping services." TAC ¶¶ 59-61. ████████ ████████████████████████████████████ and by 2018, the Plan paid far less:

| 2011 | 2012[7] | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|---------|------|------|------|------|------|------|------|------|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

SUF 20-23.

_____

of proof on the issue of causation will rest on the beneficiaries").

[6] Plaintiffs' estimate that the Plan paid $61 per participant for recordkeeping was based on *all* of the direct compensation paid to Fidelity—including fees paid by certain participants for optional services. Calling this an estimate of "recordkeeping" costs was misleading at best. Dkt. 54-1 at 13; Dkt. 60 at 5; *cf. also Marks*, 2020 WL 2504333, at *6 ("Plaintiffs' guess that the Plan pays $140 per participant for recordkeeping fees has 'no factual basis.'") (citing *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016)). At the pleading stage, Plaintiffs claimed that it was "not appropriate to engage in factual debate as to whether some small portion of the compensation" reported was for services other than core recordkeeping. Dkt. 58 at 15. Discovery has shown that this was no rounding error.

[7] Effective August 1, 2012, the Plan's rate was reduced to ██ per participant, for a

-13-

The ARSP's actual recordkeeping fees were not only lower than the level Plaintiffs allege, they were consistently lower than other peer plans in the market. For example, the █████ recordkeeping rate the ARSP paid starting in 2012 was ████ ████████████████████ reported by CIEBA that year. SUF 19, 22.

The interrogatories Defendants served during discovery confirm the absence of a triable issue on loss. Defendants asked Plaintiffs to identify third-party recordkeepers that could have provided comparable services to the Plan for less than amount Fidelity was compensated. Plaintiffs objected that the request was premature because they needed expert discovery and discovery from third parties, and stated that the answer to this question could be found in documents in Defendants' control. *See* Ex. 7 at pp. 8-9 (Bugielski Answers to Rogs) & Ex. 8 pp. 8-9 (Simecek Answers to Rogs). Ultimately, however, Plaintiffs did not even take discovery from Fidelity or other third parties to establish the recordkeeping rates paid by comparable plans. Nor did Plaintiffs disclose an expert on recordkeeping fees—an independent ground for granting summary judgment—*See Cunningham v. Cornell University*, 2019 WL 4735876, at \*10 (S.D.N.Y. Sept. 27, 2019) (granting summary judgment where plaintiff had no admissible expert evidence "demonstrat[ing] a material issue of fact on their loss as a result of recordkeeping fees").[8]

### 2.    Plaintiffs Have No Evidence Of Causation

For similar reasons, Plaintiffs cannot meet their burden to show a causal link between allegedly imprudent acts and any harm allegedly suffered by the Plan. *Wright,* 360 F.3d at 1099. There is no lay or expert evidence that Fidelity would have lowered its recordkeeping rates ██████████████████████████ ███████████████████████████████   To the contrary, ███████████ blended annual rate of approximately ████████████████████ SUF 21.

[8] In *Cunningham*, the plaintiffs offered experts to testify to loss, but—similar to *Marshall* (*see* n.4 *supra*)—the court excluded the experts as unreliable before granting summary judgment. *See* 2019 WL 4735876, at \*7-10 (holding that the experts "d[id] not use a reliable methodology to determine what a prudent fiduciary would have secured as a recordkeeping fee"). Again, this is an easier case, as Plaintiffs do not have an expert at all.

-14-

1 ████████████████████████████████████████████

2 ████████████████████████████████████ SUF 18.

3        To be sure, in their pleading Plaintiffs cherry-pick five other large plans that,

4 they allege, paid roughly the same as the ARSP for recordkeeping during the class

5 period. TAC ¶ 62. But Plaintiffs have not supported those allegations with *facts*, as

6 is required at summary judgment. Nor have they shown that the ARSP could have

7 obtained any slightly lower rates supposedly obtained by the other plans.

8        Even if credited, Plaintiffs' allegations would not create a genuine issue.

9 Many of the plans Plaintiffs identify allegedly paid more during the class period than

10 the ARSP. For example, the TAC asserts that the Costco 401(k) paid T. Rowe Price

11 $29 per participant for recordkeeping in 2015 ████████████ $38 per

12 participant in $2016 ██████, and $35 per participant in 2017 ██████). *Id*. In

13 addition, ERISA does not require fiduciaries to select the rock-bottom price for a

14 service. *See Tibble*, 729 F.3d at 1135 (rejecting this "bright-line approach to

15 prudence"). Mere allegations that a few large plans paid ██████████████

16 ████████████████ do not come close to meeting Plaintiffs' summary

17 judgment burden—particularly when, as here, ████████████████

18 ████████████████████████ SUF 19, 22.

19 **II.    Plaintiffs' Voluntary Dismissal Of Count III Confirms That There Was**

20 **No Fiduciary Breach**

21        The TAC contains allegations, made on "information and belief," that

22 Defendants entered into a "larger agreement" that "required the Plan's participants

23 to pay Fidelity greater than market compensation . . . while Fidelity provided

24 discounts on administrative services to other employee benefit plans." TAC ¶¶ 81-

25 86. This supposed "agreement" has proved to be a fantasy. No evidence of any such

26 agreement was uncovered in discovery. Plaintiffs recently voluntarily dismissed

27 Count III—their duty of loyalty claim (*id*. ¶¶ 147-150)—in its entirety. Dkt. 161.

28        Plaintiffs' disloyalty allegations did not just support Count III, however. They

were also a cornerstone of Plaintiffs' allegations in Count I. *See* TAC ¶¶ 130-31. Indeed, at the pleading stage, this Court specifically emphasized ERISA's prohibition on "self-dealing" and credited allegations of a "larger agreement" in concluding that Plaintiffs had plausibly alleged that "the fiduciary process was defective." Dkt. 79 at 13-14; Dkt. 106 at 6 (similar). It is now beyond dispute that the "larger agreement" on which Plaintiffs staked their claims does not exist. Thus, not only does the record show that AT&T in fact followed a prudent process to monitor fees, but Plaintiffs' voluntary dismissal of Count III further underscores why summary judgment is appropriate on Count I.

**III.   Plaintiffs Have No Evidence Of A Prohibited Transaction (Count II)**

Plaintiffs allege in Count II that Defendants violated ERISA Section 406(a)(1)(C), which prohibits a fiduciary from causing a "party in interest" to "furnish[] goods, services, or facilities" to a plan. 29 U.S.C. § 1106(a)(1)(C). Plaintiffs contend that Defendants caused the Plan to engage in a prohibited transaction by causing it to enter into transactions for services with Fidelity and Financial Engines. Defendants are entitled to summary judgment on this Count because Plaintiffs are wrong as a matter of law.

ERISA defines a "party in in interest" to include "a person providing services to [a] plan." 29 U.S.C. § 1002(14)(B). In Plaintiffs' view, this means that Defendants are "categorically prohibit[ed]" from causing Fidelity or Financial Engines to furnish "services" to the Plan. TAC ¶¶ 141-142. But the problem with that reading of the statute is plain. If Plaintiffs were correct, then ERISA Section 406 would facially prohibit *all* fiduciaries from causing service providers to provide services to plans.

Although plaintiffs routinely try to bring prohibited transaction claims based on nothing more than the retention of a service provider, courts repeatedly reject such claims as a matter of law. That is because courts should not interpret ERISA in ways that would "lead to absurd results." *Hurlic v. S. Cal. Gas Co.*, 539 F.3d 1024, 1032 (9th Cir. 2008). In *Marshall*, for instance, Judge Birotte held that it is "circular"

to contend that "an entity which becomes a party in interest by providing services to the Plan[] has engaged in a prohibited transaction simply because the Plan[] ha[s] paid for those services." 2019 WL 4058583, at *12; *see also, e.g.*, *Patrico*, 2018 WL 1319028, at *7 (concluding that the contention that a defendant "engaged in a prohibited transaction by paying a party in interest … for services rendered to the Plan" is "unpersuasive"). In short, as the Third Circuit recently held, construing Section 406(a)(1) to "expose fiduciaries to liability for every transaction whereby services are rendered to the plan . . . would be absurd." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 340 (3d Cir. 2019).

An independent flaw in Plaintiffs' prohibited transaction claim is that ERISA Section 408 exempts fiduciaries from liability under Section 406(a) if the underlying transaction is a "reasonable arrangement[] . . . necessary for the establishment or operation of the plan" and "no more than reasonable compensation is paid therefore." 29 U.S.C. § 1108(b)(2). There is no dispute that the services Fidelity and Financial Engines provided to the Plan were necessary. *See* 29 C.F.R. § 2550.408b-2(b) ("A service is necessary for the establishment or operation of a plan . . . if the service is appropriate and helpful to the plan obtaining the service in carrying out the purposes for which the plan is established or maintained.").

Further, the fees the ARSP paid to Fidelity and Financial Engines were entirely reasonable under Plaintiffs' own standards. *See* Part I *supra.* Plaintiffs do not contend that similar services were available elsewhere for less. Indeed, ███████
█████████████████████████████████████████████████████████
██████████████████. TAC ¶ 61. Thus, even if Section 406(a)(1)(C) applied here—it does not—the Section 408(b)(2) exception would also apply and defeat liability.[9]

---

[9] Plaintiffs allege that Defendants cannot show that Fidelity's rates were reasonable under Section 408(b)(2) because AT&T Services supposedly did not obtain necessary disclosures from Fidelity. TAC ¶ 143. That is simply false. The 408(b)(2) disclosures from Fidelity are in the record. *See* Ex. 34 through Ex. 37.

1    **IV.    Plaintiffs Have No Claim Based On The Form 5500s**

2        Plaintiffs allege that they are entitled to injunctive relief based on purportedly

3    incorrect Form 5500s filed with the Department of Labor. TAC ¶¶ 96-108. This

4    claim is not set out separately in the TAC, but Plaintiffs argued in their motion to

5    dismiss briefing (Dkt. 104 at 7) that it arises under ERISA Section 502(a)(3), which

6    authorizes plan participants to bring claims "to enjoin any act or practice which

7    violates any provision of this subchapter or the terms of the plan." 29 U.S.C.

8    § 1132(a)(3). As explained below, such a claim fails for multiple reasons.

9        **A.    Plaintiffs Lack Standing To Bring Claims Based On Form 5500s**

10        To start, Plaintiffs do not have standing to challenge the Plan's Form 5500

11   filings. This Court concluded that Plaintiffs had made adequate allegations to

12   support standing at the pleading stage. Dkt. 106 at 6-9; Dkt. 79 at 12-13. However,

13   Defendants respectfully submit that the Supreme Court's subsequent decision in

14   *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020), and the facts developed in discovery

15   compel a different outcome at this stage of the case.[10]

16        At the pleading stage, this Court's standing determination was based

17   principally on *Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332

18   F.3d 1198 (9th Cir. 2003), which the Court read to mean that ERISA plaintiffs do

19   not need to "prove individual harm when seeking injunctive relief" under ERISA

20   Section 502(a)(3). Dkt. 106 at 7-8; Dkt. 79 at 12. Plaintiffs agreed, claiming that it

21   was "exactly right" that "plaintiffs seeking purely injunctive remedies of ERISA's

22   disclosure requirements do not need to demonstrate actual injury." Dkt. 104 at 6.

23        But as another district court in this Circuit recently observed in a defined-

24   contribution case, the argument that plaintiffs "do not need to allege an actual injury

25   ───────────────
[10] Even before *Thole*, other decisions had called into question the conclusion that
26   plaintiffs had standing in similar circumstances. *See Sheedy v. Adventist Health Sys.
     Sunbelt Healthcare Corp.*, 2020 WL 70976, at *3 (M.D. Fla. Jan. 7, 2020)
27   (dismissing claims based on defendant's "fail[ure] to file annual reports" because
     alleged procedural violations are not enough to "presume . . . a corresponding
     concrete injury"); *Reed v. Queens Vill. Comm. for Mental Health for J-Cap, Inc.*,
28   2019 WL 4452386, at *11 (E.D.N.Y. Sept. 17, 2019) (dismissing on standing
     grounds a claim that the defendant had "concealed" information in a Form 5500).

-18-

because they seek 'purely equitable relief' under ERISA" is "essentially the same argument that the Supreme Court rejected in *Thole*." *Anderson v. Intel Corp. Investment Policy Committee*, 2021 WL 229235, at *14 (N.D. Cal. Jan. 21, 2021). In *Thole*, participants in a defined-benefit plan brought claims against a fiduciary despite suffering no past injury or threatened future injury from the alleged breach. The Supreme Court held that "Article III standing requires a concrete injury even in the context of a statutory violation." 140 S. Ct. at 1620-21. Further, the fact that Section 502(a)(3) gives participants a "general cause of action" to sue for equitable relief "does not affect the Article III standing analysis." *Id*. at 1621. As *Anderson* recognizes, *Thole* thus "clarifies" that ERISA plaintiffs suing in connection with defined-contribution and defined-benefit plans "must still meet Article III's standing requirement" when seeking equitable relief. 2021 WL 229235, at *14.

Plaintiffs' lack of standing for this claim is particularly apparent when opposing summary judgment, where they cannot rest on the pleadings but must set forth "specific facts" to satisfy Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Both Plaintiffs admitted that they never reviewed the Plan's Form 5500s prior to filing this lawsuit. Mr. Bugielski testified that prior to filing suit, he had never seen a Form 5500, did not know what a Form 5500 was, and had never reviewed a Form 5500 outside of deposition preparation with his counsel. SUF 48. Mr. Simicek had no memory of asking for a copy of the Form 5500, could not identify any information on the Form 5500, and did not recall reviewing a Form 5500 between 2011 and 2016. SUF 49. Far from providing the facts necessary to show Article III standing, both named Plaintiffs admitted that they did not suffer injury from alleged errors or omissions in the Form 5500s. *See Anderson*, 2021 WL 229235, at *14 ("Absent allegations that Plaintiffs read or relied upon the allegedly defective documents, Plaintiffs have failed to allege an injury-in-fact.").

## B.    Defendants Did Not Violate Any Underlying Duty

Even if Plaintiffs had standing to bring a Form 5500 claim under Section

502(a)(3), their attempt to obtain injunctive relief would fail because Plaintiffs cannot show an underlying ERISA violation. Section 502(a)(3) "does not authorize 'appropriate equitable relief' *at large*, but only for the purpose of 'redress[ing any] violations or . . . enforce[ing] any provisions' of ERISA." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 239 (2000) (emphasis in original).[11]

Plaintiffs cannot show an underlying violation in this case for several reasons.

***First***, any attempt to base a Section 502(a)(3) claim on the prudence, loyalty, or prohibited transaction theories set out in the TAC fails as discussed in Parts I-III *supra*.

The only other alleged violation of ERISA the TAC mentions is a fleeting reference to a breach of the "duty of candor." TAC ¶¶ 108, 136. But neither ERISA's provisions addressing fiduciary liability, 29 U.S.C. §§ 1101-1114, its provisions on reporting and disclosure, *id*. §§ 1021-1031, nor the regulations implementing the statute, 29 C.F.R. pt. 2509 *et seq.*, mention such a duty. Because ERISA is a "comprehensive and reticulated statute," courts should be "reluctant" to read in additional duties or remedies not specified in the text of the law. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-47 (1985).

There is almost no case law on the existence or content of a duty of candor under ERISA in the Ninth Circuit. In this District, the only ERISA decision Defendants are aware of that addresses a duty of candor claim is *Armijo v. ILWU-PMA Coastwise Indemnity Plan*, 2018 WL 6265062 (C.D. Cal. Nov. 14, 2018). There, the plaintiff alleged a breach of the duty of candor based on purportedly misleading preauthorization letters and explanations of benefits. The district court did not address the merits of the claim, however, instead granting summary judgment to the defendants on standing grounds because the plaintiffs had not alleged a willful

---

[11] *See also, e.g.*, *Monper v. Boeing Co.*, 2014 WL 12102180, at *6 (W.D. Wash. May 28, 2014) ("an underlying ERISA violation is required to support liability for failure to monitor under ERISA § 502(a)(3)"); *Gates v. United Health Grp.*, 2012 WL 2953050, at *11 (S.D.N.Y. July 16, 2012) (the ability to seek equitable relief pursuant to Section 502(a)(3) "does not relieve [a plaintiff] from having to establish an underlying violation of the statute").

1  injury to themselves or to the plan. *Id.* at *6-9; *cf.* Part IV.A *supra*.

2      ***Second***, even if a duty of candor applied to some disclosures under ERISA, it

3  would not apply here. Unlike ERISA disclosures that must be sent to participants,

4  *e.g.*, 29 C.F.R. § 2550.404a-5(c)—or, for that matter, preauthorization letters and

5  explanations of benefits like those at issue in *Armijo*—Form 5500s are filed with the

6  Department of Labor. *See* 29 U.S.C. § 1024(a). And even as to disclosures that are

7  sent directly to participants, "under ordinary circumstances defects in fulfilling the

8  reporting and disclosure requirements of ERISA do not give rise to a substantive

9  remedy other than that provided for in section 502(a)(1)(A) of that Act," which is

10 not available to participants. *Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124 (3d Cir.

11 1995); *see also Jacobs v. Verizon Commc'ns, Inc.*, 2017 WL 8809714, at *13

12 (S.D.N.Y. Sept. 28, 2017) ("Where, as here, ERISA does not expressly provide a

13 private remedy for a violation of a disclosure requirement, courts have consistently

14 declined to read a cause of action into the statute.").[12]

15     ***Third***, submitting Form 5500s to the Department of Labor is not a *fiduciary*

16 function. Form 5500 disclosures are made by the plan administrator (here, AT&T

17 Services). 29 U.S.C. §§ 1021(b)(1), 1023(c). Yet ERISA "defines an administrator

18 . . . as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a

19 plan." *Acosta v. Brain*, 910 F.3d 502, 517 (9th Cir. 2018) (quoting *Pegram v.

20 Herdrich*, 530 U.S. 211, 225-26 (2000)). Put another way, "there is no liability for

21 breach of fiduciary duty if the challenged conduct of the plan administrator . . . is

22 not fiduciary in nature." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d

23 269, 278 n.13 (4th Cir. 2019). Thus, as the Ninth Circuit has recently held, "the

24 alleged wrong must occur in connection with the performance of a fiduciary function

25 to be cognizable as a breach of fiduciary duty." *Bafford v. Northrop Grumman*

26 ───────────
[12] ERISA Section 502(a)(1)(A), 29 U.S.C.§ 1132(a)(1)(a), allows a participant to sue
27 for the relief provided for in subsection (c) of that section. Subsection (c), in turn,
   provides for various monetary penalties for failure to provide requested information,
   but does not authorize a participant to sue based on a Form 5500. Only the Labor
28 Secretary may assess a civil penalty for violation of ERISA's annual reporting
   requirements. *Id.* § 1132(c)(2).

1   *Corp.*, 994 F.3d 1020, 1028 (9th Cir. 2021).

2      Courts have recognized that "ministerial functions like preparing and

3   submitting regulatory filings are not discretionary acts and therefore do not support

4   an inference of fiduciary status." *Godfrey v. Greatbanc Tr. Co.*, 2019 WL 4735422,

5   at *3 (N.D. Ill. Sept. 26, 2019); *see also, e.g.*, *Anoka Orthopaedic Assocs., P.A. v.*

6   *Lechner*, 910 F.2d 514, 517 (8th Cir. 1990) ("the preparation of reports required by

7   government agencies[] does not entail discretionary authority or responsibility"); *In*

8   *re JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131, at *3 (N.D. Cal. July 14,

9   2005) ("The preparation of government reports required by government agencies is

10  a ministerial function, and those performing such functions are not fiduciaries").

11  Likewise, an interpretive bulletin from the Department of Labor advises that

12  "[p]reparation of reports required by government agencies" is a ministerial function

13  that does not establish ERISA fiduciary status. 29 C.F.R. § 2509.75-8.[13]

14      Under these principles, AT&T Services's preparation and submission of the

15  Form 5500s is not a fiduciary function and cannot give rise to fiduciary liability

16  under Section 502(a)(3). *Cf. Taveras v. UBS AG*, 513 F. App'x 19, 24 (2d Cir. 2013)

17  (dismissing candor claim based on alleged misstatements in SEC filings because

18  such statements were not made in the defendants' "ERISA fiduciary capacities").

19  Indeed, as one district court recently observed, "plaintiffs have not cited any cases

20  in which a court held that a defendant who filled out a Form 5500 . . . improperly

21  violated a fiduciary duty." *Reed*, 2019 WL 4452386, at *11.[14]

22      ***Finally***, were that not enough, Plaintiffs' claim is factually deficient. The

23  _____

24  [13] In *Bafford*, the Ninth Circuit cited this bulletin as support for the "fundamental precept that *discretion* is one of the central touchstones for a fiduciary role." 994 F.3d at 1028; *see also Anoka*, 910 F.2d at 517 (citing the bulletin); *Godfrey*, 2019 WL 4735422, at *3 (same); *JDS*, 2005 WL 1662131, at *3 (same).

25  

26  [14] *See also Jacobs*, 2017 WL 8809714, at *13-15 (rejecting fiduciary claim based on an allegedly incorrect Form 5500); *In re Ins. Brokerage Antitrust Litig.*, 2008 WL 141498, at *7 (D.N.J. Jan. 14, 2008) (there are "no published cases to support the[] claim that Defendants violated fiduciary duties owed to Plaintiffs under ERISA in improperly filling out Form 5500s"); *Pappas v. Buck Consultants, Inc.*, 1989 WL 157517, at *2 (N.D. Ill. Dec. 12, 1989), *aff'd*, 923 F.2d 531 (7th Cir. 1991) (same).

evidence shows that neither Plaintiff read or relied on the Form 5500s they now challenge. SUF 48-49. This is sufficient to foreclose a candor claim. *See Reed*, 2019 WL 4452386, at *11 (dismissing claim where plaintiffs "have not demonstrated how they relied on any [allegedly] material misrepresentation" in the Form 5500); *Jacobs*, 2017 WL 8809714, at *15 (same where plaintiffs "ha[ve] not asserted that [they] relied on the allegedly inaccurate Form 5500 in any way"). Moreover, there is no evidence that Defendants or those filing the Form 5500 intended to mislead participants or fail to act candidly in any way.

## C.   Defendants Complied With Applicable Requirements

Last, Plaintiffs' attempt to obtain injunctive relief fails because they cannot show a violation of any reporting instructions.

Plaintiffs allege that Defendants failed to properly report the amount of compensation "paid to Fidelity from Financial Engines" in the Plan's Form 5500s. TAC ¶¶ 101-102, 106-108. As Plaintiffs admit, however, the Department of Labor does not require plans to disclose the *amount* of "eligible indirect compensation" received by service providers. *Id.* ¶¶ 99-100. Item 2(g) of Form 5500 specifically states that filers should exclude "eligible" indirect compensation. Ex. 29 at -1480.

The definition of "eligible indirect compensation" is not found in the ERISA or its regulations. It is found only in the instructions for the Form 5500. Those instructions define the term as follows:

> **(1)  Eligible Indirect Compensation**: The types of indirect compensation that can be treated as eligible indirect compensation are indirect compensation that is fees or expense reimbursement payments <u>charged to investment funds and reflected in the value of the investment</u> or return on investment of the participating plan or its participants, finder's fees, "soft dollar" revenue, float revenue, and/or brokerage commissions or other transaction-based fees for transactions or services involving the plan <u>that were not paid directly by the plan or plan sponsor</u> (whether or not they are capitalized as investment costs).

> Investment funds or accounts for this purpose would include mutual

funds, bank commingled trusts, including common and collective trusts, insurance company pooled separate accounts, and other separately managed accounts and pooled investment vehicles in which the plan invests. <u>Investment funds or accounts would also include separately managed investment accounts that contain assets of individual plans.</u>

(2) **Required Written Disclosures**: For the types of indirect compensation described above to be treated as eligible indirect compensation for purposes of completing line 1, you must have received written materials that disclosed and described (a) the existence of the indirect compensation; (b) the services provided for the indirect compensation or the purpose for payment of the indirect compensation; (c) the amount (or estimate) of the compensation or a description of the formula used to calculate or determine the compensation; and (d) the identity of the party or parties paying and receiving the compensation.

Ex. 9 at p. 26. An FAQ from the Department of Labor's Employee Benefits Services Administration reiterates that the term "eligible indirect compensation" includes fees charged to "separately managed investment accounts that contain assets of an individual plan." Frequently Asked Questions About the 2009 Form 5500 Schedule C (July 2008) at Q3, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/2009-form-5500-schedule-c.pdf.

The Form 5500 instructions (Ex. 9 at p. 27) then direct filers to indicate whether eligible indirect compensation was received as follows:

**Element (f).** Check "Yes" <u>if any of the indirect compensation was eligible indirect compensation</u> for which the plan received the necessary disclosures. See instructions for line 1 for definition of eligible indirect compensation. Check "No" if none of the indirect compensation was eligible indirect compensation.

**Element (g).** Enter the total of all indirect compensation <u>that is not eligible indirect compensation</u> for which the plan received the necessary disclosure. Do not leave blank. If none, enter "0".

**Element (h).** Check "Yes" if the service provider, instead of an amount or an estimated amount, gave the plan a formula or other description of

-24-

the method used to determine some or all of the indirect compensation received.

These instructions show that any payments by Financial Engines to Fidelity in connection with the accounts Financial Engines manages for Plan participants are "eligible indirect compensation." Fidelity's 2015 disclosure of indirect compensation from Financial Engines contained all of the information required under the instructions, including a formula ████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ SUF 40. Fidelity's subsequent 408(b)(2) disclosure in 2019 contained a modified formula with reduced basis point fees. SUF 42. AT&T Services appropriately classified these indirect payments to Fidelity as eligible indirect compensation under Elements (f) and (g), indicated receipt of a formula under Element (h), and reported all direct payments from the Plan to Fidelity and from the Plan to Financial Engines in item (d). *E.g.*, Ex. 29 at -1480 (2016 Form); Ex. 30 at -1534 (2017 Form). That is what the Department of Labor requires.

## CONCLUSION

As explained above, Plaintiffs have no evidence of an imprudent process, no evidence that the Plan paid higher than average fees, and no evidence of any disloyalty or self-dealing. Plaintiffs also lack standing to challenge the Form 5500 filings, cannot show a predicate ERISA violation, and are wrong on the merits. Because every one of Plaintiffs' key factual and legal contentions has proved to be unfounded, the Court should award summary judgment to Defendants on all claims.

1

2   Dated: June 14, 2021                    Respectfully submitted,

3                                           MAYER BROWN LLP

4                                           By: */s/ Nancy G. Ross*

5                                           MAYER BROWN LLP
                                            Nancy G. Ross (*pro hac vice*)
6                                             nross@mayerbrown.com
                                            Richard E. Nowak (*pro hac vice*)
7                                             rnowak@mayerbrown.com
                                            Jed W. Glickstein (*pro hac vice*)
8                                             jglickstein@mayerbrown.com
                                            71 South Wacker Drive
9                                           Chicago, IL 60606
                                            (312) 782-0600
10                                          (312) 701-7711 – Facsimile

11                                          John Nadolenco (SBN 181128)
                                              jnadolenco@mayerbrown.com
12                                          350 South Grand Ave
                                            25th Floor
13                                          Los Angeles, CA 90071-1503
                                            (213) 229-9500
14                                          (213) 625-0248 – Facsimile

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. IN SUPPORT OF DEFS. MOTION FOR SUMMARY JUDGMENT - CASE NO. 2:17-CV-8106