Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608

Todd S. Collins (*Pro Hac Vice*)
Ellen T. Noteware (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, Pennsylvania 19103

John J. Nestico (*Pro Hac Vice*)
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
6000 Fairview Rd, Suite 1200
Charlotte, North Carolina 28210

Eric Lechtzin (SBN: 248958)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, California 90012

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JULIO C. ALAS, ROBERT J.
BUGIELSKI and CHAD S.
SIMECEK, individually as
participants in the AT&T
Retirement Savings Plan and as
representatives of all persons
similarly situated,

      Plaintiffs,

  vs.

AT&T SERVICES, INC., and the
BENEFIT PLAN INVESTMENT
COMMITTEE,

      Defendants.

Case No. 2:17-cv-8106-VAP-RAO

**RESPONSE TO MINUTE ORDER REGARDING FILING OF PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

Judge: Hon. Virginia A. Phillips
Magistrate: Hon. Rozella A. Oliver

On August 26, 2021, the Court by Minute Order, ECF No. 203, directed Plaintiffs to file their Statement of Undisputed Facts ("SUF") in Opposition to Defendants' Motion for Summary Judgment.

As the Court's Order points out, Defendants acknowledge that Plaintiff provided a copy of the SUF to Defendants via email on July 13, 2021 (Dkt. 192-1, at 2 n.1).  In addition, prior to filing Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on July 12, 2021, Plaintiffs' counsel had provided to counsel for Fidelity Workplace Services, a non-party whose claimed confidential proprietary and/or trade secret information was sought to be protected by Plaintiffs' Application to File Under Seal, a copy of Plaintiffs' SUF in order to give Fidelity's counsel the opportunity to request appropriate redactions.  Plaintiffs, however, failed, until now, to file the SUF with the Court, which is attached hereto. Plaintiffs' failure was inadvertent, and Plaintiffs' counsel apologize to the Court.

DATED August 26, 2021.

*/s/John J. Nestico*
Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
jbloom@schneiderwallace.com

John J. Nestico (*Pro Hac Vice*)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP

6000 Fairview Rd, Suite 1200
Charlotte, North Carolina 28210
Telephone: (510) 740-2946
Facsimile: (866) 505-8036
jnestico@schneiderwallace.com

Eric Lechtzin (SBN: 248958)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (267) 408-8445
elechtzin@edelson-law.com

Todd S. Collins (*Pro Hac Vice*)
Ellen T. Noteware (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000
tcollins@bm.net
enoteware@bm.net

Grant Joseph Savoy (SBN: 284077)
Shoham J. Solouki (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, California 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for United States District Court, Central District of California, by using the Court's CM/ECF system on August 26, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

*/s/John J. Nestico*
John J. Nestico

*Attorney for Plaintiffs*

EXHIBIT 1

1   Todd M. Schneider (SBN: 158253)
2   Jason H. Kim (SBN: 220279)
    James A. Bloom (SBN: 311051)
3   SCHNEIDER WALLACE
    COTTRELL KONECKY LLP
4   2000 Powell Street, Suite 1400
    Emeryville, California 94608
5   Telephone: (415) 421-7100
    Facsimile: (415) 421-7105
6   tschneider@schneiderwallace.com
    jkim@schneiderwallace.com
7   jbloom@schneiderwallace.com

    John J. Nestico (*Pro Hac Vice*)
    SCHNEIDER WALLACE
    COTTRELL KONECKY LLP
    6000 Fairview Ave.,
    Suite 1200
    Charlotte, NC 28211
    Tel: (510) 740-2946
    Fax: (866) 505-8036
    jnestico@schneiderwallace.com

    Eric Lechtzin (SBN: 248958)
    EDELSON LECHTZIN LLP
    3 Terry Dr., Suite 205
    Newtown, PA 18940
    215-867-2399
    elechtzin@bm.net

10  Todd S. Collins (*Pro Hac Vice*)
11  Ellen T. Noteware (*Pro Hac Vice*)
    BERGER MONTAGUE PC
12  1818 Market Street
    Philadelphia, Pennsylvania 19103
13  Telephone: (215) 875-3000
    tcollins@bm.net
14  enoteware@bm.net

    Grant Joseph Savoy (SBN: 284077)
    Shoham J. Solouki (SBN: 278538)
    SOLOUKI | SAVOY, LLP
    316 W. 2nd Street, Suite 1200
    Los Angeles, California 90012
    Telephone: (213) 814-4940
    Facsimile: (213) 814-2550
    grant@soloukisavoy.com
    shoham@soloukisavoy.com

15  *Attorneys for Plaintiffs and the Class*

16

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT J. BUGIELSKI and CHAD S. SIMECEK, individually as participants in the AT&T Retirement Savings Plan and as representatives of all persons similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>AT&T SERVICES, INC. and the BENEFIT PLAN INVESTMENT COMMITTEE,<br><br>    Defendants. | Case No. 2:17-cv-8106-VAP-RAO<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  August 23, 2021<br>Time: 2:00 PM<br>Place: Courtroom 8A<br><br>Judge: Hon. Virginia A. Phillips |

**PLAINTIFFS' RESPONSE TO IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 56 of the Central District of California and ¶ 4 of the Court's Standing Order, Plaintiffs hereby respond to Defendants AT&T Services, Inc. ("AT&T Services") and the Benefit Plan Investment Committee Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment.

Unless stated otherwise, the deposition transcripts and exhibits cited in Plaintiffs' Responses, below, refer to the exhibits to the Declaration of John J. Nestico, which were filed as support for Plaintiffs' Motion for Summary Judgment (EFC # 167-2).

| Defs.' SUF | Fact | Supporting Evidence | Plaintiffs' Response |
|---|---|---|---|
| | **Plan Basics** | | |
| 1 | The AT&T Retirement Savings Plan ("Plan") is a 401(k) plan offered to eligible AT&T employees. | Ex. 12, ATT00001112 (1/1/2018 Plan) | Undisputed. |
| 2 | AT&T Inc. is the Plan Sponsor. | Ex. 12, ATT00001112 at -121 (1/1/2018 Plan § 1.3) | Undisputed. |
| 3 | AT&T Services is the Plan Administrator. | Ex. 10, ATT00001298 (12/14/2010 AT&T Services Consent)<br><br>Ex. 12, ATT00001112 at - | Undisputed. |

| | | 146 (1/1/2018 Plan § 3.1(86)) | |
|---|---|---|---|
| | **Delegations of Authority** | | |
| 4 | In July 2011, AT&T Services delegated discretion over third party administration and day-to-day direction for the AT&T Retirement Savings Plan to the Senior Vice President–Compensation, Benefits, & Policy. | Ex. 6, Webb Tr. 46:24-48:25<br><br>Ex. 11, ATT00001300 at -300-301 (7/1/2011 AT&T Services Consent) | Disputed. The 2011 ARSP Restatement, Def. Ex. 16 and 2018 ARSP Restatement, Def. Ex. 15 provide in section 3.1(86) that the plan administrator "means AT&T Services, Inc." Defendants Answer, ECF No. 112 at ¶¶ 2, 14, 113-15, filed on April 6, 2019, admits that AT&T Services Inc. is the plan administrator. The parties to the Fidelity Services Agreement are Fidelity and AT&T Services Inc. The parties to the Financial Engines Services Agreement are Financial Engines Advisors LLC and AT&T services Inc. Marty Webb, as Vice President – Benefits, signed those agreements because he held the position designated by AT&T Services Inc. as the officeholder authorized to act on behalf of AT&T |

| | | | Services Inc. |
|---|---|---|---|
| 5 | In 2015, AT&T Services delegated discretion over third party administration and day-to-day direction for the AT&T Retirement Savings Plan to the Vice President–Benefits. That delegation authorized the Vice President–Benefits to make further delegations with respect to the AT&T Retirement Savings Plan. | Ex. 13, ATT00005621 at -624 (6/5/15 Resolution - AT&T Benefit Plan Fiduciary Delegations Pt. V) | Disputed. Def. Exs. 16, 17, 19, 21, 24, ATT00001953. All agreements for administrative or consulting services where AT&T Services, Inc. is the contracting party; demonstrating that AT&T Services, Inc. retained discretionary and exercised discretionary authority over administrative and consulting services to the ARSP. |
| 6 | Following the 2015 delegation, the Vice President–Benefits delegated authority over day-to-day direction of third parties to the Director of Savings Plan Operations. | Ex. 14, ATT00005625 (6/9/15 Additional Resolution – AT&T Benefit Plan Fiduciary Delegations) | |
| 7 | Marty Webb was AT&T Services's Vice President–Benefits from the start of the class period until December 2019. | Ex. 6, Webb Tr. 16:16-17:18 | Undisputed. |
| 8 | Julie Galloway was AT&T Services's Vice President– | Ex. 2, Galloway Tr. 11:11-23 | Undisputed. |

| | | | |
|---|---|---|---|
| | Benefits from January 2020 to the present. | | |
| 9 | John Phipps was AT&T Services's Assistant Vice President for Retirement from 2008 to March 2020. In that role, he was responsible for the design and operations of the AT&T Retirement Savings Plan. | Ex. 4, Phipps Tr. 10:2-11:1<br><br>Ex. 6, Webb Tr. 53:2-21 | Undisputed. |
| 10 | Gary Hanson has been AT&T Services's Director of Executive Compensation since 2019. He served as Director – Savings Plan Operations until roughly the middle of 2015. | Ex. 3, Hanson Tr. 7:21-9:6, 11:15-12:20<br><br>6/9/21 Decl. of John Phipps ¶ 17 | Undisputed. |
| 11 | AT&T Services delegated responsibility for certain investment-related functions, such as monitoring plan investment expenses, to the Benefit Plan Investment Committee. | Ex. 6, Webb Tr. 37:19-38:18<br><br>Ex. 11, ATT00001300 at -300 (7/1/2011 AT&T Services Consent)<br><br>Ex. 12, ATT00001586 at -591-592 (5/31/2012 BPIC Org. Doc., Art. | Disputed. Defendant AT&T Services, Inc. is a fiduciary of the ARSP. (Exhibit 1 at 26. Exhibit 4 at 1). |

| | | | | |
|---|---|---|---|---|
| | | | VIII) Ex. 32, ATT00003579 at -579 (12/2/2011 BPIC minutes, noting that "[t]he AT&T savings plans pay expenses that are generally lower than other comparably large plans in the CIEBA and CEM surveys"). | |
| 12 | | AT&T Services's delegation of responsibility to the Benefits Plan Investment Committee did not include negotiating with or monitoring compensation paid to Fidelity with respect to the Plan. | Ex. 2, Galloway Tr. 61:9-62:7, 63:1-64:10 Ex. 6, Webb Tr. 79:1-25, 133:1-136:4, 138:14-139:14, 149:16-152:16 | Disputed. Defendant Benefit Plan Investment Committee ("BPIC") is a fiduciary of the Plan that is responsible for matters related to the ARSP other than administration. (Webb Tr. at 39:10-16, 49:1-3; Exhibits 2, 4 at 1-2, 11 at 1-2 (BPIC organizational document, effective May 31, 2012). Ex. 4.); Defendant BPIC "has all powers and authority that may be necessary or appropriate to the establishment, qualification, administration, |

| | | | | maintenance, and operation of each of the trusts established as part of any employee benefit plan, program, practice and procedure maintained by AT&T Inc. or its subsidiaries." (Webb Tr. at 131:5-18, 132:1-8; Exhibit 11 at 1-2); |
|---|---|---|---|---|
| | | | | Defendant BPIC has the responsibility to monitor and review the Plan's expenses and renegotiate contracts. (Webb Tr. at 132:17 – 133:18; Exhibit 11 at 1-2). |
| | **Plan Recordkeeping** | | | |
| 13 | AT&T engaged Fidelity Workplace Services LLC ("Fidelity") to serve as the Plan's recordkeeper in 2005, following a Request for Proposal ("RFP") process. | Ex. 6, Webb Tr. 166:3-167:7 | | Undisputed. |
| 14 | AT&T Services's 2011 Service Agreement with Fidelity became effective March 4, 2011 and, if not renewed, expired on | Ex. 16, ATT00002906 at -911, -952, -963 (2011 Fidelity Services Agmt. §§ 1.1, 3.57, and signature page) | | Undisputed. |

| | | December 31, 2017. | | |
|---|---|---|---|---|
| | 15 | As part of a 2011 Plan Consolidation Project, AT&T evaluated the fees paid by several of AT&T's retirement plans, including the Plan. AT&T concluded that the Plan's costs were the lowest of the AT&T plans. | Ex. 12, ATT00001112 at -124-130 (1/1/2018 Plan § 2.5) (Plan Mergers)<br><br>Ex. 33, ATT00002671 at -675-676 (3/1/2011 Consolidation Project presentation) | Disputed. Exhibit 12 is the organizational document for the Benefit Plan Investment Committee. Exhibit 15, which is ATT00001112 section 2.5, says nothing about any evaluation of fees or comparison of fees among plans. Exhibit 33 does not state that ARSP plan costs "were the lowest of the AT&T plans," it states only that the "ARSP has lower recordkeeping fees". |
| | 16 | AT&T Services Benefits personnel regularly reviewed Fidelity's compensation and industry publications and surveys to ensure that the Plan was paying reasonable amounts for services and met with Fidelity personnel quarterly. | Ex. 4, Phipps Tr. 16:22-17:10<br><br>Ex. 6, Webb Tr. 79:1-81:14<br><br>Ex. 41, ATT00002449 (12/5/2011 Deloitte 401(k) survey)<br><br>Ex. 42, ATT00002577 (2017 Deloitte 401(k) survey)<br><br>6/9/21 Decl. of John Phipps | Disputed. Defendants failed to obtain from Fidelity a disclosure of, and failed to determine the total amount of indirect compensation received by Fidelity, what services were being provided for that compensation, and they failed to analyze whether such amounts were reasonable. Ex. 37 at 3; Pltfs.' Ex. 12 at 3; Exs. 25-31, each at 6.<br><br>Financial Engines has |

| | | | ¶¶ 5-9 | paid Fidelity an annual asset-based fee that was initially ███████ of the total fee charged to participants (Phipps Tr. at 54:18-22. Ex. 35)

"[A]n amendment to this fee structure that went into place in April 1 of 2015 that lowered that number to a range ███████ ██████████ that would be paid to Fidelity from Financial Engines." (Phipps Tr. at 55:2-6; Exhibit 55)

"That agreement is between Fidelity and Financial Engines and is part of their negotiations. We contract separately and independently with Fidelity and with Financial Engines." (Galloway Tr. at 48:18 -49:5)

"[W]hat Financial Engines and Fidelity worked out for fees, was between them." (Phipps Tr. at 46:6-8.) |

| | | | |
|---|---|---|---|
| | | | "[W]e typically did not evaluate the fees that our vendors would pay to third parties." (Phipps Tr. at 47:5-7.)

Fidelity received indirect compensation from BrokerageLink, but the 408b-2 disclosure reports from Fidelity did not include such amounts. (Phipps Tr. at 17:6-21. Ex. 12 at 3; Ex. 52 at 3.)

Defendants did not consider Fidelity compensation from BrokerageLink and Financial Engines in determining whether Fidelity's compensation was reasonable. (Galloway Tr. at 48:18 – 49:9; 48:18 – 49:9; 49:6-9; Phipps Tr. at 55:20 – 56:1) |

| | | | |
|---|---|---|---|
| 17 | In 2016, AT&T Services retained Deloitte Consulting LLP to provide opinions and recommendations concerning the Plan's fees and services relative to the market and to assist in negotiating a new agreement with Fidelity. | Ex. 6, Webb Tr. 149:16-152:13<br><br>Ex. 24, ATT00001953 (Deloitte 7/29/16 work order) | Undisputed. |
| 18 | AT&T Services's contracts with Fidelity included ███████████████ | Ex. 16, ATT00002906 at -944 (2011 Fidelity Services Agmt. § 3.39)<br><br>Ex. 19, ATT00006614 at -617 (2018 Fidelity Services Agmt. § 3.3) | Undisputed. |

| | 19 | AT&T Services regularly received and reviewed benchmarking studies from Deloitte, CEM Benchmarking, and the Committee on Investment of Employee Benefit Assets (CIEBA) which consistently showed that Plan's recordkeeping expenses were lower than peer plans. | Ex. 42, ATT00002577 at -597 (9/20/2017 Deloitte Survey - median $50 recordkeeping fee)<br><br>Ex. 43, ATT00026348 at -403 (10/11/2013 CIEBA Membership Profile - $51 average recordkeeping fee)<br><br>Ex. 44, ATT00006072 at -126 (10/3/2014 CIEBA Membership Profile - $48 average recordkeeping fee)<br><br>Ex. 47, ATT00003331 at -365-366 (10/4/2016 Deloitte Services - ARSP costs below comparator companies) | Disputed.  AT&T Services regularly received benchmarking studies comparing certain fees the ARSP was paying for certain recordkeeping services, but those benchmarking studies did not take into account all direct compensation that was being paid to Fidelity and especially did not take into account undisclosed indirect compensation Fidelity was receiving from Financial Engines and BrokerageLink. |
| | 20 | The AT&T Retirement Savings Plan ███████ participant to Fidelity for recordkeeping services in 2011. | Ex. 16, ATT00002906 at -996 (2011 Savings Admin. Servs. Agmt., App'x B Pt. III) | Disputed.  Recordkeeping is an undefined term, although administrative services to the Plan |



| | | | Ex. 38, ATT00026603 (2011 Q4 invoice - █████ fee) | are provided through the Fidelity Services Agreement, Defs'.' Ex. 16, Appendix B Part III, ATT00002996-3000 and 19, Appendix B-1c. describes a range of services designated as Administrative Services. The price structure for administrative services is detailed in Appendix C-1a. The ████ charge is simply one of many charges for Plan services and referred to as the "Core Charge." Ex. 16, Appendix B Part III and Ex. 19 Appendix C-1a, ██████. Prior to 2018, the Plan's annual reports consistently did not distinguish among the various fees detailed in Appendix B Part III or Appendix C-1a. All direct compensation to Fidelity was reported on the Plans' 5500s as a single amount. Exs. The 5500s of other large plans referenced in the TAC have |

| | | | consistently reported compensation to the respective plans' recordkeepers as a single amount for a range of services, including services for recordkeeping, trust services, loan processing, communications, distribution and redemption fees, account maintenance, and other services described Appendix B-1a. Exs. 25-31, each at 6. Since the comparisons in the TAC were based on total direct compensation received by comparable recordkeepers, the term "recordkeeping expenses" should include fees for all services, not just the Core Charge. Therefore, the ARSP did not pay a fee of ███████ for recordkeeping services in 2011. |
|---|---|---|---|



| 21 | Effective August 1, 2012, AT&T negotiated a reduction in AT&T Retirement Savings Plan recordkeeping fees, ███ per participant ████████). | Ex. 17, ATT00003108 at -110 (8/23/2012 Third Amendment to Services Agmt. § 2)<br><br>Ex. 39, ATT00026629 (2012 Q4 invoice - ████ quarterly maintenance fee) | Disputed. ████ per participant represents only one of the numerous fees for recordkeeping and administrative services charged by Fidelity. *See* detailed dispute of SUF 20, above. Additionally, ████████ does not take into account the estimated █████ undisclosed additional compensation Fidelity received through Plan investments through BrokerageLink. |

| | | | | |
|---|---|---|---|---|
| 22 | In October 2016, AT&T Services and Deloitte determined that other large plans (45,000 or more participants) paid $38 to $94 per participant for recordkeeping, with an average of $50. Deloitte concluded that, "[w]hile some adjustments can be made to fees and fee structures for all three plan types, current financial terms in both Fidelity Agreements remain competitive compared to market trends and well-aligned to AT&T's size and complexity." | Ex. 2, Galloway Tr. 66:14-21<br><br>Ex. 46, ATT00001961 (October 2016 Procurement Review)<br><br>Ex. 47, ATT00003331 at -338, -365-366 (10/4/2016 Deloitte Services and Fees Recommendations) | Undisputed. |
| 23 | Effective January 1, 2018, AT&T negotiated a further reduction in recordkeeping fees, to ▇▇▇▇ The contract with Fidelity provided that the parties could negotiate for further reductions if Fidelity's cost to deliver the services | Ex. 19, ATT00006614 at -702-703 (2018 Saving Admin Servs. Agmt., App'x C-1a tbl. 2)<br><br>Ex. 40, ATT00026763 (2018 Q2 invoice - ▇▇▇▇ participant quarterly | Disputed. *See* comment to ¶ 20 above. Additionally, the ▇▇▇▇ ▇▇▇▇ does not include the additional estimated ▇▇▇ in compensation that Fidelity received from Financial Engines during 2018, Ex. 55, or the ▇▇▇▇ |

---

[1] Because Defendant's never obtained direct information from Fidelity regarding its compensation from Financial Engines, Plaintiffs were unable to obtain from

| | | | |
|---|---|---|---|
| | "significantly shift[ed]" during the contract term. | maintenance fee) | ██████ Fidelity received in undisclosed compensation from Plan investments through BrokerageLink. |
| **Other Fidelity Services** | | | |
| 24 | Fidelity provided other individualized services to the Plan, including initiating and maintaining loans and non-hardship withdrawals, processing qualified domestic relations orders, and processing cash dividends to Plan participants.<br><br>Fidelity also performed other special projects for the Plan. | Ex. 6, Webb Tr. 56:1-57:7, 65:16-66:14<br><br>Ex. 16, ATT00002906 at -996-997 (3/4/2011 Admin. Services Agmt., App'x B Pt. III)<br><br>Ex. 37, ATT00008819 at -824-825 (exemplar 9/30/2017 Fidelity Statement of Services) | Undisputed. |

Defendants the precise amount of Fidelity's compensation from Financial Engines.
An ████████████████████████████████████████████████████████████████████

| | | | | |
|---|---|---|---|---|
| | 25 | Fidelity provided Plan participants with access to its BrokerageLink service. BrokerageLink, a self-directed brokerage account, offers sophisticated participants the ability to select investments outside of those offered on the plan's default menu. | Ex. 2, Galloway Tr. 32:8-20<br><br>Ex. 4, Phipps Tr. 27:24-28:9 | Disputed to the extent that there is no material limitation, based on sophistication, of which participants can invest through BrokerageLink. |
| | 26 | Participants did not pay an account fee to use BrokerageLink. Rather, participants were subject to Fidelity's "retail brokerage commission schedule in place" if they voluntarily decided to execute trades on BrokerageLink. | Ex. 16, ATT00002906 at -999 (2011 Fidelity Services Agmt., App. B)<br><br>Ex. 34, ATT00027829 (June 27, 2012 408(b)(2) disclosure) | Undisputed. |
| | 27 | Participants can access the BrokerageLink commission schedule and fund prospectuses containing fee information through the NetBenefits platform. | Ex. 4, Phipps Tr. 58:5-60:1 | Undisputed. |

| | | Financial Engines | | |
|---|---|---|---|---|
| | 28 | In July 2013, AT&T concluded that Plan participants were overly concentrated in AT&T shares and low-yield, stable value fund offerings, and that participants could benefit from additional money management and portfolio allocation tools. | Ex. 48, ATT00002320 at -321 (7/12/2013 AT&T Savings Plan – Exploring Money Management & Enhanced Services presentation) | Undisputed. |
| | 29 | Mr. Phipps, Mr. Hanson, and others at AT&T Services led an effort to find an investment advisory services and managed account services provider. In September 2013, AT&T Services engaged Deloitte Consulting LLP to help conduct the search and issued an RFP. | Ex. 4, Phipps Tr. 36:11-37:20<br><br>Ex. 23, ATT00005689 (9/19/2013 Deloitte work order)<br><br>Ex. 49, ATT00006894 (Sept. 2013 RFP) | Disputed. To the extent SUF ¶¶ 29 and 30 imply or suggest that an RFP (Request for Proposal) was conducted among a broad range of service providers and that Defendants, after reviewing responses to the RFP from multiple service provides, selected Financial Engines and Fidelity as the two finalists, the evidence cited does not support the facts asserted. There is no evidence that the RFP was sent to anyone. There is no evidence of any responses to the RFP. Connectivity between Financial Engines and |

| | | | the Fidelity platform is essential to the performance of Financial Engines' managed account service. FE ADV; Ex. 55. Despite that, there is only one question in the 20-page RFP regarding the service providers connection with Fidelity and it does not ask whether the service provider can connect to the Fidelity platform. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 30 | After the RFP, AT&T narrowed its choices to two providers—Fidelity and Financial Engines Advisors, LLC. | Ex. 3, Hanson Tr. 15:2-17:8<br><br>Ex. 4, Phipps Tr. 32:17-33:25<br><br>Ex. 50, ATT00008764 (10/29/2013 Financial Engines presentation) | Disputed. The cited exhibits provide no evidence as to when AT&T narrowed its choices; that is, whether AT&T knew at the time of the RFP that Financial Engines was the only third-party managed account provider with access to Fidelity's platform. Quite the contrary, Deloitte's Oct. 2013 Update Report on the RFP clearly shows that the only comparison was between Financial Engines and Fidelty. Pltf.'s EX. 57, Defined Contribution Managed Services, Steering Committee Update, ATT00017412 |
| 31 | AT&T Services selected Financial Engines as the Plan's managed account services provider after a lengthy evaluation process. The choice was based on several factors, including cost and independence. | Ex. 3, Hanson Tr. 17:9-19:20, 24:5-25<br><br>Ex. 6, Webb Tr. 169:3-173:2<br><br>Ex. 51, ATT00006004 at -013-020 (2/26/2014 presentation to steering committee) | Undisputed. |

| | | | Ex. 52, ATT00002130, at -136 (6/24/2014 Money Management RFP PowerPoint) | |
|---|---|---|---|---|
| | 32 | AT&T entered in a contract with Financial Engines in August 2014 to provide advisory and managed account services to the Plan. | Ex. 20, ATT00003211 at -275-280 (8/1/2014 Financial Engines Contract, App. A) | Undisputed. |
| | 33 | Participants who voluntarily chose to use Financial Engines's managed account services agreed to allow Financial Engines to execute trades in their Plan account, although participants could cancel with no penalty at any time. | Ex. 22, ATT00016883 (12/4/14 Supp. to Financial Engines Prof'l Mgmt. Program Terms and Conditions) | Undisputed. |
| | 34 | Financial Engines uses data and technology provided by Fidelity to offer its services to retirement plans. | Ex. 2, Galloway Tr. 18:18-19:4<br><br>Ex. 3, Hanson Tr. 45:3-21<br><br>Ex. 4, Phipps Tr. 40:24-44:21, 52:14-23 | Disputed. The cited evidence does not establish that the data and technology referred to is greater than or in addition to the same recordkeeping, account data, and technology provided for by the Fidelity Services Agreement that allows participants to |

| | | | manage their own accounts. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 35 | AT&T was aware that Financial Engines and Fidelity had a separate agreement by which Financial Engines paid Fidelity for access to Fidelity's data and technology in order to provide Financial Engines' advisory and account management services to retirement plans. | Ex. 2, Galloway Tr. 18:18-19:13<br><br>Ex. 3, Hanson Tr. 29:23-34:25<br><br>Ex. 4, Phipps Tr. 39:21-42:1<br><br>Ex. 50, ATT00008764 at -806 (10/29/2013 presentation – portion of fees would be paid to the recordkeeper for "administrative support in connection with the implementation and ongoing delivery" of services)<br><br>Ex. 53, ATT00011823 (9/17/14 email from Hanson to Phipps with estimate of charges) | Disputed. The cited evidence does not establish that the phrase "access to Fidelity's data and technology" means anything other than that Fidelity gave Financial Engines access to the accounts of participants who had given Financial Engines the authority to access and manage the investment of their accounts. |

| | | | | |
|---|---|---|---|---|
| 36 | The Services Agreement between AT&T Services and Financial Engines states that Financial Engines "has entered into an agreement with the Plan Recordkeeper to establish and maintain secure communication links and data connectivity" and that a portion of the plan fees would be paid to the Plan Recordkeeper "as compensation for these activities." The contract also stated that Financial Engines will not "charge AT&T or Plan Participants any additional fees as a result of the [Financial Engines'] payment to the Plan Recordkeeper." | Ex. 20, ATT00003211 at -240 (8/1/2014 Financial Engines Contract § 3.17(e)) | Disputed. Ex. 36 demonstrates that all amounts that Fidelity received in connection with services provided by Financial Engines (which were never disclosed to participants) were calculated as a ████████ ████████ and therefore were paid by Plan participants. |

| | | | |
|---|---|---|---|
| 37 | In September 2014, AT&T sent Fidelity a Letter of Direction relating to the selection of Financial Engines. The letter provided that "Financial Engines compensates Fidelity for maintaining the links and related services with an annual fee ███████ ████████ ████████ ████████ ████" The letter further provided that ███████ ████████ ████████ ████████ ████████ ████████ ████" | Ex. 18, ATT00001941 at - 942 (9/12/2014 LoD) | Disputed to the extent that the letter is offered as evidence that participants electing to use Financial Engines' managed account service paid no fee to Fidelity in connection with that service. SUF 39 states that Financial Engines charged participants between 25 and 35 basis points for the managed account service, depending on account size. The Letter of Direction clearly states that Fidelity was receiving ███████ ████████ ████████ ████ |
| 38 | Financial Engines began offering its managed account services to Plan participants in 2015. | Ex. 20, ATT00003211 at - 216 (8/1/2014 Financial Engines Services Contract § 1.2(f) – providing for "Rollout Date" of January 5, 2015) | Undisputed. |



| | | | |
|---|---|---|---|
| 39 | Financial Engines initially charged a Plan Access Fee of $2.00 per year per active participant. Financial Engines also charged an asset-based fee for those participants who voluntarily signed up to use Financial Engines's professional management services (35 bps on assets of $50K or less; 30 bps on assets of $50K-$250K, and 25 bps on assets of $250K or greater). | Ex. 20, ATT00003211 at -279-280 (8/1/2014 Financial Engines Services Contract, App. B)<br><br>Ex. 54, ATT00026819 (exemplar Financial Engines 2017Q1 management fee invoice)<br><br>Ex. 55, ATT00026799 (exemplar Financial Engines 2017Q1 advisory fee invoice) | Undisputed |
| 40 | In October 2015, Fidelity sent AT&T Services a 408(b)(2) disclosure indicating changes to the indirect compensation that Fidelity received from Financial Engines. | Ex. 35, ATT00026780 (10/8/2015 408(b)(2) change notice to Phipps) | Undisputed |
| 41 | In October 2017, AT&T extended the term of the Financial Engines contract. Financial Engines eliminated the $2.00 per participant per year Plan Access Fee and also reduced its | Ex. 4, Phipps Tr. 52:25-53:21<br><br>Ex. 21, ATT00003182 at -192 (12/19/2017 Amendment No. 2, App. B) | Undisputed |

| | | | | |
|---|---|---|---|---|
| | | asset based fees for professional management services (30 bps on the first $250K of assets, and 20 bps on assets of $250K or greater). | Ex. 56, ATT00026827 (exemplar Financial Engines 2018Q1 management fee invoice)<br><br>Ex. 57, ATT00002231 (10/4/2017 email from Reiff to Phipps) | |
| | 42 | In February 2019, Fidelity sent AT&T a 408(b)(2) disclosure indicating further changes to the indirect compensation Fidelity receives from Financial Engines. | Ex. 36, ATT00001938 (1/31/2019 notice of change in compensation to Phipps) | Undisputed |
| **Indirect Fidelity Compensation** | | | | |
| | 43 | AT&T Services estimated Fidelity's compensation from BrokerageLink by looking at fund balance spreadsheets and calculating associated expense ratios. | Ex. 4, Phipps Tr. 16:11-19:2<br><br>Ex. 45, ATT00027833 (2018 estimate worksheet) | Disputed. The spreadsheet ATT000027833 is not a 2018 estimate worksheet. The metadata for the document indicates it was not created until Fe. 26, 2019. The Plan's 5500 for 2012 indicates that the Plan held more than |

| | | | | |
|---|---|---|---|---|
| | | | | $1,000,000,000 in mutual funds acquired through BrokerageLink . Ex. 25, Independent Auditor's Report at 9 (32 of 53).at The spreadsheet on its face estimates Fidelity's compensation from only approximately half of the value of accounts invested through BrokerageLink and for only Fidelity funds. There is no calculation of Fidelity's compensation from non-Fidelity funds. |
| 44 | AT&T's Phipps, who was "central" to the fee negotiations with Fidelity, explained that "[w]e recognized the fact that BrokerageLink was valuable to Fidelity. And using that and other sources of revenue that Fidelity would receive . . . , we have consistently kept our | Ex. 4, Phipps Tr. 22:20-23:13, 27:24-28:2, 31:8-15 | | Disputed. Phipps' "explanation" is mere *ipse dixit.* Moreover, Phipps' testimony is contradicted by the documentary evidence indicating that (i) estimates of Fidelity's compensation from BrokerageLink were not performed until 2019 and, therefore, could not have been |

- 28 -

| | | recordkeeping fee well below market." | | used to negotiate Fidelity's fees prior to the time AT&T estimated how much compensation Fidelity was receiving through BrokerageLink, ATT00027833; and (ii) the amendment to the Fidelity Services Agreement expressly prohibiting Fidelity's revenue-sharing compensation from BrokerageLink being considered when calculating services credit to the Plan resulting from revenue sharing. Pltfs.' Ex 17 at 3. |
|---|---|---|---|---|
| | 45 | AT&T Services estimated Fidelity's compensation from Financial Engines by using the information provided in Fidelity's 408(b)(2) disclosures and modeling the total amount of revenue Fidelity was likely to receive. | Ex. 3, Hanson Tr. 29:19-32:5<br><br>Ex. 4, Phipps Tr. 54:4-55:11<br><br>Ex. 53, ATT00011823 (9/17/14 Hanson email to Phipps re Financial Engines estimates) | Undisputed |
| | 46 | AT&T's Phipps noted that "[w]e certainly took note" of the fact that Financial Engines paid Fidelity for | Ex. 4, Phipps Tr. 46:1-47:11, 55:23-56:1 | Disputed.  Phipps statement is unsupported and uncorroborated by any other evidence and contradicted by |

| | | | |
|---|---|---|---|
| access to data, and that from AT&T's perspective, the fact "Fidelity was receiving compensation from Financial Engines" made "the relationship between AT&T and Financial Engines "all the more valuable." | | | other testimony: "I wouldn't say we did an analysis to determine, you know, any fees that one of our vendors paid to anybody else they contract with, and that would include Financial Engines", Plffs' SUF 111; and (ii) "what Financial Engines and Fidelity worked out for fees, was between them", Plffs' SUF 112; and (iii) , "we typically did not evaluate the fees that our vendors would pay to third parties." Plffs' SUF 113. |
| 47 | Phipps testified that AT&T Services "absolutely" took into account compensation that Fidelity was received from Financial Engines during fee negotiations. He credited the "very sizeable reduction in recordkeeping fees" that AT&T negotiated in 2018— an "incredible reduction" ▮▮▮▮ ▮▮▮T&T Retirement Savings Plan participant—to | Ex. 4, Phipps Tr. 56:2-57 :4 | Disputed. Phipps' uncorroborated, self-serving statement is contradicted by his own testimony that (i) "I wouldn't say we did an analysis to determine, you know, any fees that one of our vendors paid to anybody else they contract with, and that would include Financial Engines", Plffs' SUF 111; and (ii) "what Financial Engines and Fidelity worked out for fees, |

| | | | |
|---|---|---|---|
| | that negotiating strategy. | | Plffs' SUF 112; and (iii) , "we typically did not evaluate the fees that our vendors would pay to third parties." Plffs' SUF 113. |
| **Facts Relevant to Standing** | | | |
| 48 | Prior to filing suit, Plaintiff Robert Bugielski had never seen a Form 5500, did not know what a Form 5500 was, and had never reviewed a Form 5500 outside of deposition preparation with his counsel. | Ex. 1, Bugielski Tr. 51:16-52:15<br><br>Ex. 7, Bugielski Interrogatory Responses at ROG 2 | Undisputed |
| 49 | Plaintiff Chad Simecek did not remember asking for a copy of the Form 5500, could not identify any information on the Form 5500, and did not recall reviewing a Form 5500 for the years 2011 through 2016. | Ex. 5, Simecek Tr. 68:23-69:25, 139:13-140:7, 159:5-17<br><br>Ex. 8, Simecek Interrogatory Responses at ROG 2 | Undisputed |

In opposition to Defendants' SUF, Plaintiffs hereby includes Plaintiffs' Statement of Undisputed Facts.

Unless stated otherwise, the deposition transcripts and exhibits cited in Plaintiffs' Responses, below, refer to the exhibits to the Declaration of John J.

Nestico, which were filed as support for Plaintiffs' Motion for Summary Judgment (EFC # 167-2), except as to Exhibits 57 - 83 cited in ¶¶ 129-163, below, which are appended to the Declaration of John J. Nestico in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 1 | The AT&T Retirement Savings Plan (the "ARSP" or "Plan") is an individual account, defined contribution plan under 29 U.S.C. § 1002(2)(A) and §1002(34). | Exhibit 1 at 1(Plan Document); Webb Tr. at 31:2-20. |
| 2 | The ARSP is a 401(k) plan. | Webb Tr. at 17:3-7; Exhibit 1 at 1 (Plan Document). |
| 3 | AT&T, Inc. is a sponsor of the ARSP. | Webb Tr. at 34:24-25. |
| 4 | AT&T, Inc. assigned Defendant AT&T Services, Inc. its "rights, duties, and responsibilities" with respect to the ARSP. | Exhibit 3 at 1(AT&T Services Consent to Designation as Plan Administrator) |
| 5 | Defendant AT&T Services, Inc. is the Plan's administrator. | Webb Tr. at 35:3-7, 45; Exhibit 3 at 1. |
| 6 | Defendant AT&T Services, Inc. is a fiduciary of the ARSP. | Ex.1 at 26. Exhibit 4 at 1. |
| 7 | Defendant Benefit Plan Investment Committee ("BPIC") is a fiduciary of the Plan that is responsible for matters related to the ARSP other than administration. | Webb Tr. at 39:10-16, 49:1-3; Exhibits 2, 4 at 1-2, 11 at 1-2 (BPIC organizational document, effective May 31, 2012). Ex. 4. |
| 8 | Defendant BPIC "has all powers and authority that may be necessary or appropriate to the establishment, qualification, administration, maintenance, and operation of each of the trusts established as part of any employee benefit plan, program, practice and procedure maintained by AT&T Inc. or its subsidiaries." | Webb Tr. at 131:5-18, 132:1-8; Exhibit 11 at 1-2. |
| 9 | Defendant BPIC has the responsibility to monitor and review the Plan's expenses and renegotiate contracts. | Webb Tr. at 132:17 – 133:18; Exhibit 11 at 1-2. |
| 10 | The membership of Defendant BPIC is comprised of AT&T's CFO, Treasurer, Controller, Vice President of Investment Management, and Vice President Benefits. | Webb Tr. at 41:10 – 43:13; Exhibit 2 at 1. |
| 11 | "Individuals serving on the BPIC shall automatically change as the individual assigned such title (or the successor to such title) changes without need for specific appointment of such successor person holding such title." | Webb Tr. at 44:6-17; Exhibit 2 at 1. |
| 12 | Participants in a defined contribution plan | Webb Tr. at 31:21 – |

| | | | |
|---|---|---|---|
| | | like the ARSP get no more at retirement than they have in their accounts at the time of retirement. | 32:9. 29 U.S.C § 1002(34) |
| | 13 | The value of individual accounts in the ARSP is determined by employee and employer contributions, the return on investment of those contributions, less any expenses. | Webb Tr. at 32:10-25. 29 U.S.C § 1002(34) |
| | 14 | Expenses of the ARSP are recordkeeping fees, other administrative fees, and fees related to the different investments or funds within the account. | Webb Tr. at 33:9-13. |
| | 17 | Plaintiff Bugielski worked for AT&T (or its predecessors) from 1989 until his retirement in 2016 | Bugielski Tr. at 17:14-19, 27:1-7. |
| | 18 | Plaintiff Bugielski participated in the ARSP during the class period. | Bugielski Tr. at 23:6-8, 24:1-9. |
| | 19 | Plaintiff Simecek has worked for AT&T from 1997-2000, 2001-2010, 2013-2017, and 2018 through the date of his deposition. | Simecek Tr. at 27:3-19, 28:6-9, 32:18-20, 35:17-19, 38:18-20, 40:20-23. |
| | 20 | Plaintiff Simecek participated in the ARSP since at least 2011. | Simecek Tr. at 43:25 – 44:5, 170:17-21. |
| | 21 | The Plan had 220,276 participants with account balances as of December 31, 2012. | Exhibit 5 at 2 (2012 form 5500) |
| | 22 | The Plan had a total of 229,531 participants with account balances as of December 31, 2013 | Webb Tr. at 77:19-23; Exhibit 6 at 3 (2013 form 5500) |
| | 23 | The Plan had a total of 212,798 participants with account balances as of December 31, 2014 | Webb Tr. at 88:23 – 89:3; Exhibit 7 at 2 (2014 form 5500) |
| | 24 | The Plan had a total of 231,941 participants with account balances as of December 31, 2015 | Exhibit 8 at 2 (2015 form 5500) |
| | 25 | The Plan had a total of 241,414 participants with account balances as of December 31, 2016 | Webb Tr. at 112:22 – 113:5; Exhibit 9 at 2 (2016 form 5500) |
| | 26 | The Plan had a total of 244,935 participants with account balances as of December 31, 2017 | Exhibit 40 (2017 form 5500) |
| | 27 | The Plan had a total of 249,894 participants at year-end 2018 | Exhibit 41 (2018 form 5500) |
| | 28 | The Plan had a total of 273,289 participants at year-end 2019 | Exhibit 42 (2019 form 5500) |
| | 29 | The Plan had net assets of $26,164,000,000 at year-end 2012 | Webb Tr. at 65:5-10; Exhibit 5 at 14. |
| | 30 | The Plan had net assets of $29.8 billion at year-end 2013 | Webb Tr. at 85:7-11; Exhibit 6 at 14. |
| | 31 | The Plan had net assets of $30 billion at year-end 2014 | Webb Tr. at 90:10-12; Exhibit 7 at 14 |
| | 32 | The Plan had net assets of $29,469,686,000 at year-end 2015 | Webb Tr. at 102:6-8; Exhibit 8 at 15 (2015 form 5500) |
| | 33 | The Plan had net assets of $34,786,285,000 at year-end 2016, | Webb Tr. at 119:3-5; Exhibit 9 at 15 (2016 form 5500) |

| 34 | The Plan had net assets of $38,629,249,000 at year-end 2017 | Exhibit 40 (2017 form 5500). |
| 35 | The Plan had net assets of $37,044,727,000 at year-end 2018 | Exhibit 41 (2018 form 5500). |
| 36 | The Plan had net assets of $49,280,973,000 at year-end 2019 | Exhibit 42 (2019 form 5500). |
| 37 | Fidelity Investments provides recordkeeping and other administrative services for the Plan. | Webb Tr. at 55:20 - 56:11. |
| 38 | Fidelity also provides recordkeeping and administrative services to AT&T defined benefit plans. | Webb Tr. at 144:6-9. |
| 39 | No other entity besides Fidelity provides recordkeeping services for AT&T defined benefit plans. | *Id.*. |
| 40 | During the 2012 to 2019 time frame, AT&T did not issue any RFPs for recordkeeping for the ARSP. | Webb Tr. at 167:8-10. |
| 41 | Fidelity also provides health savings account administration for AT&T. | Webb Tr. at 142:3-4. Ex. 48 Fid Services Agmt |
| 42 | Webb, as Vice President of Benefits, reviewed the compensation paid to Fidelity on a quarterly basis. | Webb T. at 79:12-25, 81:4-14. |
| 43 | The Fidelity Brokerage Commission Schedule provided to Plan participants choosing to invest their Plan accounts through BrokerageLink acknowledges that Fidelity receives indirect compensation with respect to mutual fund shares acquired through BrokerageLink | Ex. 51 Fidelity Brokerage Commission Schedule at 1 |
| 44 | In 2011, the ▮▮▮▮ect compensation to Fidelity of ▮▮▮▮ for recordkeeping and admini▮▮▮es. | Pltfs'. Ex. 40 at 6. |
| 45 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2011 Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Pltfs'. Ex. 40 at 6. |
| 46 | In 2012, the Plan paid ▮▮▮t compensation to Fidelity of more than ▮▮▮ million for recordkeeping and adm▮▮▮rative services. | Webb Tr. at 59:2-23, 60:2-5; Exhibit 5 at 6. |
| 47 | Fidelity also received eligible indirect compensation in 2012. | Webb Tr. at 60:8-13, 62:6-13; Exhibit 5 at 6. |
| 48 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2012 Annual Report on Form 5500; instead it reports that Fidelity received "0" dollars in indirect compensation. | Webb T. at 62:14-21; Exhibit 5 at 6. |
| 49 | Defendants failed to disclose on the Plan's Annual Report on Form 5500 that Fidelity received indirect compensation with respect to participant investments through BrokerageLink in 2012. | Exhibit 25 at 6. |
| 50 | In 2013, the Plan paid ▮▮▮▮pensation to Fidelity of more than ▮▮▮ for | Webb Tr. at 82:15-18; Exhibit 26 at 6. |

| | | |
|---|---|---|
| | recordkeeping and administrative services. | |
| 51 | Fidelity also received eligible indirect compensation in 2013. | Webb Tr. at 82:19-22; Exhibit 6 at 6. |
| 52 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2013 Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Webb T. at 82:23 – 83:4; Exhibit 26 at 6. |
| 53 | In 2014, the Plan paid _____ pensation to Fidelity of more than _____ for recordkeeping and adm _____ services | Webb Tr. at 89:8-12; Exhibit 27 at 6. |
| 54 | Fidelity also received eligible indirect compensation in 2014 | Webb Tr. at 89:13-21; Exhibit 27 at 6. |
| 55 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2014 Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Webb Tr. at 89:22-25; Exhibit 27 at 6. |
| 56 | In 2015, the Plan paid direct compensation to Fidelity of for recordkeeping and administrative services. | Webb Tr. at 96:24 – 97:2. Exhibit 28 at 6 |
| 57 | Fidelity also received eligible indirect compensation in 2015 | Webb Tr. at 97:15-20; Exhibit 28 at 6. |
| 58 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2015 Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Webb Tr. at 97:21-25; Exhibit 28 at 6. |
| 59 | In 2016, the Plan paid _____ pensation to Fidelity of more than _____ for recordkeeping and adm _____ services. | Webb Tr. at 113:14-17; Exhibit 29 at 6. |
| 60 | Fidelity also received eligible indirect compensation in 2016 | Webb Tr. at 113:21-25; Exhibit 29 at 6. |
| 61 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Webb Tr. at 114:1-4; Exhibit 29 at 6. |
| 62 | In 2017, the Plan began reporting compensation i _____ | Webb Tr. at 124:18 – 125:12; Exhibit 30 at 6 (2017 form 5500). |
| 63 | _____ ed eligible indirect compensation in 2017, indirect compensation with respect to Plan investments through BrokerageLink. | Exhibit 30 at 6 (2017 form 5500).  Exhibit 28 at note 3. |
| 64 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2017 Annual Report on Form 5500, instead it reports "0". | Exhibit 30 at 6 (2017 form 5500). Exhibit 28 at note 3. |
| 65 | Defendants failed to disclose that Fidelity received indirect compensation with respect to participant investments through BrokerageLink and from Financial Engines in | Exhibit 30 at 6 |

| | | | |
|---|---|---|---|
| 1 | | 2017 | |
| 2 | 66 | In 2018, the Plan paid ███████████ ping ████████████████████ | Exhibit 41 at 6 (2018 form 5500). |
| 3 | | | |
| 4 | 67 | ███████████████████ ect compensation in 2018. | Exhibit 31 at 6 __(2018 form 5500). |
| 5 | 68 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2018 Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Exhibit 31 at 6_(2018 form 5500). |
| 6 | | | |
| 7 | 69 | In 2019, the Plan paid ███████████ ping ████████████████████ | Exhibit 32 at 6 (2019 form 5500). |
| 8 | | | |
| 9 | 70 | ███████████████████ ct compensation in 2019. | Exhibit 32 at 6 (2019 form 5500). |
| 10 | 71 | The amount of indirect compensation Fidelity received is not disclosed on Schedule C of the Plan's 2019 Annual Report on Form 5500, instead it reports that Fidelity received "0" dollars in indirect compensation. | Exhibit 42 at 6 (2019 form 5500). |
| 11 | | | |
| 12 | | | |
| 13 | 72 | ARSP contracted with Financial Engines to provide investment advice to plan participants because many participants "were making some bad decisions" with their investments. | Webb Tr. at 92:10-19; 165:9-14. |
| 14 | | | |
| 15 | 73 | ARSP selected Financial Engines after an RFP for money management. | Webb Tr. at 92:20-23, 164:19-25. Ex 53 Managed Account RFP |
| 16 | | | |
| 17 | 74 | The only other investment advice program considered by Defendants was provided by Fidelity through its Portfolio Advisory Service, which participants a ███████████ contrasted wit ██████████████ al Engines | Ex 32 Managed Service Option |
| 18 | | | |
| 19 | | | |
| 20 | 75 | In 2015, the Plan contracted with Financial Engines for the purpose of providing investment advice to participants. | Webb Tr. at 94:2-4.. |
| 21 | | | |
| 22 | 76 | The Financial Engines professional account management service takes into account: age, total assets, what future retirement plans the participant provides. | Webb Tr. at 104:23 – 105:1. Ex. 49 at 8, section C.3. |
| 23 | | | |
| 24 | 77 | The second service that Financial Engines provides, the professional account management service, provides a guided service. | Webb Tr. at 105:2-7. |
| 25 | | | |
| 26 | 78 | The professional account management service can direct the investment of the participant's account. | Webb Tr. at 110:11-16. Ex. 49 at 8, section C.3. |
| 27 | 79 | The cost of the professional service is asset based. | Webb Tr. at 105:4-6. Ex. 39 |
| 28 | 80 | The Plan paid Financial Engines fees of | Webb. Tr. at 98:8-14, |

| | | $2,226,000 in 2015 | 102:22 – 103:9; Exhibit 8 (2015 Form 5500) |
|---|---|---|---|
| | 81 | The Plan paid Financial Engines fees of $4,004,000 in 2016 | Webb Tr. at 114:12-15; Exhibit 9 (2016 Form 5500) |
| | 82 | The services Financial Engines provided in 2016 did not change from 2015 other than the number of participants using it. | Webb Tr. 114:19-24, 115:2-9. |
| | 83 | The Plan paid Financial Engines fees of $5,636,000 for 2017 | Webb Tr. at 125:16-21; Exhibit 10 (2017 Form 5500) |
| | 84 | The Plan paid Financial Engines fees of $5,159,000 for 2018 | Exhibit 41 at 6 (2018 form 5500 |
| | 85 | The Plan paid Financial Engines fees of $10,287,000 for 2019 | Exhibit 42  at 6 __(2019 form 5500 |
| | 86 | Financial Engines paid a portion of its fees to Fidelity. | Webb. Tr. at 99:10-16. Ex. 55 |
| | 87 | Fidelity maintains computer records of all of the individual accounts within the Plan. | Webb Tr. at 100:3-7. |
| | 88 | The only service Fidelity provided to Financial Engines was access to Fidelity's electronic file feed. | Webb Tr. at 99:19-21, 100:8-24, 117:5-19, 118:5-23, 129:2-10. Ex. 50 at 13 |
| | 89 | Fidelity provides an "ongoing file feed" to Financial Engines in connection with the ARSP. | Webb Tr. at 100:3-24. |
| | 90 | Financial Engines is getting the data directly from Fidelity, and it's realtime. | Hanson Tr. at 45:3-21. |
| | 91 | Fidelity has provided this service to Financial Engines up to the present time. | Webb Tr. at 117:7-19. |
| | 92 | ████████████████ ts for discretionary professional account management services for t | Phipps Tr. at 54:18-22. Ex. 35 |
| | 93 | ████████████████ | Phipps Tr. at 54:18-22; Exhibit 39 at AT&T00011826. |
| | 94 | ██████████ hat "an amendment to this fee structure that went into place in April 1 of 2015 that ████████ mber to a range between ██████████ that would be paid to Fideli██ Engines." | Phipps Tr. at 55:2-6; Exhibit 55 |
| | 95 | "Financial Engines was going to charge 40 basis points for the first 100K of someone's balance, and then it kind of tiered down over time." | Hanson Tr. at 24:14-20; Exhibit 32 at 3. |
| | 96 | Fees charged by Financial Engines were tiered: 35 basis points (0.35%) for accounts under $50,000, 30 basis points (0.30%) for the portion of accounts between $50,000 and $250,000, and 25 basis points (0.25%) for the portion of accounts that exceeded $250,000. | Exhibit 35. |
| | 97 | There is "a sharing of compensation … | Hanson Tr. at 30:22-25; |

| | | |
|---|---|---|
| | between Financial Engines and Fidelity | Exhibit 55 at 1940 |
| 98 | ████████████rn paid Fidelity ████<br>████████████or giving Financ█<br>cipants' accounts. | Webb Tr. at 146:9-23;<br>Exhibit 15 at page<br>1942. |
| 99 | "Financial Engines compensates Fidelity for<br>maintain████████████ces<br>with an ████████████<br>applied ████████████t for<br>Professional Mana████████es<br>████████████." | Exhibit 15 at page<br>1942. |
| 100 | receiving a fee ████████████ of the<br>assets under ma████████e<br>Financial Engines managed acc████es. | Hanson Tr. at 32:6-12. |
| 101 | ████████uld have charged a ████████<br>████████to provide advisory | Hanson Tr. at 25:5-7,<br>33:14-20. |
| 102 | ████████it is a significant piece of what,<br>you know, Financial Engines was going to<br>receive, you know. ·And I guess it -- it was<br>surprising to me that Fidelity, they were<br>going to get about the same amount of money<br>probably regardless." | Hanson Tr. at 34:7-15. |
| 103 | "I'm certain John [Phipps] and I talked about<br>it…. You know, we were all aware of -- of<br>the arrangement." | Hanson Tr. at 34:20-25. |
| 104 | Fidelity and Financial Enginges have a<br>longstanding relationship that goes beyond<br>AT&T | Hanson Tr. at 35:1-13. |
| 105 | The "relationship between Financial Engines<br>and Fidelity was, you know, broader than our<br>AT&T·relationship] [with Fidelity]; and, you<br>know, I got the sense that, you know, had<br>been going -- that they had this relationship --<br>it was a longstanding relationship." | Hanson Tr. at 35:5-12. |
| 106 | Julianne Galloway, AT&T's Vice President<br>of Global Benefits, served as Defendants'<br>30(b)(6) witness. | Galloway Tr. at 7:15-<br>23, 11:8-23. |
| 107 | Galloway admitted that Defendants failed to<br>take into account the indirect compensation<br>received by Fidelity from Financial Engines | Galloway Tr. at 48:18 –<br>49:9. |
| 108 | Q. And did you or anybody in the – within<br>the employee benefits group make a<br>determination of what was reasonable for the<br>services being provided by Fidelity?<br><br>A. *That agreement is between Fidelity and<br>Financial Engines and is part of their<br>negotiations. We contract separately and<br>independently with Fidelity and with<br>Financial Engines.* | Galloway Tr. at 48:18 -<br>49:5 (emphasis added). |
| 109 | Q. So does that mean that you really didn't<br>make an inquiry about whether that fee was a<br>reasonable fee? | Galloway Tr. at 49:6-9<br>(emphasis added). |

| | | A. *I did not see documentation as to that effect.* | |
|---|---|---|---|
| 110 | AT&T did not evaluate whether the fee Fidelity received from Financial Engines was reasonable in relation to the service it was providing. | Phipps Tr. at 45:3-15. |
| 111 | Phipps testified: "I wouldn't say we did an analysis to determine, you know, any fees that one of our vendors paid to anybody else they contract with, and that would include Financial Engines." | Phipps Tr. at 45:12-15. |
| 112 | Phipps testified "what Financial Engines and Fidelity worked out for fees, was between them." | Phipps Tr. at 46:6-8. |
| 113 | Phipps stated, "we typically did not evaluate the fees that our vendors would pay to third parties." | Phipps Tr. at 47:5-7. |
| 114 | Letter from AT&T Service Inc. to Bob Mills, Senior Vice President Fidelity, "Finally, so that we can determine whether there any entities which receive "Indirect Compensation" from you related to our plans, please indicate whether you pay any "Indirect compensation" to any entities and the amount of such compensation. We will use this information to determine if we need to make additional inquires with any such entities." | EX. 33 ATT00001981 |
| 115 | Phipps stated that the compensation to Fidelity didn't matter to AT&T because "that was an arrangement that was made between Financial Engines and Fidelity... But we did not get in the middle of negotiations between Fidelity and Financial Engines." | Phipps Tr. at 55:20 – 56:1; Exhibit 35, ATT00011823 (email from Hanson to Phipps) |
| 116 | Defendants understood that payments from Financial Engines to Fidelity needed to be disclosed pursuant to section 408(b)(2). | Phipps Tr. at 48:12-22; Exhibit 33. |
| 117 | Defendants would use such fee disclosure "information to determine if we need to make additional inquiries with any such entities." | Phipps Tr. at 49:11-13; Exhibit 33. |
| 118 | BrokerageLink is a service provided by Fidelity. | Webb Tr. at 69:10-13. |
| 119 | BrokerageLink allows participants, if they choose to do so, to purchase investments that are not designated investment alternatives within the 401(k) plan, but are available in the marketplace including individual securities and mutual funds. | Webb Tr. at 69:14-19, 70:16-18. |
| 120 | BrokerageLink was available to ARSP participants in 2011. | Phipps Tr. at 16:7-15; Exhibit 30 at       . |
| 121 | BrokerageLink continues to be available to ARSP participants. | Webb Tr. at 95:17-20. Ex. 42 ARSP 2019 5500 at 34, page 11 of Independent Auditors' Report |
| 122 | Fidelity received indirect compensation from | Phipps Tr. at 17:6-21. |

| | | | |
|---|---|---|---|
| | | BrokerageLink, but the 408b-2 disclosure reports from Fidelity did not include such amounts, which are referred to as revenue sharing. | Ex. 12 at 3; Ex. 52 at 3. |
| | 123 | Defendants did not receive the required 408(b)(2) disclosures from Fidelity regarding indirect compensation from BrokerageLink | Phipps Tr. at 17:25 – 18:5. Exs. 12 at 3; Ex.52 at 3. |
| | 124 | Defendants did not disclose to participants Fidelity's indirect compensation from Financial Engines | Exs. 5 – 10, 41, 42, each at 6. |
| | 125 | Defendants did not disclose to participants Fidelity's indirect compensation from BrokerageLink. | *Id.* |
| | 126 | Defendants did not consider Fidelity compensation from BrokerageLink and Financial Engines in determining whether Fidelity's compensation was reasonable. | Galloway Tr. at 48:18 – 49:9; 48:18 – 49:9; 49:6-9; Phipps Tr. at 55:20 – 56:1 |
| | 127 | John Phipps maintained a spreadsheet that listed more than 1,400 funds available through BrokerageLink that paid revenue sharing to Fidelity as ind███████ation ███ unts varying from ██████████ | Phipps Tr.; Ex. 56; |
| | 127A | ███ hundred of those funds paid Fidelity ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ | Pltfs'. Ex. 56 |
| | 127B | ██████████g amo██ isted on the spreadsheet is ████████████ | Ex. 56 |
| | 128 | ███████ delity Services Agreement covers all four 401(k) plans sponsored by AT&T (AT&T Savings & Security Plan; AT&T Retirement Savings Plan; AT&T Puerto Rico Retirement Savings Plan; and Bellsouth Savings & Security Plan) including the professional managed account services of Financial Engines | Ex. 48 at 2, Ex. 15 |
| | 129 | After Defendants' RFP referred to in Def. SUF 29, Deloitte and Defendants evaluated only two potential providers of managed account services: Fidelity and Financial Engines. | Ex. 57 at 8. |
| | 130 | For Plan years 2009 through 2016, the 5500 for the ARSP reported Fidelity's direct compensation as a single amount reflecting total fees for all recordkeeping and administrative services using services codes | Exs. 5-10, 30, each at 6. |

| | | 15 (recordkeeping and information management) 64 (recordkeeping ), 65 (account maintenance fees), and 71 (securities brokerage commissions and fees) | |
|---|---|---|---|
| 131 | | The 2017 5500, filed in October 2018, split Fidelity's compensation into two components: "participant elected fee" using services codes 15 (recordkeeping and information management) 64 (recordkeeping ), 65 (account maintenance fees), and 71 (securities brokerage commissions and fees), and "Universal Basic Fee" also using services codes 15 (recordkeeping and information management) 64 ( recordkeeping ), 65 (account maintenance fees), and 71 (securities brokerage commissions and fees). In other words, AT&T reported both compensation components as being for recordkeeping services. | Exs. 41, 42 each at 6. |
| 132 | | The 2016 Annual Return on form 5500 for the Costco 401(k) Plan reports total compensation paid to T. Rowe Price as the plan's recordkeeper and trustee of $5,787,513. | Pltfs.' Ex. 59 at 6 |
| 133 | | The 2016 Annual Return on form 5500 for the Costco 401(k) Plan reports total number of participants as 155,046. | Pltfs.' Ex. 59 at 2 |
| 134 | | The 2017 Annual Return on form 5500 for the Costco 401(k) Plan reports total compensation paid to T. Rowe Price as the plan's recordkeeper and trustee of $5,530,542. | Pltfs.' Ex. 60 at 6 |
| 135 | | The 2017 Annual Return on form 5500 for the Costco 401(k) Plan reports total number of participants as 165,196. | Pltfs.' Ex. 60 at 2 |
| 136 | | The 2018 Annual Return on form 5500 for the Costco 401(k) Plan reports total compensation paid to T. Rowe Price as the plan's recordkeeper and trustee of $6,052,243. | Pltfs.' Ex. 61 at 6 |
| 137 | | The 2018 Annual Return on form 5500 for the Costco 401(k) Plan reports total number of participants as 174,403. | Pltfs.' Ex. 61 at 2 |
| 138 | | The 2019 Annual Return on form 5500 for the Costco 401(k) Plan reports total compensation paid to T. Rowe Price as the plan's recordkeeper and trustee of $7,645,224. | Pltfs.' Ex. 62 at 6 |
| 139 | | The 2019 Annual Return on form 5500 for the Costco 401(k) Plan reports total number of participants as 179.978. | Pltfs.' Ex. 62 at 2 |
| 140 | | The 2016 Annual Return on form 5500 for the FedEx Corporation Retirement Savings Plan (the FedEx Plan") reports total compensation paid to Vanguard as the plan's | Pltfs.' Ex. 63 at 6 |

| | | recordkeeper and trustee of $7,053,647. | |
|---|---|---|---|
| | 141 | The 2016 Annual Return on form 5500 for the FedEx Plan reports total number of participants as 232,254. | Pltfs.' Ex. 63 at 2 |
| | 142 | The 2017 Annual Return on form 5500 for the FedEx Plan reports total compensation paid to Vanguard as the plan's recordkeeper and trustee of $9,388,480. | Pltfs.' Ex. 64 at 6 |
| | 143 | The 2017 Annual Return on form 5500 for the FedEx  Plan reports total number of participants as 231,798. | Pltfs.' Ex. 64 at 2 |
| | 144 | The 2018 Annual Return on form 5500 for the FedEx Plan reports total compensation paid to Vanguard as the plan's recordkeeper and trustee of $9,067,350. | Pltfs.' Ex. 65 at 6 |
| | 145 | The 2018Annual Return on form 5500 for the FedEx Plan reports total number of participants as 232,254. | Pltfs.' Ex. 65 at 2 |
| | 146 | The 2019 Annual Return on form 5500 for the FedEx Plan reports total compensation paid to Vanguard as the plan's recordkeeper and trustee of $8,522,397. | Pltfs.' Ex. 66 at 6 |
| | 147 | The 2019 Annual Return on form 5500 for the FedEx Plan reports total number of participants as 258,156. | Pltfs.' Ex. 66 at 2 |
| | 148 | The 2016 Annual Return on form 5500 for the Hospital Corporation of America ("HCA") Master Retirement Trust (the HCA Trust") reports total compensation paid to Conduent (formerly Xerox) as the plan's recordkeeper of $7,318,430. | Pltfs.' Ex. 67 at 6 |
| | 149 | The 2016 Annual Return on form 5500 for the HCA 401(k) Plan reports total number of participants as 339,806. | Pltfs.' Ex. 68 at 2 |
| | 150 | The 2017 Annual Return on form 5500 for the HCA Trust reports total compensation paid to Conduent as the plan's recordkeeper of $7,973,153. | Pltfs.' Ex. 69 at 6 |
| | 151 | The 2017 Annual Return on form 5500 for the HCA 401(k) Plan reports total number of participants as 363,783. | Pltfs.' Ex. 70 at 2 |
| | 152 | The 2018 Annual Return on form 5500 for the HCA Trust reports total compensation paid to Conduent as the plan's recordkeeper of $8,108,330. | Pltfs.' Ex. 71 at 6 |
| | 153 | The 2018 Annual Return on form 5500 for the HCA 401(k) Plan reports total number of participants as 387,421. | Pltfs.' Ex. 72 at 2 |
| | 154 | The 2019 Annual Return on form 5500 for the HCA Trust reports total compensation paid to Conduent as the plan's recordkeeper of $9,563,440. | Pltfs.' Ex. 73 at 6 |
| | 155 | The 2019 Annual Return on form 5500 for the HCA 401(k) Plan reports total number of participants as 412,913. | Pltfs.' Ex. 74 at 2 |

| 156 | The 2016 Annual Return on form 5500 for the Home Depot Futurebuilder Trust (the Home Depot Trust") reports total compensation paid to Hewitt as the plan's recordkeeper of $5,754,884. | Pltfs.' Ex. 75 at 6 |
|-----|---|---|
| 157 | The 2016 Annual Return on form 5500 for the Home Depot Futurebuilder Plan reports total number of participants as 400,908. | Pltfs.' Ex. 76 at 2 |
| 158 | The 2017 Annual Return on form 5500 for the Home Depot Trust reports total compensation paid to Hewitt and it successor Conduent as the plan's recordkeepers of $8,247,263. | Pltfs.' Ex. 77 at 6 |
| 159 | The 2017 Annual Return on form 5500 for the Home Depot Futurebuilder Plan reports total number of participants as 412,961. | Pltfs.' Ex. 78 at 2 |
| 160 | The 2018 Annual Return on form 5500 for the Home Depot Trust reports total compensation paid to Conduent as the plan's recordkeeper of $8,190,791. | Pltfs.' Ex. 79 at 6 |
| 161 | The 2018 Annual Return on form 5500 for the Home Depot Futurebuilder Plan reports total number of participants as 417,692. | Pltfs.' Ex. 80 at 2 |
| 162 | The 2019 Annual Return on form 5500 for the Home Depot Trust reports total compensation paid to Conduent as the plan's recordkeeper of $7,794,477. | Pltfs.' Ex. 81 at 6 |
| 163 | The 2019 Annual Return on form 5500 for the Home Depot Futurebuilder Plan reports total number of participants as 424,733. | Pltfs.' Ex. 82 at 2 |
|  |  |  |

1

Dated: July 12, 2021                                Respectfully submitted,

2

By: */s/John J. Nestico*

3                                                   John J. Nestico (*Pro Hac Vice*)
                                                    SCHNEIDER WALLACE
4                                                   COTTRELL KONECKY LLP
                                                    6000 Fairview Road, Suite 1200
5                                                   Charlotte, NC 28210
                                                    Telephone: (510) 740-2946
6                                                   jnestico@schneideiwallace.com

7                                                   Todd M. Schneider (SBN: 158253)
                                                    Jason H. Kim (SBN: 220279)
8                                                   James A. Bloom (SBN: 311051)
                                                    SCHNEIDER WALLACE
9                                                   COTTRELL KONECKY LLP
                                                    2000 Powell Street, Suite 1400
10                                                  Emeryville, California 94608
                                                    Telephone: (415) 421-7100
11                                                  Facsimile: (415) 421-7105
                                                    tschneider@schneiderwallace.com
12                                                  jkim@schneiderwallace.com
                                                    jbloom@schneiderwallace.com

13
                                                    Todd S. Collins (*Pro Hac Vice*)
14                                                  Ellen T. Noteware (*Pro Hac Vice*)
                                                    BERGER MONTAGUE PC
15                                                  1818 Market Street
                                                    Philadelphia, Pennsylvania 19103
16                                                  Telephone: (215) 875-3000
                                                    Facsimile: (215) 875-4604
17                                                  tcollins@bm.net
                                                    enoteware@bm.net
18
                                                    Eric Lechtzin (SBN: 248958)
19                                                  EDELSON LECHTZIN LLP
                                                    3 Terry Dr., Suite 205
20                                                  Newtown, PA 18940
                                                    Telephone: (215) 867-2399
21                                                  Facsimile: (267) 685-0676
                                                    elechtzin@edelson-law.com
22
                                                    Grant Joseph Savoy (SBN: 284077)
23                                                  Shoham J. Solouki (SBN: 278538)
                                                    SOLOUKI | SAVOY, LLP
24                                                  316 W. 2nd Street, Suite 1200
                                                    Los Angeles. California 90012
25                                                  Telephone: (213) 814-4940
                                                    Facsimile: (213) 814-2550
26                                                  grant@soloukisavoy.com
                                                    shoham@soloukisavoy.com
27
                                                    *Attorneys for Plaintiffs and the Class*
28