1   GIBSON, DUNN & CRUTCHER LLP

2

3   ASHLEY E. JOHNSON (*Pro Hac Vice*)
        AJohnson@gibsondunn.com
4   KARL G. NELSON (*Pro Hac Vice*)
        KNelson@gibsondunn.com
5   2001 Ross Avenue, Suite 2100
    Dallas, Texas  75201
    Telephone:  214.698.3100
6   Facsimile:    214.571.2900

7   JENNAFER M. TRYCK, SBN 291088
        JTryck@gibsondunn.com
8   3161 Michelson Drive
    Irvine, California  92612-4412
9   Telephone:  949.451.3800
    Facsimile:    949.451.4220

10

11  *Attorneys for Defendants*

12  [*Additional Counsel on Following Page*]

13

14              **UNITED STATES DISTRICT COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16

| | |
|---|---|
| JULIO C. ALAS, et al., | CASE NO. 2:17-cv-08106-SPG-RAO |
| Plaintiffs, | **NOTICE OF  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS** |
| v. | |
| AT&T, INC., AT&T SERVICES, INC., and AT&T BENEFIT PLAN INVESTMENT COMMITTEE, | |
| Defendants. | The Honorable Sherilyn Peace Garnett |
| | Hearing Date:  January 14, 2026 Time:  1:30 p.m. Courtroom:  5C |

25

26

27

28

2:17-cv-08106-SPG-RAO

Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE COTTRELL
KIM LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608

John J. Nestico (*Pro Hac Vice*)
SCHNEIDER WALLACE COTTRELL
KIM LLP
2138 Harris Rd,
Charlotte, NC 28210

Eric Lechtzin (SBN: 248958)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940

Grant Joseph Savoy (SBN: 284077)
Shoham J. Solouki (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, CA 90012

Natalie Lesser (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, PA 19103

Alexandra K. Piazza (*Pro Hac Vice*)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942

*Attorneys for Plaintiffs*

ii    2:17-cv-08106-SPG-RAO

**TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE** that on January 14, 2026, at 1:30 p.m. in Courtroom 5C, before the Honorable Sherilyn Peace Garnett, located in the United States Courthouse, 350 West 1st Street, Los Angeles, CA 90012, the parties will and hereby do move and cross-move for summary judgment, as follows:

Defendants AT&T Services, Inc. and the Benefit Plan Investment Committee (together, "AT&T" or "Defendants") will and hereby do move the Court for an order, pursuant to Federal Rule of Civil Procedure 56(c), granting summary judgment on Plaintiffs' duty-of-prudence (Count I) and prohibited-transaction (Count II) claims in the Third Amended Complaint ("TAC").

Plaintiffs will and hereby do move the Court for an order holding Defendants liable for breaching their fiduciary duties to the Plan by causing the Plan to engage in transactions prohibited under Section 406 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

Defendants' Motion is based on the following grounds:

1.    Defendants are entitled to judgment on Count I for breach of the duty of prudence, related to recordkeeping expenses, because Plaintiffs have no evidence that Defendants acted imprudently in negotiating recordkeeping fees.    In addition, Defendants are entitled to judgment on Count I because Plaintiffs have no evidence of causation or loss.  The actual recordkeeping fees for the AT&T Retirement Savings Plan (the "Plan") were equal to—and often much lower than—the rates that Plaintiffs allege would have been reasonable.

2.    Defendants are entitled to judgment on Count II alleging prohibited transactions, because ERISA Section 408(b)(2) provides an exemption to the prohibited transaction provision for reasonable contracts that are necessary for the operation of the plan, so long as no more than reasonable compensation is paid for those services.  The Ninth Circuit has already held that the services Fidelity provided to the Plan were necessary, and there is no genuine dispute of material fact that the fees the Plan paid to

1  Fidelity were reasonable under Plaintiffs' own standards.

2          Plaintiffs' Motion is based on the following grounds:

3          The transactions at issue in this case are categorically prohibited unless the
4  Defendants have satisfied the conditions set forth in the ERISA Section 408(b)(2)
5  exemption. Exemptions are affirmative defenses imposing on the Defendants the
6  obligation to plead and prove satisfaction of those conditions, specifically, obtaining
7  from the party in interest complete disclosure of the services being provided and all
8  direct and indirect compensation being received by the party in interest in connection
9  with those services, then making an affirmative determination that the compensation is
10 reasonable in relation to services provided. Yet Defendants have not produced a single
11 document demonstrating that they (i) obtained those disclosures from Fidelity with
12 respect to the BrokerageLink transaction; (ii) obtained complete disclosures of the
13 services being provided by Fidelity in connection with the Financial Engines transaction;
14 or (iii) made any evaluation of the reasonableness of Fidelity's compensation in relation
15 to the services provided. Conversely, Plaintiffs have introduced a litany of documentary
16 evidence proving Defendants' failure to meet the conditions of the exemption and,
17 therefore, breaching their fiduciary duties as a matter of law. Furthermore, having failed
18 to account for millions of dollars of Fidelity's compensation in excess of what
19 Defendants had determined were reasonable fees, the entire excess amount should be
20 considered unreasonable by Defendants' own standard.

21                              *       *       *

22         The parties' motions are based on this Notice of Motion, the attached Joint Brief,
23 Joint Appendix of Facts, Joint Appendix of Evidence, the pleadings, papers, and records
24 in this action, and on any other such matters and evidence as may be presented to the
25 Court at the hearing.

26         The parties' motions are made following the conference of counsel pursuant to
27 Local Rule 7-3 and this Court's Civil Standing Order for Motions for Summary
28 Judgment, which took place by video conference on Monday, August 11, 2025, and by

1  email thereafter. *See* Declaration of Ashley E. Johnson ¶ 2.

2

3  DATED: November 19, 2025                GIBSON DUNN & CRUTCHER LLP

4
                                          By: */s/ Ashley E. Johnson*
5

6                                         ASHLEY E. JOHNSON (*Pro Hac Vice*)
                                             AJohnson@gibsondunn.com
7                                         KARL G. NELSON (*Pro Hac Vice*)
                                             KNelson@gibsondunn.com
8                                         Gibson Dunn & Crutcher LLP
                                          2001 Ross Avenue, Suite 2100
9                                         Dallas, Texas 75201
                                          Telephone: 214.698.3100
10                                        Facsimile:  214.571.2900

11                                        JENNAFER M. TRYCK, SBN 291088
                                             JTryck@gibsondunn.com
12                                        Gibson Dunn & Crutcher LLP
                                          3161 Michelson Drive
13                                        Irvine, California 92612-4412
                                          Telephone: 949.451.3800
14                                        Facsimile:  949.451.4220

15                                        Attorneys for Defendants AT&T INC.,
                                          AT&T SERVICES, INC., and AT&T
16                                        BENEFIT PLAN INVESTMENT
                                          COMMITTEE
17

18  DATED: November 19, 2025              */s/ John J. Nestico*
                                          Todd M. Schneider (SBN: 158253)
19                                        Jason H. Kim (SBN: 220279)
                                          James A. Bloom (SBN: 311051)
20                                        SCHNEIDER WALLACE COTTRELL
                                          KIM LLP
21                                        2000 Powell Street, Suite 1400
                                          Emeryville, CA 94608
22                                        Telephone: (415) 421-7100
                                          Facsimile: (415) 421-7105
23
                                          tschneider@schneiderwallace.com
24                                        jkim@schneiderwallace.com
                                          jbloom@schneiderwallace.com
25

26

27                                        John J. Nestico (Pro Hac Vice)
                                          SCHNEIDER WALLACE COTTRELL
28

KIM LLP
6000 Fairview Rd, Suite 1200
Charlotte, NC 28210
Telephone: (510) 740-2946
Facsimile: (866) 505-8036
jnestico@schneiderwallace.com

Eric Lechtzin (SBN: 248958)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (267) 408-8445
elechtzin@edelson-law.com

Natalie Lesser (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
nlesser@bergermontague.com

Alexandra K. Piazza (*Pro Hac Vice*)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: (215) 875-3000
apiazza@bergermontague.com

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, CA 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*

1

## **ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4(a)(2)(i)**

2          Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that all other signatories listed and

3    on whose behalf the filing is submitted concur in this filing's content and have

4    authorized this filing.

5

6                                              By:  */s/ Ashley E. Johnson*
                                                   Ashley E. Johnson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  GIBSON, DUNN & CRUTCHER LLP

2  ASHLEY E. JOHNSON (*Pro Hac Vice*)
       AJohnson@gibsondunn.com
3  KARL G. NELSON (*Pro Hac Vice*)
       KNelson@gibsondunn.com
4  2001 Ross Avenue, Suite 2100
   Dallas, Texas 75201
5  Telephone: 214.698.3100
   Facsimile: 214.571.2900
6
   JENNAFER M. TRYCK, SBN 291088
7      JTryck@gibsondunn.com
   3161 Michelson Drive
8  Irvine, California 92612-4412
   Telephone: 949.451.3800
9  Facsimile: 949.451.4220

10  *Attorneys for Defendants*

11

12  [*Additional Counsel on Following Page*]

13

14

15                **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17  JULIO C. ALAS, et al.,              CASE NO. 2:17-cv-08106-SPG-RAO

                   Plaintiffs,          **JOINT BRIEF FOR DEFENDANTS'**
18                                       **MOTION FOR SUMMARY**
                                         **JUDGMENT AND PLAINTIFFS'**
19         v.                            **CROSS-MOTION FOR SUMMARY**
                                         **JUDGMENT ON PLAINTIFFS'**
20  AT&T, INC., AT&T SERVICES, INC.,     **PROHIBITED TRANSACTION**
    and AT&T BENEFIT PLAN               **CLAIMS**
21  INVESTMENT COMMITTEE,

22                 Defendants.

23                                       The Honorable Sherilyn Peace Garnett

24                                       Hearing Date: January 14, 2026
                                         Time: 1:30 p.m.
25                                       Courtroom: 5C

26

27

28
   JOINT BRIEF FOR DEFENDANTS'                    2:17-cv-08106-SPG-RAO
   MOTION FOR SUMMARY JUDGMENT
   PLAINTIFFS' MOTION FOR
   SUMMARY JUDGMENT

Todd M. Schneider (SBN: 158253)
Jason H. Kim (SBN: 220279)
James A. Bloom (SBN: 311051)
SCHNEIDER WALLACE COTTRELL
KIM LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608

John J. Nestico (*Pro Hac Vice*)
SCHNEIDER WALLACE COTTRELL
KIM LLP
2138 Harris Rd,
Charlotte, NC 28210

Eric Lechtzin (SBN: 248958)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940

Grant Joseph Savoy (SBN: 284077)
Shoham J. Solouki (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, CA 90012

Natalie Lesser (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, PA 19103

Alexandra K. Piazza (*Pro Hac Vice*)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

    I.    AT&T's Introduction ................................................................ 1

    II.   Plaintiffs' Introduction ......................................................... 3

BACKGROUND ................................................................................................. 6

    I.    AT&T's Background ............................................................... 6

        A.    The AT&T Retirement Savings Plan ................................ 6

        B.    Plan Recordkeeping ....................................................... 7

        C.    BrokerageLink and Financial Engines .......................... 8

        D.    Procedural History ....................................................... 11

    II.   Plaintiffs' Background ......................................................... 14

        A.    The BrokerageLink Transaction .................................. 14

        B.    The Financial Engines Transaction ............................. 16

LEGAL STANDARD ....................................................................................... 18

AT&T'S MOTION FOR SUMMARY JUDGMENT ...................................... 18

    I.    Plaintiffs Have No Evidence of Imprudence (Count I). ....... 18

        A.    Defendants Considered Fidelity's Indirect Compensation. ............. 19

            1.    AT&T Considered Indirect Compensation from Financial Engines. .......... 20

            2.    AT&T Considered Indirect Compensation from BrokerageLink. .......... 24

        B.    Plaintiffs Have No Evidence of Loss or Causation. ...................... 27

            1.    AT&T Recordkeeping Fees Were Less Than Plaintiffs' Benchmark and Less than Average for the Market. .......... 27

            2.    Public Form 5500s Do Not Show Loss or Causation. ......... 29

    II.   Plaintiffs Have No Evidence of a Prohibited Transaction (Count II). ...... 33

        A.    AT&T's Arrangement with Fidelity Was Reasonable. .................. 33

        B.    Fidelity's Compensation Was Reasonable. ................................ 35

PLAINTIFFS' OPPOSITION TO AT&T'S MOTION FOR SUMMARY
JUDGMENT .................................................................................... 37

    I.      In support of their claims of a prudent process, Defendants ignore
           their failure to evaluate and factor in Fidelity's indirect
           compensation ............................................................................... 37

    II.     Defendants have failed to produce evidence that Defendants
           prudently evaluated Fidelity's indirect compensation ............................. 38

    III.    Defendants have failed to rebut the substantial evidence that they
           failed to prudently and diligently evaluate Fidelity's indirect
           compensation ............................................................................... 43

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'
PROHIBITED TRANSACTION CLAIMS ....................................................... 46

    I.      Burden of Proof ........................................................................... 46

    II.     Legal Background ......................................................................... 47

    III.    Defendants failed to evaluate Fidelity's Indirect Compensation in
           relation to both the BrokerageLink transaction and the Financial
           Engines transaction. ...................................................................... 49

    IV.    Defendants' Misconduct satisfies all the elements of a violation of
           ERISA §406(a)(1)(C) ..................................................................... 50

    V.     Defendants knew or should have known that they were obligated to
           obtain complete disclosures from Fidelity ............................................. 51

    VI.    Considering Defendants' failure to satisfy the conditions of the
           408(b)(2) exemption, the Plan's Loss should be measured by the
           entirety of Fidelity's indirect compensation .......................................... 52

    VII.   Fidelity's BrokerageLink Indirect Compensation .................................... 53

    VIII.  Fidelity's Indirect Compensation from Financial Engines ......................... 55

AT&T'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' PROHIBITED TRANSACTION
CLAIM ........................................................................................... 56

    I.      Plaintiffs Cannot Show that They Are Entitled To Judgment—or
           Even To Proceed to Trial—on Their Prohibited Transaction Claim. ......... 58

         A.    Fidelity Disclosed BrokerageLink's Compensation. ........................ 59

         B.    Fidelity Disclosed Financial Engines' Compensation. ...................... 64

II.    Plaintiffs Cannot Prove Damages. ............................................... 67

    A.    Plaintiffs Cite to No Case Law to Support Their Damages Model. .......................................................................... 68

    B.    Plaintiffs Cannot Show That Fidelity's Indirect Compensation Was Unreasonable or Resulted in Higher Costs to the Plan. ............................................................ 70

AT&T'S CONCLUSION ............................................................. 74

PLAINTIFFS' CONCLUSION ...................................................... 74

I.    The Undisputed Facts Show that Defendants Caused the Plan to Engage in a Prohibited Transaction .......................................... 74

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allegis Grp., Inc. v. Bero,*
  689 F. Supp. 3d 81 (D. Md. 2023), *aff'd*, 2025 WL 2141298 (4th Cir. July 29, 2025) ................................................................................................ 62

*Anderson v. Intel Corp. Inv. Pol'y Comm.,*
  137 F.4th 1015 (9th Cir. 2025) ................................................................ 19

*Baizer v. Comm'r,*
  204 F.3d 1231 (9th Cir. 2000) ................................................................ 68

*Brotherston v. Putnam Invs., LLC,*
  907 F.3d 17 (1st Cir. 2018) ..................................................................... 27

*Bugielski v. AT&T Servs., Inc.,*
  76 F.4th 894 (9th Cir. 2023) ....2, 5, 13, 19, 20, 23, 24, 25, 26, 27, 33, 34, 35, 58, 59, 63

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................ 18

*Commissioner* v. *Keystone Consol. Industries, Inc.,*
  508 U.S. 152 (1993) ................................................................................ 37

*Cryer v. Franklin Res., Inc.,*
  2018 WL 6267856 (N.D. Cal. Nov. 16, 2018) ....................................... 36

*Cunningham v. Cornell Univ.,*
  604 U.S. 693, 145 S. Ct. 1020 (2025) ...........................3, 14, 37, 38, 47, 50, 52

*Donovan v. Bierwirth,*
  754 F.2d 1049 (2d Cir. 1985) ................................................................. 46

*England v. DENSO Int'l Am., Inc.,*
  2023 WL 4851878 (E.D. Mich. July 28, 2023) ..................................... 30

*Etter v. J. Pease Constr. Co.,*
  963 F.2d 1005 (7th Cir. 1992) ................................................................ 69

*Harris Trust and Sav. Bank v. Salomon Smith Barney Inc.,*
  530 U.S. 238 (2000) ........................................................................... 37, 52

*Hughes v. Nw. Univ.,*
  595 U.S. 170 (2022) .....................................................................2, 19, 33, 36

*Kanawi v. Bechtel Corp.,*
  590 F. Supp. 2d 1213 (N.D. Cal. 2008) ................................................. 75

*Kuper v. Iovenko,*
  66 F.3d 1447 (6th Cir. 1995) ................................................................. 27

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Laabs v. Faith Techs., Inc.*,
   2022 WL 17418358 (E.D. Wis. Nov. 9, 2022)........................................... 30

*Lauderdale v. NFP Ret., Inc.*,
   2022 WL 17260510 (C.D. Cal. Nov. 17, 2022) ........................................ 27

*Leigh v. Engle*,
   727 F.2d 113 (7th Cir. 1984) ................................................................. 46

*Lockheed Corp. v. Spink*,
   517 U.S. 882, 135 L. Ed. 2d 153, 116 S. Ct. 1783 ............................... 51

*Marshall v. Northrop Grumman Corp.*,
   2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ........................................ 12

*Mateya v. Cook Grp. Inc.*,
   2023 WL 4608536 (S.D. Ind June 16, 2023) ...................................... 30, 31

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...................... 18

*McMerty v. Herzog*,
   710 F.2d 429 (8th Cir. 1983) ................................................................. 46

*Meacham,* 128 S. Ct. 2395, 171 L. Ed. 2d 283 ......................................... 46

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ................................................................. 32

*Mills v. Molina Healthcare, Inc.*,
   2024 WL 1216711 (C.D. Cal. Mar. 20, 2024) ........................................ 68

*Mills v. Molina Healthcare, Inc.*,
   No. 24-6223 (9th Cir. Oct. 11, 2024) ..................................................... 69

*Narayan v. Compass Grp. USA, Inc.*,
   2020 U.S. Dist. LEXIS 41564 (E.D. Cal. Mar. 10, 2020)....................... 18

*Neil v. Zell*,
   753 F. Supp. 2d 724 (N.D. Ill. 2010) ..................................................... 52

*Pearson v. U.S. Bank Nat'l Ass'n*,
   2014 WL 4163020 (D. Minn. Aug. 21, 2014) ........................................ 62

*Perry v. Merit Sys. Prot. Bd.*,
   582 U. S. 420, 137 S. Ct. 1975, 198 L. Ed. 2d 527 (2017) ................... 46

*Probst v. Eli Lilly & Co.*,
   2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ...................................... 30, 32

*Reich v. Polera Bldg Corp.*,
   1996 U.S. Dist. LEXIS 1365 (S.D.N.Y. Feb. 15, 1996) ......................... 51

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Sigetich v. Kroger Co.*,
2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) .......................................... 30

*Singh v. Deloitte LLP*,
650 F. Supp. 3d 259 (S.D.N.Y. 2023) ...................................................... 30

*Taylor* v. *Sturgell*,
553 U. S. 880, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008) ..................... 46

*Teets v. Great-W. Life & Annuity Ins. Co.*,
286 F. Supp. 3d 1192 (D. Colo. 2017) ..................................................... 52

*Teets v. Great-West Life & Annuity Ins. Co.*,
921 F.3d 1200 (10th Cir. 2019) ............................................................... 47

*Tibble v. Edison Int'l*,
729 F.3d 1110 (9th Cir. 2013) ............................................................ 33, 36

*United States v. Wilkins*,
2016 WL 2616497 (W.D. Mo. Apr. 8, 2016) ........................................... 62

*White v. Chevron Corp.*,
2017 WL 2352137 (N.D. Cal. May 31, 2017)...................................... 32, 36

*Williams v. Sprint/United Mgmt. Co.*,
230 F.R.D. 640 (D. Kan. 2005) ................................................................ 62

*Wright v. Or. Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) .................................................................. 27

*Wye Oak Tech., Inc. v. Republic of Iraq*,
2019 WL 4044046 (D.D.C. Aug. 27, 2019) ............................................. 61

**Statutes**

75 Fed. Reg. 41618 ................................................................................ 4, 47

77 Fed. Reg. 5631 ........................................................................................ 4

77 Fed. Reg. 5634 ...................................................................................... 64

ERISA § 3(14)(B) ......................................................................................... 5

ERISA § 404 ........................................................................................... 1, 37

ERISA § 404(a) ................................................................ 3, 11, 12, 27, 38

ERISA § 406 ...................................................................................... 1, 5, 53

ERISA § 406(a) .................................................... 12, 13, 48, 51, 52

ERISA § 406(a)(1) ..................................................................................... 38

ERISA § 406(a)(1)(C) ..................................................... 3, 4, 6, 37, 48, 75

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

ERISA § 408(b)(2)...................................................................................6, 38, 48

ERISA § 409(a)...........................................................................................6, 52

ERISA § 413 ..................................................................................................44

**Other Authorities**

*Fulfilling Fiduciary Obligations Can Present Challenges for 401(k) Plan
Sponsors* (GAO July 2008),
http://www.gao.gov/assets/280/278247.pdf ............................................47

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................18

**Regulations**

29 C.F.R. § 2520.103 .....................................................................................49

29 C.F.R. § 2550.408(b)(2)(c)(xii) ...................................................................4

29 C.F.R. § 2550.408b-2 ................................................................32, 36, 47

29 C.F.R. § 2550.408b-2(1) ...........................................................................48

29 C.F.R. § 2550.408b-2(1)(iv) ......................................................................48

29 C.F.R. § 2550.408b-2(c) ..........................................................3, 6, 49, 51

29 C.F.R. § 2550.408b-2(c)(1)(iii) ................................................................48

29 C.F.R. § 2550.408b-2(c)(1)(iii)(B) ...........................................................31

29 C.F.R. § 2550.408b-2(c)(1)(iv) .................................................................49

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C) ..............................................................6

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(1) .......................................................58

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(2)...........................................50, 58, 75

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(3)........................................................75

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B) ..........................................................69

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(1) ........................................................6

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(2) ......................................................20

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(3) ......................................................59

29 C.F.R. § 2550.408b-2(c)(1)(viii)(C) .....................................................32, 69

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

29 C.F.R. § 2550.408b-2(c)(1)(viii)(D) ................................................ 28, 31, 32, 69

29 C.F.R. § 2550.408b-2(c)(1)(ix) .................................................................. 51

29 C.F.R. § 2550.408b-2(c)(viii)(B)(3) ...................................................... 61, 65

26 U.S.C. § 4975 ....................................................................................... 53, 68

29 U.S.C. § 1002(14)(B) ................................................................................... 5

29 U.S.C. § 1023 ................................................................................................ 49

29 U.S.C. § 1104 ................................................................................................ 47

29 U.S.C. § 1104(a)(1) ....................................................................................... 3

29 U.S.C. § 1104(a)(1)(B) ................................................................................ 19

29 U.S.C. § 1106 ................................................................................................ 51

29 U.S.C. § 1106(a) .............................................................................. 47, 48, 74

29 U.S.C. § 1106(a)(1)(C) .................................................................. 46, 50, 52

29 U.S.C. § 1108(b)(2)(A) ......................................................................... 33, 58

29 U.S.C. § 1109(a) ...................................................................................... 53, 68

# INTRODUCTION

## I.    AT&T's Introduction

Plaintiffs, former AT&T employees who qualified for the AT&T Retirement Savings Plan (the "Plan"), have failed to develop any evidence that AT&T Services, Inc. and the Benefit Plan Investment Committee violated ERISA by inadequately monitoring and controlling the Plan's expenses paid to its recordkeeper, Fidelity Workplace Services. Upon appeal from this Court's prior decision granting summary judgment to AT&T, the Ninth Circuit held that this Court should reevaluate Plaintiffs' claims under an altered legal standard, under which AT&T's fees to Fidelity must be reasonable in light of additional and independent fees that Fidelity earned for non-recordkeeping services. Applying the new legal standard, the outcome of this motion should be the same as it was previously: Plaintiffs simply lack evidence to generate a dispute of material fact as to the reasonableness of AT&T's processes and the fees it paid Fidelity. Because AT&T's reasonableness defeats both of the claims that remain to be adjudicated in this case, this Court should grant summary judgment to AT&T on Plaintiffs' claims under ERISA § 404 (duty of prudence) and § 406 (prohibited transactions).

With respect to Plaintiffs' duty of prudence claim, this Court already correctly concluded that "no factual dispute exists as to whether [Defendants] breached their duty of prudence in evaluating and monitoring the recordkeeping fees" because AT&T "engaged in" "monitoring . . . through periodic reviews and through the hiring of outside experts." Dkt. 211 at 20. The Ninth Circuit did not disturb that conclusion. Rather, it directed this Court to consider whether AT&T prudently considered the compensation Fidelity received from Financial Engines and BrokerageLink, two separate services offered to Plan participants, in monitoring recordkeeping fees for the Plan. The undisputed evidence shows that AT&T did consider this compensation for that purpose. AT&T knew about Fidelity's compensation from Financial Engines and BrokerageLink long before contracting for those services and used that knowledge to reduce its already

below-market recordkeeping fees with Fidelity over time. Accordingly, summary judgment remains appropriate.

Plaintiffs' duty of prudence claim fails for another, independent reason: They have no evidence that AT&T's supposedly imprudent conduct caused any higher recordkeeping fees or inflicted any loss on Plaintiffs. Unrebutted record evidence shows that the Plan paid far *less* for recordkeeping than comparable retirement plans. In fact, the Plan's actual recordkeeping fees were equal to or *less than* the rates that Plaintiffs alleged would have been reasonable for the Plan to pay. Plaintiffs also do not dispute that AT&T hired an independent consultant to verify the reasonableness of its recordkeeping fees, and that the independent consultant concluded those fees were below market. Nor have Plaintiffs disputed that AT&T's contracts with Fidelity contained a "most favored customer" clause to ensure that the Plan would only receive the *best* rates for recordkeeping services that Fidelity offered to the market. And despite this clause, AT&T continued to negotiate even lower recordkeeping fees over time, using its knowledge of Fidelity's direct and indirect compensation. The unreasonable standard that Plaintiffs would have this Court apply fails to account for the "difficult tradeoffs" facing ERISA fiduciaries and would flout the Supreme Court's directive that "courts *must* give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise" when deciding prudence claims. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) (emphasis added).

Finally, Plaintiffs' prohibited-transaction claim fails because there is no genuine dispute of material fact that each of the elements of an exception authorizing AT&T's contract with Fidelity is satisfied: (1) the contract itself was reasonable; (2) Plaintiffs agree that the services were necessary, *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 909 (9th Cir. 2023); and (3) the fees the Plan paid for the services Fidelity and Financial Engines provided to the Plan were reasonable. For the contract to be reasonable, Fidelity had to disclose to AT&T relevant facts about its direct and indirect compensation. This

Court already concluded that "Fidelity's disclosures clearly provide a 'reasonable' description of the indirect and direct compensation that it received from BrokerageLink and Financial Engines," Dkt. 211 at 30—a holding undisturbed by the Ninth Circuit. And the fees the Plan paid were reasonable and not excessive because they were below market and lower than the fees paid by comparable retirement plans.

Accordingly, the Court should again grant summary judgment in AT&T's favor on both of Plaintiffs' remaining claims.

## II.    Plaintiffs' Introduction

The fundamental obligation of a retirement plan fiduciary is to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing them benefits and defraying reasonable expenses of administering the plan. Section 404(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1104(a)(1). Congress recognized when passing ERISA that contracts for plan services between a plan and a party in interest were among a category of transactions that were likely to injure a plan. Accordingly, ERISA Section 406(a)(1)(C) categorically prohibits such transactions unless the plan fiduciary follows certain procedures designed to ensure that the transaction is necessary and reasonable.

> "Section 1106(a)(1)(C) contains three elements. It prohibits fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities" (3) "between the plan and a party in interest." Section 1106(a)(1)(C)'s bar is categorical: Any transaction that satisfies its three elements is presumptively unlawful."

*Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1027 (2025).

Those procedures were specified in amendments to 29 C.F.R. § 408b-2(c), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure,* requiring detailed disclosures by plan service providers, describing the service to be provided, whether the service was being provided by an affiliate or subcontractor, and

all compensation expected to be received in connection with the service and the payer of that compensation. The U.S. Department of Labor ("DOL") explained:

> In recent years, there have been a number of changes in the way services are provided to employee benefit plans and in the way service providers are compensated. Many of these changes may have improved efficiency and reduced the costs of administrative services and benefits for plans and their participants. However, the complexity resulting from these changes also has made it more difficult for plan sponsors and fiduciaries to understand what service providers actually are paid for the specific services rendered.
>
> *         *         *
>
> The Department's proposal required that reasonable contracts and arrangements between employee benefit plans and certain providers of services to such plans include specified information ***to assist plan fiduciaries in assessing the reasonableness of the compensation paid for services and the conflicts of interest that may affect a service provider's performance of services.***

*Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure*, 75 FR 41618 (emphasis added).

After four years of public comment and multiple revisions, the final 408(b)(2) Rule was explicit: "***No*** contract or arrangement for services between a covered plan and a covered service provider, nor any extension or renewal, is reasonable within the meaning of section 408(b)(2) of the Act … unless the requirements of this paragraph (c)(1) are satisfied." 77 FR 5631 (Feb. 3, 2012) (Emphasis added). Failure to satisfy these requirements means the contract constitutes a non-exempt prohibited transaction under § 406(a)(1)(C). The 408(b)(2) Rule applies to every contract in existence prior to, on and after July 1, 2012, requiring virtually every plan service provider to provide the mandated disclosures to a responsible plan fiduciary no later than the effective date. 29 C.F.R. § 408(b)(2)(c)(xii). This was not new guidance. S*ee* Field Assistance Bulletin 2002-3 (Nov. 5, 2002).

AT&T, Inc. ("AT&T"), which is not a Defendant, maintains the AT&T Retirement Savings Plan ("Plan" or "ARSP") for the benefit of its employees. Joint

Appendix of Undisputed Facts ("JAF") ¶3. AT&T Inc. is the Plan Sponsor, and AT&T Services is the Plan Administrator. *Id*.; JAF ¶5. AT&T Services has delegated certain investment-related responsibilities, such as selecting investment options and monitoring related expenses, to a committee comprised of AT&T executives, the Benefit Plan Investment Committee ("BPIC"). JAF ¶7. Fidelity Workplace Services ("Fidelity") has served as the Plan's recordkeeper since 2005. *Bugielski v. AT&T Services*, 76 F.4th 894, 898 (9th Cir. 2023) ("Op."). As recordkeeper, Fidelity performs various administrative functions, such as enrolling new participants in the Plan, maintaining participants' accounts, and processing participants' contributions to the Plan. In exchange for these services, Fidelity charges the Plan a flat fee for each participant. *Id.* As the Plan's recordkeeper, Fidelity is a "party in interest" for purposes of the prohibitions of ERISA § 406. ERISA §3(14)(B), 29 U.S.C. 1002(14)(B)

Subsequently, AT&T Services caused the Plan to engage in two separate transactions with Fidelity and/or its affiliate, Fidelity Brokerage Services LLC. The first was to engage Fidelity to provide Plan participants with access to Fidelity's self-directed brokerage account platform, BrokerageLink. Ex. 16 at ATT00002982. BrokerageLink allows participants to invest in mutual funds and other securities not otherwise available through the Plan. Participants agree to pay a fee for each transaction based on a brokerage commission schedule that Fidelity provides. Exhibit 34.

Then, in 2014, Defendants elected to add professional investment advisory and managed account services provided by Financial Engines pursuant to an agreement between Fidelity and Financial Engines in which Financial Engines was the exclusive third-party provider of managed account services to Fidelity's retirement plan customers. Exhibit 20 at ATT00003211. Financial Engines charged the Plan an asset-based fee for its managed account services that varied based on the value of a participant's account. At the inception of the arrangement, Financial Engines charged tiered fees of 35 basis points ("bps") (0.35%) for accounts under $50,000; 30 bps

(0.30%) for the next $200,000; and 25 bps (0.25%) for the portion the account that exceeded $250,000. JAF ¶ 96.

Both transactions with Fidelity, a party in interest, for plan services, were prohibited by the explicit language of ERISA § 406(a)(1)(C) unless Defendants satisfied all the conditions for the applicable exemption provided by ERISA § 408(b)(2) and 29 C.F.R. § 2550.408b-2(c) (the "408(b)(2) Rule"). The 408(b)(2) Rule requires disclosure of all direct compensation defined in § 2550.408b-2(c)(1)(viii)(B)(1); and all compensation paid among related parties, including subcontractors to ensure that the plans they oversee pay no more than reasonable compensation to the companies that provide services to their plans. 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C).

Defendants failed in multiple ways to obtain the required disclosures with respect to both transactions, making it impossible to determine whether Fidelity's compensation was reasonable in relation to the services provided. As a result, Defendants caused the Plan to engage in non-exempt prohibited transactions, in breach of their fiduciary duties, making them " liable to make good to [the Plan] any losses to . . . resulting from each such breach, and. . . shall be subject to such other equitable or remedial relief as the court may deem appropriate." ERISA §409(a).

## BACKGROUND

### I. AT&T's Background

### A. The AT&T Retirement Savings Plan

The Plan is a defined-contribution 401(k) plan for eligible AT&T employees. Joint Appendix of Fact ("JAF") 1. AT&T Inc. is the Plan Sponsor, and AT&T Services is the Plan Administrator. JAF 2. AT&T Services delegated certain investment-related responsibilities, such as selecting investment options and monitoring related expenses, to the Benefit Plan Investment Committee, which is comprised of AT&T executives. Exs. 6, 11, 12, 32. AT&T Services delegated discretion over third-party administration and day-to-day direction, including recordkeeping fees, to its Vice President–Benefits.

Exs. 13, 14. For most of the relevant period, AT&T Services' Vice President–Benefits was Marty Webb, assisted by Assistant Vice President–Retirement John Phipps and Director–Savings Plan Operations Gary Hanson, among others. JAF 4, 6–7. In January 2020, Mr. Webb retired, and Julie Galloway became Vice President–Benefits. JAF 5.

### B. Plan Recordkeeping

The Plan, like other 401(k) plans, has a recordkeeper to perform various administrative functions, such as tracking participant contributions and investments, processing distributions, and answering participant questions. In 2005, AT&T Services contracted with Fidelity Workplace Services ("Fidelity"), to provide recordkeeping services to the Plan. JAF 8. Fidelity is one of the leading service providers for large institutional retirement plans.

To select Fidelity, AT&T Services conducted a Request for Proposals ("RFP") process in which it collected and compared information from multiple potential benefits vendors regarding recordkeeping services and fees. JAF 8. AT&T Services and Fidelity first executed a Recordkeeping Contract in 2005. *Id.* At all times during the class period, AT&T Services' contracts with Fidelity included a "most favored customer" clause, providing that the Plan would receive rates "no less favorable than those currently extended to any other" similarly situated customers. JAF 9.

In addition to serving as the Plan's recordkeeper, Fidelity offered a la carte services that individual Plan participants could select, such as loan procurement or processing cash dividends. JAF 10. For its recordkeeping services, Fidelity charges the Plan a flat fee ("Core Services" fee) on a per-participant basis. JAF 11. Fidelity charges separate fees for its a la carte services to the individual participants who separately select these offerings. JAF 12. The Plan reported both forms of direct compensation that it or its participants paid to Fidelity in its Annual Reports ("Form 5500"). JAF 13.

Over the course of the Plan's contractual relationship with Fidelity, AT&T continually negotiated lower fees. In 2011, the per-participant Core Services fee was

$31 per participant; it was reduced to $29 the following year.  JAF 14, 15.  In 2016, Fidelity's Recordkeeping Contract came up for renewal.  AT&T retained Deloitte Consulting LLP ████████████████████████████████████████████ ██████████████████████████████████████████████████████████.  JAF 16.  Deloitte reported that ███████████████████████████████████████ ██████████████████████████████.  JAF 17.  Deloitte also concluded that "██████████████████████████████████████████████████████ ████████████████████████████████████████."  JAF 18.  Despite already paying below-market rates, AT&T nevertheless renegotiated its terms with Fidelity in 2017, resulting in a significant reduction—to $20 per participant—effective January 1, 2018.  JAF 17, 19.  This rate was ████████████████ that Deloitte determined ███████████████████████████████.  JAF 17.

### C.    BrokerageLink and Financial Engines

***BrokerageLink***.  In addition to its recordkeeping services, Fidelity separately offered and was compensated for its brokerage account platform, BrokerageLink. JAF 25.  BrokerageLink was made available to every Plan participant (though not all participants utilized it).   The platform expanded investor choice for the Plan's participants by allowing them to trade mutual funds, individual stocks and bonds, and other investments not offered through the Plan's standard investment menu.  JAF 26. Plan participants did not pay an account fee to use BrokerageLink.  JAF 27.  Instead, Plan participants paid for BrokerageLink only if they chose to use the platform to execute trades.  JAF 27–28.  BrokerageLink charged users according to a brokerage commission schedule, which it disclosed.  JAF 28.  Plan participants could access the BrokerageLink commission schedule and fund prospectuses containing fee information through the NetBenefits platform.  JAF 29.

Fidelity made disclosures of its arrangements with BrokerageLink to the Plan.  In particular, Fidelity disclosed in 2012 the "service, fee, and compensation information

regarding [the Plan's] BrokerageLink accounts." Ex. 34 at ATT00027829. Fidelity also explained in its disclosures to the Plan that it might separately receive compensation from the mutual funds offered through BrokerageLink for services it provided to the funds—such as access to Plan participants—and how this compensation could be calculated. JAF 30.

AT&T used Fidelity's indirect compensation from BrokerageLink to negotiate lower recordkeeping fees. JAF 33. Indeed, "on more than one occasion," Fidelity provided AT&T reports of "the investments in BrokerageLink," which listed "the mutual funds and the dollar values" of money invested through BrokerageLink into those funds. Ex. 1 (Phipps Tr.) 16:22–17:10; JAF 31. Additionally, AT&T found the ratio of money that Fidelity would be paid for each transaction by "looking up in the [securities] proxies the associated expense ratio." Ex. 1 (Phipps Tr.) at 18:6–18. AT&T was then able to use the total amounts invested through BrokerageLink and the expense ratio for each mutual fund to "do[] the math to determine what the total fees would have been." Ex. 1 (Phipps Tr.) at 17:25–18:18; *id.* at 57:23–58:9. Based on its calculations, AT&T "evaluat[ed] the reasonableness of the overall fees paid to Fidelity for its services to the Plan." Phipps Decl. ¶ 8. AT&T "recognized the fact that BrokerageLink was valuable to Fidelity," and "leveraged the revenue sharing through BrokerageLink to achieve lower fees for recordkeeping." Ex. 1 (Phipps Tr.) at 22:19–23:4; 31:8–15.

***Financial Engines.*** In 2013, AT&T decided to expand the benefits it offered to Plan participants by offering investment advice and account management services. JAF 35–36. AT&T again conducted an RFP process and narrowed its choices to two investment advisors—Fidelity and Financial Engines. JAF 35–36; Ex. 52. Ultimately, AT&T selected Financial Engines over Fidelity to provide advisory and managed account services to the Plan, ██████████████████████████, because AT&T felt that, among other reasons, "the service offered by Financial Engines was superior to the service offered by Fidelity" and that an independent advisor would be in the best

interest of Plan participants.  JAF 36–37; Ex. 4 (Webb Tr.) at 172:3–6; Ex. 52.  In 2014, AT&T contracted with Financial Engines to provide advisory and managed account services to the Plan.  JAF 36–37.

"During the RFP process," as AT&T was "evaluating the submission[]" from Financial Engines, AT&T became "aware that there was a fee being paid by Financial Engines to Fidelity."  Ex. 1 (Phipps Tr.) at 39:21–40:3.  Bob Mills, Fidelity's Senior Vice President, called Gary Hanson, AT&T's Director of Executive Compensation, in September 2014 to explain the arrangement between Financial Engines and Fidelity.  Ex. 2 (Hanson Tr.) at 32:15–33:5.  Once Mr. Hanson "found out about" the "sharing of compensation . . . between Financial Engines and Fidelity," he ascertained "what that arrangement exactly was," and then modeled the fees he expected Fidelity to receive from that arrangement.  Ex. 2 (Hanson Tr.) at 30:19–31:18; JAF 50.  Mr. Hanson then provided that modeling of Fidelity's indirect compensation from Financial Engines to Mr. Phipps.  Ex. 53.  Specifically, he told Mr. Phipps that Fidelity would receive "$1 annually per plan participant" and noted that "Fidelity charges FE 22.5 [basis points]."  *Id.*

Mr. Hanson also modeled Fidelity's indirect compensation from Financial Engines based on hypothetical dollar figures.  *Id.*; *see also* Ex. 1 (Phipps Tr.) at 54:4–55:11.  Mr. Hanson and Mr. Phipps discussed the arrangement, Ex. 2 (Hanson Tr.) at 34:17–25, which Mr. Phillps decided that he was "good with" and approved.  Ex. 53.  In fact, Fidelity's indirect compensation from Financial Engines was so well known at AT&T that the entire "RFP project team . . . [was] all aware of [] the arrangement."  Ex. 2 (Hanson Tr.) at 34:17–25; *see also* Ex. 3 (Galloway Tr.) at 71:16–19.

Consistent with AT&T's understanding of the arrangement between Financial Engines and Fidelity, under the Financial Engines–Fidelity contract—to which AT&T and the Plan were not parties—Fidelity agreed to provide Financial Engines with access to participants' data and to its secure technological systems in exchange for a portion of

the fees Financial Engines earned from its financial advisory services to the Plan.  JAF 44.  According to Mr. Hanson, who assisted in evaluating and selecting Financial Engines to provide managed account services to Plan participants, Financial Engines' ability to access Plan participant's "realtime" data directly from Fidelity was "the key part" of the agreement between Fidelity and Financial Engines.  Ex. 2 (Hanson Tr.) at 45:3–21.  Initially, Financial Engines charged the Plan a flat per-participant fee.  JAF 39.  In 2017, AT&T renegotiated with Financial Engines to eliminate the flat fee and to charge only a lower asset-based fee.  JAF 41.

AT&T ensured that Financial Engines' arrangement with Fidelity did not result in higher costs for Plan participants.  For example, the AT&T–Financial Engines agreement provided that Financial Engines would not "charge AT&T or Plan Participants any additional fees as a result of [Financial Engines'] payment to the Plan Recordkeeper [Fidelity]."  JAF 46.  AT&T reiterated to Fidelity in a September 2014 Letter of Direction that "Plan participants are not charged any additional fee for the data connectivity arrangement" "solely between Financial Engines and Fidelity."  JAF 47.  Moreover, armed with the knowledge of Fidelity's indirect compensation from Financial Engines, AT&T was able to significantly reduce the fees it paid to Fidelity.  JAF 24.  For instance, AT&T "absolutely" considered the "dollars that Fidelity would be receiving in connection with the Financial Engines agreement with respect to [their] negotiations with Fidelity on their overall fees for recordkeeping."  Ex. 1 (Phipps Tr.) at 56:2–10.  Using those fees, AT&T even "negotiated with Fidelity" to get "a very sizable reduction in recordkeeping fees."  *Id.*

### D.    Procedural History

In 2018, Plaintiffs filed a Third Amended Complaint, alleging three counts: (1) AT&T breached its fiduciary duties under ERISA § 404(a) by failing to prudently and loyally monitor the compensation paid to Fidelity from the Plan for recordkeeping services, and failed to report that compensation on its Form 5500s (Count I); (2) AT&T's

agreement with Fidelity was a "prohibited transaction" under ERISA § 406(a) that did not fall within an exemption for necessary agreements with service providers involving reasonable compensation (Count II); and (3) AT&T's recordkeeping contract with Fidelity "increased the costs of the Plan's recordkeeping services" to save "AT&T money on the administration of other plans and programs" (Count III).  Dkt. No. 81.

The parties conducted extensive discovery relating to these claims.  Plaintiffs did not, however, seek any discovery from Fidelity or Financial Engines.  Dkt. No. 215 at 26–27.  Plaintiffs also chose not to pursue discovery from other companies or their retirement plans.  *Id.*  Nor did Plaintiffs retain an expert witness to testify on issues related to compensation or market rates for comparable recordkeeping services provided to similar companies, or to examine and testify regarding the Plan's practices.  *Id.*

On June 4, 2021, the parties stipulated to dismiss Count III of the Third Amended Complaint.  Dkt. No. 161.  Defendants then moved for summary judgment on Plaintiffs' two remaining claims, Dkt. No. 165, and Plaintiffs moved for partial summary judgment on their fiduciary breach claim, Dkt. No. 167.  On September 28, 2021, this Court granted Defendants' motion and denied Plaintiffs' motion.  Dkt. Nos. 211, 215.

As to Plaintiffs' duty of prudence claim under § 404(a), the Court held that "Defendants present[ed] extensive evidence that they acted prudently in monitoring the Plan's recordkeeping expenses."  Dkt. No. 211 at 19.  The Court followed another court in this district to hold that "ERISA does not require, as a matter of law, that fiduciaries leverage the type of third-party fees at issue here in order to reduce recordkeeping fees."  *Id.* at 22 (quoting *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019)).  The Court also granted summary judgment on Plaintiffs' claim for fiduciary breach in reporting compensation on the Plan's Form 5500s.  It concluded that AT&T did not run afoul of any Department of Labor reporting obligations, finding that "[i]n contrast to [AT&T's] detailed, thorough application of the

Department of Labor's instructions for the Form 5500s, Plaintiffs [had] not met their burden of showing there is a triable issue of fact pursuant to the forms." *Id.* at 37–38.

As to Plaintiffs' prohibited-transaction claim, the Court assumed that Defendants' agreement with Fidelity fell within the categories of prohibited transactions in § 406(a), and held that Plaintiffs "failed to carry their burden of showing a triable issue of fact regarding the reasonableness of Fidelity's compensation from the Plan." Dkt. No. 211 at 25. The Court reasoned that Plaintiffs had not presented "competent evidence of other companies' recordkeeping expense reporting practices, or evidence showing that companies routinely factor in the wide variety of services that Plaintiffs allege should be included," and "produc[ed] no credible evidence" as to how other companies' recordkeeping expenses are computed. *Id.* at 25–26.

The Ninth Circuit reversed in part and affirmed in part this Court's judgment and remanded for further proceedings consistent with its opinion. *Bugielski*, 76 F.4th at 917. In reversing the grant of summary judgment on Plaintiffs' duty of prudence claim, the Ninth Circuit determined that third-party compensation, particularly the compensation that Fidelity received from Financial Engines, was not categorically irrelevant to an ERISA fiduciary's monitoring duties. *Id.* at 912. The court reversed the grant of summary judgment on Plaintiffs' prohibited transaction claim for the same reason, after explicitly rejecting the decisions of two other Circuits to hold that § 406(a) applies to arms-length transactions with service providers. *Id.* at 908–09. On both issues, the Ninth Circuit provided guidance regarding the appropriate analysis and remanded for this Court to "conduct this analysis in the first instance." *Id.* at 912, 913.

As to Plaintiffs' reporting claim, the Ninth Circuit affirmed in part and reversed in part, holding that Defendants were entitled to summary judgment with respect to BrokerageLink but not to Financial Engines. *Bugielski*, 76 F.4th at 914–16. The Ninth Circuit did not remand this portion of Plaintiffs' claim, which is now resolved.

Defendants filed a petition for writ of certiorari with the Supreme Court of the United States, seeking review of the circuit split created by the Ninth Circuit's decision. After holding the case for its resolution of *Cunningham v. Cornell University*, 604 U.S. 693 (2025), the Supreme Court denied the petition on April 28, 2025.

## II.    Plaintiffs' Background

### A.    The BrokerageLink Transaction

With respect to the BrokerageLink transaction, the undisputed facts demonstrate that Defendants failed to obtain virtually any disclosure of Fidelity's revenue sharing compensation until sometime in 2018 after this lawsuit was filed. Exhibit 104, metadata information page for ATT00027835.

Two of AT&T's Senior Executive witnesses, Marty Webb and Julianne Galloway, acknowledged the failure to obtain disclosures, asserting that Fidelity's compensation from third parties was a separate matter between Fidelity and the third party. As Ms. Galloway testified:

> **Q.** And did you or anybody in the – within the employee benefits group make a determination of what was reasonable for the services being provided by Fidelity?
>
> **A. That agreement is between Fidelity and Financial Engines and is part of their negotiations. We contract separately and independently with Fidelity and with Financial Engines.**
>
> Q. So does that mean that you really didn't make an inquiry about whether that fee was a reasonable fee?
>
> **A. I did not see documentation as to that effect.**

JAF ¶¶121-123. That view was corroborated by John Phipps, AT&T Services' Assistant Vice President for Retirement and a BPIC member who testified: "What Financial Engines and Fidelity worked out for fees, was between them;" and "[W]e typically did not evaluate the fees that our vendors would pay to third parties." JAF ¶¶ 125 – 127.

One reason they made little effort at obtaining disclosures is that a 2011

amendment to the Administrative Services Agreement specified that, while certain AT&T plans that offered Fidelity funds as investment choices would receive a credit against recordkeeping fees for revenue sharing from those Fidelity funds, no AT&T plan would receive credit for revenue sharing compensation Fidelity received from funds acquired through BrokerageLink. Exhibit 16 at ATT00002992. By that amendment, AT&T essentially abandoned any obligation to act in the best interest of participants for the millions of dollars of revenue sharing Fidelity was receiving through revenue sharing.

In any event, Phipps' testimony on this issue is suspect. For example, in his declaration submitted in connection with Defendants' Motion for Summary Judgment, Ex. A, Phipps states:

> "During the class period, I reviewed on multiple occasions the Fidelity mutual funds that Plan participants purchased using BrokerageLink and analyzed the Plan's assets in those funds along with the funds' expense ratios. Using this information, we were able to reasonably estimate the additional compensation that Fidelity received in connection with these individual investments. We considered that information in evaluating the reasonableness of the overall fees paid to Fidelity for its services to the Plan. Exhibit 45 (ATT00027833) to the Ross Declaration is a copy of a spreadsheet that I prepared with my assistant, Melissa Chappa, to construct such an estimate."

The referenced spreadsheet, EX. 45, ATT00027833, according to its metadata, was not created until February 26, 2019. Exhibit 106. *See also,* Exhibit 103 showing metadata for Exhibit 100.

Furthermore, there is no disclosure of the amount Fidelity received as revenue sharing for any of the funds. It was clearly impossible to ascertain from the spreadsheet the amount of compensation Fidelity was receiving through BrokerageLink and, therefore, to have "considered" that indirect compensation when evaluating the reasonableness of Fidelity's recordkeeping fees. Indeed, Mr. Phipps implausible argument based on non-existent data in a spreadsheet he created with his assistant proves

to a degree of certainty that he did not do what the 408(b)(2) Rule explicitly requires: obtain disclosure *from Fidelity* of all direct and indirect compensation Fidelity was receiving in connection with its services to the Plan. The failure to obtain that disclosure from Fidelity is even more damning in the face of Defendants' written instruction to Fidelity to disclose all indirect compensation, including revenue sharing through 12b-1 fees. Exhibit 106 at ATT00001982.

Fidelity's 408(b)(2) disclosure form entitled "Investment Option-Related Services and Compensation", is expressly designed to include "the compensation received by Fidelity from unaffiliated fund providers or annuity contract issuers for Fidelity's record keeping and administrative services with respect to such investments, which is referred to as "indirect compensation" under the 408(b)(2) regulation." However, the indirect compensation from BrokerageLink was simply reported as "Unknown." Exs. 107 at ATT00001892 and 108 at ATT00008821. The only information reported on the Plan's 5500s for Plan years 2011 through 2019 was in a footnote to a Supplement to Schedule C, "Service Provider Information", that stated:

> "For Self-Directed Brokerage Investments, each fund family may offer an indirect support fee paid to Fidelity Investments. Each indirect support fee paid by a fund may differ depending on the form of investment. Please contact your Fidelity representative to receive information on indirect support fees for your Self-Directed Brokerage Investments."

*See, e.g.,* Exs. 109 at ATT00026789 and 110 at ATT00027676.

AT&T Services finally began reporting the revenue sharing percentages mutual fund companies were paying Fidelity in a 75-page Supplement to the Plan's 2020 plan year 5500, listing 1670 mutual funds that paid an average of 29.6 basis points in revenue sharing, filed September 23, 2021. Ex. 111 at 47-102.

## B.    The Financial Engines Transaction

Unlike the BrokerageLink transaction, Defendants were well-aware of the fee split between Financial Engines and Fidelity. Gary Hanson, Director of Executive Compensation, who was assisting Phipps in the evaluation and selection of an

investment advisor to provide managed account services to Plan participants, had performed an analysis of the fee arrangement proposed by Financial Engines and the fee split between Financial Engines and Fidelity. His projections indicated that, assuming 10% of Plan participants elected to participate in Financial Engines' managed account services, the total fee charged for those services would be $9.6 million, of which Financial Engines would receive $4.1 million for managing the accounts of roughly 20,000 participants (43% of total fees) and Fidelity would receive $5.5 million for simply providing Financial Engines electronic access to participants' accounts (57% of total fees). Exhibit 53.[1]  Hanson emailed his analysis to Phipps at 4:22 p.m. on Sept. 17, 2014. Slightly more than five hours later, at 9:50 p.m. that same day, Phipps responded: "Thanks Gary. I am good with this." Ex. 53. The agreement with Fidelity implementing the Financial Engines transaction was signed on August 8, 2014. Ex. 20 at ATT00003309.

Given the circumstances and timing of the approval of the fee-splitting arrangement, it is unlikely that Mr. Phipps would have made any reasonable inquiry into the questions any prudent fiduciary would have asked to ensure that he satisfied the conditions of the 408(b)(2) exemption.

While it is clear the Defendants failed to make any inquiry into the actual cost to Fidelity of providing Financial Engines secure electronic access to participants' accounts, a significant clue to that value is suggested by the agreement between AT&T and Fidelity providing for the implementation of Financial Engines' connection to Fidelity: "Fidelity shall charge $40,000 for an implementation fee for this service, with no ongoing maintenance fee." Ex. 18 at ATT00001943.  It seems clear that the only cost to Fidelity to implement and maintain Financial Engines' electronic access to Fidelity's

---

[1] Such fee-sharing was subsequently reduced to "the greater of (i) 45-47% of [Financial Engines'] fees or (ii) 13-16 basis points on . . . the Plan's assets under management (AUM) with Financial Engines." JAF ¶ 108. Even after the reduction, Fidelity was still receiving at least 45-47% of Financial Engines' fees.

platform was $40,000. Any amount more than that must be considered excessive and unreasonable. Moreover, by necessity, the secure communications link between Financial Engines and Fidelity had been established with respect to the first plan customer of Fidelity that elected to offer the managed account services provided by Financial Engines, long before AT&T chose to offer that service to Plan participants. "The "relationship between Financial Engines and Fidelity was, you know, broader than our AT&T· relationship … a longstanding relationship." JAF ¶ 104. Of course, Fidelity had long ago provided this connection to Financial Engines for other plans. For example, the Delta Air Lines Family Care Savings Plan, a 401(k) plan with $14 billion in assets and more than 90,000 participants, for which Fidelity provides recordkeeping services, has offered Financial Engines managed account services since 2009. Exhibit 112 at 5.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If a moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Narayan v. Compass Grp. USA, Inc.*, 2020 U.S. Dist. LEXIS 41564, *9 (E.D. Cal. Mar. 10, 2020).  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at *10. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## AT&T'S MOTION FOR SUMMARY JUDGMENT

### I.    Plaintiffs Have No Evidence of Imprudence (Count I).

ERISA requires a plan fiduciary to "discharge his duties with respect to a plan . . .

with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  Duty-of-prudence claims are "evaluate[d] . . . prospectively, based on the methods the fiduciaries employed, rather than retrospectively, based on the results they achieved."  *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025).  Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, . . . courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."  *Hughes*, 595 U.S. at 177.

This Court already determined that "Defendants present[ed] extensive evidence that they acted prudently in monitoring the Plan's recordkeeping expenses."  Dkt. No. 211, at 19.  But because the Court concluded that ERISA did not require fiduciaries to "leverage the type of third-party fees at issue here in order to reduce recordkeeping fees," *id.* at 22, it did not focus on BrokerageLink and Financial Engines.  The Ninth Circuit held that AT&T had to demonstrate that it considered "the compensation—direct and indirect—received by service providers like Fidelity," including indirect compensation from BrokerageLink and Financial Engines, in order "to satisfy [its] duty of prudence under § 404."  *Bugielski*, 76 F.4th at 912–13 (cleaned up).  Because there is no genuine dispute of material fact that AT&T did so, summary judgment is appropriate.

## A.    Defendants Considered Fidelity's Indirect Compensation.

There is no dispute of material fact that AT&T prudently monitored recordkeeper fees.  The record is replete with evidence of a robust process by which AT&T not only considered Fidelity's indirect compensation but used it to negotiate lower recordkeeping fees.  For instance, AT&T reviewed Fidelity's total compensation and met with Fidelity representatives on a "quarterly" basis "to discuss Fidelity's services to the Plan and the fees Fidelity charged for those services."  JAF 21.  It is also undisputed that AT&T repeatedly required Fidelity to disclose its "Indirect Compensation," JAF 23—*i.e.*,

"compensation received from any source other than the covered plan, the plan sponsor, the covered service provider, or an affiliate," 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(2). AT&T used this information to negotiate reductions to the Plan's recordkeeping fees. *See* Ex. 1 (Phipps Tr.) at 46:1–12; *id.* at 56:2–10; *id.* 31:8–15, 27:18–28:9.

Further, the record shows that AT&T compared Fidelity's recordkeeping fees to those of peer plans, relying on data from Deloitte, CEM Benchmarking, and the Committee on Investment of Employee Benefits Assets (CIEBA), to ensure they were reasonable. JAF 22; *see also* Ex. 33 at 5 (noting that the Plan's "recordkeeping fees" were "lower" than the fees of the rest of AT&T's plans). In 2016, AT&T hired Deloitte ██████████████████████████████████████████████████████████████ ████████. JAF 16. Deloitte validated that Fidelity's recordkeeping rate was ████████ ██████████████████ and that the "████████████████" were "████████ ████████████████████████████████████████████████████." JAF 17–18. AT&T nevertheless negotiated for Fidelity to further lower its rates. JAF 19. After reviewing this evidence, this Court rightly concluded that "no factual dispute exists as to whether [AT&T] breached their duty of prudence in evaluating and monitoring the recordkeeping fees" because AT&T "engaged in" "monitoring . . . through periodic reviews and through the hiring of outside experts." Dkt. 211 at 20.

The Ninth Circuit did not overturn that conclusion. Instead, it directed this Court, to specifically examine whether AT&T (1) "considered the compensation Fidelity received from the mutual funds available through BrokerageLink," and (2) "considered the compensation Fidelity received from Financial Engines." *Bugielski*, 76 F.4th at 913. The undisputed evidence shows that AT&T *did* consider the compensation that Fidelity received from both sources *and* used it to lower its recordkeeping fees.

### 1. AT&T Considered Indirect Compensation from Financial Engines.

AT&T considered Fidelity's indirect compensation from Financial Engines and used it to obtain a "sizable reduction in recordkeeping fees." JAF 24. Indeed, AT&T

knew about Fidelity's compensation from Financial Engines *even before Financial Engines began rendering services to the Plan.* JAF 48. AT&T put out an RFP for investment advisory services, to which Financial Engines responded. JAF 35. "During the RFP process," as AT&T was "evaluating the submission[]" from Financial Engines, AT&T became "aware that there was a fee being paid by Financial Engines to Fidelity." Ex. 1 (Phipps Tr.) at 39:21–40:3. Bob Mills, Fidelity's Senior Vice President, called Gary Hanson, AT&T's Director of Executive Compensation, in September 2014 to explain the arrangement between Financial Engines and Fidelity. Ex. 2 (Hanson Tr.) at 32:15–33:5. Once Mr. Hanson "found out about" the "sharing of compensation . . . between Financial Engines and Fidelity," he ascertained "what that arrangement exactly was," and then modeled the sorts of fees he expected Fidelity to receive from that arrangement. *Id.* at 30:19–31:18; JAF 50. Mr. Hanson then provided that modeling of Fidelity's indirect compensation from Financial Engines to Mr. Phipps. Ex. 53. Specifically, he told Mr. Phipps that Fidelity would receive "$1 annually per plan participant" and noted the "Fidelity charges FE 22.5 [basis points]." *Id.*

| | |
|---|---|
| 3. | For the advisory service, Fidelity charges FE 22.5bps |
| 4. | For the platform fee, FE charges $2 annually per *active* plan participant |
| 5. | For the platform fee, Fidelity charges FE $1 annually per plan participant |

*Id.* (highlighted added). Mr. Hanson then modeled Fidelity's indirect compensation from Financial Engines, based on hypothetical dollar figures:

| | Financial Engines | Fidelity | Total |
|---|---|---|---|
| Advisory Service Charge | $4,000,000 | $5,200,000 | $9,200,000 |
| Platform | $100,000 | $300,000 | $400,000 |
| Total | $4,100,000 | $5,500,000 | $9,600,000 |
| % of Total | 43% | 57% | 100% |

*Id.*; *see also* Ex. 1 (Phipps Tr.) at 54:4–55:11. Mr. Hanson and Mr. Phipps discussed the arrangement, Ex. 2 (Hanson Tr.) at 34:17–25, which Mr. Phillps ultimately decided that he was "good with" and approved. Ex. 53. In fact, Fidelity's indirect compensation

from Financial Engines was so well known at AT&T that the entire "RFP project team . . . [was] all aware of [] the arrangement."  Ex. 2 (Hanson Tr.) at 34:17–25; *see also* Ex. 3  (Galloway Tr.) at 71:16–19 (testifying that AT&T was "aware that Fidelity was getting indirect compensation from BrokerageLink and Financial Engines").

Armed with the knowledge of Fidelity's indirect compensation from Financial Engines, AT&T was able to significantly reduce the fees it paid to Fidelity.  JAF 24. For instance, Mr. Phipps testified that AT&T "absolutely" considered the "dollars that Fidelity would be receiving in connection with the Financial Engines agreement with respect to [their] negotiations with Fidelity on their overall fees for recordkeeping." Ex. 1 (Phipps Tr.) at 56:2–10.  Using those fees, AT&T even "negotiated with Fidelity" to get "a very sizable reduction in recordkeeping fees." *Id.*

Given this clear record, Plaintiffs cannot seriously contest that AT&T considered—and made use of—Fidelity's indirect compensation from Financial Engines when monitoring Plan fees.  Nevertheless, in prior briefing, Plaintiffs tried to manufacture a factual dispute on this issue based on two types of inapposite, cherrypicked evidence.  The Court should reject these arguments, as it did before.

*First*, two witnesses testified that AT&T was not involved in any negotiations that occurred between Financial Engines and Fidelity.  Ex. 1 (Phipps Tr.) at 46:1–12 ("[W]hat Financial Engines and Fidelity worked out for fees, was between them."); Ex. 3 Galloway Tr. at 51:2–9 ("That agreement is between Fidelity and Financial Engines and is part of their negotiations.  We contract separately and independently with Fidelity and with Financial Engines."); Ex. 1 (Phipps Tr.) at 55:18–56:1.  But the fact that AT&T did not *dictate* the fees that Fidelity received from Financial Engines in a separate contract between those entities says nothing of whether AT&T *considered* those fees when negotiating its own agreements with Fidelity.  And that is precisely what AT&T did in this case, relying on detailed information concerning indirect fees Fidelity collected from Financial Engines to negotiate lower fees for Plan participants.

*Second*, Plaintiffs misleadingly cherry-picked sound bites from the testimony of two witnesses, who said they did not "evaluate" or conduct an "analysis to determine" the fees paid from a third party to Fidelity. Ex. 1 (Phipps Tr.) at 47:4–11 ("[W]e typically did not evaluate the fees that our vendors would pay to third parties."); *id.* at 45:3–15 (AT&T did not do "an analysis to determine . . . any fees that one of our vendors paid to anybody else they contract with, and that would include Financial Engines."); Ex. 3 (Galloway Tr.) at 51:10–14 (testifying that she had not "see[n] documentation" showing that AT&T considered whether the fees exchanged between Financial Engines and Fidelity were "reasonable"). But Plaintiffs take those quotes entirely out of context—each refers to the fact that AT&T did not analyze whether Financial Engines' compensation to Fidelity was reasonable *for Financial Engines*. AT&T plainly evaluated whether its own fees to Fidelity were reasonable, taking into consideration the fees that Financial Engines paid to Fidelity. *See supra* pp. 20–22. Put differently, AT&T did not need to scrutinize whether Fidelity was ripping off Financial Engines to determine whether the fees the Plan was paying to Fidelity were reasonable. Instead, as the Ninth Circuit stated, AT&T needed to (1) "consider all compensation—direct and indirect" that Fidelity received, and (2) "make responsible decisions *for the plan*." *Bugielski*, 76 F.4th at 911 (emphasis added). Accordingly, AT&T needed to consider the reasonableness of indirect compensation *for the Plan*—not *for the payee* (*i.e.*, Financial Engines). It was thus entirely proper for AT&T not to "evaluate the fees that [its] vendors would pay to third parties" to determine whether the vendor was getting a good deal, but instead to use that payment information as a "data point as to just how valuable that relationship is from a Fidelity perspective," Ex. 1 (Phipps Tr.) at 47:4–11, and to then leverage that information to secure lower Plan fees from Fidelity.

While the Ninth Circuit asserted that the "conflicting testimony" it had before it did not "support AT&T's claim that it considered the compensation Fidelity received from Financial Engines," the Ninth Circuit explicitly limited its review to the more

limited record before it, and its explicit review of the record on this issue consisted *solely of three deposition quotes*. *Bugielski*, 76 F.4th at 913. The Ninth Circuit thus did not consider the undisputed, documentary evidence showing AT&T considered Fidelity's compensation from Financial Engines as early as September 2014. JAF 48–49. For good reason: the primary focus of the parties before the Ninth Circuit was the application of the test this Court had held governed, not the facts that would be relevant if the Ninth Circuit applied a *different* test. The Ninth Circuit's intention that this Court do a fuller review of the record is evident in its remand for the Court to consider the record under the proper framework in the first instance—it would make no sense for the Ninth Circuit to remand for consideration of an issue it had already decided.

### 2. AT&T Considered Indirect Compensation from BrokerageLink.

Similarly, AT&T not only was aware of and considered Fidelity's indirect compensation from BrokerageLink, but also used it to negotiate lower recordkeeping fees. JAF 33. Notably, "on more than one occasion," Fidelity provided AT&T reports of "the investments in BrokerageLink," which listed "the mutual funds and the dollar values" of money invested through BrokerageLink into those funds. Ex. 1 (Phipps Tr.) 16:22–17:10; JAF 31. Accordingly, AT&T knew the amount of money invested in each mutual fund through BrokerageLink. In addition, AT&T found the ratio of money that Fidelity would be paid for each transaction by "looking up in the [securities] proxies the associated expense ratio." Ex. 1 (Phipps Tr.) at 18:6–18. Armed with the total amounts invested through BrokerageLink, and the expense ratio for each mutual fund, AT&T was able to "do[] the math to determine what the total fees would have been." Ex. 1 (Phipps Tr.) at 17:25–18:18; *id.* at 57:23–58:9 (AT&T had a "fair idea of what" Fidelity's compensation through BrokerageLink "would be based on our various calculations"). Specifically, AT&T would multiply the market value of the shares invested through BrokerageLink by the expense ratio to get the fee paid to Fidelity through

BrokerageLink.  Ex. 45.  Here is an example of AT&T's calculation spreadsheet showing the indirect compensation Fidelity received through BrokerageLink:

| M | N | O | P | Q | R |
|---|---|---|---|---|---|
| SumOfMKTVAL | Prod ID Desc | ETF Type | | Exp Ratio | Fee |
| $237,231,459 | FIDELITY MUTUAL FUND-MM | | | 0.38% | $901,480 |

*Id.* (highlighting added).

Based on these calculations, AT&T "evaluat[ed] the reasonableness of the overall fees paid to Fidelity for its services to the Plan."  Phipps Decl. ¶ 8.  AT&T "recognized the fact that BrokerageLink was valuable to Fidelity," and "AT&T leveraged the revenue sharing through BrokerageLink to achieve lower fees for recordkeeping."  Ex. 1 (Phipps Tr.) at 22:19–23:4; 31:8–15; *see also id.* at 23:5–13 (AT&T knew BrokerageLink "was extremely valuable to Fidelity"); Ex. 3 (Galloway Tr.) at 71:16–19 (Plan was "aware that Fidelity was getting indirect compensation from BrokerageLink").

In prior briefing, Plaintiffs tried to create a factual dispute about AT&T's consideration of BrokerageLink compensation based on two inapposite facts.  *First*, Plaintiffs imply that AT&T did not consider Fidelity's compensation through BrokerageLink because Fidelity did not specifically disclose BrokerageLink as "Indirect Compensation" on its 408b-2 disclosure.  Dkt. 187 at 42 (Plfs.' SUF 122).  But whether Fidelity disclosed BrokerageLink fees on a fee disclosure form says nothing about what AT&T knew about those fees from other sources or how it used that information when monitoring Plan fees.  All that is required is for AT&T to have considered Fidelity's compensation through BrokerageLink when assessing its Plan fees, *see Bugielski*, 76 F.4th at 913, and the undisputed evidence shows that AT&T did just that—negotiating lower fees for the Plan based on indirect fees Fidelity received from BrokerageLink.  JAF 31–33.  Nothing more is required to satisfy ERISA's prudence requirement.

*Second*, Plaintiffs have noted that AT&T did not require Fidelity to offer "credits" associated with the indirect compensation it received from BrokerageLink.  Dkt. 185 at

12.  But nothing in the law requires AT&T to demand that Fidelity give it "credits" to offset indirect compensation.  *See Bugielski*, 76 F.4th at 913.  In any event, "AT&T leveraged the revenue sharing through BrokerageLink to achieve lower fees for recordkeeping," to the same economic effect. Ex. 1 (Phipps Tr.) at 31:8–15, 27:18–28:9.

*Third*, the Ninth Circuit noted that it did not have before it evidence that AT&T "considered the compensation Fidelity received from the mutual funds available through BrokerageLink." *Bugielski*, 76 F.4th at 913.  But that is because of the posture of the Ninth Circuit appeal, where the parties' focus was on whether there was a legal or factual basis to require AT&T to consider that compensation.  *See id.* (noting that AT&T did not "argue that it considered the compensation Fidelity received from the mutual funds available through BrokerageLink").  As detailed above, however, the undisputed evidence establishes that there is no genuine issue of fact that Mr. Phipps calculated Fidelity's indirect compensation from BrokerageLink; indeed, AT&T has provided the Court with an example of a spreadsheet showing those calculations.  Ex. 45.

In short, AT&T amply considered the compensation Fidelity received through both BrokerageLink and Financial Engines.  And the record is devoid of any evidence— expert or otherwise—suggesting that AT&T's activities fell short of those of a reasonable fiduciary in these circumstances.  There is no expert testimony about what a reasonably prudent fiduciary would have done here.  While the Ninth Circuit concluded that expert testimony is not always necessary, *Bugielski*, 76 F.4th at 913,  Plaintiffs have not offered any *other* evidence that a reasonably prudent fiduciary would have taken some further steps with respect to Fidelity's recordkeeping fees.  Plaintiffs took no discovery from other companies or their retirement plans, so they have no factual evidence suggesting that any other fiduciary has used the existence or amount of fees such as those Fidelity received from Financial Engines or through BrokerageLink to decrease recordkeeping fees or that other recordkeepers with higher fees were not receiving the same type of fees for separate services.  Accordingly, there is no genuine

1  dispute that AT&T did not violate its duty of prudence under ERISA § 404(a).

2  ### B.    Plaintiffs Have No Evidence of Loss or Causation.

3  Plaintiffs' duty-of-prudence claim also fails for the independent reason that they

4  have not offered evidence permitting a finding that AT&T's allegedly imprudent

5  decisions led to any loss.  It is well established that "a plaintiff [must] prove[] a loss in

6  the wake of an imprudent [] decision."  *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17,

7  35 (1st Cir. 2018).  Indeed, a "plaintiff must show a *causal link* between the failure to

8  investigate and the harm suffered by the plan."  *Wright v. Or. Metallurgical Corp.*, 360

9  F.3d 1090, 1099 (9th Cir. 2004) (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir.

10  1995), *abrogated in part on other grounds, Fifth Third Bancorp v. Dudenhoefer*, 573

11  U.S. 409 (2014)); *Lauderdale v. NFP Ret., Inc.*, 2022 WL 17260510, at *12 (C.D. Cal.

12  Nov. 17, 2022) ("To defeat Defendants' summary judgment motion, Plaintiffs must

13  present facts that Defendants' actions caused the losses to the Plan.").[2]

14  Here, Plaintiffs cannot satisfy their burden to prove loss or causation because they

15  cannot show that *any process* would have led to lower recordkeeping fees.  After all,

16  there can be no genuine dispute that (1) the Plan's actual recordkeeping fees were equal

17  to—and often much lower than—the rates that Plaintiffs allege would have been

18  reasonable; (2) AT&T's payments to Fidelity were lower than the market average; and

19  (3) Fidelity provided AT&T a most-favored customer clause that ensured AT&T

20  received Fidelity's best rates for its services.

21  ### 1.    AT&T Recordkeeping Fees Were Less Than Plaintiffs' Benchmark and
22  ###         Less than Average for the Market.

23  Plaintiffs' theory of loss is their claim that the Plan supposedly paid $61 per

---

25  [2] While Defendants made this same argument in their prior summary-judgment motion, the Court ruled on other grounds and did not address it.  Given the Ninth Circuit's remand for holistic consideration of the "duty-of-prudence claim under the proper framework in the first instance," this argument is squarely within the scope of remand. *Bugielski*, 76 F.4th at 913.

participant for recordkeeping on average, or "roughly double" the costs paid by similar plans during the class period.  TAC ¶¶ 71, 60.  They allege that similar plans pay "no more than roughly $30 per participant for comparable recordkeeping services."  TAC ¶ 61.  But Plaintiffs' $61 figure includes more than just recordkeeping.  It includes all direct compensation AT&T paid to Fidelity for any service—a theory Plaintiffs did not plead in their Third Amended Petition (and that cannot be compared to what other companies pay for recordkeeping alone).  *See*, *e.g.*, TAC ¶ 59 (alleging "payments for recordkeeping servic*es*"); *id.* ¶ 60 ("recordkeeping expenses"); *id.* ¶ 61 ("recordkeeping services"); *id.* ¶ 67 ("recordkeeping costs"); *id.* ¶ 69 ("offset to recordkeeping fees"). For example, this figure includes participant loan processing and account maintenance fees, as well as "securities brokerage commission and fees," which is expressly excluded from the definition of "recordkeeping services" under applicable ERISA regulations. *See* 29 C.F.R. § 2550.408b-2(c)(1)(viii)(D); *e.g.*, Ex. 29 at ATT00001480 (including code 71 in direct compensation); Ex. 9 at 27 (defining code 71).

When the focus is trained on AT&T's actual recordkeeping fees, AT&T paid Fidelity less than Plaintiffs' benchmark.  At the start of the class period, the Plan paid roughly $30 or less for recordkeeping services.  And by 2018, the Plan paid even less— only $20 per participant:

| **2011** | **2012**[3] | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|---|---|---|---|
| $31 | $30 | $29 | $29 | $29 | $29 | $29 | $20 | $20 | $20 |

JAF 14–15, 19. As this Court correctly recognized, AT&T's payments to Fidelity "fall within the range that Plaintiffs themselves suggest is reasonable." Dkt. No. 211 at 27.

Not only did the Plan's recordkeeping fees fall below Plaintiffs' own range of reasonableness, but they were also consistently lower than average for the market.  For example, in 2012, the Plan's $29 recordkeeping rate was ██████████ reported by CIEBA that year. Ex. 43 at 52; JAF 15.  Similarly, in 2013, the Plan's rate

---

[3] Effective August 1, 2012, the Plan's rate was reduced to $29 per participant  JAF 15.

was ████████████████████ CIEBA reported.  Ex. 44 at 51; JAF 15. Survey data from Deloitte confirms that the Plan's recordkeeping expenses were in line with, and often lower than, other major defined contribution plans, and does not suggest that those other plans involved fiduciaries not receiving comparable non-recordkeeping compensation.  In 2016, Deloitte and AT&T determined that ████████████████ ████████████████████████████, while AT&T paid only $29.  JAF 14–15, 17, 19.  And Deloitte reported that t███████████ █████████████████████.  Ex. 47 at 35; Ex. 42 at 21. Ultimately, Deloitte concluded that the "███████████████" in the "██████ ████████████████████████████████████ ██████████████." JAF 18.

Plaintiffs cannot show causation or loss without proof Fidelity would have lowered its recordkeeping fees even further below the already below-market rates it was charging AT&T if AT&T had engaged in some different process.  To make that showing, Plaintiffs would need evidence that Fidelity offered lower rates to other comparable plans for the same or similar services or evidence from Fidelity suggesting that it would have accepted such lower rates.  They have no such evidence.  To the contrary, throughout the class period, AT&T's contract with Fidelity contained a "most-favored customer" clause, which ensured that Fidelity's fees were "not less favorable than those currently extended to any other" similarly situated customer."  JAF 9; Dkt. No. 211 at 20 (noting Plaintiffs do not dispute this clause).

**2.  Public Form 5500s Do Not Show Loss or Causation.**

Plaintiffs retained no expert witness and engaged in no third-party discovery to provide any evidence to show that Plan participants could have secured a lower fee from Fidelity (or any other recordkeeper capable of servicing AT&T's massive Plan). Plaintiffs' only evidence on this point consists of a handful of public Form 5500s.  But those forms do not support a showing of loss for three reasons.

*First*, unsurprisingly, courts have repeatedly rejected the use of Form 5500s to show loss, recognizing, as this Court has, that Form 5500 disclosures "are merely a tool to report annual financial income to the [Employee Benefit Security Administration]— they do not serve as detailed accounts of retirement plans' recordkeeping services." Dkt. No. 211 at 14; *see also Probst v. Eli Lilly & Co.*, 2023 WL 1782611, at *12 (S.D. Ind. Feb. 3, 2023) (rejecting reliance on "Form 5500s as the source for the comparator plan information"). In other words, Form 5500s do not show the types or levels of services that plans elect from their recordkeepers. Indeed, comparator plans often receive different combinations of services that "intuitively cost different amounts." *Mateya v. Cook Grp. Inc.*, 2023 WL 4608536, *5 (S.D. Ind June 16, 2023); *Probst*, 2023 WL 1782611, at *11. "[D]ifferences in costs and the differences in services reported among . . . comparable plans suggest that even minor variations in services impact per participant recordkeeping fees." *Sigetich v. Kroger Co.*, 2023 WL 2431667, at *9 (S.D. Ohio Mar. 9, 2023). This level of detail is simply not reflected in a Form 5500 filing. Additionally, some plans receive "services other than recordkeeping" but lump all services into one sum so that the fee per participant is not "an accurate representation of what the comparator plan paid for recordkeeping." *Probst*, 2023 WL 1782611, at *12. Thus, courts frequently reject plaintiffs' reliance on Form 5500s without additional analysis of the specific services comparators provided. *See*, *e.g.*, *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 (S.D.N.Y 2023); *Laabs v. Faith Techs., Inc.*, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022); *Mateya*, 2023 WL 4608536, at *3; *England v. DENSO Int'l Am., Inc.*, 2023 WL 4851878, at *4 (E.D. Mich. July 28, 2023).

*Second*, the particular Form 5500s Plaintiffs rely on here are emblematic of this problem: they do not provide information detailing the specific services provided, and Plaintiffs did not otherwise seek such information in discovery. *E.g.*, Dkt. 185-8, 185-14, 185-20. Plaintiffs admit Fidelity provided the Plan many services besides recordkeeping. Ex. 5 at ¶ 24. But without discovery from the alleged comparator plans

or their recordkeepers, Plaintiffs cannot show the specific services these plans received, the quality of such services, the compensation structure for their recordkeepers, or how the individuals preparing the forms calculated direct compensation generally and recordkeeping fees specifically. Absent this information, Plaintiffs cannot raise a dispute of material fact as to whether the comparator plans are fair comparators to AT&T's Plan. Nor can they create a dispute of material fact as to the reasonableness of AT&T's fees without any evidence of what supposed comparator plan fees cover.

Plaintiffs also failed to offer an expert who could have opined on "how recordkeeping expenses are generally evaluated or reported as an industry practice," Dkt. No. 211 at 26, or on appropriate fees based on more than four cherry-picked Form 5500s that provide no information about the specific services being provided. So, for example, the Plan's report of $61 in total direct per-participant payments to Fidelity on average includes fees for three separate services other than recordkeeping fees (participant loan processing, account maintenance fees, and securities brokerage commission and fees, Ex. 9 at 27; Ex. 29 at ATT0000148). Plaintiffs point to other plans that reported $35 in total direct per-participant payments to their administrative service providers but offer no evidence regarding what services are covered by that $35 number. The "obvious alternative explanation" to Plaintiffs' allegations that AT&T overpaid for fees is that the Plan "and its comparators paid different amounts because they purchased different services." *See Mateya*, 2023 WL 4608536, *5. This is demonstrated by the Plan's Form 5500 filings, which list applicable service codes to indicate the sources of direct compensation. Ex. 9 at 27. For example, code 71, which appears on AT&T's Plan' filings, is for "Securities brokerage commission and fees." Ex. 29 at ATT00001480. Under applicable ERISA regulations, brokerage services and recordkeeping services are distinct. *See* 29 C.F.R. § 2550.408b-2(c)(1)(iii)(B) (referencing "recordkeeping or brokerage services" as two distinct categories of services); *see also* § 2550.408b-2(c)(1)(viii)(D) (defining "[r]ecordkeeping services" as

including "designated investment alternatives"), and § 2550.408b-2(c)(1)(viii)(C) (clarifying that "[t]he term 'designated investment alternative' shall not include brokerage windows, self-directed brokerage accounts, or similar plan arrangements"). But Plaintiffs' approach groups these distinct fees into "recordkeeping" even though they are excluded from § 2550.408b-2's definition of "recordkeeping services." *Id.* § 2550.408b-2(c)(1)(viii)(D). Thus, the average per-participant fee based on all direct compensation that Plaintiffs rely on is not "an accurate representation of what the [Plan] paid for recordkeeping." *Probst*, 2023 WL 1782611, at *11. Worse yet, code 71 appears on *none* of Plaintiffs' comparator plans. *E.g.*, Dkt. 185-8, 185-14, 185-20; *see also* Dkt. No. 195-2 at 4–8. So Plaintiffs' comparators are on their face distinguishable.

In short, Plaintiffs' proposed approach would result in liability any time a party can find a plan that allegedly paid a service provider less on a per-participant basis, whatever the bundle of services. That is not the law. To the contrary, Plaintiffs "must provide a sound basis for comparison." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018); *see also White v. Chevron Corp.*, 2017 WL 2352137 (N.D. Cal. May 31, 2017). Plaintiffs have none, which is fatal to their claim.

*Third*, even if Plaintiffs had shown that the other plans were valid comparators based on their Form 5500s—and they have not—Plaintiffs' "evidence" would still fail. Many of Plaintiffs' cherry-picked comparator plans paid the same as or *more* than the Plan during the class period. For instance, Plaintiffs allege that the Costco 401(k) Plan paid its recordkeeper $29 per participant in 2015 (the same as the Plan), $38 per participant in 2016 ($9 more), and $35 per participant in 2017 ($6 more). TAC ¶ 62; JAF 15, 19. Similarly, Plaintiffs allege that the FedEx Corporation Retirement Savings Plan and the HCA 401(k) Plan paid their recordkeepers between $23 and $30 per participant from 2012 through 2016, but the AT&T Plan never paid more than $30 per participant in that same period. TAC ¶ 62; JAF 14–15, 19.

*Finally*, there are thousands of large 401(k) plans.  That Plaintiffs identify a few plans supposedly paying less in direct compensation is irrelevant.  "Nothing in ERISA requires a fiduciary to scour the market to find and offer the cheapest possible" option, and a fiduciary can consider factors besides price.  *Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013) (cleaned up), *vacated on other grounds*, 575 U.S. 523 (2015); *Hughes*, 595 U.S. at 177.  Plaintiffs have no evidence that a similarly situated fiduciary, advised by an independent consultant that the Plan was paying below-market rates (as Deloitte concluded here), would have obtained still lower rates by taking a different course of action (or what that course of action would be).  They thus cannot satisfy their burden to show loss causation, and this alone is fatal to their fiduciary breach claim.

## II.    Plaintiffs Have No Evidence of a Prohibited Transaction (Count II).

On appeal, the Ninth Circuit concluded that AT&T's amended contract with Fidelity—like all of the ubiquitous agreements with "service providers" that retirement plans must enter to function—falls within the broad reach of so-called "prohibited transactions" that must satisfy one of the statutory exemptions to be permitted. *Bugielski*, 76 F.4th at 909.  Accordingly, the question on remand is whether, as this Court previously found, an exemption to the prohibited-transaction bar applies.  Specifically, ERISA exempts transactions if (1) the contract or arrangement is "reasonable," (2) the services are "necessary for the establishment or operation of the plan," and (3) no more than "reasonable compensation is paid" for the services.  29 U.S.C. § 1108(b)(2)(A). The Ninth Circuit already concluded that element (2) is satisfied, so the only remaining questions are whether the contract was "reasonable" and whether AT&T paid no more than reasonable compensation.  *Bugielski*, 76 F.4th at 909.

## A.    AT&T's Arrangement with Fidelity Was Reasonable.

For the first requirement of the Section 408(b)(2) exemption—reasonableness of the contract—Plaintiffs have previously argued only that Fidelity did not adequately disclose its compensation to AT&T, an argument this Court rejected and the Ninth

1  Circuit did not reach. *See Bugielski*, 76 F. 4th at 909 ("[F]or the contract or arrangement
2  to be 'reasonable,' . . . the party in interest . . . must disclose to the plan's fiduciary
3  detailed information about . . . all direct compensation the party expects to receive, and
4  . . . all indirect compensation the party expects to receive.") (cleaned up).  Specifically,
5  where indirect compensation is involved, a party in interest must disclose (1) "the
6  services for which the indirect compensation will be received," (2) "the payer of the
7  indirect compensation," and (3) "the arrangement between the payer and the party in
8  interest." *Id.* (cleaned up).  In granting AT&T's prior motion for summary judgment,
9  this Court held that "Fidelity's disclosures clearly provide a 'reasonable' description of
10  the indirect and direct compensation that it received from BrokerageLink and Financial
11  Engines." Dkt. 211 at 30.  Nothing has happened to change that conclusion.

12       *First*, Fidelity disclosed to AT&T the services for which it received indirect
13  compensation.   By September 2014 at the latest, Fidelity disclosed to AT&T that
14  Financial Engines paid it for "advisory service" and a "platform fee."  JAF 49.   And
15  Fidelity disclosed changes to its indirect compensation from Financial Engines in its
16  § 408(b)(2) disclosures.  JAF 51.  AT&T also understood that, "back in 2011, there was
17  a BrokerageLink component to the plan," by which "Fidelity would have received
18  certain commissions or revenue share from mutual fund holders or mutual funds offered
19  in the plan." Ex. 1 (Phipps Tr.) 16:11–15.  Fidelity then repeatedly provided AT&T
20  reports of the "investments in BrokerageLink." JAF 31.

21       *Second*, Fidelity disclosed the payer of the indirect compensation from Financial
22  Engines and BrokerageLink.  Specifically, in September 2014, AT&T acknowledged
23  that "FE" (Financial Engines) would pay Fidelity a variety of fees.  JAF 49.  And for
24  BrokerageLink, AT&T understood that Fidelity would receive funds "from mutual fund
25  holders or mutual funds offered in the plan."  Ex. 1 (Phipps Tr.) at 16:11–15.
26  Accordingly, AT&T identified Financial Engines, the mutual fund holders, and the
27  mutual funds as the relevant payers of indirect compensation.

28

*Third*, Fidelity's arrangement with those payers was disclosed.  As noted, AT&T's representatives memorialized in September 2014, that they knew what "Fidelity charges FE" and what "FE charges" for each "plan participant."  JAF 49. Armed with that knowledge, AT&T projected the amounts of money to which Fidelity would be entitled under its arrangement with Financial Engines.  Ex. 53  The only way AT&T could model Fidelity's arrangement with Financial Engines is if it knew about that arrangement in the first place.  Similarly, for BrokerageLink, AT&T understood that Fidelity would receive funds "from mutual fund holders or mutual funds offered in the plan." Ex. 1 (Phipps Tr.) at 16:11–15.  And, to ascertain just how large those funds were, AT&T found the ratio of money that Fidelity would be paid for each transaction by "looking up in the [securities] proxies the associated expense ratio." *Id.* at 18:6–18.

In short, Fidelity plainly disclosed each relevant fact.

## B.    Fidelity's Compensation Was Reasonable.

While the first factor requires "the party in interest to *disclose* information to the fiduciary," the third factor "expects a fiduciary to *consider* this information." *Bugielski*, 76 F.4th at 911 (emphases added).  Here, that means the Court must decide whether "AT&T . . . consider[ed] the compensation Fidelity received from Financial Engines and BrokerageLink when determining whether 'no more than reasonable compensation' was paid for Fidelity's services." *Id.* (cleaned up).

As already shown, AT&T considered the compensation Fidelity would receive from Financial Engines in September 2014. JAF 49; *supra* pp. 20–24.  Likewise, AT&T understood Fidelity's compensation through BrokerageLink "based on [its] various calculations." Ex. 1 (Phipps Tr.) at 57:23–58:9; JAF 32.

Further, AT&T's evidence demonstrates that the rates AT&T paid Fidelity were reasonable.  As explained in Part I.B, *supra*, AT&T specifically negotiated a contract with Fidelity that *guaranteed* that the Plan would receive the best rates for recordkeeping services that Fidelity offered to the market through the "most favored customer" clause.

JAF 9.  And, in fact, the record shows that the Plan's actual recordkeeping fees were equal to—and often much lower than—the rates that Plaintiffs allege would have been reasonable and lower than average for the market.  Deloitte determined that ███████████████████████████████████████████████████████ ███████████████████████████.  JAF 17.  AT&T's rate of $20 is well below this range.  JAF 19.  Even at the highest rate charged during the relevant time ($31), AT&T's rate falls below the average for comparable services and plans.  JAF 14, 17.  Generally, fees that are comparable to the market average for similar services provided to similar plans with a comparable number of participants are reasonable.  *See Cryer v. Franklin Res., Inc.*, 2018 WL 6267856, at *10–11 (N.D. Cal. Nov. 16, 2018); *White*, 2016 WL 4502808, at *14.  Plan fiduciaries have no obligation to choose the lowest-cost recordkeeping services offered.  *Tibble*, 729 F.3d at 1135; *Hughes*, 595 U.S. at 177.

Not only were the Plan's recordkeeping fees less than market rates, but they were also "within the range that Plaintiffs themselves suggest is reasonable."  Dkt. No. 211 at 27; *supra* pp. 27–33.  One of Plaintiffs' own "comparator" plans even paid more than the Plan in 2016 ($9 more) and 2017 ($6 more).  TAC ¶ 62.  In prior briefing, Plaintiffs have incorrectly insisted that an average rate of $61 based on all direct compensation AT&T paid to Fidelity for all services rendered, but they have no evidence to support this approach, which is further undermined because it improperly groups into the category of recordkeeping several fees for services expressly excluded from 20 C.F.R. § 2550.408b-2's definition of "recordkeeping services."  *See supra* pp. 27–33.

At bottom, AT&T paid "no more than reasonable compensation" for Fidelity's services because AT&T thoroughly considered compensation Fidelity received from Financial Engines and BrokerageLink and Plaintiffs again "fail[] to carry their burden of showing a triable issue of fact regarding the reasonableness of Fidelity's compensation from the Plan."  Dkt. 211 at 25.

**PLAINTIFFS' OPPOSITION TO AT&T'S MOTION FOR SUMMARY JUDGMENT**

**I.      In support of their claims of a prudent process, Defendants ignore their failure to evaluate and factor in Fidelity's indirect compensation.**

Defendants claim that this Court previously "concluded that 'no factual dispute exists as to whether [Defendants] breached their duty of prudence in evaluating and monitoring the recordkeeping fees' because AT&T 'engaged in' 'monitoring . . . through periodic reviews and through the hiring of outside experts.' . . . The Ninth Circuit did not disturb that conclusion." *Supra* at 1. This assertion flies in the face of the Ninth Circuit's observation that "AT&T does not even attempt to argue that it considered the compensation Fidelity received from the mutual funds available through BrokerageLink." Op., 76 F.4th at 913. Contrary to Defendants' spin, the record demonstrates that Defendants failed to act prudently and loyally under ERISA.

ERISA Section 406(a)(1)(C) categorically prohibits the two transactions between the Plan and Fidelity at issue in this case unless the Plan's fiduciaries follow certain procedures detailed in the 408(b)(2) exemption, which are designed to ensure that the transaction is necessary and reasonable. As the Supreme Court has instructed, "Section 1106 'supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.''" *Cunningham v. Cornell Univ., 604 U.S. 693, 145 S. Ct. 1020 (2025)* (citing *Harris Trust and Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–242 (2000) (quoting *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U.S. 152, 160 (1993)). In other words, whenever a plan fiduciary exercises discretionary authority, they are obligated by Section 404 of ERISA to act prudently and loyally, and for the exclusive purpose of providing benefits under the Plan. If a claim is made that a fiduciary has violated his general obligations under 404, the first question to ask is what a reasonably prudent fiduciary familiar with such matters would do under the circumstances then prevailing.

When, as here, a fiduciary proposes to engage in a transaction prohibited by ERISA 406(a)(1), ERISA sections 406 and 408 supplement the general fiduciary duties enumerated in ERISA Section 404(a) and specify exactly what a fiduciary must do to satisfy his duties of prudence and loyalty when engaging a party in interest.

In this case, Defendants were prohibited from engaging in the BrokerageLink and Financial Engines transactions unless they satisfied the conditions of the 408(b)(2) Rule requiring them to obtain specific, detailed disclosures from Fidelity regarding Fidelity's services and its compensation from all sources in connection with those services, and to then determine that such compensation was reasonable in relation to the services provided. *See* Plaintiffs' Motion for Summary Judgment on Plaintiffs' Prohibited Transaction Claims, *infra* at 46-55. Defendants' failure to (i) obtain and evaluate the required disclosures from Fidelity, and (ii) determine whether Fidelity's compensation was reasonable, is imprudent and/or disloyal as a matter of law. Moreover, it is the Defendants' burden to prove that they have satisfied all the conditions of that exemption. *See Cunningham*, 604 U.S. at 702("Understood as affirmative defenses, the §1108 exemptions must be pleaded and proved by the defendant who seeks to benefit from them."). Defendants have failed to carry their burden. And, having failed to demonstrate their compliance with the requirements of Section 408(b)(2) in the first instance, Defendants cannot shift the burden to Plaintiffs to demonstrate what other ostensibly prudent fiduciaries would have done under the circumstances.

## II.    Defendants have failed to produce evidence that Defendants prudently evaluated Fidelity's indirect compensation

As shown in Plaintiffs' Motion for Summary Judgment on Plaintiffs' Prohibited Transaction Claims, Defendants have presented no documentary evidence that:

     i.    they received any disclosures of Fidelity's revenue sharing compensation from BrokerageLink prior to April 12, 2018;

    ii.    they ever received disclosures from Fidelity regarding the amount of

1    Fidelity's revenue sharing compensation from BrokerageLink[4];

iii.    they ever calculated the amount of Fidelity's indirect compensation from BrokerageLink based on Fidelity's disclosures; or

iv.    they ever leveraged Fidelity's compensation from BrokerageLink to reduce the Plan's recordkeeping fees.

Nor have Defendants offered any evidence to support the assertion that they leveraged Fidelity's indirect compensation from BrokerageLink to lower recordkeeping fees. Indeed, they could not do so because they did not know the amount of Fidelity's compensation.

Defendants' argument relies heavily on the fact that they "hired an independent consultant to verify the reasonableness of its recordkeeping fees, and that the independent consultant concluded ▮▮▮▮▮▮▮▮▮▮▮▮▮." *Supra* at 2. An examination of those reports demonstrates that the fees referred to as being ▮▮▮▮▮▮ were the Fidelity Universal Basic Fees—the flat per-participant fees charged to each participant's account annually—$29 per participant in 2016. *Supra* at 18. For purposes of this Motion, Plaintiffs assume *arguendo* that the Fidelity Universal Basic Fee was the amount the Plan was directly charged for recordkeeping services, that Defendants and their consultants considered ▮▮▮▮▮▮▮▮▮▮▮, and that this fee was a result of an arm's-length negotiation. However, indulging Defendants with such assumptions still does not excuse their failures to consider Fidelity's indirect compensation from BrokerageLink and Financial Engines.

First, the consultant reports Defendants rely upon do not evaluate Fidelity's indirect compensation from BrokerageLink or Financial Engines. *See* Exs. 41, 42, 46 and 47. In fact, Fidelity's substantial indirect compensation from those two sources is

---

[4] Phipps testified as much: "Q. But yet you also testified that you asked Fidelity about how much they were receiving and you never got a complete answer on that. . . . [I]s that correct? THE WITNESS: Yes." Ex. 1 (Phipps Tr.) at 31:17–23.

not even mentioned in any of Deloitte's reports or fee evaluations. The October 4, 2016 evaluation, Ex. 47, includes ██████████████████████████████, but none suggest leveraging Fidelity's indirect compensation to lower recordkeeping fees. The report's observation that "██ ████████████████████████████████████████████████████████████████ ████████████," Ex. 47 at ATT00003344, fails to advance Defendants' position. Likewise, the Deloitte 2013 fee study, Ex. 113 ATT00002328, noted that "[s]ome or all of [a plan's] recordkeeping or administrative fees also can be paid through a portion of the asset-based investment expenses (e.g., in the form of 12b-1 fees, shareholder servicing fees or administrative servicing fees), which is often referred to as revenue-sharing." *Id*. at ATT00002336. But there is no evidence that these observations influenced AT&T's fee negotiations with Fidelity. Nor did the scope of Deloitte's "independent consultant" evaluation encompass Fidelity's indirect compensation from Financial Engines and BrokerageLink.

Second, Defendants treated Fidelity's indirect compensation from Financial Engines with the same lack of care, prudence and diligence exhibited in their evaluation of indirect compensation from BrokerageLink. Defendants have not produced any documentary evidence to support John Phipps' bare *ipse dixit* that AT&T leveraged Fidelity's indirect compensation from Financial Engines to obtain a reduction in recordkeeping fees. To the contrary, the documentary evidence Defendants have produced is consistent with the testimony of Julianne Galloway, Defendants' 30(b)(6) witness when questioned about the reasonableness of Fidelity's indirect compensation from Financial Engines:

> That agreement is between Fidelity and Financial Engines and is part of their negotiations. We contract separately and independently with Fidelity and with Financial Engines. Q. So does that mean that you really didn't make an inquiry about whether that fee was a reasonable fee? A. I did not see documentation as to that effect. Ex. 3 (Galloway Tr.) at 51:2-14.

In fact, Phipps contradicted his own testimony on the subject: "What Financial Engines and Fidelity worked out for fees, was between them . . . ." "[W]e typically did not evaluate the fees that our vendors would pay to third parties." Ex. 1 (Phipps Tr.) 46:6-8; 46:24-47:7.

That testimony is completely in line with Defendants' principal argument before the Ninth Circuit that there was no evidentiary basis that a prudent fiduciary would consider the payments that Fidelity received from Financial Engines or from its own BrokerageLink product to reduce recordkeeping payments.

Gary Hanson's testimony on this subject is also illuminating:

Q. Now, I also see that this email [Ex. 53] is dated September 17th, 2014. Is that about the time that you first learned of the fee-sharing arrangement with Fidelity?

A. Well, I -- I knew that there was some type of relationship. I knew there was some type of relationship earlier in the RFP process. But I think -- I think, maybe, the week before, you know, when you go down in that email -- I can't remember the date it said -- I think that's when I -- I think Bob Mills [Fidelity] may have called me like a day or two before, and that's when I actually learned of what the arrangement actually was."

Q. So once you chose -- or once AT&T decided to select Financial Engines, is it true that it turned out that Fidelity was going to receive a fee of 22 1/2 basis points compared to 25 basis points it would have received if it had been selected to provide the services?

A. Correct.

Q. Did that surprise you?

A. Did it -- are you asking if it surprised me that -- can you repeat the question?

Q. Yes. **Did it surprise you that Fidelity, which was not providing managed account services, and the Financial Engines program, was going to receive a fee that was virtually identical to the fee it would receive if it were providing managed account services?**

A. **Yeah. You know, I was -- I was surprised when I actually learned what the numbers were.** I was -- I was -- I was surprised what the numbers actually were. You know, it is a significant piece of what, you know, Financial Engines was going to receive, you know. And I guess it -- **it was surprising to me that**

**Fidelity, they were going to get about the same amount of money probably regardless**.

Q.· Do you recall having any discussions with Mr. Phipps, for example, or anyone else regarding Fidelity's fee from Financial Engines?

A.· Yeah.·I mean, I'm -- I'm certain John and I talked about it.·You know, I – I think we talked about this -- you know, I'm certain we talked about this with my RFP project team. You know, we were all aware of -- of the arrangement.

Ex. 2 (Hanson Tr.) 32:15-33:5; 33:14-34:25 (emphasis added).

To summarize, two days before Hanson sent Phipps his financial model showing the extraordinary fee split between Financial Engines and Fidelity, Hanson first learned that Fidelity would receive more than half of the total fee paid to Financial Engines. Hanson was surprised by that arrangement and so presented his model to Phipps. Considering the timing of the disclosure, it is reasonable to assume that the first time Hanson informed Phipps of the financial arrangement was the morning of Sept. 17. Within four and a half hours of Hanson's 4:22 p.m. email, Phipps responded "Thanks Gary. I am good with this." Ex. 53 at 1.

More importantly, AT&T failed to demand that Fidelity provide information to justify the surprising share of the total fee, as shown in Hanson's testimony:

Q.· **Do you recall any discussions with Fidelity about the amount of the fee and what services were being provided in order to receive that fee?** A.· **No.**·You know, Bob alerted me to this, and it was apparent to me that this relationship between Financial Engines and Fidelity was, you know, broader than our AT&T relationship; and, you know, I got the sense that, you know, had been going -- **that they had this relationship -- it was a longstanding relationship. And that was the limitation of our conversation about it.**

Ex. 2, 35:1-13. (emphasis added).

All of that is completely consistent with Defendants' failure to produce any evidence they made any effort to evaluate the services Fidelity was providing in connection with Financial Engines or the reasonableness of that compensation, even after learning that Fidelity's projected share of the fees for simply providing Financial

Engines with electronic access to participants' accounts, would be $5.5 million, equal to 75% of Fidelity's total charges for recordkeeping.[5]

### III. Defendants have failed to rebut the substantial evidence that they failed to prudently and diligently evaluate Fidelity's indirect compensation

The claim that AT&T "leveraged" Fidelity's revenue sharing compensation from BrokerageLink is belied by the 2011 restatement of the Administrative Services Agreement with Fidelity, Ex. 16. Part I of Appendix B, Prices, *Id*. at ATT00002992, provides that the AT&T plans would receive a credit against recordkeeping fees for revenue sharing Fidelity receives from specified Fidelity funds. But in the same provision, AT&T expressly disclaims any right to receive credits for Fidelity's revenue sharing from any funds acquired through BrokerageLink.  An identical provision was included in the 2018 restatement of the ASA. Ex. 19 at ATT00006709. It is simply not credible that AT&T negotiated fee reductions based on revenue sharing compensation they had expressly agreed would not apply.

The claim that Defendants ever calculated Fidelity's revenue sharing compensation from BrokerageLink is equally preposterous. Defendants' Memorandum, *supra* at 25 shows a screenshot of a line entry from Ex. 45 listing the Plan's holdings in a Fidelity money market fund and the fund's expense ratio. "AT&T would multiply the market value of the shares invested through BrokerageLink by the expense ratio to get the fee paid to Fidelity through BrokerageLink." *Supra*. at 24. This statement is false. Multiplying the expense ratio times the dollar value of the Plan's investment in that fund shows the total amount ***the fund*** charges participants for investment ***in that fund***, not how much Fidelity Workplace Services receives as revenue sharing from the fund.

Defendants    acknowledge    that    "Fidelity    did    not    specifically    disclose

---

[5] The total cost of recordkeeping, the Universal Basic Fee, first reported as a separate fee in 2017, was $7.25 million. Ex. 30 at 6.

BrokerageLink as 'Indirect Compensation' on its 408b-2 disclosures," which is precisely the place the 408(b)(2) Rule requires such disclosure to be made. Nor did Defendants disclose whatever information about Fidelity's indirect compensation they may have learned "from other sources," *supra* at 26, on the Plan's 5500; at least not until it was first disclosed on the Plan's 5500 for the 2022 Plan year, filed in October 2023, years after this action was filed.[6] They rely on the testimony of John Phipps that "Fidelity provided AT&T reports of 'the investments in BrokerageLink,' which listed 'the mutual funds and the dollar values' of money invested through BrokerageLink into those funds." Supra at 24. No document supports that testimony. The only document produced in discovery that reports the expense ratios of any funds is Ex. 45—created February 2, 2019 and the very one they claim was used to calculate Fidelity's compensation from BrokerageLink—lists the expense ratios for only twenty-two of the more than two thousand mutual funds listed on the spreadsheet.[7] The overwhelming weight of the evidence shows that Defendants never obtained required disclosures from Fidelity that would allow them to calculate and evaluate Fidelity's compensation from BrokerageLink, and didn't even learn the amount of Fidelity's indirect compensation until days (in the case of Gary Hanson) or hours (in the case of John Phipps) before finalizing the Financial Engines transaction, thereby failing to satisfy the most fundamental conditions of the 408(b)(2) exemption, and breaching their duties of

---

[6] Defendants' disclosure of the revenue sharing percentages for each mutual fund held through BrokerageLink on the Plan's 2022 and 2023 5500s is tantamount to an admission that such disclosures are and were required, as expressly recognized by Defendants' own independent consultant, Deloitte: "Full Disclosure. Although fee disclosure regulations were finalized in the past year, the 2011 survey did not indicate an overwhelming prevalence of full disclosure. While 66% of plan sponsors stated that their provider fully discloses revenue-sharing agreements and investment offsets, 15% of respondents said their recordkeeper does not disclose any revenue-sharing arrangements.." Ex. 41 at 25. Failure to disclose the indirect compensation Defendants claim they knew of and had calculated supports a finding of concealment that could have a material effect on the statute of limitations under ERISA §413.

[7] The only other spreadsheets produced, Ex. 100 ATT00027834, Ex. 102 ATT00027836, and Ex. 101 ATT00027835, created April 12, 2018, Ex. 103 , April 8, 2019 Ex. 104 , and March 13, 2020 Ex. 105  respectively, provide the revenue sharing percentages but not the value of the funds held through BrokerageLink.

1    prudence and loyalty.[8]

2    **Defendants' Legal Arguments and Assumptions Ignore the Law**

3        Remarkably, Defendants argue that it doesn't matter that Fidelity was "ripping

4 off" Financial Engines because AT&T was only required "to consider the

5 reasonableness of indirect compensation *for the Plan*—not *for the payee* (*i.e.*, Financial

6 Engines)." This argument is absurd. First, the indirect compensation Defendants were

7 supposed to evaluate was the indirect compensation Fidelity was receiving *from*

8 Financial Engines. Financial Engines was not receiving indirect compensation; it was

9 paying indirect compensation; charging participants 35 basis points and paying Fidelity

10 22.5 basis points. Therefore, participants were indirectly paying Fidelity 22.5 basis

11 points. Defendants' argument assumes that the amount Fidelity was charging Financial

12 Engines had no effect on the amount Financial Engines charged participants. But the

13 whole point of the 408(b)(2) Rule is to require fiduciaries to evaluate the indirect

14 compensation Fidelity, the party in interest, was receiving and ensuring that, through

15 disclosure and negotiation, the Plan was not paying Fidelity more than reasonable

16 compensation in relation to the services it was providing the Plan.

17        Defendants further argue that it doesn't matter if they failed to evaluate Fidelity's

18 indirect compensation because, even taking into account Fidelity's indirect

19 compensation, the fees paid by the Plan for recordkeeping were still within the **range** of

20 fees being paid by other unidentified plans, according to Deloitte, their expert consultant

21 who also completely ignored Fidelity's indirect compensation. The real question is

22 whether Defendants' failure to perform their obligations imposed by the 408(b)(2) Rule

23 caused the Plan to pay more in fees that it would have had Defendants satisfied their

24 fiduciary obligation. The answer must be "yes." After all, the entire premise and

---

[8] Testimony from Phipps that AT&T "recognized that BrokerageLink was valuable to Fidelity", *supra* at 9 and from Hanson that the "relationship between Financial Engines and Fidelity was . . . broader than our AT&T relationship", *supra* at 18 indicates a greater interest in preserving those relationships than in serving participants with undivided loyalty.

assumption of the 408(b)(2) Rule is that fiduciaries who properly evaluate previously undisclosed and unknown indirect compensation will be able to negotiate lower fees, and the failure to do so is an actionable fiduciary breach. "This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (citing *Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984) and *McMerty v. Herzog*, 710 F.2d 429, 431 (8th Cir. 1983). "Any doubt or ambiguity should be resolved against the breaching fiduciaries." *Tibble v. Edison Int'l*, 2017 WL 3523737, at *13 (C.D. Cal. Aug. 16, 2017).

Defendants' Motion should be denied.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS

### I.    Burden of Proof

"Section 1106(a)(1)(C)'s bar is categorical" *Cunningham at* 1027, "except as provided in section 1108 of this title". Section 1108(b)(2) and its implementing regulation, the 408(b)(2) Rule, exempts transactions prohibited by 1106(a)(1)(C) provided certain conditions are met. The Supreme Court has now made it clear that the exemptions available under section 1108 are affirmative defenses that must be pleaded and proved by the party claiming the benefit of the exemption:

> Like the exemptions at issue in *Meacham*, the §1108 exemptions are "writ[ten] in the orthodox format of an affirmative defense." *Id.*, at 102, 128 S. Ct. 2395, 171 L. Ed. 2d 283. Understood as affirmative defenses, the §1108 exemptions must be pleaded and proved by the defendant who seeks to benefit from them. See *Taylor* v. *Sturgell*, 553 U. S. 880, 907, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008) ("Ordinarily, it is incumbent on the defendant to plead and prove [an affirmative] defense"). A plaintiff need only allege the three elements within §1106(a)(1)(C), notwithstanding the potential applicability of a §1108 exemption, because an "affirmative defense" is "not something the plaintiff must anticipate and negate in her pleading." *Perry* v. *Merit Sys. Prot. Bd.*, 582 U. S. 420, 435, 137 S. Ct. 1975, 198 L. Ed. 2d 527, n. 9 (2017).

*Cunningham*, 145 S. Ct. at 1028. Accordingly, Defendants must prove that they have satisfied each of the conditions specified in the 408(b)(2) Rule, and "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

AT&T Services is the Plan Administrator of the ARSP, and it delegates much authority to the BPIC. JAF ¶ 5, 8. The delegation from AT&T Services grants the BPIC "all power and authority that may be necessary or appropriate to the establishment, qualification, administration and operation of each of the trusts . . . ." (JAF ¶ 8). The BPIC or its delegates may "choose[] the Plan's investment funds, investment managers and Trustees and is responsible for certain other related functions." *Id*. Accordingly, Defendants AT&T Services and the BPIC were Plan fiduciaries responsible for retaining Fidelity and negotiating its compensation.

## II.    Legal Background

Congress enacted ERISA to "protect employees against mismanagement of their benefit plans." *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1206 (10th Cir. 2019). This includes "impos[ing] fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive," <u>id.</u>, requiring fiduciaries to discharge their duties prudently, *see* 29 U.S.C. § 1104, and preventing fiduciaries from engaging in transactions that could be detrimental to plan participants. *Id.* § 1106(a).

In 2012, in response to public outcries over hidden fees that plagued 401(k) plans, the U.S. Department of Labor ("DOL") established fee disclosure requirements designed to ensure greater transparency. These requirements, which are codified in 29 C.F.R. § 2550.408b-2, require plan fiduciaries to collect information from plan service providers so that fiduciaries can make informed decisions about service provider compensation.[9]

---

[9] "[P]lan fiduciaries have a duty to consider a service provider's compensation from all sources." *Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure*, Preamble at 75 Fed. Reg. 41618. The Regulations followed Governmental Accounting Office reports about hidden fees in 401(k) plans. *See, Fulfilling Fiduciary*

Prior to promulgation of the 408(b)(2) Rule, service providers were not obligated to furnish fee information, and plan sponsors were unaware of "indirect" compensation that providers received through the plan's investments. That changed in 2012 when the 408(b)(2) Rule required all covered service providers to disclose both direct and indirect compensation earned from plans. 29 C.F.R 2550.408b-2(c)(1)(iii). The 408(b)(2) Rule provides an exemption from ERISA's Prohibited Transaction rules, contained in ERISA Section 406(a), which bar ERISA fiduciaries from entering into certain transactions with parties in interest, including any plan service provider. 29 U.S.C. § 1106(a). Under Section 406(a)(1)(C), a plan fiduciary cannot allow a plan to engage in a transaction with a plan service provider unless the transaction is subject to an exemption. One such exemption applies when the otherwise prohibited transaction involves "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor . . . ." ERISA section 408(b)(2), 29 U.S.C. § 1108(b)(2). That statutory exemption is supplemented by federal regulation prescribing specific disclosures a plan fiduciary must receive from the service provider and determinations the fiduciary must make in order to satisfy the conditions of the exemption. "No contract or arrangement for services between a covered plan and a covered service provider, nor any extension or renewal, is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this section unless the requirements of this paragraph (c)(1) are satisfied." 29 C.F.R. § 2550.408b-2(1).

The 408(b)(2) Rule provides that a service arrangement will not qualify as a "reasonable arrangement" if the service provider does not deliver its fee disclosures to a "responsible plan fiduciary." 29 C.F.R. § 2550.408b-2(1)(iv). A failure to make this disclosure means the arrangement is *per se* unreasonable, and voids the prohibited transaction exemption, subjecting the plan fiduciary to liability. Specifically, the

---

*Obligations Can Present Challenges for 401(k) Plan Sponsors* (GAO July 2008), http://www.gao.gov/assets/280/278247.pdf.

408(b)(2) Rule requires that the fee disclosure provided by a service provider include a description of all direct *and all indirect compensation, including the identity of the payer of the indirect compensation* and *a description of any compensation paid among related parties* (which include any affiliate or sub-contractor of the service provider). 29 § 2550.408b-2(c)(1)(iv). Thus, the 408(b)(2) Regulations place a heavy burden on plan fiduciaries. Failure to obtain required disclosure renders an arrangement with a provider a prohibited transaction.

Defendants, as "responsible plan fiduciaries" (29 C.F.R. § 408b-2(c), were legally obligated, to obtain detailed disclosures regarding all services Fidelity was providing to the Plan and all direct and indirect compensation Fidelity expected to receive in connection with those services, and to determine that the compensation Fidelity would receive was reasonable in relation to the services being provided.

Additionally, every qualified retirement plan with 100 or more participants is required to file with the DOL an Annual Return on Form 5500 detailing financial information about the plan. Among other required reporting, the Form 5500 must identify every service provider who received more than $5,000 in compensation for the reporting year and the amount of all direct and indirect compensation received.[10]

### III. Defendants failed to evaluate Fidelity's Indirect Compensation in relation to both the BrokerageLink transaction and the Financial Engines transaction.

The mandate of the 408(b)(2) Rule is clear—the responsible plan fiduciary must obtain disclosure of all services being provided and all direct and indirect compensation the service provider expects to receive in connection with those services. It is impossible to evaluate whether a service provider's compensation is reasonable in relation to the services provided without that information.

Plaintiffs' prohibited transaction claims focus on Defendants' failure to obtain

---

[10] 29 U.S.C. § 1023; 29 C.F.R 2520.103.

complete disclosure of the nature of the services Fidelity was providing and the indirect compensation being paid to Fidelity, which should have included:

> A description of all indirect compensation … that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described pursuant to paragraph (c)(1)(iv)(A) of this section; including identification of the services for which the indirect compensation will be received, identification of the payer of the indirect compensation, and a description of the arrangement between the payer and the covered service provider, an affiliate, or a subcontractor, as applicable, pursuant to which such indirect compensation is paid.

29 F.R. § 2550.408b-2(c)(1)(iv)(C)(2). The fiduciary must then decide that the compensation is reasonable in relation to the services being provided.

## IV.    Defendants' Misconduct satisfies all the elements of a violation of ERISA §406(a)(1)(C)

"Section 1106(a)(1)(C) contains three elements. It prohibits fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities" (3) "between the plan and a party in interest." Section 1106(a)(1)(C)'s bar is categorical: Any transaction that satisfies its three elements is presumptively unlawful." *Cunningham*, 145 S. Ct. at 1027.

It is undisputed that Defendant AT&T Services, Inc. caused the Plan to engage in the two transactions at issue here. AT&T Services, Inc., is the counterparty to the 2011 Administrative Services Agreement ("2011 ASA"). Ex. 16, which included the availability of self-directed brokerage accounts through BrokerageLink. *Id.* at ATT00002982. The amendment to the 2011 ASA simultaneously provided for recordkeeping offsets (credits) for Plan investments in certain Fidelity investment products but expressly denied the Plan any recordkeeping offsets for revenue sharing compensation Fidelity received through BrokerageLink. *Id.* at ATT00002992 (Appendix B, Annual Recordkeeping Fee). Likewise, AT&T Servies, Inc. is the counter-

party and signatory to the agreement with Financial Engines for the provision of managed account services and the related amendment to the Administrative Services Agreement with Fidelity.

## V.    Defendants knew or should have known that they were obligated to obtain complete disclosures from Fidelity

"The transactions covered by Section 406(a)(1) 'are per se violations of ERISA regardless of the motivation which initiated the transaction, the prudence of the transaction, or the absence of any harm arising from the transaction." *Reich v. Polera Bldg Corp.*, 1996 U.S. Dist. LEXIS 1365, *2 (S.D.N.Y. Feb. 15, 1996).

If the requirements of 29 C.F.R. 2550.408b-2(c) are not met, the responsible plan fiduciary's decision to enter into a contract with a service provider to provide services to the plan constitutes a non-exempt prohibited transaction, in violation of 29 U.S.C. § 1106, unless the responsible plan fiduciary can establish that:

> The responsible plan fiduciary did not know that the covered service provider failed or would fail to make disclosures and reasonably believed that the covered service provider disclosed the information required by paragraph (c)(1)(iv) or (vi) of this section.
> The responsible plan fiduciary, upon discovering that the covered service provider failed to disclose the required information, requests in writing that the covered service provider furnish such information; and
> If the covered service provider fails to comply with such written request within 90 days of the request, then the responsible plan fiduciary notifies the Department of Labor of the covered service provider's failure, in accordance with paragraph (c)(1)(ix)(E) of this section.

29 C.F.R. 2550.408b-2(c)(1)(ix). There was no evidence produced by Defendants in this case of any such written request by any Plan fiduciary.

The Supreme Court has made it clear that all that must be shown is that the fiduciary knew the facts of the transaction; that is, in this case, that the fiduciary engaged a party in interest to provide services directly or indirectly to the Plan.

> Those circumstances, in turn, involve a showing that the *plan fiduciary*, with actual or constructive knowledge of the facts satisfying the elements of a §

406(a) transaction, caused the plan to engage in the transaction. *Lockheed Corp.* v. *Spink,* 517 U.S. 882, 888-889, 135 L. Ed. 2d 153, 116 S. Ct. 1783.

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241, (2000).

The fiduciary needs to know the facts underlying the transaction that bring it within the purview of § 406(a). But nothing in *Harris* requires the fiduciary transferor or the non-fiduciary transferee to have knowledge of the law, i.e., knowledge that the transaction violated ERISA. *See Neil v. Zell*, 753 F. Supp. 2d 724, 731 (N.D. Ill. 2010) (interpreting *Harris* to mean that fiduciary and non-fiduciary defendants need only have "actual or constructive knowledge of the deal's details").

Other district courts that have considered the matter have agreed that *Harris* does not require the fiduciary transferor to have knowledge that the transaction violated ERISA. *See Teets v. Great-W. Life & Annuity Ins. Co.*, 286 F. Supp. 3d 1192, 1208–09 (D. Colo. 2017) ("As to a plan fiduciary, 'facts satisfying the elements of a 29 U.S.C. § 1106(a) transaction' seems plainly aimed at requiring only a knowledge of basic facts[.]" (brackets omitted)). This approach is consistent with the knowledge requirement as it is expressed in the statute. *See* 29 U.S.C. § 1106(a)(1)(C) ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest," ).

**VI.   Considering Defendants' failure to satisfy the conditions of the 408(b)(2) exemption, the Plan's Loss should be measured by the entirety of Fidelity's indirect compensation**

As the Supreme Court has reiterated: "Section 1106 "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan." *Cunningham*, 145 S. Ct. at 1025. In other words, engaging in a prohibited transaction is a specific form of fiduciary breach. Therefore, pursuant to ERISA §409(a), the breaching fiduciary "shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . ." 29 U.S.C. § 1109(a). The question remains what remedies are available.

Section 4975 of the Internal Revenue Code of 1986, as amended, (the "Code"), 26 U.S.C. §4975 parallels the language of Section 406 of ERISA. In addition to describing the transactions that are prohibited and the exemptions to those prohibitions, 4975 imposes excise taxes on the amount involved in the transaction. The tax is 15% of the amount involved in the transaction for each year during the taxable period. If the transaction is not corrected during the taxable period, the tax increases to 100% of the amount involved. Correction means "with respect to a prohibited transaction, undoing the transaction to the extent possible, but in any case, placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards."

Undoing the BrokerageLink and Financial Engines transactions in this case would be a practical impossibility and would put the Plan in a far worse condition. In the absence of recission as the preferred method of correcting a prohibited transaction, the appropriate remedy would be to put the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards.

## VII. Fidelity's BrokerageLink Indirect Compensation

BrokerageLink is Fidelity's trademarked self-directed brokerage program that allows ARSP to purchase mutual funds and other individual securities that are not designated Plan investment alternatives. A self-directed brokerage account has been available to ARSP participants through BrokerageLink at least since the effectiveness of the 2011 ASA. Ex. 16 at ATT00002982.

Fidelity charges transaction-based fees for participants' investments and receives substantial undisclosed indirect compensation from the mutual funds acquired by ARSP participants through BrokerageLink. Exhibit 34. According to two spreadsheets produced by Defendants, Exhibits 100 and 101, and the 2020-2023 Annual Reports, Exhibits 114, 115 and 116, more than 1,500 funds available through BrokerageLink paid "revenue sharing" fees to Fidelity. Analysis of the first disclosure made by Fidelity to AT&T regarding revenue sharing from BrokerageLink, indicates that eight hundred of those funds paid Fidelity 40 basis points; 140 funds paid Fidelity between 35 and 39 basis points; 30 funds paid Fidelity between 20 and 24 basis points; 200 funds paid Fidelity between 15 and 17 basis points; 200 funds paid Fidelity 10 to 12 basis points; and 125 funds paid Fidelity less than 10 basis points. JAF ¶ 141.  Eighty of the listed funds paid Fidelity a flat dollar amount per participant investing in the fund of between $10 and $25 per participant. *Id*.  The average revenue sharing amount for all funds listed on the spreadsheet is 29.41 basis points. The average revenue sharing percentage reported on the 2023 5500 was 29.9 basis points (0.299%).

The Table below summarizes data for total assets invested and the percentage of assets invested in mutual funds through BrokerageLink:

| Year | Total BL Assets | Mutual Fund Assets[11] | Revenue Sharing Compensation |
|------|-----------------|------------------------|------------------------------|
| 2011 | $1,325,858,917.00 | $917,646,000.00 | $2,755,232.12 |
| 2012 | $1,466,964,147.00 | $1,014,659,000.00 | $3,046,513.65 |
| 2013 | $1,809,147,931.00 | $1,234,113,000.00 | $3,705,424.28 |
| 2014 | $1,888,059,000.00 | $1,257,195,000.00 | $3,774,727.99 |
| 2015 | $1,799,725,000.00 | $1,229,124,400.28 | $3,690,446.01 |
| 2016 | $1,879,075,000.00 | $1,283,316,580.29 | $3,853,158.03 |
| 2017 | $2,195,317,000.00 | $1,499,294,442.79 | $4,501,631.56 |
| 2018 | $2,007,335,174.00 | $1,370,912,023.73 | $4,116,163.35 |
| 2019 | $2,373,290,000.00 | $1,620,841,322 | $4,866,576.07 |

[11] The Plan's Annual Reports for 2011-2014 reported separately the amount invested in mutual funds through BrokerageLink, but not the subsequent years. The amounts listed in the table for 2015-2023 are reported as the average of the amounts reported for 2011-2014 as a percentage of the total amount invested through BrokerageLink. There is no data regarding revenue sharing percentages for the 2011-2017 plan years.

| 2020 | $3,187,793,000.00 | $2,177,107,146.56 | $6,444,237.15 |
| 2021 | $3,513,862,000.00 | $2,399,796,370.79 | $7,223,387.08 |
| 2022 | $ 2,361,448,000.00 | $1,612,753,813.38 | $4,918,899.13 |
| 2023 | $ 2,805,189,000.00 | $1,915,807,274.61 | $5,728,263.75 |

## VIII.  Fidelity's Indirect Compensation from Financial Engines

Fidelity offered ARSP participants investment advisory and managed account services pursuant to an agreement between Fidelity and Financial Engines since 2014. JAF ¶¶ 86. Financial Engines initially charged the Plan an asset-based fee for its managed account services that varies based on the value of a participant's account: tiered fees of 35 basis points (0.35%) for accounts under $50,000; 30 basis points (0.30%) for the next $200,000; and 25 basis points (0.25%) for the portion the account that exceeded $250,000. JAF ¶ 110.

According to the ARSP's 5500s, the Plan paid Financial Engines $2,226,000; $4,004,000; $5,636,000, $5,159,000, $10,287,000, $11,815,000, $12,323,000, $7,950,000 and $8,083,000 for 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 respectively. Exhibits 105-118 each at 6. Financial Engines, in turn, paid Fidelity a large portion of the fees it received from the ARSP. JAF ¶¶ 106, 107, 111-116. Financial Engines originally agreed to pay Fidelity an annual asset-based fee of 22.5 basis points (0.225%) of the value of assets it managed. Based on Defendants' projections, Fidelity would receive more than 50 percent of the total fee paid for Financial Engines' managed account services. JAF ¶¶ 106, 107. That fee-sharing was subsequently reduced to "the greater of (i) 45-47% of [Financial Engines'] fees or (ii) 13-16 basis points on . . . the Plan's assets under management (AUM) with Financial Engines.". JAF ¶ 108. Even after the reduction, Fidelity still receiving at least 45-47% of Financial Engines' fees.[12] As of January 1, 2019, Fidelity's split of Financial Engines'

---

[12] Financial Engines reported on its Form ADV filed with the Securities and Exchange Commission that it pays plan platform providers like Fidelity a portion of the fees earned from the retirement plans for doing little more than providing access to an electronic file feed or secured communications link. Ex. 128.

fees had been capped at $975,00, still substantially more than the cost of a service that cost $40,000 to implement and required no ongoing maintenance fees.

The record establishes that neither AT&T Services nor the BIPC performed any analysis to determine what it cost Fidelity, if anything, to provide similar access to Financial Engines and whether the kickbacks Fidelity received from Financial Engines bore a reasonable relationship to such costs. JAF ¶¶ 117-127. Given the modest per participant charge for the suite of recordkeeping services, of which electronic access to Fidelity's portal was just a small part, the only reasonable inference is that it cost a small, perhaps infinitesimal fraction of the millions of dollars that Fidelity received from Financial Engines – millions of dollars that were ultimately paid by the ARSP and its participants. JAF ¶¶ 94-99, 106-110.

## AT&T'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PROHIBITED TRANSACTION CLAIM

After this Court granted AT&T's motion for summary judgment on Plaintiffs' duty-of-prudence and prohibited-transaction claims, the Ninth Circuit remanded for this Court to reevaluate Plaintiffs' claims in light of an altered legal standard, requiring this Court to consider the indirect compensation Fidelity received from BrokerageLink and Financial Engines.  On remand, Plaintiffs move for summary judgment only on their prohibited transaction claim, arguing that AT&T has not satisfied Section 408(b)(2)— an exemption to the prohibited-transactions bar—as a matter of law.

Plaintiffs cannot demonstrate they are entitled to judgment on their prohibited transaction claim because, as set forth in AT&T's separate summary judgment motion, AT&T has conclusively shown that the Section 408(b)(2) exemption applies to its contract with Fidelity.  Plaintiffs do not even try to contest that Section 408(b)(2)'s requirements of reasonable and necessary fees are satisfied; instead, they focus exclusively on the claim that Fidelity was required to provide AT&T with additional disclosures to make the contract itself reasonable.  But Fidelity disclosed to AT&T a

description of the indirect compensation it received from both Financial Engines and BrokerageLink. And this Court *already concluded* that "Fidelity's disclosures clearly provide a 'reasonable' description of the indirect and direct compensation that it received from BrokerageLink and Financial Engines," Dkt. 211 at 30—a holding undisturbed by the Ninth Circuit. There is no basis for the Court to depart from its finding now—and certainly not to conclude that the Court's prior evaluation of the evidence was so erroneous that summary judgment should be entered for Plaintiffs. Accordingly, Plaintiffs' motion for summary judgment should be denied (and AT&T's motion granted).

Even assuming Plaintiffs could establish their prohibited transaction claim warranted summary judgment—which they cannot—they have offered not a shred of evidence of damages, much less evidence sufficient to establish damages as a matter of law. Instead, Plaintiffs urge this Court to adopt the outrageous view that Fidelity's fees were so excessive that they are entitled to damages measured by "the entirety of Fidelity's indirect compensation." *Supra* pp. 52. Not only do Plaintiffs fail to cite any precedent to support such an extreme remedy, they provide no evidence that Fidelity's compensation from BrokerageLink and Financial Engines was unreasonable or resulted in any loss to the Plan. In fact, record evidence shows that the Plan paid far *less* for recordkeeping services than comparable retirement plans, and that AT&T leveraged compensation Fidelity received from BrokerageLink and Financial Engines to *lower* costs for the Plan even further. Under such circumstances, Plaintiffs cannot *survive* summary judgment, much less *obtain* it.

Accordingly, the Court should deny Plaintiffs' motion for summary judgment on their prohibited transaction claim.

**I.      Plaintiffs Cannot Show that They Are Entitled To Judgment—or Even To Proceed to Trial—on Their Prohibited Transaction Claim.**

In this Court's prior summary judgment proceedings, it concluded that AT&T had satisfied the Section 408(b)(2) exemption to the prohibited-transaction bar as a matter of law.  The Ninth Circuit concluded—as this Court previously had—that AT&T's amended contract with Fidelity that incorporated BrokerageLink's and Financial Engines' services—like other "service provider" agreements that are necessary for the operation of retirement plans like AT&T's—falls within the broad reach of ERISA's prohibited transaction provisions, and thus must satisfy one of the statutory exemptions to be permitted.  *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 909 (9th Cir. 2023).  Because this Court's prior ruling that "Fidelity's disclosures clearly provide a 'reasonable' description of the indirect and direct compensation that it received from BrokerageLink and Financial Engines" remains correct, Plaintiffs' motion should be denied.  Dkt. 211 at 30.

Section 408(b)(2) exempts transactions if "(1) the contract or arrangement is 'reasonable,' (2) the services are 'necessary for the establishment or operation of the plan,' and (3) no more than 'reasonable compensation is paid' for the services." *Bugielski*, 76 F.4th at 909 (quoting 29 U.S.C. § 1108(b)(2)(A)).  The Ninth Circuit already concluded, and Plaintiffs do not dispute, that element (2) is satisfied.  *Id.*  And Plaintiffs do not argue now that the third element is not met—that is, Plaintiffs do not dispute that no more than reasonable compensation was paid to Fidelity.  Instead, Plaintiffs rest their motion exclusively on the first element.  For the contract to be reasonable, "the party in interest . . . must disclose to the plan's fiduciary" a "description" of all direct and indirect compensation the party expects to receive and a description of the services to be provided.  *Id.* (citing 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(1)–(2)).  Plaintiffs claim that disclosure was not made.

Where, as here, indirect compensation is involved, the party in interest must disclose (1) "the services for which the indirect compensation will be received," (2) "the payer of the indirect compensation," and (3) "the arrangement between the payer and the party in interest." *Id*. (cleaned up). A "description" of indirect compensation "may be expressed as a monetary amount, formula, percentage of the covered plan's assets or a per capita charge for each participant or beneficiary or, if the compensation or cost cannot reasonably be expressed in such terms, by any other reasonable method." 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B)(3). Although the description of indirect compensation *may* be a "monetary amount," that is not required. *Id*. Formulas, percentages, and "any other reasonable method[s]" suffice. *Id*. At bottom, the description "must contain sufficient information to permit evaluation of the reasonableness of the compensation or cost." *Id*.

Fidelity disclosed to AT&T that it received indirect compensation from Financial Engines and BrokerageLink. This Court already concluded that the contract satisfies the Section 408(b)(2) exemption because "Fidelity's disclosures clearly provide a 'reasonable' description of the indirect and direct compensation that [Fidelity] received from BrokerageLink and Financial Engines." Dkt. 211 at 30. Nothing in the Ninth Circuit's opinion affected this decision, and this Court should reaffirm it.

### A.    Fidelity Disclosed BrokerageLink's Compensation.

Fidelity disclosed to AT&T the indirect compensation it expected to receive from BrokerageLink for the services Fidelity provided to BrokerageLink. AT&T understood that, "back in 2011, there was a BrokerageLink component to the plan," by which "Fidelity would have received certain commissions or revenue share from mutual fund holders or mutual funds offered in the plan." Ex. 1 (Phipps Tr.) 16:11–15; JAF 30–33. Fidelity disclosed in 2012 the "service, fee, and compensation information regarding [the Plan's] BrokerageLink accounts." Ex. 34 at ATT00027829 (Fidelity "receives compensation from the authorized agent/advisor based on either assets held in or

transactions performed in the BrokerageLink account."); *id.* at ATT00027830 (Fidelity "has contracted to receive other compensation in connection with the purchase and/or the ongoing maintenance of positions in certain mutual fund shares in your brokerage account").

Fidelity's disclosures provided a "description" of indirect compensation it received from BrokerageLink and its arrangement with BrokerageLink. As early as 2012—the outset of the Plan's relationship with BrokerageLink—Fidelity sent AT&T the BrokerageLink Commission Schedule and Addendum, which explained in detail how BrokerageLink's fee schedule operates. Ex. 34. Specifically, this document indicated that Fidelity would receive "indirect compensation" as revenue sharing from funds in which participants invested through BrokerageLink. *Id.* at ATT00027829 ("[T]he compensation described in the Addendum is referred to as indirect compensation under the 408(b)(2) regulation."). And it detailed the various types of fees associated with different mutual funds as well as other investment options. *Id.* This is but one example. As Mr. Phipps testified, he received these 408(b)(2) disclosures from Fidelity on numerous occasions. *See* Ex. 1 (Phipps. Tr.) at 16:25–17:1. Fidelity also sent AT&T reports "that showed all the investments that were made through BrokerageLink." *See* Ex. 1 (Phipps. Tr.) at 17:6–10. These fund balancing spreadsheets identified each of the mutual funds in which participants invested through BrokerageLink and the amount of assets invested with those funds. Exs. 37, 45; Ex. 1 (Phipps. Tr.) 17:13–16 (explaining that these reports would include "all of the different funds and the dollar amount of those funds").

AT&T's ability to consider and determine the amount of compensation Fidelity received from BrokerageLink was far from "impossible," as Plaintiffs claim. *See supra* pp. 49. To determine Fidelity's compensation, AT&T found the ratio of money that Fidelity would be paid for each transaction by "looking up in the [securities] proxies the associated expense ratio." Ex. 1 (Phipps Tr.) at 18:6–18. Using the total amounts

invested through BrokerageLink and the expense ratio for each mutual fund, AT&T was then able to "do[ ] the math to determine what the total fees would have been." Ex. 1 (Phipps Tr.) at 17:25–18:18; *id.* at 57:23–58:9. Specifically, AT&T developed and utilized a calculation spreadsheet that multiplied the market value of the shares invested through BrokerageLink by the expense ratio to get the fee paid to Fidelity through BrokerageLink. Ex. 45. Mr. Phipps provided an example of AT&T's calculation spreadsheet showing the indirect compensation Fidelity received through BrokerageLink:

| M | N | O | P | Q | R |
|---|---|---|---|---|---|
| SumOfMKTVAL | Prod ID Desc | ETF Type | | Exp Ratio | Fee |
| $237,231,459 | FIDELITY MUTUAL FUND-MM | | | 0.38% | $901,480 |

*Id.*; Phipps' Decl. at ¶ 8. Thus, AT&T had "sufficient information to permit evaluation of the reasonableness of the compensation or cost." 29 C.F.R. § 2550.408b-2(c)(viii)(B)(3). That AT&T evaluated the reasonableness of Fidelity's compensation from BrokerageLink is underscored by the fact that AT&T was able to use that information to "leverage[ ] the revenue sharing through BrokerageLink to achieve lower fees for recordkeeping." Ex. 1 (Phipps Tr.) at 22:19–23:4, 31:8–15.

Plaintiffs have three counterarguments. None is persuasive. First, Plaintiffs argue that the only evidence AT&T has to support its position post-dates this litigation. *See supra* pp. 15. They point to the alleged metadata from two spreadsheets (Exhibit 45 and Plaintiffs' Exhibit 133), which they say shows the documents were created in 2019 and 2018, respectively. This argument wholly ignores AT&T's evidence from 2012, 2015, and 2017. Exs. 34, 35, 37. This Court previously credited this much earlier evidence, *see* Dkt. 211 at 30, and it should do the same here.

Additionally, "metadata" alone cannot create a genuine dispute of material fact. Courts recognize that "[m]etadata can be misleading." *E.g.*, *Wye Oak Tech., Inc. v. Republic of Iraq*, 2019 WL 4044046, at *10 (D.D.C. Aug. 27, 2019), *vacated and*

*remanded on other grounds*, 24 F.4th 686 (D.C. Cir. 2022); *United States v. Wilkins*, 2016 WL 2616497, at *4 (W.D. Mo. Apr. 8, 2016), *report and recommendation adopted*, 2016 WL 2587278 (W.D. Mo. May 4, 2016); *Williams v. Sprint/United Mgmt. Co*., 230 F.R.D. 640, 646 (D. Kan. 2005) (recognizing metadata can be "inaccurate"). This is particularly true when it comes to "creation dates"—which Plaintiffs rely on here. It is "common" knowledge "that 'creation dates' in metadata may be altered by copying a document or moving it to a new location." *Wilkins*, 2016 WL 2616497, at *4; *Pearson v. U.S. Bank Nat'l Ass'n*, 2014 WL 4163020, at *17 (D. Minn. Aug. 21, 2014). The inaccuracy and misleading nature of metadata is underscored by Plaintiffs' previous representation to this Court that AT&T's Exhibit 45's metadata showed it was created on April 12, 2018. *Compare* Supplemental Declaration of John J. Nestico in Support of Plaintiffs' Motion for Partial Summary Judgment (Dkt. 195-2) at 7–9, *with* Pls. Ex. 140. Plaintiffs offer no explanation for why they now say the metadata shows a creation date of February 26, 2019. *See supra* pp. 15.

Plaintiffs cannot "refute[] this common understanding of how metadata works" because they have no expert testimony. *Pearson*, 2014 WL 4163020, at *17. "Courts routinely conclude that the interpretation and analysis of metadata requires an expert qualified in the field" because it is "beyond the understanding of the average lay person." *Allegis Grp., Inc. v. Bero*, 689 F. Supp. 3d 81, 108 (D. Md. 2023) (citation omitted) (collecting cases), *aff'd*, 2025 WL 2141298 (4th Cir. July 29, 2025); *Pearson*, 2014 WL 4163020, at *17 ("Plaintiff's attorney's opinion testimony about the document's metadata is not competent expert testimony and is inadmissible."). Plaintiffs never proffered an expert to opine on the metadata in this case. But even if Plaintiffs were not required to provide expert testimony, their explanation is insufficient. Plaintiffs offer only a "speculative" "conclusion[] about [the] metadata," which is inadmissible and "does not create a genuine dispute of material fact." *Pearson*, 2014 WL 4163020, at *17.

Second, Plaintiffs contend that the Court should not credit Fidelity's Statement of Services and Compensation—which "include[d] information required . . . under section 408(b)(2)," Ex. 37, Pls. Ex. 130—because they claim that "the indirect compensation from BrokerageLink was simply reported as 'Unknown.'" *See supra* pp. 16. But these two documents explicitly refer to Fidelity's prior disclosures on revenue sharing payments under the heading "Services and Compensation Reported Separately." It says: "If the Plan offers BrokerageLink, you will receive separately a schedule of brokerage commissions and other fees related to that service as well as disclosure related to compensation that Fidelity may receive from the mutual funds available through the service." Ex. 37 at ATT00008827; Pls. Ex. 130 at ATT00001898. And AT&T has shown that it received that commission and fee schedule from Fidelity. Ex. 34. This argument also ignores Mr. Phipps' testimony that AT&T received these types of reports in the past, and that AT&T used the disclosures to determine Fidelity's compensation. Ex. 1 (Phipps Tr.) at 16:22–17:10; *see also* Phipps' Decl. at ¶ 5, 8. Plaintiffs say Mr. Phipps' testimony is "suspect" because the metadata on the spreadsheet he provided says it wasn't created until 2019. But as explained above, a conclusory assertion about metadata cannot create a genuine dispute of material fact, and Plaintiffs fail to articulate any other ground on which to question Mr. Phipps' testimony.

Finally, Plaintiffs distort the testimony of Marty Webb and Julianne Galloway to contend that they "acknowledged the failure to obtain disclosures" regarding BrokerageLink. *See supra* pp. 14. But that is not what either witness said; Plaintiffs' cherry-picked deposition testimony is taken out of context. For one, the cited testimony relates to Financial Engines, not BrokerageLink. Additionally, the testimony relates to the fact that AT&T did not analyze whether Financial Engines' compensation to Fidelity was reasonable *for Fidelity*. AT&T needed to consider only the reasonableness of the indirect compensation for *the Plan*. *Bugielski*, 76 F.4th at 911 (citing Reasonable

Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5634, 5635–36). As explained above, it did so using Fidelity's disclosures.

Ultimately, Plaintiffs complain that Fidelity did not disclose the *amount* of indirect compensation it received from BrokerageLink. *See supra* pp. 15 ("there is no disclosure of the *amount* Fidelity received as revenue sharing for any of the funds" (emphasis added)). But nothing in Section 408(b)(2) requires Fidelity to disclose exact dollar amounts, and Plaintiffs have cited no authority to that effect. There is no genuine dispute that Fidelity disclosed its indirect compensation using a "reasonable method."

### B. Fidelity Disclosed Financial Engines' Compensation.

Fidelity likewise disclosed to AT&T the indirect compensation it expected to receive from Financial Engines for the services Financial Engines provided to Fidelity. AT&T was aware "[d]uring the RFP process"—which took place from 2013 to 2014— that "there was a fee being paid by Financial Engines to Fidelity." Ex. 1 (Phipps Tr.) at 39:21–40:3. By September 2014 at the latest, Fidelity disclosed to AT&T that Financial Engines paid it for "advisory services" and a "platform fee." JAF 49. Bob Mills, Fidelity's Senior Vice President, called Gary Hanson—who was in charge of the investment advisory services RFP process, Ex. 1 (Phipps Tr.) at 37:10–20—in September 2014 to explain the arrangement between Financial Engines and Fidelity, Ex. 2 (Hanson Tr.) at 32:15–33:5. And AT&T's representatives memorialized that month that they knew what "Fidelity charges FE" and what "FE charges" for each "plan participant." JAF 49. Thus, Fidelity disclosed the services for which it received indirect compensation and that Financial Engines was the entity that paid that compensation.

Fidelity's disclosures further provided a "description" of the indirect compensation and the arrangement between the parties by disclosing the formula for which it expected to receive indirect compensation from Financial Engines. Exs. 35, 36. At the time AT&T implemented Financial Engines, it had a 2014 Letter of Direction that described the indirect compensation Fidelity received from Financial Engines for

"services provided by Fidelity." Ex. 18. That letter indicated that "Financial Engines compensates Fidelity for maintaining the links and related services with an annual fee of 22.5 basis points, applied to the assets under management for Professional Management," plus "an annual $1.00 platform fee for each advice eligible plan participant." *Id.* at ATT00001942. AT&T received 408(b)(2) disclosures from Fidelity when Fidelity and Financial Engines changed the formula or the amount of indirect compensation Financial Engines paid Fidelity. These disclosures identified the new fee mechanism and rate, the effective date, and the nature of Fidelity's services. Exs. 35, 36. For example, Fidelity disclosed in a 2015 disclosure that Financial Engines would pay Fidelity based on the following formula instead of the original 22.5 basis points:

> Financial Engines will pay Fidelity an annual Asset-Based Fee equaling the greater of:
>
> > 45% - 47% of the fees assessed for discretionary account services for the plan(s) identified above or
> >
> > 13 - 16 basis points on the above identified plan's assets under management (AUM) with Financial Engines.

Ex. 35. And when that formula changed in 2019, Fidelity provided another disclosure:

> Fidelity previously provided disclosure(s) related to the compensation Fidelity receives from Financial Engines. Effective January 1, 2019, Fidelity and Financial Engines amended their agreement and Fidelity will receive compensation from Financial Engines as described in its entirety below:
>
> • Variable compensation based on the assets held in Financial Engines' Managed Account Program ("AUM") not to exceed amounts calculated as follows:

| Financial Engines AUM per Plan* | Annual Fidelity Compensation (% of AUM) |
|---|---|
| First $500 million | 0.13% (or up to $650,000) |
| Next $500 million | Additional 0.065% (or up to $325,000) |
| Greater than $1 billion | No additional amounts above the $975,000 calculated immediately above |

Ex. 36.

Plaintiffs do not argue that, given these disclosures, AT&T lacked "sufficient information to permit evaluation of the reasonableness of the compensation or cost." 29

C.F.R. § 2550.408b-2(c)(viii)(B)(3).  Nor can they.  Armed with Fidelity's disclosures, AT&T projected the amounts of money to which Fidelity would be entitled under its arrangement with Financial Engines.  Ex. 53.  AT&T then used that information when negotiating the Financial Engines agreement and when renegotiating the Fidelity recordkeeping agreement.  Ex. 53; JAF 50; Ex. 1 (Phipps Tr.) at 56:2–57:4.  Indeed, Mr. Phipps testified that he considered Fidelity's compensation from Financial Engines during fee negotiations and credited the "very sizeable reduction in recordkeeping fees" that AT&T negotiated in 2018—an "incredible reduction" from $29 to $20 per participant—to that negotiating strategy.  Ex. 1 (Phipps Tr.) at 56:2–57:4.  The only way AT&T could model Fidelity's arrangement with Financial Engines and use it to lower recordkeeping fees is if it had "sufficient information" about that arrangement in the first place.

Plaintiffs concede that AT&T was "well-aware of the fee split between Financial Engines and Fidelity" and admit that Mr. Hanson performed an analysis of the fee arrangement proposed by Financial Engines.  *Supra* pp. 16, 17.  Plaintiffs are thus forced to quibble with *how long* Mr. Phipps analyzed the email Mr. Hanson sent.  Plaintiffs argue that "it is unlikely that Mr. Phipps would have made any reasonable inquiry into the questions any prudent fiduciary would have asked to ensure that he satisfied the conditions of the 408(b)(2) exemption."  *Supra* pp. 17.  But Plaintiffs do not say what those questions are or how much longer Mr. Phipps needed to study Mr. Hanson's analysis.  And they do not identify *anything* that a reasonably prudent fiduciary would have done but that Mr. Phipps failed to do.  In short, Plaintiffs offer nothing more than the bare conclusion that a hypothetical prudent fiduciary would somehow have acted differently than Mr. Phipps.  In any event, Plaintiffs' only basis for summary judgment is their theory that the relevant compensation was not adequately disclosed to AT&T; their baseless suppositions about what a reasonable fiduciary in Mr. Phipps' shoes would have done with information once it was disclosed to him is immaterial to whether the

1  relevant information was disclosed in the first place.

2  Nor do Plaintiffs explain why Mr. Phipps could not rely on Mr. Hanson's analysis.
3  In his role at the time, Mr. Hanson knew about "virtually all aspects of savings plan
4  administration," Ex. 2 (Hanson Tr.) at 13:4–12; was the "primary" person for RFP
5  process; reported to Mr. Phipps, Ex. 1 (Phipps Tr.) at 37:10–20; was involved in the
6  implementation of Financial Engines; and spoke directly to Bob Mills about the
7  arrangement between Fidelity and Financial Engines.  Ex. 2 (Hanson Tr.) at 15:23–16:5,
8  32:15–33:2.  The evidence shows that Hanson, Phipps, and the entire "RFP project team"
9  were "all aware of . . . the arrangement."  Ex. 2 (Hanson Tr.) at 34:20–25.  And Mr.
10  Hanson specifically testified that he was "certain" he and Mr. Phipps discussed Financial
11  Engines' fee.  Ex. 2 (Hanson Tr.) at 34:17–25.  How much time Mr. Phipps spent on the
12  analysis after the RFP team and Mr. Hanson (the person primarily in charge of the RFP)
13  had already analyzed the fee is irrelevant.  This is especially true given that how long
14  Mr. Phipps reviewed the disclosures has no bearing on the question on which Plaintiffs
15  move for summary judgment:  whether Fidelity disclosed the compensation.  AT&T has
16  shown that it did, and that not only means that Plaintiffs are not entitled to summary
17  judgment, but also that Plaintiffs have insufficient evidence to go to trial.

18  **II.    Plaintiffs Cannot Prove Damages.**

19  Plaintiffs have also failed to offer *any* evidence of damages, which means they
20  not only are not entitled to summary judgment, but cannot survive AT&T's motion for
21  summary judgment.    Because Plaintiffs lack any evidence of what reasonable
22  compensation would be—particularly since they *do not even contest* the reasonableness
23  of Fidelity's compensation in their motion—they are forced to argue that the damages
24  on their prohibited transaction claim are "the entirety of Fidelity's indirect
25  compensation" from BrokerageLink and Financial Engines.  *Supra* pp. 52.  In other
26  words, Plaintiffs contend that because Fidelity allegedly did not disclose to AT&T the
27  payments it received from BrokerageLink and Financial Engines, AT&T should forfeit

28

every dollar Fidelity received from BrokerageLink and Financial Engines, and the Plan should effectively receive these services for free.  Plaintiffs' total failure to introduce competent damages evidence provides no basis for this Court to conclude that Plan participants should have received the services of Financial Engines and BrokerageLink at no cost.

### A.    Plaintiffs Cite to No Case Law to Support Their Damages Model.

Plaintiffs have not identified a single case holding that, in a prohibited transaction claim where the only alleged flaw is that the party in interest made an inadequate disclosure to the plan's fiduciary, damages in the amount of all compensation received by the party in interest from third parties is an appropriate remedy.  And Plaintiffs have made no attempt to argue, much less prove, that the terms of the transaction were unreasonable or the Plan suffered any loss.[13]  Plaintiffs cannot survive summary judgment, much less *obtain* summary judgment, in the absence of any evidence of loss.

Under ERISA, a fiduciary who breaches his duties "shall be personally liable to make good to [the] plan any losses to the plan resulting from each such breach."  29 U.S.C. § 1109(a).  As Judge Blumenfeld recently observed, "[s]ection 1109(a) also permits recovery of losses caused by a prohibited transaction."  *Mills v. Molina Healthcare, Inc.*, 2024 WL 1216711, at *13 (C.D. Cal. Mar. 20, 2024), *amended in part by* 2024 WL 4554094 (C.D. Cal. Sept. 17, 2024), *appeal docketed*, No. 24-6223 (9th Cir. Oct. 11, 2024).  However, "[a]bsent a loss, there are no damages to measure—and thus no basis under § 1109(a) to order that fiduciaries 'make good to [the] plan any losses to the plan resulting from [their] breach.'"  *Id.* at *15.  In other words, "the lack of loss . . . means that there is nothing for Plaintiffs to recover on their prohibited transaction claim even if they could establish a violation."  *Mills*, 2024 WL 4554094, at *6; *see also*

---

[13] Plaintiffs cite to section 4975 of the Internal Revenue Code, which imposes an excise tax on persons who engage in prohibited transactions with employee benefit plans. *Supra* pp. 53 (citing 26 U.S.C. § 4975).  But enforcement of this provision is "explicitly reserv[ed] to the Secretary of the Treasury," not the Court.  *Baizer v. Comm'r*, 204 F.3d 1231, 1234–36 (9th Cir. 2000).

*Etter v. J. Pease Constr. Co.*, 963 F.2d 1005, 1009–10 (7th Cir. 1992) (finding "remedy of damages" "not appropriate" on prohibited transaction claim where the "Plan obviously did not suffer a loss").[14]

Here, Plaintiffs cannot establish that they are entitled to *any* damages—let alone damages in the amount of "the entirety of Fidelity's indirect compensation," *Supra* pp. 52—because the Plan's recordkeeping fees were less than average for the market and less than Plaintiffs' own benchmark for what is reasonable.  As explained in AT&T's separate summary judgment motion, Plaintiffs' theory of loss is their claim that the Plan supposedly paid $61 per participant for recordkeeping on average, or "roughly double" the costs paid by similar plans during the class period.  TAC ¶¶ 71, 60.  But Plaintiffs' $61 figure includes more than just recordkeeping—it includes *all* direct compensation that AT&T paid to Fidelity for *any* service.  For example, this figure includes participant loan processing and account maintenance fees, as well as "securities brokerage commission and fees," which is expressly excluded from the definition of "recordkeeping services" under applicable ERISA regulations.  *See supra* pp. 28 (citing 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B), (C), (D)); *e.g.*, Ex. 29 at ATT00001480 (including code 71 in direct compensation); Ex. 9 at 27 (defining code 71).

Focusing only on AT&T's actual recordkeeping fees, the evidence demonstrates that the Plan's recordkeeping fees were significantly lower than average for the market.  Throughout the class period, AT&T's contract with Fidelity contained a "most-favored customer" clause, which ensured that Fidelity's fees were "not less favorable than those currently extended to any other similarly situated customer."  JAF 9.  Additionally, in 2016, Deloitte and AT&T determined that ███████████████████████ ████████████████████████████████████████████████, while AT&T paid

---

[14] The plaintiffs in *Mills* filed an appeal to the Ninth Circuit challenging, among other things, the district court's finding that their failure to establish loss precluded any remedy on their prohibited transaction claim.  The appeal remains pending.  *See generally, Mills v. Molina Healthcare, Inc.*, No. 24-6223 (9th Cir. Oct. 11, 2024).

only $29. JAF 14–15, 17. And by 2018, the Plan paid even less in recordkeeping fees—only $20 per participant. JAF 19. As the Court previously recognized, AT&T's payments to Fidelity "fall within the range that Plaintiffs themselves suggest is reasonable." Dkt. 211 at 27. Tellingly, Plaintiffs do not argue otherwise here—instead, Plaintiffs *concede* that the Plan incurred only a "modest per participant charge for the suite of recordkeeping services." *Supra* pp. 56.

At bottom, Plaintiffs offer no evidence to establish the Plan suffered any loss related to recordkeeping fees, which is the theory Plaintiffs plead in their Third Amended Complaint. *See, e.g.*, TAC ¶ 59 (alleging "payments for recordkeeping services"); *id.* ¶ 60 (alleging "the Plan's participants paid, on average, $61 per participant each year in recordkeeping expenses"). Absent a showing of any loss, Plaintiffs cannot carry their burden of proving they are entitled to any damages, much less the entirety of Fidelity's indirect compensation from BrokerageLink and Financial Engines.

## B. Plaintiffs Cannot Show That Fidelity's Indirect Compensation Was Unreasonable or Resulted in Higher Costs to the Plan.

Plaintiffs have also failed to present any evidence showing that the compensation paid by BrokerageLink and Financial Engines to Fidelity was unreasonable or resulted in higher costs to the Plan.

***BrokerageLink.*** Nowhere do Plaintiffs argue—let alone provide evidence showing—that the compensation paid to Fidelity from BrokerageLink was excessive or resulted in higher costs to Plan participants. To the contrary, participants did not pay an account fee to use the BrokerageLink platform. Ex. 16 (2011 Fidelity Services Agreement), App'x B at 94 (listing "$0 account fee" for BrokerageLink's investment services); Ex. 1 (Phipps Tr.) at 28:3–6 (testifying that there was "no platform fee or anything else associated with BrokerageLink fees"). If Plan participants voluntarily decided to execute trades on BrokerageLink, BrokerageLink charged users according to a brokerage commission schedule which it disclosed. Ex. 34 (June 27, 2012 408(b)(2)

disclosure).  To that end, Plan participants were subject to trading fees "as they would be with any brokerage account."  Ex. 3 (Galloway Tr.) at 45:19–25.

Moreover, AT&T "recognized . . . that BrokerageLink was valuable to Fidelity" and "leveraged the revenue sharing through BrokerageLink to achieve *lower* fees for recordkeeping."  Ex. 1 (Phipps Tr.) at 22:19–22, 31:8–15 (emphasis added).  Plaintiffs cite no evidence contradicting Mr. Phipps' testimony.  Indeed, at no point in their discussion of the "revenue sharing" fees that BrokerageLink paid to Fidelity do Plaintiffs suggest that the compensation Fidelity received from BrokerageLink's services was excessive compared to the services that Fidelity provided.  *Supra* pp. 53–55.  Nor do Plaintiffs offer any evidence that other, non-AT&T plans received BrokerageLink services free of charge or without Fidelity collecting revenue-sharing fees.

***Financial Engines.***  Plaintiffs likewise do not offer any evidence that the compensation Fidelity received from Financial Engines was unreasonable or resulted in higher costs to the Plan.  As with BrokerageLink, AT&T used its knowledge of Fidelity's indirect compensation from Financial Engines to significantly reduce the fees it paid to Fidelity.  JAF 24.  Mr. Phipps testified that by leveraging the "dollars that Fidelity would be receiving in connection with the Financial Engines agreement," AT&T "negotiated with Fidelity" to get "a very sizable reduction in recordkeeping fees."  Ex. 1 (Phipps Tr.) at 56:2–10.

Plaintiffs claim that the compensation Fidelity received from Financial Engines was "excessive and unreasonable" because "the only cost to Fidelity to implement and maintain Financial Engines' electronic access to Fidelity's platform was $40,000."  *Supra* pp. 17–18.  On its face, this misinterprets the agreement between Financial Engines and Fidelity.  Under the contract, Fidelity agreed to provide Financial Engines not just access to the secure technological systems Fidelity maintained for the Plan, but also access to all "plan and participant data (including participant account information and participant indicative data)" as may be requested by Financial Engines on an

"ongoing basis." Ex. 18 at ATT00001941. According to Mr. Hanson, who assisted in evaluating and selecting Financial Engines to provide managed account services to Plan participants, Financial Engines' ability to access Plan participant's "realtime" data directly from Fidelity was "the key part" of the agreement between Fidelity and Financial Engines. Ex. 2 (Hanson Tr.) at 45:3–21. In other words, the value that Fidelity provided Financial Engines was not just the technical connection to Fidelity's system, but the ability of Financial Engines to access and use the data of thousands of Plan participants, as necessary to provide professional management services to the Plan.

Plaintiffs also claim that Fidelity's compensation from Financial Engines was unreasonable because Fidelity had previously provided a connection to Financial Engines for other, non-AT&T plans. *Supra* pp. 18. Specifically, Plaintiffs point to the Delta Air Lines Family Care Savings Plan, for which Fidelity allegedly provides recordkeeping services and which has apparently "offered Financial Engines managed account services since 2009." *Id.* (citing Ex. 112). But Plaintiffs lack any evidence showing that the Delta plan, or any other plan for which Fidelity provided recordkeeping services, offered managed account services through Financial Engines without a connectivity or data fee paid by Financial Engines to Fidelity (let alone that Fidelity would allow AT&T to bypass these fees). Nor do Plaintiffs show that the Plan's lower than average recordkeeping fees were somehow offset by higher payments from Financial Engines to Fidelity as compared to other plans. Indeed, Plaintiffs fail to explain how Financial Engines' payments to Fidelity resulted in higher costs to the Plan at all. If anything, Plaintiffs' focus on the "large portion" of fees Fidelity received from Financial Engines suggests that Financial Engines' compensation to Fidelity may have been unreasonable *for Financial Engines*. *Supra* pp. 55. But, as the Plan's fiduciary, AT&T's rightful focus was on what *the Plan* paid to Financial Engines and Fidelity for its services, not whether Fidelity was ripping off Financial Engines.

1    Equally unsupported is Plaintiffs' claim that AT&T failed to perform "any

2    analysis to determine what it cost Fidelity, if anything, to provide similar access to

3    Financial Engines." *Supra* pp. 56. The record shows that AT&T undertook a

4    comprehensive, months-long process to select an investment advisor and carefully

5    considered the total costs of both Fidelity's and Financial Engines' proposals. JAF 34–

6    36. And during this process, the entire "RFP project team" was "well aware" of the

7    arrangement between Fidelity and Financial Engines. Ex. 2 (Hanson Tr.) at 34:20–25.

8    Ultimately, AT&T selected Financial Engines, ██████████████████████████,

9    because AT&T felt that, among other reasons, "the service offered by Financial Engines

10   was superior to the service offered by Fidelity" and that an independent advisor would

11   be in the best interest of Plan participants. Ex. 4 (Webb Tr.) at 172:3–6; Ex. 52 at

12   ATT00002136 (Money Management Presentation dated June 26, 2014, recommending

13   Financial Engines ██████████████████ and noting "concerns related to

14   conflict of interest with non-401(k) assets" with Fidelity).

15   With no evidence to point to, Plaintiffs resort to speculation, claiming without

16   support that the "only reasonable inference" is that providing administrative services to

17   Financial Engines costs a "small" fraction of what Fidelity received from Financial

18   Engines in compensation, and that "millions of dollars" were somehow paid by Plan

19   participants. *Supra* pp. 56. In reality, however, AT&T ensured that Financial Engines'

20   arrangement with Fidelity did not result in higher costs for Plan participants. For

21   example, the agreement between AT&T and Financial Engines provided that Financial

22   Engines would not "charge AT&T or Plan Participants any additional fees as a result of

23   [Financial Engines'] payment to the Plan Recordkeeper [Fidelity]." JAF 46. AT&T

24   likewise made clear to Fidelity in a September 2014 Letter of Direction that "Plan

25   participants are not charged any additional fee for the data connectivity arrangement"

26   "solely between Financial Engines and Fidelity." JAF 47. Plaintiffs do not point to

27   anything in the record contradicting this evidence.

28

In the end, Plaintiffs have no evidence to establish that the compensation Fidelity received from BrokerageLink or Financial Engines resulted in any higher costs to the Plan. In fact, as described above, the record evidence supports the opposite—that AT&T leveraged Fidelity's arrangement with BrokerageLink and Financial Engines to *lower* Fidelity's costs to the Plan. Plaintiffs' request that the Court award them damages equal to the entirety of Fidelity's indirect compensation from BrokerageLink and Financial Engines amounts to nothing more than an attempt to sidestep their lack of evidence showing that Fidelity's indirect compensation was unreasonable, and if it was, what amount would have been reasonable as compared to other plans. Accordingly, Plaintiffs' baseless request for damages must be denied, and AT&T is entitled to summary judgment on the issue of damages.

## AT&T'S CONCLUSION

The record clearly establishes, as this Court previously found, that Fidelity adequately disclosed the compensation it received from Financial Engines and BrokerageLink and that the fees AT&T paid to Fidelity are reasonable. Plaintiffs can neither show that they are entitled to summary judgment nor produce evidence sufficient to survive AT&T's motion for summary judgment. AT&T respectfully requests that this Court deny Plaintiffs' summary judgment motion and grant Defendants' motion for summary judgment on Plaintiffs' duty-of-prudence and prohibited-transaction claims in Counts I and II.

## PLAINTIFFS' CONCLUSION

### I.    The Undisputed Facts Show that Defendants Caused the Plan to Engage in a Prohibited Transaction

ERISA's Prohibited Transaction rules categorically bar ERISA fiduciaries from entering into non-exempt transactions with parties in interest, including any plan service provider. 29 U.S.C. § 1106(a). Fidelity was and is a party in interest.

As Plan fiduciaries, Defendants were not permitted, to transact with Fidelity to

pay Fidelity for its services using Plan assets unless the transaction was subject to an exemption to the prohibited transaction rules of ERISA. "ERISA § 406(a) begins with the premise that virtually all transactions between a plan and a party in interest are prohibited, unless a statutory or administrative exemption applies." *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1222 (N.D. Cal. 2008). The prohibited transaction exemption prescribed for necessary plan services requires disclosure of "all indirect compensation that the covered service provider [Fidelity] . . . reasonably expects to receive in connection with the services", 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(2), including any compensation that would be paid between Fidelity and any subcontractor, such as Financial Engines. 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C)(3).

The undisputed facts recited above demonstrate that Defendants failed to obtain from Fidelity disclosure of Fidelity's indirect compensation from BrokerageLink and failed to evaluate the nature and value of the services provided by Fidelity Brokerage Services with respect to BrokerageLink, and failed to evaluate the nature and value of services provided by Fidelity with respect to the managed account services provided by Financial Engines. Defendants cannot show that they contracted to pay no more than reasonable compensation for Fidelity's services to the Plan, and thus the agreements to hire and pay Fidelity were prohibited transactions in violation of ERISA §406(a)(1)(C). For the foregoing reasons, Plaintiffs respectfully request that this Court enter summary judgment in favor of Plaintiffs for Defendants' failure to satisfy the conditions required by the 408(b)(2) exemption, thereby causing the Plan to engage in a non-exempt prohibited transactions.

1   DATED: November 19, 2025                GIBSON DUNN & CRUTCHER LLP

2

3                                           By:  /s/ Ashley E. Johnson

4                                           ASHLEY E. JOHNSON (*Pro Hac Vice*)
                                              AJohnson@gibsondunn.com
5                                           KARL G. NELSON (*Pro Hac Vice*)
                                              KNelson@gibsondunn.com
6                                           Gibson Dunn & Crutcher LLP
                                            2001 Ross Avenue, Suite 2100
7                                           Dallas, Texas 75201
                                            Telephone:  214.698.3100
8                                           Facsimile:  214.571.2900

9                                           JENNAFER M. TRYCK, SBN 291088
                                              JTryck@gibsondunn.com
10                                          Gibson Dunn & Crutcher LLP
                                            3161 Michelson Drive
11                                          Irvine, California  92612-4412
                                            Telephone:  949.451.3800
12                                          Facsimile:  949.451.4220

13                                          Attorneys for Defendants AT&T INC.,
                                            AT&T SERVICES, INC., and AT&T
14                                          BENEFIT PLAN INVESTMENT
                                            COMMITTEE
15

16  DATED: November 19, 2025                */s/ John J. Nestico*

17                                          Todd M. Schneider (SBN: 158253)

18                                          Jason H. Kim (SBN: 220279)

                                            James A. Bloom (SBN: 311051)

19                                          SCHNEIDER WALLACE

20                                          COTTRELL KIM LLP

                                            2000 Powell Street, Suite 1400

21                                          Emeryville, CA 94608

22                                          Telephone: (415) 421-7100

                                            Facsimile: (415) 421-7105

23                                          tschneider@schneiderwallace.com

24                                          jkim@schneiderwallace.com

                                            jbloom@schneiderwallace.com

25

26                                          John J. Nestico (Pro Hac Vice)

                                            SCHNEIDER WALLACE

27                                          COTTRELL KIM LLP

                                            6000 Fairview Rd, Suite 1200

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Charlotte, NC 28210
Telephone: (510) 740-2946
Facsimile: (866) 505-8036
jnestico@schneiderwallace.com

Eric Lechtzin (SBN: 248958)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (267) 408-8445
elechtzin@edelson-law.com

Natalie Lesser (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
nlesser@bergermontague.com

Alexandra K. Piazza (*Pro Hac Vice*)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: (215) 875-3000
apiazza@bergermontague.com

Grant Joseph Savoy, Esq. (SBN: 284077)
Shoham J. Solouki, Esq. (SBN: 278538)
SOLOUKI | SAVOY, LLP
316 W. 2nd Street, Suite 1200
Los Angeles, CA 90012
Telephone: (213) 814-4940
Facsimile: (213) 814-2550
grant@soloukisavoy.com
shoham@soloukisavoy.com

*Attorneys for Plaintiffs*